UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| SARAH LEYLA POWELL<br><br>Petitioner,<br><br>v.<br><br>ADRIAN MAURICE POWELL JR.,<br><br>Respondent. | Civil Case No. _____ |

**VERIFIED PETITION FOR RETURN OF CHILDREN TO GERMANY AND FOR ISSUANCE OF SHOW CAUSE ORDER**

**The Convention on the Civil Aspects of International Child Abduction, done at The Hague on October 25, 1980; International Child Abduction Remedies Act, 22 U.S.C. 9001** *et seq.*

NOW COMES the Petitioner, Sarah Leyla Powell (hereinafter "Leyla" or "Mother" and files this Verified Petition for Return of Children to Germany and for Issuance of Show Cause Order against the Respondent, Adrian Maurice Powell Jr. (hereinafter "Adrian" or "Father").

**I.      INTRODUCTION**

1.      Petitioner seeks to return to Germany with her two minor children (ages 5 and 9) after they were wrongfully retained in the State of Maine by their

1

father. The wrongful retention occurred after the Father sponsored the Mother to come to the United States on a student visa, even though the application declared that Mother intended to return to Germany with the children.

2.      The Petitioner, Sarah Leyla Powell, is a citizen of Germany.  The Respondent, Adrian Maurice Powell, Jr. is a citizen of the United States.

3.      Their children, N.P. (d.o.b. __/__/2016) and Z.P. (d.o.b. __/__/2020) were born in Germany.  They are dual citizens.

4.      The wrongful retention began on or about February 8, 2025, and continues.

5.      This Petition is brought pursuant to The Convention on the Civil Aspects of International Child Abduction, done at the Hague on October 25, 1980[1] (hereinafter the "Hague Convention" or "Convention") and the International Child Abduction Remedies Act,  22 U.S.C. §§ 9001 - 9011 (hereinafter "ICARA").

6.      The Convention came into effect in the United States of America on July 1, 1988, and was ratified between the United States of America and Germany on December 1, 1990.[2]

7.      The objects of the Convention are as follows: (1) to secure the immediate return of children wrongfully removed or wrongfully retained in any

---

[1] T.I.A.S. No. 11,670 at 1, 22514 U.N.T.S. at 98, reprinted in 51 Fed. Reg. 10493 (1986).

[2] Hague Abduction Convention Country List, text available at: https://travel.state.gov/content/travel/en/International-Parental-Child-Abduction/abductions/hague-abduction-country-list.html (last accessed December 22, 2025).

Contracting State; and (2) to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in other Contracting States. *See* Convention, art. 1.

## II.     JURISDICTION

8. This Court has jurisdiction under ICARA § 9003 because this case involves the retention of children under the age of sixteen (16) in the United States from their habitual residence of Germany, and the children are currently located within the jurisdiction of this Court in York County, Maine.

## III.     FACTS

9. Sarah Leyla Powell (age 33) was born and raised in Germany. She met Adrian Maurice Powell Jr. in 2015 while he was serving in the U.S. Air Force and stationed in Germany.

10. The couple married in Germany on March 3, 2016.

11. Leyla gave birth to their daughter on __/__/ 2016 in Germany.

12. The couple moved briefly to the United States in September 2017. The early relationship was marked by incidents of abuse and domestic violence by Adrian. The couple separated and Leyla returned to Germany with their daughter in December 2018.

13. The couple reconciled and Adrian returned to Germany as a civilian in October 2019.

14. Leyla gave birth to their son on __/__/ 2020 in Germany.

15. The couple separated again in the fall of 2021, and Adrian returned to his family's home in Baltimore, Maryland. Leyla and the children stayed in Germany.

16. On November 18, 2021, Adrian granted to Leyla a custody power of attorney prepared in accordance with German law, allocating decision-making authority to Leyla on all matters of personal, financial and health-related concerns for the children. A true and correct copy is attached hereto as **Exhibit A**.

17. Leyla continued raising the children alone in Germany. She supported herself and the children while working for the Mannheim city government. The children visited Adrian once in the United States, but he mostly kept in contact by telephone and video.

18. The first language of both children is German. Their daughter had obtained most of her schooling in Germany, where she was an excellent student. The children have extended family in Germany.

19. Leyla was the primary caregiver for the couple's children since their birth.

20. In July 2023, Leyla began divorce proceedings in Germany by serving a petition on Adrian.

21. On September 6, 2023, the parties entered into a written divorce agreement, presented to the German family court on September 7, 2023. The agreement recognized that the children had their permanent residence with their mother in Germany, and obligated Adrian to pay both child support and spousal support. A true and correct copy is attached hereto as **Exhibit B**. The final divorce would not be granted by the German family courts until a mandated waiting period had elapsed.

22. Following this settlement, Leyla and Adrian remained in contact about their children. Leyla also began communicating with Adrian's girlfriend (later his wife) Kylie Powell. Leyla confided in Adrian and Kylie about the pressures raising the children as a single mother, and she expressed frustration with her job limitations based on her education.

23. In early 2024, Adrian offered to assist Leyla by sponsoring her to come to the United States on a student visa to obtain higher education. By that time, Adrian and Kylie had moved from Baltimore to Old Orchard Beach, Maine and they were running a business. Adrian suggested that Leyla attend York County Community College in nearby Wells, Maine. Adrian hired an attorney to prepare the student visa application package for Leyla.

24. The family court in Mannheim, Germany, granted the parties' final divorce by an order dated May 16, 2024. A true and correct copy is attached hereto as **Exhibit C**.

25. On August 6, 2024, Leyla let Adrian come to Germany and bring the children back with him to the United States so they could enroll in school ahead of Leyla's own travel. Leyla gave Adrian the children's passports for this travel; and Adrian told her he would return the passports when she arrived.

26. At that time, Leyla was already accepted by York County Community College, pending her visa approval.

27. The parties declared in the visa application that the children would be going back with Leyla to Germany if the student visa was denied.

28. The visa application also stated that Leyla intended to return to Germany with the children after she completed her education. Adrian supported this position in his sworn declarations to sponsor Leyla's visa. The goal was to give both Leyla and the children an educational experience in the United States. After that, Leyla could build a better life for herself and her children in Germany. The application emphasized Leyla's continued ties to Germany.

29. Leyla's F-1 student visa application was submitted in September 2024 and granted on October 8, 2024. Leyla then followed her children to the United States on December 14, 2024 (the soonest date permitted by her visa). She began her classes at York County Community College in January 2025.

30. Adrian's declaration also stated that he would provide financial support for Leyla, including her tuition, housing, transportation and a financial allowance. This was critical for Leyla's temporary status in the United States

because (a) Leyla needed to concentrate on her studies and (b) Leyla's student visa only allowed for very limited employment on campus.

31. Adrian and Kylie arranged for Leyla to move into an apartment in Saco, not far from their home. The children were supposed to stay overnight with Leyla on alternating weekends. However, Adrian promised Leyla she would have free access to the children throughout the week and could see them daily.[3]

32. Leyla began pursuing her studies. However, problems began developing in the co-parenting relationships. Leyla noticed that the children began acting strangely, and it appeared their father was trying to pressure them to live permanently with him. Leyla also noted behavioral and emotional problems with the children.

33. Leyla also detected efforts to curtail her contact with the children. Events and calls were canceled or rescheduled without notice. Adrian began trying to prevent Leyla from taking the children to her residence.

34. In early February, Adrian and Kylie began pressuring Leyla to find outside work, although she had already applied for an on-campus job (which was allowed by her F-1 visa status). Adrian and Kylie pressured Leyla to find other work that would violate her student visa status. Adrian and Kylie also said they would end Leyla's lease, and she would have to move into "shared" housing.

---

[3] In fact, Adrian told Leyla he would be reducing the "allowance" described in his visa declaration, because they would be sharing meals. He also gave her a key to the house for access.

Leyla knew that moving into a dormitory or shared apartment would hurt her ability to have extended time and overnights with her two young children.

35. The situation was also getting difficult for the children. They wanted to spend more time with their mother, especially the youngest child who was only four years old.

36. Leyla was distressed by these events. On February 8, 2025, Leyla informed Adrian that she was going back to Germany with the children. She requested that Adrian give her back the children's German passports, which Adrian still had in his possession.

37. Adrian refused to give Leyla the passports, and said he would not allow the children to go back with her to Germany.

38. Leyla then experienced months of nightmarish fear and distress. She requested the passports on several more occasions from February through August, but Adrian refused each time. Adrian even denied Leyla the ability to bring the children back to Germany to visit her ailing grandfather.

39. Leyla found herself completely under the control of Adrian. He determined when she was allowed to see her children. Leyla was also under Adrian's control in terms of her education, housing and transportation.[4]

---

[4] Leyla's only source of transportation is a car that belongs to Kylie Powell. Her job on campus paid $17 per hour and was limited to only 12-13 hours a week Adrian and Kylie leased the apartment for her, which Adrian was able to terminate on 45 days' notice.

40. Adrian effectively controlled Leyla's ability to live in the United States, because her visa status depended on her attending college. Leyla feared Adrian would cut off her support at any time, and she would lose her legal status and be permanently separated from her children.

41. Leyla's fears were confirmed as Adrian tried to persuade Leyla return to Germany <u>without</u> the children. Adrian offered to pay for the flight back to Germany if Leyla reduced her contact with the children to summer school vacations. Adrian told Leyla she had no money to fight him in court, and she would never get the children because she had no housing and no job. On other occasions, Adrian tried to placate Leyla by saying she just needed to focus on her studies and she would get the children back when she became financially stable.

42. Leyla did not know what to do, and was overwhelmed by the circumstances imposed on her by Adrian. When she tried to meet with Adrian at his house in late August to retrieve the passports, he called the police on her.

43. In September 2025, Adrian and Kylie moved out of their residence and relocated to another residence in Old Orchard Beach. They did not inform Leyla of the move, and instructed the children to keep their new address secret from their mother.[5]

44. Unknown to Leyla, Adrian had already begun preparing paperwork in July 2025 to seek custody of the children. He registered the German divorce

---

[5] Leyla did not obtain the address until it was provided through legal counsel for the parties at a case management conference on November 24, 2025.

9

order in the Biddeford District Court, and served Leyla with a motion to modify in October 2025. In his motion, Adrian seeks primary residence of the children and final decision-making authority for their welfare.

45. With assistance from family, Leyla retained counsel and objected to the Motion to Modify.

46. After Leyla opposed his motion, Adrian emailed Leyla to tell her he would no longer pay for her schooling or housing. Adrian then communicated directly with Leyla's landlord, stating that he was no longer paying her rent and Leyla would have to leave in January. Leyla had no funds to maintain the apartment. Adrian's revocation of his sponsorship (both housing and tuition) threatened Leyla's F-1 non-immigrant status.

47. Leyla's family assisted her with retaining counsel in Germany.

48. Leyla continues her efforts to return to Germany with her children.

49. On December 4, 2025, Leyla filed a petition with the family court in Mannheim Germany, asking that Court to assume jurisdiction of the custody dispute so she can return home with the children.

50. Adrian's retention of the children is a breach of Leyla's rights of custody under German law.

## IV.   COUNT I – WRONGFUL RETENTION

51. The Mother restates and re-alleges the allegations contained in foregoing Paragraphs as if fully set forth herein.

52. The Hague Convention applies to cases in which a child under the age of 16 years has been removed or retained from his or her habitual residence in breach of rights of custody under the law of the child's habitual residence, which the petitioner had been exercising at the time of the wrongful removal or wrongful retention of the child.

53. The children in this case are under the age of 16 (ages 5 and 9).

54. The children's habitual residence is Germany, and their habitual residence was Germany on the date the Father retained the children in the United States from Germany.

55. From the totality of the circumstances perspective as of the date of retention on or about February 8, 2025 , Germany was the children's home.

56. Germany is the children's ordinary home and holds a degree of settled purpose from the child's perspective.

57. The children were born and raised in Germany, resided there continuously for years, attended school and/or childcare in Germany and received their medical and dental care in Germany. The children spoke German as their primary language.

58. The children are fully involved and integrated in all aspects of daily and cultural life in Germany. The children have extended family and friends in Germany. The children have - and will have - their routine medical care and dental care in Germany. The children have attended school and/or other activities in Germany, including extracurricular activities, playdates, and cultural activities in Germany. The children are fluent in German and English.

59. The parties recognized in their divorce agreement that Mother was the primary residential parent of the children in Germany.

60. The parties recognized that the children's presence in the United States was temporary in nature and tied exclusively to the Mother's student visa, which expressly required a return to Germany upon completion of studies.

61. There was no shared intent to abandon Germany as the children's habitual residence. There was not sufficient time or circumstances present for acclimatization in the United States or to displace Germany as the children's habitual residence.

62. No German court or other authority authorized the children's permanent removal to the United States of America.

63. At the time the Father retained the children in the United States from Germany, the Mother had (and continues to have) Hague Convention article 5.a "rights of custody" to the children under German law.  She lived with the children, cared for the children and made decisions for the children.

64. The Mother and Father automatically had joint parental custody of the children under German law because they were married when the children were born. (German Civil Code §1626).

65. It is a breach of joint parental custody under German law for one holder of joint parental custody to retain a child outside Germany without the consent of the other holder of joint parental custody.

66. Mother also had sole custody to determine the children's residence as a result of Father's grant of the German custody power of attorney.

67. It is a breach of Mother's sole parental custody under German law for Father to retain the children outside of Germany without the Mother's consent.

68. No German court has ever entered an order awarding sole custody or sole residence determination authority to the Father.

69. In February 2025, the Mother communicated her decision to return to Germany with the children and demanded their passports. Father expressly forbade the Mother from returning to Germany with the children, expressly forbade international travel for any reason, and blocked the Mother's efforts by unilaterally retention of the children's passports.

70. The Father's retention of the child in the United States is therefore in breach of the Mother's Hague Convention article 5.a "rights of custody."

71. Notice is given in this pleading that the Mother is relying upon foreign law. Fed. R. Civ. P. 44.1.

72. The Mother has requested the return of the children to Germany.

73. The Mother has never consented or acquiesced to the retention of the children in the United States from Germany.

74. The Mother has promptly, and to the best of her ability under difficult circumstances, taken all legal steps available to her to seek the return of the children to Germany.

75. The children are currently physically located within the District of Maine, specifically in the Town of Old Orchard Beach, County of York and State of Maine.

## V.   COUNT II – ARTICLE 18 RETURN

76. The Mother restates and re-alleges the allegations contained in the foregoing Paragraphs as if fully set forth herein.

77. The Mother invokes Article 18 of the Convention, which grants this Court plenary power to order the child's return at any time.

## VI.   PROVISIONAL AND EMERGENCY REMEDIES

78. The Mother requests that the Court issue a Show Cause Order forthwith ordering the appearance of the Father before this Court on the first

available date on the Court's calendar, and directing the Mother to serve the Show Cause Order on the Father forthwith by private process. [6]

79. Unless this Court takes expedited action to issue the initial order requested by the Mother, irreparable harm will occur to the well-being of the children in that they will continue to be deprived of sufficient contact with their Mother. Further, the Hague Convention requires expedited action and sets a six-week aspirational goal for final determination of this case.

80. Pursuant to ICARA § 9004, in a proceeding for the return of a child, "[n]o court exercising jurisdiction … may … order a child removed from a person having physical control of the child unless the applicable requirements of State law are satisfied." ICARA § 9004.

81. In Maine, the Uniform Child Custody Jurisdiction and Enforcement Act ("UCCJEA") governs the resolution of both domestic and international child custody disputes and is codified in 19-A M.R.S. §1731 *et seq*. Maine law addresses the appearance of the parties and the child in §1754 of the UCCJEA. That section authorizes this Court to order the appearance of a child and custodian(s). *Id*. This Court therefore has the authority to issue a show cause order, ordering the appearance of the Father (and children if found necessary) in that the provisions of 42 U.S.C. §9004 can be met.

---

[6] Petitioner's counsel must seek protection for December 31, 2025 through January 9, 2026, because counsel will be out of state on a pre-booked family trip.

82. The Mother further requests that this Court issue along with the Show Cause Order an order requiring residence and/or contact with the Mother, prohibiting the removal of the children from this District, to take custody of the children's German passports or other travel documents, and to schedule an expedited hearing on the Mother's petition seeking return to Germany.

83. Mother asks that this Court stay all proceedings in Biddeford District Court until final resolution of the Hague Convention, pursuant to Section 16.

### VII. UCCJEA DECLARATION

84. Pursuant to 19-A MRS §1753(1), the children have lived at the following places and with the following persons for the past five years.

   a. The children's present address is 41 Fern Avenue, Old Orchard Beach, ME 04064 with Father, and 21 Hill Street, Saco, Maine when with Mother.

   b. **August 2024 to present:** The children have lived with Father in Old Orchard Beach, Maine. They began staying with Mother in Saco, Maine on alternating weekends and other times from December 2024 to present.

   c. **November 2021 to August 2024:** The children lived with Mother in Mannheim, Germany.

    d. **December 2020 to November 2021:** The children lived with Mother and Father in Mannheim, Germany.

85.    No one other than the parties has physical custody of the children, or claims to have custody or visitation rights with respect to the children.

86.    Petitioner has not been involved in any way in, and has no information about, another court case in Maine or in any other state or country concerning custody of the minor children except as follows:

    a. *Powell v. Powell*, Biddeford District Court, BIDDC-FM-2025-00649, motion to modify.

    b. *Powell, Sarah ./. Powell, Adrian*, Mannheim (Germany) District Court, 1 F 3014/25 application for transfer of custody.

## VIII.  NOTICE OF HEARING

87.    All parties shall receive notice in accordance with 22 U.S.C. § 9003(c), the Maine UCCJEA and Federal Rules of Civil Procedure.

## IX.  ATTORNEYS' FEES AND COSTS INCLUDING TRANSPORTATION EXPENSES PURSUANT TO CONVENTION ARTICLE 26 AND ICARA §9007

88.    The Mother seeks to recover all of her costs and expenses, including without limitation reasonable attorney's fees and costs, and transportation costs

relating to the return of the children under all applicable law, including without limitation ICARA §9007.

## X.     CONCLUSION

WHEREFORE, Petitioner prays that this Honorable Court will grant the following:

1. Grant the Verified Petition for Return of the Children to Germany, and order the prompt return of the minor children to their habitual residence in Germany;

2. Stay the proceedings in Biddeford District Court until this case is decided;

3. Issue a Show Cause Order to be served by private process and schedule a hearing on the next available date;

4. Issue an Order providing for the children to reside with Mother during the pendency of these expedited and summary proceedings;

5. Award Petitioner her reasonable attorney's fees, costs and other expenses relating to this matter, including transportation expenses; and

6. Grant such further relief as this Court deems just and appropriate .

## VERIFICATION

I, Sarah Leyla Powell, do solemnly declare and affirm under the penalties of perjury under the laws of the United States of America that the factual averments in the foregoing Verified Petition are true and correct to the best of my knowledge and belief.

Dated at Sanford, Maine this <u>22nd</u> day of December, 2025

*/s/ Sara Leyla Powell*
Sarah Leyla Powell

Dated at Sanford, Maine this <u>22nd</u> day of December, 2025.

*/s/ Bradley C. Morin*
Bradley C. Morin, Bar No. 004268
Attorney for Petitioner

**BOURQUE CLEGG
CAUSEY & MORIN LLC**
P.O. Box 1068
949 Main St.
Sanford ME 04073
Tel. 207-324-4422
Fax 207-324-9556
bmorin@bourqueclegg.com