Messages - Leyla (new) (+12074686513)                                        +14109071307, 14109071307

iMessage
12/20/2024 3:32:03 PM

https://tickets.fandango.com/transaction/ticketing/mobileexpress/
TicketOrderConfirmationPage.aspx?route=confirmation

12/21/2024 2:43:37 PM



12/21/2024 2:45:14 PM



12/22/2024 7:21:46 AM

**Leyla (new) (+12074686513)**
I'm going home be back later

12/22/2024 7:21:57 AM

**Leyla (new) (+12074686513)**
Sorry for yesterday 😅

12/22/2024 7:23:55 AM

**Leyla (new) (+12074686513)**
Can you lock the door?

12/23/2024 9:01:59 AM

You can pull up

12/23/2024 2:32:35 PM

Park the car in front of the door pls! 😊

EXHIBIT A
Page 1 of 15

Messages - Leyla (new) (+12074686513)                                    +14109071307, 14109071307

12/23/2024 6:34:20 PM

Omw

1/3/2025 3:05:15 PM



1/31/2025 5:46:36 PM

Leyla (new) (+12074686513)
Hi send money please

1/31/2025 5:50:56 PM

Leyla (new) (+12074686513)
Hi I received 458

1/31/2025 5:50:58 PM

Leyla (new) (+12074686513)
?

1/31/2025 5:51:27 PM

Yea in euro, it's 500 in USD

1/31/2025 5:51:52 PM

And the I sent the 278 for the bills separately

1/31/2025 5:52:26 PM

Leyla (new) (+12074686513)
Ok got it

1/31/2025 5:52:43 PM

Leyla (new) (+12074686513)
Can you look in Nilay's Foto album if her sonogram pics are in there

1/31/2025 5:52:49 PM

Leyla (new) (+12074686513)
We looking at Zauns

1/31/2025 5:52:56 PM

Leyla (new) (+12074686513)
And she wants to see hers

Messages - Leyla (new) (+12074686513)                                    +14109071307, 14109071307

1/31/2025 5:53:25 PM



1/31/2025 5:53:25 PM



1/31/2025 5:53:25 PM

I look for them

2/9/2025 1:52:24 PM

Leyla (new) (+12074686513)
Adrian

2/9/2025 1:53:37 PM

Leyla (new) (+12074686513)
I offer it one last time, either you and I talk today or I am going to consult a lawyer tomorrow.

2/9/2025 1:53:48 PM

Leyla (new) (+12074686513)
I will not further talk to Kylie

2/9/2025 1:54:38 PM

Leyla (new) (+12074686513)
And let the schools know that she will no longer have any access to the children's information.

2/9/2025 1:54:50 PM

Leyla (new) (+12074686513)
I will do that first thing in the morning

Messages - Leyla (new) (+12074686513)                                    +14109071307, 14109071307

2/9/2025 1:55:08 PM

Leyla (new) (+12074686513)
She is not trustworthy

2/9/2025 1:56:37 PM

Leyla (new) (+12074686513)
I have custody and that is my decision

2/9/2025 1:58:19 PM

I will talk to you tomorrow

2/9/2025 1:58:36 PM

We will sort this out tomorrow

2/9/2025 1:59:21 PM

Leyla (new) (+12074686513)
Adrian I'm not talking to Kylie

2/9/2025 1:59:29 PM

Leyla (new) (+12074686513)
And I will contact the school

2/9/2025 1:59:41 PM

Leyla (new) (+12074686513)
She writes in a manipulative way

2/9/2025 1:59:56 PM

Leyla (new) (+12074686513)
To push me into a instabil mental health corner

2/9/2025 2:00:22 PM

Leyla (new) (+12074686513)
But she herself says she wanted ti be dead after our turkey argument

2/9/2025 2:00:29 PM

Leyla (new) (+12074686513)
This has taken a dangerous turn

2/9/2025 2:01:48 PM

Leyla (new) (+12074686513)
And I will not let this happen

2/10/2025 7:07:40 AM

Leyla (new) (+12074686513)
Whats the time and place for our meeting today?

EXHIBIT A
Page 4 of 15

Messages - Leyla (new) (+12074686513)                                      +14109071307, 14109071307

2/10/2025 8:10:46 AM



Five Guys
maps.apple.com

https://maps.apple.com/?address=6%
20Old%20Dogs%20Lane%0ABiddeford,
%20ME%20%2004005%0AUnited%
20States&auid=1999328248052270546-
&ll=43.476292,-70.511719&lsp=9902&q=
Five%20Guys&t=m

2/10/2025 8:10:46 AM

At 6pm

Text message
2/10/2025 10:52:40 AM

Leyla (new) (+12074686513)

Ok

2/10/2025 1:08:39 PM

Leyla (new) (+12074686513)

I talked to the legal office. Please bring a written statement with you to
our meeting , that states the following:

What do you mean when you're saying the housing might be not up to
my standards?

Housing should be :

Close to school
Safe and sanitary
A place where our kids can visit

Shared housing is not agreed upon, as stated in our declaration.

What is the budget you set out for me, as stated in your declaration?

EXHIBIT A
Page 5 of 15

Messages - Leyla (new) (+12074686513)                                        +14109071307, 14109071307

2/10/2025 1:52:15 PM

**Leyla (new) (+12074686513)**

I talked to the legal office.

Please bring a written statement with you to our meeting , that states the following:

What do you mean when you're saying the housing might be not up to my standards?

Housing should be :

Close to school
Safe and sanitary
A place where our kids can visit

Shared housing is not agreed upon, as stated in our declaration.

What is the budget you set out for me, as stated in your declaration?

iMessage
2/10/2025 1:52:43 PM

Liked "I talked to the legal office.

Please bring a wri..."

Text message
2/10/2025 2:37:24 PM

**Leyla (new) (+12074686513)**

I talked to the legal office.

Please bring a written statement with you to our meeting , that states the following:

What do you mean when you're saying the housing might be not up to my standards?

Housing should be :

Close to school
Safe and sanitary
A place where our kids can visit

Shared housing is not agreed upon, as stated in our declaration.

What is the budget you set out for me, as stated in your declaration?

2/10/2025 2:42:12 PM

**Leyla (new) (+12074686513)**

Do you receive this?

iMessage
2/10/2025 2:43:05 PM

Yes i put a thumbs up on it

2/10/2025 3:50:43 PM

Hey I can't talk on the phone, everything ok?

2/10/2025 4:19:03 PM

**Leyla (new) (+12074686513)**

Adrian you need to pick phone calls up my children live in your house

Messages - Leyla (new) (+12074686513)                                    +14109071307, 14109071307

2/10/2025 4:39:42 PM

Do you want to FaceTime them?

2/10/2025 4:40:29 PM

Leyla (new) (+12074686513)
I wanted to walk with them by the beach but you didn't pick up

2/10/2025 5:35:08 PM

Leyla (new) (+12074686513)
You are not coming to the spot?

2/13/2025 4:14:10 PM

Could you bring the kids back soon, Nilay wanted to finish up her sowing project for school tomorrow

2/14/2025 7:12:15 AM

Leyla (new) (+12074686513)
Hey adrian, I didn't receive the money .

2/14/2025 3:21:40 PM

You can pull right up the door the kids have their coats on

2/14/2025 5:30:01 PM

Leyla (new) (+12074686513)
I only received 450$

2/14/2025 5:36:34 PM

You received 458 euros, it's $500

2/14/2025 5:38:09 PM

Leyla (new) (+12074686513)
It says 1 € is 0.99 dollars

2/14/2025 5:39:26 PM



2/14/2025 5:47:54 PM

Leyla (new) (+12074686513)
I received 450$ ... I thought we doing dollars

Messages - Leyla (new) (+12074686513)                                    +14109071307, 14109071307

2/14/2025 5:48:03 PM

Leyla (new) (+12074686513)
Not euros

2/14/2025 5:48:08 PM

Leyla (new) (+12074686513)
I don't get it

2/14/2025 6:06:00 PM

I sent $500 to your account which is worth 458 in euros to your German back account

2/15/2025 9:58:39 AM

Leyla (new) (+12074686513)
Ok

2/17/2025 11:14:24 AM

Leyla (new) (+12074686513)
Adrian, you do not want to talk and dismiss my parental concerns. This will not work long term. I want to talk about the long term living situation of the kids.

2/19/2025 11:05:19 PM

Leyla (new) (+12074686513)
Hey I want to get the kids either after school or Friday . Which one a better?

2/19/2025 11:05:47 PM

Leyla (new) (+12074686513)
Tomorrow *

2/20/2025 9:13:20 AM

Today you can get them and take them to karate

2/20/2025 9:25:24 AM

Leyla (new) (+12074686513)
Ok

2/20/2025 11:45:43 AM

91183696_IdCard.pdf

2/20/2025 11:45:43 AM

Here is your insurance card.

2/20/2025 11:48:26 AM

Leyla (new) (+12074686513)
Thank you

EXHIBIT A
Page 8 of 15

Messages - Leyla (new) (+12074686513)                                    +14109071307, 14109071307

2/20/2025 11:48:49 AM

Leyla (new) (+12074686513)
Where can I see what it covers

2/20/2025 6:40:58 PM

2024 Patriot Exchange Program EPSNI.pdf

2/21/2025 6:30:00 AM

Let me know when you're bringing Z back

2/21/2025 6:47:45 AM

Leyla (new) (+12074686513)
I don't know yet we just woke up

2/21/2025 11:33:47 AM

Text me when you're outside

2/21/2025 11:49:03 AM

Leyla (new) (+12074686513)
On our way

2/21/2025 11:49:12 AM

Leyla (new) (+12074686513)
5 minutes

2/21/2025 11:56:05 AM

Leyla (new) (+12074686513)
Outside

EXHIBIT A
Page 9 of 15

Messages - Leyla (new) (+12074686513)                                    +14109071307, 14109071307

2/22/2025 9:48:35 AM

Leyla (new) (+12074686513)

Hey adrian,

I am trying to focus on my studies, this is what I came here for. My grades are good but the situation is not sustainable. •The financial hardship •the relationship with you and Kylie •The kids living with you and we are not on good terms •The uncertainty of my living situation. It's affecting my health negatively.

Imagine 1000$ wich I don't get after transaction through PayPal 940$ minus private loan which we discussed before my arrival and before the visa process, gas. I'm left with 600$ a month. Now that is 300$ for two weeks. And you two promised and declared a completely different amount.

I applied to one of two available jobs on campus and haven't heard back. You know the visa regulations on work authorization. And after the last argument demanding me to contribute to rent if I found a job I realize that you have no consideration that I am building a new life here . I'm sure you would agree that with this amount maintaining a living is impossible. I'm just surviving.

At this point I am ok returning to Germany and finding another way to get my education if the situation remains this way. The circumstances are not sustainable. We need to sit down and find an agreement with the kids living situation. Please take your time and think and schedule a meeting or phone call with me.

2/22/2025 5:02:11 PM

Leyla (new) (+12074686513)

If I don't receive any answers from you, ask yourself what else I can do other than including a third party.

2/22/2025 5:04:41 PM

Hey Leyla, we can have a phone call on Monday at 4pm. We are trying to make the weekend enjoyable for the kids before they start school again on Monday.

2/22/2025 5:06:28 PM

Leyla (new) (+12074686513)

Ok , yes that works.

2/25/2025 2:18:10 AM

Leyla (new) (+12074686513)

I want mediation, you set me up,  you can't take my children away you think you did but you haven't. I will make this public adrian I will talk to the news if I have to. These my children and I have cared for them , alone with just wanted a chance to finally get education gain freedom. I made a pact with the devil again trusting you.

2/25/2025 2:19:09 AM

Leyla (new) (+12074686513)

I will remain in college.

2/25/2025 2:19:21 AM

Leyla (new) (+12074686513)

But what you are doing is crazy

Messages - Leyla (new) (+12074686513)                                                    +14109071307, 14109071307

2/25/2025 2:21:53 AM

Leyla (new) (+12074686513)

Coming for college, kids are stolen from you.

2/25/2025 8:34:00 AM

I understand that you're upset, and I am not trying to take the children away from you. My focus has always been their well-being and stability. I believe that both of us should be able to communicate calmly and work through our differences in a way that's best for them.

Moving forward, I think it's best that we limit communication to text and email so we can ensure things are handled clearly and in writing. This will help avoid any misunderstandings and allow us both to approach matters thoughtfully.

Regarding your concerns about education and freedom, I'm open to discussing a plan that supports both you and the kids in the long term. However, threatening to go public or making demands based on fear only creates more tension and makes it harder to find a solution.

I propose that we go through mediation so we can have a neutral space to talk about everything. It's important for us both to approach this without making rash decisions. Let's work together to find the best way forward, especially when it comes to the kids.

2/25/2025 9:16:02 AM

Leyla (new) (+12074686513)

Adrian I talked to Sandy last night. I took her perspective to heart, since she's neutral in this situation. She loves our kids and me. I just want to get my education out here and be there for them. When I get my degree we will ask them want they want. But returning without a degree is irresponsible. Now until then it's a long time and we will see what they want to do when the time comes they will be much more able to make their own choices. Right now I just want to be there for them as best as I can while im pursuing my degree. I'm not fighting any more battles, in my pain I felt that I need to be heard since I feel that you are holding them here . But it's not about how I feel right now, it's about N█ and Z█ having a stable environment with a good relationship with both of their parents. We can get mediation, that's fine with me.

2/25/2025 11:58:24 AM

Liked "Adrian I talked to Sandy last night. I took her perspective to heart, since she's neutral in this situation. She loves our kids and me. I just want to get my education out here and be there for them. When I get my degree we will ask them want they want. But returning without a degree is irresponsible. Now until then it's a long time and we will see what they want to do when the time comes they will be much more able to make their own choices. Right now I just want to be there for them as best as I can while im pursuing my degree. I'm not fighting any more battles, in my pain I felt that I need to be heard since I feel that you are holding them here . But it's not about how I feel right now, it's about N█ and Z█ having a stable environment with a good relationship with both of their parents. We can get mediation, that's fine with me."

2/25/2025 12:03:37 PM

Thank you for taking Sandy's point of view into consideration. I agree that we all want to create a stable environment for N█ and Z█. Also, just a reminder, this weekend is your time with the kids. Would you want me to drop them off at your house?

Messages - Leyla (new) (+12074686513)                                                    +14109071307, 14109071307

2/25/2025 12:23:55 PM

Leyla (new) (+12074686513)

Yea drop them off please at like 3 pm , please bring the photo albums, extra socks and their hair care products. For each a towel would be good too

2/25/2025 2:37:54 PM

Leyla (new) (+12074686513)

Snack
Hello,

I just wanted to let you know that Z███ is eating both of his snacks in the morning and is still hungry in the afternoon. I told him I would ask you to send 3 snacks if possible. He has also mentioned not liking his snacks, so I mentioned he might be able to help pack the snacks so he feels a little more independent. He had a great day, the only hiccup was when he didn't have a snack left in the afternoon. Thank you!

-J. Deschenes (JES)
Regarding: Z███ F███
https://rmt1.cc/u/FDJA95tlcV
STOP to unsubscribe

2/25/2025 2:38:20 PM

Leyla (new) (+12074686513)

Hi I have snacks suggestions that used to work well

2/25/2025 2:38:23 PM

Leyla (new) (+12074686513)

N the past

2/25/2025 2:38:30 PM

Leyla (new) (+12074686513)

But I'm driving now

2/25/2025 2:48:10 PM

Leyla (new) (+12074686513)

I noticed that he is often constipated , I'm not criticizing but it's an observation I made multiple times. Fruit for snack time is great , sliced apples, quarters of oranges with peel on, grapes, cucumber, paprika , carrots

2/25/2025 2:49:22 PM

Leyla (new) (+12074686513)

Bagel with creame cheese and honey
Toast with peanut butter and banana sclices
Gouda cheese and little bretzels

2/25/2025 2:49:32 PM

Liked "I noticed that he is often constipated , I'm not criticizing but it's an observation I made multiple times. Fruit for snack time is great , sliced apples, quarters of oranges with peel on, grapes, cucumber, paprika , carrots "

Messages - Leyla (new) (+12074686513)                                                    +14109071307, 14109071307

2/25/2025 2:49:34 PM

Liked "Bagel with creame cheese and honey
Toast with peanut butter and banana sclices
Gouda cheese and little bretzels
"

2/25/2025 2:50:10 PM

Leyla (new) (+12074686513)
Greek yoghurt with honey and walnuts

2/25/2025 6:41:38 PM

Leyla (new) (+12074686513)
They both like another healthy breakfast at home,  oat meal quickly self
made 3 ingredients:

Applesauce sugar free
Milk
Quick oats

Very quick to make✅Keeps full✅ tastes great ✅ healthy ✅costs
low✅

2/25/2025 6:42:06 PM

Leyla (new) (+12074686513)
They like dried mango if that's available

2/25/2025 6:42:20 PM

Leyla (new) (+12074686513)
Nuts for Z█   not sure bout N█

2/25/2025 7:20:19 PM

Thanks that was helpful! We just left the grocery store

Read 2/25/2025

2/27/2025 5:06:45 PM

Leyla (new) (+12074686513)
www.irs.gov
https://www.irs.gov/individuals/international-taxpayers/substantial-
presence-test

2/27/2025 5:06:45 PM

Leyla (new) (+12074686513)
Just sending cause not enough WiFi to read now

2/27/2025 5:06:45 PM

Leyla (new) (+12074686513)
Can you download that form

2/27/2025 5:06:45 PM

Leyla (new) (+12074686513)
And bring it tomorrow

2/27/2025 5:06:45 PM

Leyla (new) (+12074686513)
Thanks

Messages - Leyla (new) (+12074686513)                                      +14109071307, 14109071307

2/27/2025 5:06:45 PM

Leyla (new) (+12074686513)

Form 8843

2/27/2025 5:06:47 PM

Leyla (new)



2/28/2025 9:32:35 AM

Leyla (new) (+12074686513)

Hi adrian I just wanted to say my bills also get taken out on the first

2/28/2025 9:32:51 AM

Leyla (new) (+12074686513)

And your job usually pays you at the end of the month

2/28/2025 9:32:55 AM

Leyla (new) (+12074686513)

Not on the first

2/28/2025 9:50:30 AM

Leyla (new) (+12074686513)

I need to go to the store the kids will be here and it's the last day of the month

2/28/2025 9:51:10 AM

Leyla (new) (+12074686513)

And pay my bills on time

2/28/2025 9:51:12 AM

Leyla (new) (+12074686513)



2/28/2025 9:52:01 AM

Leyla (new) (+12074686513)

Leyla.dag1992@gmail.com

Messages - Leyla (new) (+12074686513)                                    +14109071307, 14109071307

2/28/2025 9:52:17 AM

Leyla (new) (+12074686513)
Paypal

2/28/2025 9:52:31 AM

Leyla (new) (+12074686513)
So no more exchange fees

2/28/2025 9:54:23 AM

Leyla (new) (+12074686513)
The money for the lawyer and court

2/28/2025 9:54:31 AM

Leyla (new) (+12074686513)
Is due on the first as well

2/28/2025 9:54:42 AM

Leyla (new) (+12074686513)
Thank you

2/28/2025 9:54:44 AM

Leyla (new) (+12074686513)



2/28/2025 2:49:38 PM

Leyla (new) (+12074686513)
On my way to store

3/3/2025 1:03:04 PM

Leyla (new) (+12074686513)
Hi I want to join the parent teacher meeting

3/3/2025 1:03:13 PM

Leyla (new) (+12074686513)
Thursday March 13th

3/3/2025 1:03:25 PM

Leyla (new) (+12074686513)
I'm in class until 12:15

EXHIBIT A
Page 15 of 15

15/01/2026, 18:45                                    PayPal: Activities



**Filter by**

**Date: 01/01/25 to 01/15/26**   ✕

◄                                                                              ►

**Sep 2025**



**Sarah Leyla Powell**                                    **−€158.78 EUR**
Sep 2 . Money Sent                                        Repeat
"I'm unable to pay your lawyer directly"

**Aug 2025**

**Sarah Leyla Powell**                                    **−€158.83 EUR**
Aug 2 . Money Sent                                        Repeat

**Jun 2025**



**Sarah Leyla Powell**                                    **−€311.06 EUR**
Jun 30 . Money Sent                                       Repeat

**May 2025**

**Sarah Leyla Powell**                                    **−€311.20 EUR**
May 31 . Money Sent                                       Repeat

EXHIBIT B
Page 1 of 3

15/01/2026, 18:45                                    PayPal: Activities

 **Sarah Leyla Powell**
May 1 . Money Sent                                  **−€311.19 EUR**
                                                    **Repeat**

## Mar 2025

 **Sarah Leyla Powell**
Mar 31 . Money Sent                                 **−€311.41 EUR**
                                                    **Repeat**

## Feb 2025

 **Sarah Leyla Powell**
Feb 28 . Money Sent                                 **−€311.55 EUR**
                                                    **Repeat**

 **Sarah Leyla Powell**
Feb 14 . Money Sent                                 **−€476.72 EUR**
                                                    **Repeat**

 **Sarah Leyla Powell**
Feb 4 . Money Received                              **+$49.99**
"Hi"

## Jan 2025

 **Sarah Leyla Powell**
Jan 31 . Money Sent                                 **−€290.99 EUR**
                                                    **Repeat**

 **Sarah Leyla Powell**
Jan 31 . Money Sent                                 **−€476.72 EUR**
                                                    **Repeat**

EXHIBIT B
Page 2 of 3

15/01/2026, 18:45                                                    PayPal: Activities

 **Sarah Leyla Powell**                                      **−€519.52 EUR**
Jan 14 . Money Sent                                              Repeat

 **Sarah Leyla Powell**                                      **−€291.00 EUR**
Jan 1 . Money Sent                                               Repeat

 **Sarah Leyla Powell**                                      **−€515.41 EUR**
Jan 1 . Money Sent                                               Repeat



EXHIBIT B
Page 3 of 3

15/01/2026, 18:40                                          PayPal: Activities



EXHIBIT C
Page 1 of 5

PayPal: Activities

SP  **Sarah Leyla Powell**                                      **−$514.80**
    Nov 15 . Money Sent                                          Repeat

SP  **Sarah Leyla Powell**                                      **−$514.80**
    Nov 1 . Money Sent                                           Repeat

Oct 2025

SP  **Sarah Leyla Powell**                                      **−$514.80**
    Oct 15 . Money Sent                                          Repeat

SP  **Sarah Leyla Powell**                                      **−$514.80**
    Oct 1 . Money Sent                                           Repeat

Sep 2025

SP  **Sarah Leyla Powell**                                      **−$514.80**
    Sep 15 . Money Sent                                          Repeat

SP  **Sarah Leyla Powell**                                      **−$514.80**
    Sep 1 . Money Sent                                           Repeat

Aug 2025

SP  **Sarah Leyla Powell**                                      **−$514.80**
    Aug 18 . Money Sent                                          Repeat

EXHIBIT C
Page 2 of 5

15/01/2026, 18:40                                      PayPal: Activities

| | | |
|---|---|---|
| SP | **Sarah Leyla Powell**<br>Aug 15 . Money Sent | **−$514.80**<br>Repeat |
| SP | **Sarah Leyla Powell**<br>Aug 1 . Money Sent | **−$514.80**<br>Repeat |

### Jul 2025

| | | |
|---|---|---|
| SP | **Sarah Leyla Powell**<br>Jul 15 . Money Sent | **−$514.80**<br>Repeat |

### Jun 2025

| | | |
|---|---|---|
| SP | **Sarah Leyla Powell**<br>Jun 30 . Money Sent | **−$514.80**<br>Repeat |
| SP | **Sarah Leyla Powell**<br>Jun 24 . Money Sent | **−$51.75**<br>Repeat |
| SP | **Sarah Leyla Powell**<br>Jun 15 . Money Sent | **−$514.80**<br>Repeat |

### May 2025

| | | |
|---|---|---|
| SP | **Sarah Leyla Powell**<br>May 29 . Money Sent | **−$514.80**<br>Repeat |

EXHIBIT C
Page 3 of 5

15/01/2026, 18:40                                        PayPal: Activities

| | | |
|---|---|---|
| SP | **Sarah Leyla Powell**<br>May 15 . Money Sent | **−$514.80**<br>Repeat |
| SP | **Sarah Leyla Powell**<br>May 1 . Money Sent | **−$514.80**<br>Repeat |

### Apr 2025

| | | |
|---|---|---|
| SP | **Sarah Leyla Powell**<br>Apr 15 . Money Sent | **−$514.80**<br>Repeat |

### Mar 2025

| | | |
|---|---|---|
| SP | **Sarah Leyla Powell**<br>Mar 31 . Money Sent | **−$514.80**<br>Repeat |
| SP | **Sarah Leyla Powell**<br>Mar 14 . Money Sent | **−$514.80**<br>Repeat |

### Feb 2025

| | | |
|---|---|---|
| SP | **Sarah Leyla Powell**<br>Feb 28 . Money Sent | **−$514.80**<br>Repeat |



EXHIBIT C
Page 4 of 5

15/01/2026, 18:40                                    PayPal: Activities

EXHIBIT C
Page 5 of 5

To Whom this may concern:

I am Alyssa M. Powell. I am the sister of Adrian M. Powell Jr. I am the aunt of N▓▓▓ P▓▓ and Z▓▓ P▓▓. Over the course of time that the children have been in my brother's care, I have seen great improvement from the children.

Being that I am a certified childcare provider in a center that cares for children up to five years old, I watch children's Social-Emotion skills develop daily. From my observation, when together, I've noticed Z▓▓'s social-emotional skills have improved greatly. He was not able to communicate his feelings or words very well before he was with my brother. In my own experience, he had a hard time even talking to me. But, currently, he has improved greatly and has became more comfortable verbally and in being open about his feelings, needs, and wants.

N▓▓ has always been such a happy, expressive child, since she was a little girl. When in Germany, she's been expressing to my mother and I how much she wanted to come to America to be with us as well as her father. Now that she has been here, she has expressed that she loves being in America and knowing that now we are close, she wants to see us more and more each day. She's talked about the amount of friends she's made and how excited she has been about the extracurricular activities she has been able join with the great support of her father and Mrs. Kylie Powell. Overall, there has not been a single bad day since she been with my brother.

Mr. Powell, my brother, and Mrs. Kylie Powell have been very supportive and loving of these children. The children's dreams, feelings, wants, and needs come first before anything. They assure that they are comfortable in their own skin and surroundings. He believes in his children and their goals, he expresses how proud he is of them in their improvements and successes. I believe this motivation was needed in their life and I'm overjoyed that they have Mr. Powell and Mrs. Kylie Powell.

Best regards,

Alyssa M. Powell

To Whom it may concern.

I consider myself a grandmother to Nilay Powell and Zayn Powell. The children affectionately call me "Grangie." I am Kylie Powell's stepmother, and I make this statement based on my personal knowledge and time spent with the children.

Nilay and Zayn live with Adrian and Kylie Powell in Old Orchard Beach, Maine. They reside there full time and have regular visitation with their mother on an every-other-weekend basis.

The children are enrolled in the Old Orchard Beach schools and visit us often at our home in Wayne, Maine. Since their move to Maine, we have celebrated holidays and milestones together, including Easter, Christmas, birthdays, and many weekends. When they visit, they enjoy playing in our backyard, which is more rural than Old Orchard Beach. They love sledding in the winter, riding on the side-by-side, using our waterslide in the warmer months and of course playing with the dogs.

We stay closely connected with the children's day-to-day lives and regularly receive updates about their school and activities. Nilay participates in soccer and basketball, and Zayn has played football. Both children also participated in karate for a period of time.

Based on my observations, Nilay and Zayn share a strong, positive bond with Adrian and Kylie. They are comfortable and affectionate with them, and it is clear that they feel safe and supported in their home. When the children moved to Maine in the Summer of 2024, it was a joy to welcome them into our family life, and they have become fully integrated since that time.

The children are excited about the arrival of their baby brother and often share their plans and enthusiasm with us. They are bright, curious, and enjoy talking with us about their interests and goals.

Adrian and Kylie provide a stable, loving home where the children's emotional, educational, and social needs are met. Nilay and Zayn consistently express happiness about spending time with our family, and we deeply value our relationship with them.

Sincerely,

**Angie Stewart**

Digitally signed by Angie Stewart
DN: C=AdkinsRealis, CN=Angie Stewart,
E=angie.steward@atkinsrealis.com
Reason: I am the author of this document
Location:
Date: 2026.01.13 09:21:45-05'00'
Foxit PDF Editor Version: 2025.2.0

Angie Stewart
941 Main St
Wayne, ME 04284
207-248-1820

AtkinsRéalis - Sensitive / Sensible [FR]

EXHIBIT E
Page 1 of 1

Hi, I have had the privilege of coaching N███ in two sports, soccer and basketball. She has been an important member of both of our teams. She is dedicated and shows up to every practice ready to learn and ready to work. She tries her best during all practices and games with a smile on her face. N███ has great rapport with all teammates and treats them all with kindness. I can see that her teammates really like her and enjoy having her around. During games against other teams and towns she treats all officials and opponents with the utmost respect. I have greatly enjoyed being able to coach N███

Glenn Trinder

January 13, 2026

To Whom It May Concern,

I am writing in support of my niece, K, and her husband, A, and in favor of maintaining custody of A's children, N and Z, here in the state of Maine. I offer this perspective as both a close, long-standing family member and as a doctorate-prepared occupational therapist with advanced training in child development, social-emotional health, and family systems.

Although I have not provided formal therapy services to N or Z, I am a reliable historian who has had consistent, meaningful involvement in their lives since their arrival in Maine. I am very close with my niece, K, having played a significant role in her upbringing. She and my daughter are more like sisters than cousins, and our extended family is close-knit, stable, and supportive. Children are deeply valued in our family regardless of biological relationship, and I have observed this same inclusive, respectful, and nurturing treatment extended fully to N and Z.

**Emotional Ties and Sense of Belonging**
N and Z have developed strong, secure emotional attachments within their household and extended family network in Maine. They are warmly welcomed at family gatherings, greeted by name, included naturally in activities, and given positive attention, reflecting a clear sense of belonging. K treats her stepchildren with patience, affection, and consistency, and I have repeatedly observed a loving and emotionally supportive family dynamic among K, A, N, and Z.

Z demonstrates a particularly close and secure bond with his father, A. He often sits near him, seeks him out for conversation or play, and appears emotionally regulated and comfortable in his presence. Over the past year, I have observed Z becoming more confident and outgoing socially. N is naturally outgoing, adapts easily to new environments, and interacts comfortably with peers and adults, reflecting strong emotional security and social confidence.

**Stability, Continuity, and Adjustment**
I see the children at least monthly through holidays, family gatherings, babysitting support, and informal visits. Across these settings, both children consistently present as happy, well-adjusted, appropriately behaved, and responsive to adult guidance, suggesting a stable and predictable caregiving environment.

During a full-day outing to the beach, the children engaged in swimming, walking along the shore, reading, and self-directed play. They followed safety instructions carefully and demonstrated age-appropriate judgment and impulse control. Their behavior reflected a sense of security and effective parental support.

On another occasion, I picked the children up from school. K provided detailed directions, coordinated with the school, and ensured all safety protocols were followed. The children were relaxed, talkative, and greeted by peers by name, indicating positive school adjustment and peer relationships. At home later that day, Z participated successfully in a scheduled telehealth appointment with clear parental

EXHIBIT G
Page 1 of 2

preparation and support, while I worked with N on a multi-step construction activity. The home environment was calm, organized, and supportive.

**Educational Support and Developmental Progress**

Both children demonstrate curiosity and positive engagement in learning. Z is an emerging reader who initially appeared unsure of his literacy skills earlier in the school year, but during a shared reading experience demonstrated stronger abilities than he first expressed. While reading *The Gingerbread Man*, he read with good cadence, offered expressive commentary, identified words beginning with specific letters, and spelled simple words aloud. His improving test scores, displayed in the family kitchen, reflect that education is valued and supported in the home. These observations reflect growing confidence and comfort with learning activities in a supportive environment.

N demonstrates strong academic engagement and learning-related strengths. She shows sustained attention and persistence during creative, multi-step tasks such as sewing and fabric art, and takes pride in completed projects she has worked on collaboratively with K. She also participates in extracurricular activities, such as soccer, and appropriately expresses preferences about activities that are or are not a good fit for her. These behaviors reflect healthy self-awareness, confidence, and support for both academic and creative development.

**Family Support, Safety, and Future Stability**

N and Z are safe, well cared for, and emotionally supported in their current environment. Their daily routines, educational needs, and extracurricular interests are attended to thoughtfully and consistently. They benefit from a strong extended family network in Maine that provides emotional support, continuity of relationships, and practical assistance. The family is also preparing to welcome a new baby brother, reinforcing a sense of permanence, connection, and future-oriented stability.

Both children consistently demonstrate warmth, empathy, humor, and joy—behaviors characteristic of children who feel secure, loved, and emotionally safe.

Based on my background, close relationship with the family, and repeated observations of N and Z across multiple settings, I firmly believe it is in their best interest to remain in Maine. Doing so preserves emotional bonds, educational continuity, community connections, extended family support, and overall stability—factors commonly considered in determining a child's best interest, including emotional security, continuity of care, and stability of relationships.

Thank you for your thoughtful consideration.

Respectfully submitted,

*Jessica Richard* (electronic signature)

Jessica Richard, OTD, OTR/L
Occupational Therapist
Leeds, Maine

EXHIBIT G
Page 2 of 2

Kendra Quinn

1277 West Road

Litchfield Maine 04350


To Whom it May Concern,

I am Kylie Powell's sister. I see N█ P███ and Z███ P███ as my niece and nephew. I also have a seven-year-old stepdaughter, R███, who is close in age to N█ and Z███ and spends a lot of time with them.

N█ and Z███ live in Maine with Adrian and Kylie Powell and spend time with their mother every other weekend. Our families coordinate schedules so that R███ is home on the same weekends N███ and Z███ are home. We plan playdates often and see each other regularly, so the kids spend a lot of time together.

Since N███ and Z███ moved to Maine in August 2024, I've noticed how comfortable they are in their routines and relationships. Z███ has become more confident in group play and does well taking turns and following rules. He has a great sense of humor and enjoys making people laugh. N███ is confident, social, and quick to jump into activities with other kids.

The three children play very well together. We spend time outside, run around, and do kid-centered activities that involve a lot of imagination and cooperation. The kids are relaxed with each other and transition easily between play, meals, and downtime.

N███ and Z███ attend school in Old Orchard Beach. I regularly hear about their school days through conversations with Kylie during drop-off and pick-up, and from the kids themselves. N███ talks a lot about her friends, school activities, and sports. She enjoys reading and sharing what she's working on in class, and we hear about her accomplishments and activities as they happen. Z███ talks often about his teachers and friends and enjoys sharing what he's learning. He likes practicing reading and counting and is especially interested in rocks and gems, which he is always excited to explain or show off when we see each other.

From the time I spend with them and my ongoing involvement in their lives, N███ and Z███ come across as happy, connected, and comfortable in their day-to-day routines and relationships here in Maine

Sincerely,

Kendra Quinn

EXHIBIT H
Page 1 of 1

January 13, 2026,

To Whom It May Concern:

We had the good fortune of meeting Kylie, Adrian, N███, and Z███ within our community a couple of years ago and have since fostered a relationship between our families.  We have spent time together out at community events, in swim lessons, on play dates and within their home.  Our 6 year old daughter has formed a strong connection with both N███ and Z███, a truly special, and meaningful bond as all three children are Bi-Racial.

Kylie and Adrian display the utmost amount of love and patience with a deep sense of calmness and care in all of their actions, putting N███ and Z███ at the forefront of all of their decisions and interactions.  Kylie and Adrian are attuned to their children's strengths and needs, fostering an environment of unwavering love and stability where their children are able to develop a strong sense of self.  We feel honored to call Kylie and Adrian our friends and admire their character and commitment to providing N███ and Z███ with a family structure that cultivates joy, love, identity and community.  Please feel free to contact us with any questions.

Sincerely,

Katie Reynolds                              Darryl Jenkins
207-356-4646                               646-577-3336
katieareynolds@yahoo.com          jenkinsco128@gmail.com

EXHIBIT I
Page 1 of 1

12/01/2026, 21:34                                         MBA Report Creator



X

Loranger Memorial School
148 Saco Ave.
Old Orchard Beach ME 04064
(207) 934-4848
Principal: Matthew Foster

| Student Info | |
| --- | --- |
| Name | N___ P___ |
| Grade | |
| Home Room | Wilder |
| School Year | 2024-2025 |

StudentID___136

*RSU 23 will provide a high quality education for all students. We will meet all learners as they are, and inspire and support them until they experience success. We will prepare passionate, empathetic, goal-driven members of a society who can embrace change.*

| Grade Key | |
| --- | --- |
| 4 | Exceeding Grade Level Expectations |
| 3 | Meeting Grade Level Expectations |
| 2 | Approaching Grade Level Expectations |
| 1 | Limited Progress Toward Grade Level Expectations |
| IE | Insufficient Evidence or No Evidence |

| Attendance | T1 | T2 | T3 | YR |
| --- | --- | --- | --- | --- |
| Days Absent | 0 | 0 | | 0 |
| Times Tardy | 6 | 1 | | 7 |

| Art Gr 3 | |
| --- | --- |
| Hurteau, Jessie | T1 |
| **Art** | |
| Understands concepts | 3 |
| Participates responsibly | 3 |
| **Teacher Comments:** | |
| Students created a sketchbook cover that included a rough and final draft. Students worked hard to personalize their work and to create bold lettering that fit and fills the space. Students created a African Circus sculpture that shows action and shares their knowledge from the Cirque Kalabante field trip**.** | |

| Habits of Work & Learning, Gr 3 | |
| --- | --- |
| Wilder, Sarah - Seymour, Paige | T1 |
| I can listen | 3 |
| I can use self talk | 3 |
| I can be assertive | 3 |
| I can identify the feelings of others | 3 |
| I can focus attention | 3 |
| I am respectful | 3 |
| I take responsibility | 3 |
| I am accepting | 3 |
| I am safe | 3 |

| Health Gr 3 | |
| --- | --- |
| Floyd, Heath | T1 |
| **Health and Wellness** | |
| Understands concepts | 3 |
| Participates responsibly | 3 |
| **Teacher Comments:** | |
| MLR A1-Healthy Behaviors; MLR C1- Age Appropriate practices/decisions; MLR C2- Avoiding/Reducing Health risks; MLR E2- Effective Communication Skills | |

| Language Arts Gr 3 | |
| --- | --- |
| Wilder, Sarah - Seymour, Paige | T1 |
| **Reading** | |
| I can ask and answer questions to show understanding of text (Running Record) | 2 |
| I can identify the lesson of a story or poem supported by evidence | 2 |
| I can identify the main idea(s) of a text, supported by key details | 3 |
| I can determine the meaning of content study words and vocabulary | 2 |
| I can read just right books with fluency | 3 |
| I can use information gained from illustrations and the words in a text to demonstrate understanding of the text | 3 |

| Library Gr 3 | |
| --- | --- |
| Rasco, Carey | T1 |
| **Library** | |
| Understands concepts | 3 |
| Participates responsibly | 3 |
| **Teacher Comments:** | |
| We've covered three library units this trimester: Unit I Orientation: Finding and checking out books. Library Citizenship: STAR rules and book care. Genre Personality: Exploring which kind of books each student might like the best. Unit II Introduce/review two library apps: 1. Destiny, the library online catalog 2. SORA, the library online books database. Introduce/review robotics and coding with LEGO Spike kits. Honoring Hispanic/LatinX Heritage with stories, crafts, music and dance. Unit III Digital Citizenship: Our digital footprint. Discerning personal vs. private information and what's safe to share online. Honoring Veterans Day, Native American heritage, and Thanksgiving tradition with stories and discussion. | |

| Math Gr 3 | |
| --- | --- |
| Wilder, Sarah - Seymour, Paige | T1 |
| **Operations and Algebraic Thinking** | |
| Represent and solve problems involving multiplication and division | 3 |
| Understand properties of multiplication and the relationship between multiplication and division | 3 |
| Multiply and divide within 100 | 3 |

| Music Gr 3 | |
| --- | --- |
| Shaw, Katherine | T1 |
| **Music** | |
| Understands concepts | 3 |
| Participates responsibly | 3 |
| **Teacher Comments:** | |
| Third grade musicians have used games and activities to identify and perform many rhythm values. Quarter, eighth, sixteenth, half, whole notes and quarter and half rests are being practiced. Students play various pitched percussion instruments, xylophones and metallophones, to practice melodies. Musicians also use listening maps to guide experiences with musical form, dynamics and instrument families**.** | |

| Physical Education Gr 3 | |
| --- | --- |
| McDonald, Craig | T1 |
| **Physical Education** | |
| Understands concepts | 3 |
| Participates responsibly | 3 |

EXHIBIT J
Page 1 of 9

12/01/2026, 21:34                                      MBA Report Creator

Loranger Memorial School                    Report Card 2024–2025                    Student Name: N___ F___
                                                                                                    Grade:3
                                                                                     Homeroom:Wilder

| Wilder, Sarah  - Seymour, Paige (*Continued*) | T1 |
| --- | --- |
| **I** can ask and answer questions to demonstrate understanding of a text, referring explicitly to the text as the basis for the answers | 3 |
| **I** am making progress toward reading at grade 3 reading level | 2 |
| **Speaking and Listening** | |
| **I** can engage effectively in a range of collaborative discussions with diverse partners on grade 3 topics and texts, building on other's ideas and expressing my own clearly | 3 |
| **Writing** | |
| **I** can write informative texts to explain a topic and convey ideas and information clearly | 3 |
| **I** can use academic and domain specific words to develop my topic with facts and details | 3 |

| McDonald, Craig  (*Continued*) | T1 |
| --- | --- |
| **Teacher Comments:** | |
| The central focus during the first trimester is to develop motor skills and social skills through a variety of cooperative games and activities. Students will also learn the benefits of being physically fit, and how to maintain living a healthy lifestyle. | |

| Morning Meeting Gr 3 | |
| --- | --- |
| **Wilder, Sarah  - Seymour, Paige** | T1 |
| **Teacher Comments:** | |
| It has been a pleasure getting to know N___ during the first trimester. She is an assertive, motivated student who shows compassion for her peers. She is able to share ideas clearly through her writing and always produces high quality work. | |

EXHIBIT J
Page 2 of 9

12/01/2026, 21:35

MBA Report Creator

X

Loranger Memorial School
148 Saco Ave.
Old Orchard Beach ME 04064
(207) 934-4848
Principal: Matthew Foster



| Student Info | |
| --- | --- |
| Name | N   P |
| Grade | 3 |
| Home Room | Wilder |
| School Year | 2024-2025 |

StudentID    136

*RSU 23 will provide a high quality education for all students. We will meet all learners as they are, and inspire and support them until they experience success. We will prepare passionate, empathetic, goal-driven members of a society who can embrace change.*

| Grade Key | |
| --- | --- |
| 4 | Exceeding Grade Level Expectations |
| 3 | Meeting Grade Level Expectations |
| 2 | Approaching Grade Level Expectations |
| 1 | Limited Progress Toward Grade Level Expectations |
| IE | Insufficient Evidence or No Evidence |

| Attendance | T1 | T2 | T3 | YR |
| --- | --- | --- | --- | --- |
| Days Absent | 0 | 1 | 0 | 1 |
| Times Tardy | 6 | 2 | 0 | 8 |

| Art Gr 3 | | |
| --- | --- | --- |
| Hurteau, Jessie | T1 | T2 |
| **Art** | | |
| Understands concepts | 3 | 4 |
| Participates responsibly | 3 | 4 |
| **Teacher Comments:** | | |
| Students demonstrated knowledge of warm and cool colors in the 2-D Warm Hearts project. Students learned about Maine artist Louise Nevelson. They created low relief assemblage sketchbooks that they painted in monochromatic acrylic paints. | | |

| Habits of Work & Learning, Gr 3 | | |
| --- | --- | --- |
| Wilder, Sarah  - Seymour, Paige | T1 | T2 |
| I can listen | 3 | 3 |
| I can use self talk | 3 | 3 |
| I can be assertive | 3 | 3 |
| I can identify the feelings of others | 3 | 3 |
| I can focus attention | 3 | 3 |
| I am respectful | 3 | 3 |
| I take responsibility | 3 | 3 |
| I am accepting | 3 | 3 |
| I am safe | 3 | 3 |

| Health Gr 3 | | |
| --- | --- | --- |
| Floyd, Heath | T1 | T2 |
| **Health and Wellness** | | |
| Understands concepts | 3 | 3 |
| Participates responsibly | 3 | 3 |
| **Teacher Comments:** | | |
| Students identify situations where a health related decision is needed. Students make short and long term health goals and what actions they need to achieve goal. | | |

| Language Arts Gr 3 | | |
| --- | --- | --- |
| Wilder, Sarah - Seymour, Paige | T1 | T2 |
| **Reading** | | |
| I can ask and answer questions to show understanding of text (Running Record) | 2 | 2 |
| I can identify the lesson of a story or poem supported by evidence | 2 | |
| I can identify the main idea(s) of a text, supported by key details | 3 | 3 |
| I can determine the meaning of content study words and vocabulary | 2 | 2 |
| I can read just right books with fluency | 3 | 3 |
| I can use information gained from illustrations and the words in a text to demonstrate understanding of the text | 3 | |

| Library Gr 3 | | |
| --- | --- | --- |
| Rasco, Carey | T1 | T2 |
| **Library** | | |
| Understands concepts | 3 | 4 |
| Participates responsibly | 3 | 3 |
| **Teacher Comments:** | | |
| We've covered two library units this trimester<br>Unit IV<br>Maine Chickadee Award Nominated Books<br>Digital Citizenship: Spheres of Community<br>Digital Citizenship: Is it Real? Analyzing altered photos and the reasons people change them.<br>Library Citizenship: Practice searching for books<br>Unit V<br>Honoring Black History with stories and crafts.<br>Read aloud books: Compare and contrast artwork & themes<br>Green Screen Project | | |

| Math Gr 3 | | |
| --- | --- | --- |
| Wilder, Sarah  - Seymour, Paige | T1 | T2 |
| **Operations and Algebraic Thinking** | | |
| Represent and solve problems involving multiplication and division | 3 | 3 |
| Understand properties of multiplication and the relationship between multiplication and division | 3 | 3 |
| Multiply and divide within 100 | 3 | 3 |
| **Numbers and Operations in Base Ten** | | |
| Use place value understanding and properties of operations to perform multi-digit arithmetic | | 3 |
| **Measurement and Data** | | |
| Solve problems involving measurement and estimation of intervals of time, liquid, volumes, and masses of objects | | 3 |

| Music Gr 3 | | |
| --- | --- | --- |
| Shaw, Katherine | T1 | T2 |
| **Music** | | |
| Understands concepts | 3 | 3 |
| Participates responsibly | 3 | 3 |
| **Teacher Comments:** | | |
| Third grade musicians enjoyed playing different parts of the bucket drum as part of Sasha!, a lively circle dance! They also practiced identifying and performing rhythms. They are learning note names on lines and spaces on the treble clef and play many games to reinforce that skill. Students brought to life the book Caps for Sale by singing and playing a melody on the xylophones, using other percussion instruments to represent parts of the story. PreK students were invited to watch them and thought that the 3rd graders were like rock stars! | | |

| Physical Education Gr 3 | | |
| --- | --- | --- |
| McDonald, Craig | T1 | T2 |

1/2

12/01/2026, 21:35                           MBA Report Creator

Loranger Memorial School              Report Card 2024-2025              Student Name: | P
                                                                              Grade:3
                                                                              Homeroom:Wilder

| Wilder, Sarah  - Seymour, Paige (*Continued*) | T1 | T2 |
| --- | --- | --- |
| **I** can ask and answer questions to demonstrate understanding of a text, referring explicitly to the text as the basis for the answers | 3 | 3 |
| **I** am making progress toward reading at grade 3 reading level | 2 | 4 |
| **Speaking and Listening** | | |
| **I** can engage effectively in a range of collaborative discussions with diverse partners on grade 3 topics and texts, building on other's ideas and expressing my own clearly | 3 | |
| **Writing** | | |
| **I** can write informative texts to explain a topic and convey ideas and information clearly | 3 | |
| With guidance and support from peers and adults, **I** can develop and strengthen writing as needed by planning, revising, and editing. | | 4 |
| **I** can use academic and domain specific words to develop my topic with facts and details | 3 | |
| **I** can write narrative texts to develop real or imagined events | | 4 |
| **I** can include a clear sequence of events and use descriptive details in my writing | | 4 |

| McDonald, Craig  (*Continued*) | T1 | T2 |
| --- | --- | --- |
| **Physical Education** | | |
| Understands concepts | 3 | 3 |
| Participates responsibly | 3 | 3 |
| **Teacher Comments:** | | |
| The units taught during the second trimester are dribbling & passing, striking & volleying, and cooperative activities. Motor skills, Fitness, and social skill development are also a part of each unit. | | |

| Morning Meeting Gr 3 | | |
| --- | --- | --- |
| **Wilder, Sarah  - Seymour, Paige** | T1 | T2 |
| **Teacher Comments:** | | |
| N     s a wonderful, highly motivated student. She is kind and willing to take on any challenge that is given to her. I specifically appreciate that N     jumps right into partner talk during literacy lessons. She is confident, yet humble. Keep up the great work! | | |

EXHIBIT J
Page 4 of 9

12/01/2026, 21:35                                    MBA Report Creator

X

Loranger Memorial School
148 Saco Ave.
Old Orchard Beach ME 04064
(207) 934-4848
Principal: Matthew Foster



| Student Info | |
|---|---|
| Name | N____ P____ |
| Grade | 3 |
| Home Room | Wilder |
| School Year | 2024-2025 |

StudentID____136

*RSU 23 will provide a high quality education for all students. We will meet all learners as they are, and inspire and support them until they experience success. We will prepare passionate, empathetic, goal-driven members of a society who can embrace change.*

| Grade Key | |
|---|---|
| 4 | Exceeding Grade Level Expectations |
| 3 | Meeting Grade Level Expectations |
| 2 | Approaching Grade Level Expectations |
| 1 | Limited Progress Toward Grade Level Expectations |
| IE | Insufficient Evidence or No Evidence |

| Attendance | T1 | T2 | T3 | YR |
|---|---|---|---|---|
| Days Absent | 0 | 1 | 1 | 2 |
| Times Tardy | 6 | 2 | 0 | 8 |

| Art Gr 3 | | | |
|---|---|---|---|
| Hurteau, Jessie | T1 | T2 | T3 |
| **Art** | | | |
| Understands concepts | 3 | 4 | 4 |
| Participates responsibly | 3 | 4 | 4 |

**Teacher Comments:**
Students created clay names tiles using the slab technique. They focused on indenting/mark making as well as scratching and attaching raised elements. In the following rotation students used acrylic paints to add colorful details to make their work pop.

| Habits of Work & Learning, Gr 3 | | | |
|---|---|---|---|
| Wilder, Sarah - Seymour, Paige | T1 | T2 | T3 |
| I can listen | 3 | 3 | 3 |
| I can use self talk | 3 | 3 | 3 |
| I can be assertive | 3 | 3 | 3 |
| I can identify the feelings of others | 3 | 3 | 3 |
| I can focus attention | 3 | 3 | 3 |
| I am respectful | 3 | 3 | 3 |
| I take responsibility | 3 | 3 | 3 |
| I am accepting | 3 | 3 | 3 |
| I am safe | 3 | 3 | 3 |

| Health Gr 3 | | | |
|---|---|---|---|
| Floyd, Heath | T1 | T2 | T3 |
| **Health and Wellness** | | | |
| Understands concepts | 3 | 3 | 3 |
| Participates responsibly | 3 | 3 | 3 |

**Teacher Comments:**
Students locate resources from home, school, and the community that provide valid health information. Can identify health-related situations that might require a thoughtful decision. Can Choose a healthy option when making a decision.

| Language Arts Gr 3 | | | |
|---|---|---|---|
| Wilder, Sarah - Seymour, Paige | T1 | T2 | T3 |
| **Reading** | | | |
| I can ask and answer questions to show understanding of text (Running Record) | 2 | 3 | 3 |
| I can identify the lesson of a story or poem supported by evidence | 2 | | |
| I can identify the main idea(s) of a text, supported by key details | 3 | 3 | |
| I can determine the meaning of content study words and vocabulary | 2 | 2 | 2 |
| I can read just right books with fluency | 3 | 3 | 3 |

| Library Gr 3 | | | |
|---|---|---|---|
| Rasco, Carey | T1 | T2 | T3 |
| **Library** | | | |
| Understands concepts | 3 | 4 | 3 |
| Participates responsibly | 3 | 3 | 3 |

**Teacher Comments:**
We've covered two library units this trimester
Unit VI
Sphero Sprk+ coding: The Sprk+ is a spherical robot the size of a croquet ball. Students learned two types of coding, using blocks of code and using drawings to code. They had an obstacle course challenge and also designed their own courses.
Honoring Women's History with stories and activities.
Biography Research Project
Unit VII
Just Right Book test for interest and reading level
Honoring Asian American Pacific Islander Heritage with stories and activities.
Honoring Memorial Day by learning about the 1st "Decoration Day" at the end of the Civil War.
Learning about OOB's Libby Memorial Library for summer reading opportunities.
Time for Independent Learning Centers.

| Math Gr 3 | | | |
|---|---|---|---|
| Wilder, Sarah - Seymour, Paige | T1 | T2 | T3 |
| **Operations and Algebraic Thinking** | | | |
| Represent and solve problems involving multiplication and division | 3 | 3 | 3 |
| Understand properties of multiplication and the relationship between multiplication and division | 3 | 3 | 2 |
| Multiply and divide within 100 | 3 | 3 | 3 |
| Solve problems involving the four operations and identify and explain patterns in arithmetic | | | 2 |
| **Numbers and Operations in Base Ten** | | | |
| Use place value understanding and properties of operations to perform multi-digit arithmetic | | 3 | 3 |
| **Measurement and Data** | | | |
| Solve problems involving measurement and estimation of intervals of time, liquid, volumes, and masses of objects | | 3 | |
| Understand concept of area and relate area to multiplication and addition | | | 3 |

| Music Gr 3 | | | |
|---|---|---|---|
| Shaw, Katherine | T1 | T2 | T3 |
| **Music** | | | |
| Understands concepts | 3 | 3 | 3 |
| Participates responsibly | 3 | 3 | 3 |

EXHIBIT J
Page 5 of 9

12/01/2026, 21:35                                                    MBA Report Creator

| I can use information gained from illustrations and the words in a text to demonstrate understanding of the text | 3 | | |

EXHIBIT J
Page 6 of 9

12/01/2026, 21:35                                    MBA Report Creator

Loranger Memorial School              Report Card 2024-2025              Student Name: N___ P___
                                                                        Grade:3
                                                                        Homeroom:Wilder

| Wilder, Sarah - Seymour, Paige (*Continued*) | T1 | T2 | T3 |
|---|---|---|---|
| I can ask and answer questions to demonstrate understanding of a text, referring explicitly to the text as the basis for the answers | 3 | 3 | 3 |
| I am making progress toward reading at grade 3 reading level | 2 | 4 | 3 |
| **Speaking and Listening** | | | |
| I can engage effectively in a range of collaborative discussions with diverse partners on grade 3 topics and texts, building on other's ideas and expressing my own clearly | 3 | | |
| **Writing** | | | |
| I can write informative texts to explain a topic and convey ideas and information clearly | 3 | | 3 |
| With guidance and support from peers and adults, I can develop and strengthen writing as needed by planning, revising, and editing. | | 4 | |
| I can use academic and domain specific words to develop my topic with facts and details | 3 | | 3 |
| I can follow English language rules as grade level appropriate | | | 3 |
| I can write narrative texts to develop real or imagined events | | 4 | |
| I can include a clear sequence of events and use descriptive details in my writing | | 4 | |
| I can collect research on a topic to build and present knowledge | | | 3 |
| I can use text features to deepen my understanding of a text | | | 3 |
| I can describe the connections between information in a text | | | 3 |

| Shaw, Katherine (*Continued*) | T1 | T2 | T3 |
|---|---|---|---|
| **Teacher Comments:** | | | |
| Students used listening maps to examine the form of classical and contemporary music. They used playground balls and drums, as well as many other percussion instruments to explore musical elements. One of the highlights was using "steady beat light sabers" to bring John Williams' Imperial March to life. 3rd graders played several games to reinforce rhythm, dynamics, composition, note names and music genres. | | | |

| Physical Education Gr 3 | | | |
|---|---|---|---|
| McDonald, Craig | T1 | T2 | T3 |
| **Physical Education** | | | |
| Understands concepts | 3 | 3 | 3 |
| Participates responsibly | 3 | 3 | 3 |
| **Teacher Comments:** | | | |
| The focal point of the third trimester is to provide students with a foundation of movement experiences that will eventually lead to an active and healthy lifestyle. Motor skills, fitness, and social skill development continue to be the main focus taught in each class. | | | |

| Morning Meeting Gr 3 | | | |
|---|---|---|---|
| Wilder, Sarah - Seymour, Paige | T1 | T2 | T3 |
| **Teacher Comments:** | | | |
| N___ has had a great year in 3rd grade! She is assertive, focuses her attention, and is eager to learn. She is a wonderful student and gets along with everyone. Keep reading over the summer. Good luck in 4th grade! | | | |

EXHIBIT J
Page 7 of 9

12/01/2026, 21:36                                    MBA Report Creator



Loranger Memorial School
148 Saco Ave.
Old Orchard Beach ME 04064
(207) 934-4848
Principal: Matthew Foster



| Student Info | |
| --- | --- |
| Name | N___ P___ |
| Grade | 4 |
| Home Room | Boyer |
| School Year | 2025-2026 |

StudentID:___136

*RSU 23 will provide a high quality education for all students. We will meet all learners as they are, and inspire and support them until they experience success. We will prepare passionate, empathetic, goal-driven members of a society who can embrace change.*

| Grade Key | |
| --- | --- |
| 4 | Exceeding Grade Level Expectations |
| 3 | Meeting Grade Level Expectations |
| 2 | Approaching Grade Level Expectations |
| 1 | Limited Progress Toward Grade Level Expectations |
| IE | Insufficient Evidence or No Evidence |

| Attendance | T1 | T2 | T3 | YR |
| --- | --- | --- | --- | --- |
| Days Absent | 1 | 0 | | 1 |
| Times Tardy | 1 | 1 | | 2 |

| Art Gr 4 | |
| --- | --- |
| Hurteau, Jessie | T1 |
| **Art** | |
| Understands concepts | 3 |
| Participates responsibly | 3 |
| **Teacher Comments:** | |

Students in 4th grade practice and learn art room procedures. Students create personalized sketchbooks including 3-D style lettering, well planned layout and color applied with careful craftsmanship. Students use sketchbooks for a 5 minute warm up drawing in each class period to practice the skills of active artists. Students created 3-D dream rooms to practice drawing and perspective. Students learn about artist Wassily Kandinsky and create paintings in his abstract style.

| Health Gr 4 | |
| --- | --- |
| Floyd, Heath | T1 |
| **Health and Wellness** | |
| Understands concepts | 3 |
| Participates responsibly | 3 |
| **Teacher Comments:** | |

MLR A1- Healthy Behaviors/Personal Health; MLR C1- Healthy Practices/Behaviors;
MLR E2- Interpersonal Communication Skills

| Language Arts Gr 4 | |
| --- | --- |
| Boyer, Anabel | T1 |
| **Reading** | |
| I can discuss and record what I notice and wonder about resources | 4 |
| I can read grade level text with purpose and understanding | 4 |
| I can describe in depth a character, setting, or event in a story or drama, drawing on specific details in the text | 4 |
| I can determine the theme of a story, drama or poem from details in the text and summarize the text | 3 |
| I can explain major differences among poems, drama and prose and refer to the structural elements of poems and drama when writing or speaking about a text | 4 |
| I can determine the meaning of words and phrases as they are used in a text | 3 |
| I can draw evidence from literary or informational text to support analysis, reflection and research | 4 |
| I can refer to details and examples in a text when explaining what the text says (both explicitly as well as inferences) | 4 |
| I can read with sufficient accuracy and fluency to support comprehension | 3 |
| I can explain how an author uses reasons and evidence to support particular points in a text | 3 |

| Library Gr 4 | |
| --- | --- |
| Rasco, Carey | T1 |
| **Library** | |
| Understands concepts | 3 |
| Participates responsibly | 3 |
| **Teacher Comments:** | |

We've covered three library units this trimester:
Unit I
Orientation: Finding and checking out books; Fiction vs. NonFiction.
Library Citizenship: STAR rules, book care, making & using bookmarks.
Digital Citizenship: T.H.I.N.K. before you post
(Is it True, Helpful, Inspiring, Necessary, and Kind.)
Unit II
Introduce/review two library apps: 1. Destiny, the library online catalog, and 2. SORA, the library online books database.
Honoring Hispanic/LatinX and Indigenous People's Heritage Months with stories, crafts, and dance.
Computer Literacy: Completing a QR code scavenger hunt
Unit III
Honoring Veterans Day and Thanksgiving traditions with stories and discussion.
Beginning Research - Animal Crossings.
Introduce/review coding with LEGO Spike kits.

| Math Gr 4 | |
| --- | --- |
| Boyer, Anabel | T1 |
| **Mathematics** | |
| Demonstrates understanding of multiplicative comparison in place value | 4 |
| Reads, writes and compares multi-digit whole numbers using base-ten numerals, number names and expanded form | 3 |
| Understands place value to round numbers and perform multi-digit computation | 3 |
| Fluently adds and subtracts multi-digit whole numbers using the standard algorithm | 4 |
| Solves problems involving measurement and conversion of single system measurements from a larger unit to a smaller unit | 3 |
| Uses the four operations with whole numbers to solve problems | 4 |
| Solves multistep word problems posed with whole numbers and having whole-number answers using the four operations | 3 |
| **Teacher Comments:** | |

In math, students have developed and expanded their understanding of place value to apply to larger numbers up to the millions place. They applied this knowledge to addition and subtraction computations and calculations. They worked diligently on word problems that required more than one step to get to the final answer. Recently, students have been exploring the Metric System with measuring length, capacity, and mass. We combine this new learning with addition and subtraction of large numbers to calculate sums and differences. We are beginning to explore numeric and nonnumeric patterns and rules.

EXHIBIT J
Page 8 of 9

12/01/2026, 21:36                                                MBA Report Creator

Loranger Memorial School                          Report Card 2025-2026                     Student Name: N___P_____
                                                                                                              Grade:4
                                                                                                    Homeroom:Boyer

| Boyer, Anabel (*Continued*) | T1 |
|---|---|
| **Writing** | |
| I can write informative/explanatory texts to examine a topic and convey ideas and information clearly | 3 |
| I can introduce a topic clearly and group related information in paragraphs and sections; include formatting, illustrations, multimedia when useful to aid comprehension. | 3 |
| I can develop a topic with facts, definitions, concrete details, quotations, or other information and examples related to the topic | 3 |
| I can link ideas within categories of information using words and phrases | 3 |
| I can use commas and quotation marks to mark direct speech and quotations from a text | 3 |
| I can provide a concluding statement or section related to the information or explanation presented | 4 |
| I can, with guidance and support from peers and adults, develop and strengthen writing as needed by planning, revising, and editing | 3 |
| I can produce clear and coherent writing in which the development and organization are appropriate to task, purpose, and audience | 4 |
| I can recall relevant information from experiences or gather relevant information from print and digital sources; take notes and categorize information, and provide a list of sources | 3 |
| I can conduct short research projects that build knowledge through investigation of different aspects of a topic | 3 |
| **Language** | |
| I can determine or clarify the meaning of unknown and multiple-meaning words and phrases based on grade 4 reading and content, choosing flexibly from a range of strategies | 3 |
| I can use context as a clue to the meaning of a word or phrase | 3 |
| I can differentiate between contexts that call for formal English and situations where informal discourse is appropriate | 3 |
| I can report on a topic or text, tell a story, or recount an experience in an organized manner, using appropriate facts and relevant, descriptive details to support main ideas or themes; speak clearly at an understandable pace | 4 |
| **Speaking and Listening** | |
| I come to discussions prepared, having read or studied required materials; explicitly draw on that preparation and other information known about the topic to explore ideas under discussion | 3 |
| I can pose and respond to specific questions to clarify or follow up on information and make comments that contribute to the discussion | 4 |
| **Teacher Comments:** | |

**Teacher Comments:**
In literacy, students have dedicated their learning to the craft of poetry. They focused their work to answer the guiding questions of "What makes a poem a poem?" and "What inspires a writer to write poetry". They became experts on famous poets and studied their life and their work to make connections and conclusions. Lastly, students went through the writing process to publish poems about something meaningful and inspiring to them that they shared with a variety of audiences.

| Morning Meeting Gr 4 | |
|---|---|
| Boyer, Anabel | T1 |
| **STAR Expectations** | |
| I am safe throughout the school day. | 4 |
| I take responsibility for my belongings and my choices. | 3 |
| I am accepting of others' feedback and feelings. | 4 |
| I am respectful of others' belongings, space, and ideas. | 4 |
| **Habits of Character** | |
| I can listen attentively to others. | 4 |
| I can follow directions. | 4 |
| I can demonstrate self-control of my actions and words. | 4 |
| I can transition well from one activity to another. | 4 |
| I can communicate clearly and appropriately. | 4 |
| I can contribute and participate appropriately. | 4 |
| I can identify the feelings of others. | 4 |
| I can problem solve independently and effectively. | 4 |
| I can ask for help from others when necessary. | 4 |

**Teacher Comments:**
Nilay is a kind, caring, and very bright student. She quickly picks up new concepts and is able to organize her learning independently using the model provided. She has wonderful friendships and works well with every peer. While she can occasionally become distracted by friends, she is usually the one to get the group refocused and back on track. Nilay has demonstrated excellent progress this trimester.

| Music Gr 4 | |
|---|---|
| Shaw, Katherine | T1 |
| **Music** | |
| Understands concepts | 3 |
| Participates responsibly | 3 |

**Teacher Comments:**
Through games and activities, students have many opportunities to identify and perform rhythms of quarter, paired eighth, half, dotted half, whole and sixteenth notes, quarter and half rests. Students use listening maps which lead to better listening skills - instrument identification, form and dynamics are all discussions that students have using listening maps. Students are using pitched percussion, xylophones and metallophones, to practice melodies.

| Physical Education Gr 4 | |
|---|---|
| McDonald, Craig | T1 |
| **Physical Education** | |
| Understands concepts | 3 |
| Participates responsibly | 3 |

**Teacher Comments:**
The central focus during the first trimester is to develop motor skills and social skills through a variety of cooperative games and activities. Students will also learn the benefits of being physically fit, and how to maintain living a healthy lifestyle.

EXHIBIT J
Page 9 of 9

12/01/2026, 21:30                                    MBA Report Creator



Jameson Elementary School
20 Jameson Hill Rd
Old Orchard Beach ME 04064
(207) 934-2891
Principal: Ben Harris





| Student Info | |
|---|---|
| Name | Z. P. |
| Grade | PK4 |
| Home Room | Deschenes |
| School Year | 2024-2025 |

StudentID____33

*RSU 23 will provide a high quality education for all students. We will meet all learners as they are, and inspire and support them until they experience success. We will prepare passionate, empathetic, goal-driven members of a society who can embrace change.*

| Grade Key | |
|---|---|
| 4 | Exceeding Grade Level Expectations |
| 3 | Meeting Grade Level Expectations |
| 2 | Approaching Grade Level Expectations |
| 1 | Limited Progress Toward Grade Level Expectations |
| | *Shaded boxes indicate the standard was not introduced/assessed |
| IE | Insufficient Evidence or No Evidence |

| Attendance | T1 | T2 | T3 | YR |
|---|---|---|---|---|
| Days Absent | 0 | 0 | | 0 |
| Times Tardy | 2 | 1 | | 3 |

| Homeroom PreK | |
|---|---|
| Deschenes, Jessica | T1 |
| **Social-Emotional** | |
| Has understanding of self and takes care of own needs (shows understanding of preferences and makes choices accordingly, initiates tasks and improves skills and confidence) | 3 |
| Regulates own emotions and behaviors (understands and manages feelings and behavior, understands and follows limits and expectations, adapts to diverse settings) | 2 |
| Establishes and sustains positive relationships and interactions (ie form relationships with adults, responds to emotional cues, interacts positively with peers, makes friends, and solves social problems) | 2 |
| **Cognitive** | |
| Demonstrates initiative and curiosity (initiates a variety of tasks, shows flexibility and inventiveness, asks questions and seeks understanding) | 3 |
| Engagement and persistence (attends to various activities across various settings, demonstrates resilience and coping skills, develops and carries out plans) | 2 |
| Reflection and problem-solving (applies prior knowledge and experiences and makes predictions, considers and implements different approaches, reflects on outcome and makes adjustments) | 3 |
| **Creative Arts** | |
| Shows interest in a variety of art materials and ways for creative expression | 3 |
| Works independently and collaboratively to create pieces of art (describes their work to others) | 3 |
| Shows increasing ability to create drawings, paintings and art creations that show more detail, uniqueness and realism (uses materials safely) | 3 |
| Shows increasing ability to recognize and move to tempo changes and different styles of music (uses movement to express or cope with feelings, participates in group movement activities) | 3 |
| Sings songs with more complex and varied lyrics, patterns and notations, uses instruments appropriately | 3 |
| Engages in play to express self in creative ways (uses a variety of objects and props to engage in dramatic play, creates characters, recreates stories) | 3 |
| **Language** | |
| Listens to and understands increasingly complex language (comprehends language, follows directions) | 3 |
| Uses language to express thoughts and needs (ie uses an expanding expressive vocabulary, speaks clearly, uses conventional grammar, tells about another time or place, asks and responds to questions) | 3 |
| Uses appropriate conversational and other communication skills (ie engages in conversation and uses social rules of language) | 3 |
| **Literacy** | |
| Comprehends and responds to books and other texts (interacts with various texts, asks and answers questions, makes connections, retells stories, uses print concepts) | 3 |
| Demonstrates phonological awareness, phonics skills, and word recognition (ie rhymes, sounds, word structure) | 3 |
| Demonstrates knowledge of the alphabet (names letters, matches letter to sound) | 2 |
| Demonstrates writing skills (prints some upper and lowercase letters, writes name, writes phonetically to communicate opinions, information, and stories, understands that writing and drawing convey meaning, recognizes some familiar names/words, shares writing, uses digital tools, participates in research projects and recalls information) | 3 |
| **Physical** | |
| Demonstrates understanding of healthy choices and safe behavior (recognizes and chooses nutritional foods, shows growing understanding of healthy choices, understands safety protocols, demonstrates awareness of their environment) | 3 |
| Demonstrates fine-motor strength and coordination (uses fingers and hands, uses writing drawing tools with a 3 finger grasp, uses scissors, uses utensils) | 3 |
| Demonstrates gross-motor skills (ie: traveling, balance, uses playground equipment appropriately and with full range of motion) | 3 |

EXHIBIT K
Page 1 of 10

12/01/2026, 21:30            MBA Report Creator

Jameson Elementary School         Report Card 2024-2025         Student Name: Z___ P____
Grade:PK4
Homeroom:Deschenes

| Deschenes, Jessica  *(Continued)* | T1 |
|---|---|
| **Math** | |
| Engages with math materials and activities, uses math to solve problems in the classroom, uses manipulatives to represent concepts, can communicate using math terms | 3 |
| Uses number concepts and operations (counts, recognizes and connects numerals, recognizes small quantities instantly, explores number combinations) | 3 |
| Explores and describes spatial relationships and shapes | 3 |
| Shows understanding of measurement and data (describes compares, and classifies by attributes, demonstrates knowledges of ordinal numbers, patterns, demonstrates understanding of time, creates and uses simple charts/graphs, uses nonstandard measurement) | 3 |
| **Science and Technology** | |
| Uses scientific inquiry skills (questioning, observation, experimentation) | 3 |
| Demonstrates knowledge of the physical properties of objects and materials (uses vocabulary, uses experiences to interact with materials) | 3 |
| **Social Studies** | |
| Understands community roles, rules, and responsibilities inside and outside of the classroom | 3 |
| Demonstrates knowledge about self (needs vs wants) | 3 |
| Shows basic understanding of people and how they live (past, present, future, similarities and differences between other people, understands and accepts change over time) | 3 |
| **Teacher Comments:** | |
| Z___ s able to take care of his own needs with confidence. He is able to make friends and interact with peers. He is progressing in his ability to interact with peers positively. He is progressing in his ability to regulate his emotions and has made progress in his ability to ask for a break when he is feeling big emotions. He is very energetic and enjoys hands on learning activities. He is progressing in his ability to maintain attention during whole group instruction. He is a great artist and is meeting all creative art expectations. He is meeting most literacy expectations including name writing, uppercase letters, lowercase letters, print and phonemic awareness. He is progressing in letter sounds. He is meeting all math expectations. He is meeting all science and social study expectations that we have worked on so far. | |

EXHIBIT K
Page 2 of 10

12/01/2026, 21:31                                    MBA Report Creator



Jameson Elementary School
20 Jameson Hill Rd
Old Orchard Beach ME 04064
(207) 934-2891
Principal: Ben Harris



| Student Info | |
|---|---|
| Name | Z. P. |
| Grade | PK4 |
| Home Room | Deschenes |
| School Year | 2024-2025 |

StudentID ___33

*RSU 23 will provide a high quality education for all students. We will meet all learners as they are, and inspire and support them until they experience success. We will prepare passionate, empathetic, goal-driven members of a society who can embrace change.*

| Grade Key | |
|---|---|
| 4 | Exceeding Grade Level Expectations |
| 3 | Meeting Grade Level Expectations |
| 2 | Approaching Grade Level Expectations |
| 1 | Limited Progress Toward Grade Level Expectations |
| | *Shaded boxes indicate the standard was not introduced/assessed |
| IE | Insufficient Evidence or No Evidence |

| Attendance | T1 | T2 | T3 | YR |
|---|---|---|---|---|
| Days Absent | 0 | 2 | 0 | 2 |
| Times Tardy | 2 | 1 | 0 | 3 |

| Homeroom PreK | | |
|---|---|---|
| Deschenes, Jessica | T1 | T2 |
| **Social-Emotional** | | |
| Has understanding of self and takes care of own needs (shows understanding of preferences and makes choices accordingly, initiates tasks and improves skills and confidence) | 3 | 3 |
| Regulates own emotions and behaviors (understands and manages feelings and behavior, understands and follows limits and expectations, adapts to diverse settings) | 2 | 2 |
| Establishes and sustains positive relationships and interactions (ie form relationships with adults, responds to emotional cues, interacts positively with peers, makes friends, and solves social problems) | 2 | 2 |
| **Cognitive** | | |
| Demonstrates initiative and curiosity (initiates a variety of tasks, shows flexibility and inventiveness, asks questions and seeks understanding) | 3 | 3 |
| Engagement and persistence (attends to various activities across various settings, demonstrates resilience and coping skills, develops and carries out plans) | 2 | 2 |
| Reflection and problem-solving (applies prior knowledge and experiences and makes predictions, considers and implements different approaches, reflects on outcome and makes adjustments) | 3 | 3 |
| **Creative Arts** | | |
| Shows interest in a variety of art materials and ways for creative expression | 3 | 3 |
| Works independently and collaboratively to create pieces of art (describes their work to others) | 3 | 3 |
| Shows increasing ability to create drawings, paintings and art creations that show more detail, uniqueness and realism (uses materials safely) | 3 | 3 |
| Shows increasing ability to recognize and move to tempo changes and different styles of music (uses movement to express or cope with feelings, participates in group movement activities) | 3 | 3 |
| Sings songs with more complex and varied lyrics, patterns and notations, uses instruments appropriately | 3 | 3 |
| Engages in play to express self in creative ways (uses a variety of objects and props to engage in dramatic play, creates characters, recreates stories) | 3 | 3 |
| **Language** | | |
| Listens to and understands increasingly complex language (comprehends language, follows directions) | 3 | 3 |
| Uses language to express thoughts and needs (ie uses an expanding expressive vocabulary, speaks clearly, uses conventional grammar, tells about another time or place, asks and responds to questions) | 3 | 4 |
| Uses appropriate conversational and other communication skills (ie engages in conversation and uses social rules of language) | 3 | 3 |
| **Literacy** | | |
| Comprehends and responds to books and other texts (interacts with various texts, asks and answers questions, makes connections, retells stories, uses print concepts) | 3 | 4 |
| Demonstrates phonological awareness, phonics skills, and word recognition (ie rhymes, sounds, word structure) | 3 | 3 |
| Demonstrates knowledge of the alphabet (names letters, matches letter to sound) | 2 | 4 |
| Demonstrates writing skills (prints some upper and lowercase letters, writes name, writes phonetically to communicate opinions, information, and stories, understands that writing and drawing convey meaning, recognizes some familiar names/words, shares writing, uses digital tools, participates in research projects and recalls information) | 3 | 3 |
| **Physical** | | |
| Demonstrates understanding of healthy choices and safe behavior (recognizes and chooses nutritional foods, shows growing understanding of healthy choices, understands safety protocols, demonstrates awareness of their environment) | 3 | 3 |
| Demonstrates fine-motor strength and coordination (uses fingers and hands, uses writing drawing tools with a 3 finger grasp, uses scissors, uses utensils) | 3 | 3 |
| Demonstrates gross-motor skills (ie: traveling, balance, uses playground equipment appropriately and with full range of motion) | 3 | 3 |

EXHIBIT K
Page 3 of 10

12/01/2026, 21:31                                                    MBA Report Creator

| Math | | |
|---|---|---|
| Engages with math materials and activities, uses math to solve problems in the classroom, uses manipulatives to represent concepts, can communicate using math terms | 3 | 3 |

EXHIBIT K
Page 4 of 10

12/01/2026, 21:31                                  MBA Report Creator

Jameson Elementary School                   Report Card 2024-2025                   Student Name: Z____ P_____
                                                                                    Grade:PK4
                                                                                    Homeroom:Deschenes

| Deschenes, Jessica    (*Continued*) | T1 | T2 |
|---|---|---|
| Uses number concepts and operations (counts, recognizes and connects numerals, recognizes small quantities instantly, explores number combinations) | 3 | 3 |
| Explores and describes spatial relationships and shapes | 3 | 3 |
| Shows understanding of measurement and data (describes compares, and classifies by attributes, demonstrates knowledges of ordinal numbers, patterns, demonstrates understanding of time, creates and uses simple charts/graphs, uses nonstandard measurement) | 3 | 3 |
| **Science and Technology** | | |
| Uses scientific inquiry skills (questioning, observation, experimentation) | 3 | 3 |
| Demonstrates knowledge of the physical properties of objects and materials (uses vocabulary, uses experiences to interact with materials) | 3 | 3 |
| Demonstrates knowledge of Earth's environment (knowledge of human action impacts the earth, knowledge of weather) | | 3 |
| **Social Studies** | | |
| Understands community roles, rules, and responsibilities inside and outside of the classroom | 3 | 3 |
| Demonstrates knowledge about self (needs vs wants) | 3 | 3 |
| Understands basic geography and our environment (physical features, using maps and other tools, geography impacts people and how they live) | | 3 |
| Shows basic understanding of people and how they live (past, present, future, similarities and differences between other people, understands and accepts change over time) | 3 | 3 |
| **Teacher Comments:** | | |

Z____ s making great progress! He is able to independently take care of his own needs. He is progressing in his ability to manage his emotions, and is using his words more frequently. He is able to make friends and interact with peers. He is progressing in his ability to interact with peers positively and solve social problems with adult support. He is able to maintain attention to preferred tasks and is progressing in his ability to maintain attention during whole group instruction. He is a great artist and is meeting all creative art expectations. He can sometimes become frustrated with his artwork if it does not reach his standards. He has made amazing progress and is meeting or exceeding all literacy expectations! It has been a joy to watch Z____ grow this year!

EXHIBIT K
Page 5 of 10

12/01/2026, 21:31                                                MBA Report Creator



Jameson Elementary School
20 Jameson Hill Rd
Old Orchard Beach ME 04064
(207) 934-2891
Principal: Ben Harris



| Student Info | |
|---|---|
| Name | Z. P |
| Grade | PK4 |
| Home Room | Deschenes |
| School Year | 2024-2025 |



StudentID )33

*RSU 23 will provide a high quality education for all students. We will meet all learners as they are, and inspire and support them until they experience success. We will prepare passionate, empathetic, goal-driven members of a society who can embrace change.*

| Grade Key | | Attendance | T1 | T2 | T3 | YR |
|---|---|---|---|---|---|---|
| 4 | Exceeding Grade Level Expectations | Days Absent | 0 | 2 | 2 | 4 |
| 3 | Meeting Grade Level Expectations | Times Tardy | 2 | 1 | 0 | 3 |
| 2 | Approaching Grade Level Expectations | | | | | |
| 1 | Limited Progress Toward Grade Level Expectations | | | | | |
| | *Shaded boxes indicate the standard was not introduced/assessed | | | | | |
| IE | Insufficient Evidence or No Evidence | | | | | |

| Homeroom PreK | | | |
|---|---|---|---|
| Deschenes, Jessica | T1 | T2 | T3 |
| **Social-Emotional** | | | |
| Has understanding of self and takes care of own needs (shows understanding of preferences and makes choices accordingly, initiates tasks and improves skills and confidence) | 3 | 3 | 3 |
| Regulates own emotions and behaviors (understands and manages feelings and behavior, understands and follows limits and expectations, adapts to diverse settings) | 2 | 2 | 2 |
| Establishes and sustains positive relationships and interactions (ie form relationships with adults, responds to emotional cues, interacts positively with peers, makes friends, and solves social problems) | 2 | 2 | 2 |
| **Cognitive** | | | |
| Demonstrates initiative and curiosity (initiates a variety of tasks, shows flexibility and inventiveness, asks questions and seeks understanding) | 3 | 3 | 3 |
| Engagement and persistence (attends to various activities across various settings, demonstrates resilience and coping skills, develops and carries out plans) | 2 | 2 | 2 |
| Reflection and problem-solving (applies prior knowledge and experiences and makes predictions, considers and implements different approaches, reflects on outcome and makes adjustments) | 3 | 3 | 3 |
| **Creative Arts** | | | |
| Shows interest in a variety of art materials and ways for creative expression | 3 | 3 | 3 |
| Works independently and collaboratively to create pieces of art (describes their work to others) | 3 | 3 | 3 |
| Shows increasing ability to create drawings, paintings and art creations that show more detail, uniqueness and realism (uses materials safely) | 3 | 3 | 3 |
| Shows increasing ability to recognize and move to tempo changes and different styles of music (uses movement to express or cope with feelings, participates in group movement activities) | 3 | 3 | 3 |
| Sings songs with more complex and varied lyrics, patterns and notations, uses instruments appropriately | 3 | 3 | 3 |
| Engages in play to express self in creative ways (uses a variety of objects and props to engage in dramatic play, creates characters, recreates stories) | 3 | 3 | 3 |
| **Language** | | | |
| Listens to and understands increasingly complex language (comprehends language, follows directions) | 3 | 3 | 3 |
| Uses language to express thoughts and needs (ie uses an expanding expressive vocabulary, speaks clearly, uses conventional grammar, tells about another time or place, asks and responds to questions) | 3 | 4 | 4 |
| Uses appropriate conversational and other communication skills (ie engages in conversation and uses social rules of language) | 3 | 3 | 4 |
| **Literacy** | | | |
| Comprehends and responds to books and other texts (interacts with various texts, asks and answers questions, makes connections, retells stories, uses print concepts) | 3 | 4 | 3 |
| Demonstrates phonological awareness, phonics skills, and word recognition (ie rhymes, sounds, word structure) | 3 | 3 | 3 |
| Demonstrates knowledge of the alphabet (names letters, matches letter to sound) | 2 | 4 | 3 |
| Demonstrates writing skills (prints some upper and lowercase letters, writes name, writes phonetically to communicate opinions, information, and stories, understands that writing and drawing convey meaning, recognizes some familiar names/words, shares writing, uses digital tools, participates in research projects and recalls information) | 3 | 4 | 3 |
| **Physical** | | | |
| Demonstrates understanding of healthy choices and safe behavior (recognizes and chooses nutritional foods, shows growing understanding of healthy choices, understands safety protocols, demonstrates awareness of their environment) | 3 | 3 | 3 |
| Demonstrates fine-motor strength and coordination (uses fingers and hands, uses writing drawing tools with a 3 finger grasp, uses scissors, uses utensils) | 3 | 3 | 3 |
| Demonstrates gross-motor skills (ie: traveling, balance, uses playground equipment appropriately and with full range of motion) | 3 | 3 | 3 |

EXHIBIT K
Page 6 of 10

12/01/2026, 21:31                                        MBA Report Creator

EXHIBIT K
Page 7 of 10

12/01/2026, 21:31

MBA Report Creator

Jameson Elementary School

Report Card 2024-2025

Student Name: Z___ P___
Grade:PK4
Homeroom:Deschenes

| Deschenes, Jessica    *(Continued)* | T1 | T2 | T3 |
|---|---|---|---|
| **Math** | | | |
| Engages with math materials and activities, uses math to solve problems in the classroom, uses manipulatives to represent concepts, can communicate using math terms | 3 | 3 | 3 |
| Uses number concepts and operations (counts, recognizes and connects numerals, recognizes small quantities instantly, explores number combinations) | 3 | 3 | 2 |
| Explores and describes spatial relationships and shapes | 3 | 3 | 2 |
| Shows understanding of measurement and data (describes compares, and classifies by attributes, demonstrates knowledges of ordinal numbers, patterns, demonstrates understanding of time, creates and uses simple charts/graphs, uses nonstandard measurement) | 3 | 3 | 3 |
| **Science and Technology** | | | |
| Uses scientific inquiry skills (questioning, observation, experimentation) | 3 | 3 | 3 |
| Demonstrates knowledge of the physical properties of objects and materials (uses vocabulary, uses experiences to interact with materials) | 3 | 3 | 3 |
| Demonstrates knowledge of Earth's environment (knowledge of human action impacts the earth, knowledge of weather) | | 3 | 3 |
| Demonstrates knowledge of the characteristics of living things (uses vocabulary, shows understanding of an animal's environment and what they need to live, identifies problems and solutions) | | | 3 |
| **Social Studies** | | | |
| Understands community roles, rules, and responsibilities inside and outside of the classroom | 3 | 3 | 3 |
| Demonstrates knowledge about self (needs vs wants) | 3 | 3 | 3 |
| Understands basic geography and our environment (physical features, using maps and other tools, geography impacts people and how they live) | | 3 | 3 |
| Shows basic understanding of people and how they live (past, present, future, similarities and differences between other people, understands and accepts change over time) | 3 | 3 | 3 |
| **Teacher Comments:** | | | |

Z___ has grown so much this year! He is able to independently take care of his own needs. He has made so much progress in managing his emotions and is able to share his feelings with trusted adults to find solutions. He has made and maintained friendships that have lasted the entire year, and he is able to solve social problems with adult support. He is making progress in his ability to attend to whole group instruction. He is an enthusiastic learner and has made great academic gains this year. He is meeting or exceeding all literacy expectations and most math expectations. I have loved working with Z___ this year!

EXHIBIT K
Page 8 of 10

12/01/2026, 21:32

MBA Report Creator

X

Jameson Elementary School
20 Jameson Hill Rd
Old Orchard Beach ME 04064
(207) 934-2891
Principal: Ben Harris



| Student Info | |
|---|---|
| Name | Z___ P___ |
| Grade | KG |
| Home Room | MacDonald |
| School Year | 2025-2026 |



StudentID____)33

*RSU 23 will provide a high quality education for all students. We will meet all learners as they are, and inspire and support them until they experience success. We will prepare passionate, empathetic, goal-driven members of a society who can embrace change.*

| Grade Key | |
|---|---|
| 4 | Exceeding Grade Level Expectations |
| 3 | Meeting Grade Level Expectations |
| 2 | Approaching Grade Level Expectations |
| 1 | Limited Progress Toward Grade Level Expectations |
| | *Shaded boxes indicate the standard was not introduced/assessed |
| IE | Insufficient Evidence or No Evidence |

| Attendance | T1 | T2 | T3 | YR |
|---|---|---|---|---|
| Days Absent | 0 | 0 | | 0 |
| Times Tardy | 1 | 0 | | 1 |

| Homeroom Kindergarten | |
|---|---|
| MacDonald, Jennifer | T1 |
| **Social Emotional Learning** | |
| Regulates emotions | 2 |
| Establishes and sustains positive relationships with adults, peers, responds to cues | 3 |
| Participates cooperatively in groups | 3 |
| Demonstrates fine-motor strength and coordination (fingers/hands, writing and drawing tools) | 3 |
| Demonstrates positive approaches to learning (attends, engages, persists, shows curiosity, flexibility, and inventiveness) | 3 |
| Remembers/connects experiences | 3 |
| Classification skills | 3 |

**Teacher Comments:**
Zayn is settling into Kindergarten nicely! He's an eager learner and he tries his best. He's starting to take academic risks and is trying new things with less frustration. Zayn's staying focused on tasks, increasing his attention to detail & he enjoys being a helper in the classroom. We adore him!

| Literacy K | |
|---|---|
| MacDonald, Jennifer | T1 |
| **Phonological Awareness Skills** | |
| I can name words that rhyme | 3 |
| I can count and say syllables in words | 3 |
| **Phonemic Awareness** | |
| I can tell how two words that sound alike are different | 3 |
| **Reading** | |
| I can identify 13 uppercase and lowercase letters of the alphabet | 3 |
| I know the sounds of 13 letters | 3 |
| I can tell how a book is organized and tell about its features | 3 |
| I can tell the main idea of a story | 3 |
| I can tell how pictures and words go together | 3 |
| **Writing** | |
| I can print upper case and lower case letters | 3 |

| Math K | |
|---|---|
| MacDonald, Jennifer | T1 |
| **Mathematics** | |
| I can name numbers | 3 |
| I can count in sequence | 3 |
| I can count a number of objects | 3 |
| I can count objects in a category | 3 |
| I can identify shapes; I can describe shapes | 3 |
| I can analyze shapes; I can compare shapes; I can create shapes | 3 |

| Social Studies Gr K | |
|---|---|
| MacDonald, Jennifer | T1 |
| **Social Studies** | |
| Demonstrates knowledge about self | 3 |
| Shows basic understanding of people and how they live | 3 |
| Explores change related to familiar people or places | 3 |

| Art K | |
|---|---|
| Strandburg, Dawn | T1 |
| **Art** | |
| Understands concepts | 3 |
| Participates responsibly | 3 |

**Teacher Comments:**
The first trimester art projects for Kindergarten started with a shape painting with collage embellishments inspired by Mouse Shapes by Ellen Stoll Walsh.Next they heard a book called Apple Farmer Annie by Monica Wellington and then made an apple orchard painting.Keeping with the fall seasonal theme they heard the sweet story called The Scarecrow by Beth Ferry and created their own scarecrow pictures.Lastly they listened to Glad Monster Sad Monster by Ed Emberley and learned about contemporary street artist named Phetus and created paper collaged design monsters in his style. .They have been introduced to the Elements of art, and many art making procedures.Their weekly art class projects will come home as a portfolio collection at the end of the school year.

| Library K | |
|---|---|
| Dodier, Kalina | T1 |
| **Library** | |
| Understands concepts | 3 |
| Participates responsibly | 3 |

**Teacher Comments:**
This trimester, kindergarteners have learned several library topics. We have talked about library expectations, parts of a book, and book care. Students also started to take books home!

| Music K | |
|---|---|
| Shaw, Katherine | T1 |
| **Music** | |
| Understands concepts | 3 |
| Participates responsibly | 3 |

EXHIBIT K
Page 9 of 10

12/01/2026, 21:32

MBA Report Creator

Jameson Elementary School

Report Card 2025-2026

Student Name: Z[ ] P[ ]
Grade:KG
Homeroom:MacDonald

| MacDonald, Jennifer   (*Continued*) | T1 |
|---|---|
| I can compare numbers | 3 |
| I can describe attributes; I can compare attributes | 3 |

| Science Gr K | |
|---|---|
| MacDonald, Jennifer | T1 |
| **Science/Technology** | |
| Uses scientific inquiry skills | 3 |
| Demonstrates knowledge of the characteristics of living things | 3 |
| Physical properties of objects | 3 |
| Earth's environment | 3 |

| Shaw, Katherine   (*Continued*) | T1 |
|---|---|
| **Teacher Comments:** | |
| Kindergarten musicians are learning to use different voices: whisper, speaking and singing throughout our lessons. They use vocal exploration through picture books and high and low sounds. They have learned the names of several classroom instruments and have displayed the proper way to play them. Students played many passing and singing games and enjoyed a lesson with "Butterflies and Giants" which gave them an opportunity to learn about contrasting themes. Kindergarten musicians spend the beginning of music class practicing finger plays. Finger plays are amazing for helping children get ready to read! We're doing oral language, auditory memory, using imaginations, using sequence and pattern, crossing the midline and all sorts of small motor activities. Ask your child to show you our finger plays! | |

| Physical Education K | |
|---|---|
| McDonald, Craig | T1 |
| **Physical Education** | |
| Understands concepts | 3 |
| Participates responsibly | 3 |
| **Teacher Comments:** | |
| The central focus during the first trimester is to develop motor skills and social skills through a variety of cooperative games and activities. Students will also learn the benefits of being physically fit, and how to maintain living a healthy lifestyle. | |

EXHIBIT K
Page 10 of 10

# Beacon Direct Primary Care



Brianna Boutin N.P.

Elizabeth Higgins FNP-C



19  Northbrook  Drive

Falmouth,  Maine  04105

Brianna  Boutin,  FNP-C

**Phone:  (802)-523-3054**

**Fax:  (207)-910-9620**

NPI#:  1962854786

To Whom it May Concern,

I am writing this letter on behalf of N___ P___, DOB ___ 2016 & Z___ P___, DOB ___ 2020. I have been caring for these children in the capacity of being their primary care provider since June of 2025. Prior to these children being in my care, their primary care provider was through MaineHealth. I confirmed this prior care through obtaining medical records.

Since I have taken on the medical care of these children, I have consistently seen them for routine well child exams as well as addressed minor common childhood concerns brought to my attention by their father, Adrian Powell & their stepmother, Kylie Powell. N___ & Z___ are both thriving developmentally, physically and emotionally in the care of Adrian and Kylie. Both caretakers are diligent, empathic, doting on these children & this family is a pure joy to care for. The parents consistently accept and implement my medical advice and show appropriate concern for the children. The parents never hesitate to bring any issues to my attention. When the children are in my office, they are comfortable in the presence of Adrian & Kylie. They seek comfort from them in an appropriate manner & also express themselves through play & language as I would expect

19 Northbrook Dr
Falmouth, ME 04105-1381

Phone: (802) 523-3054
Fax: (207) 910-9620
Email: brianna@beacondirectprimarycare.com

N___ P___ (9)
Page 1 of 2

EXHIBIT L
Page 1 of 2

# Beacon Direct Primary Care



Brianna Boutin N.P.

Elizabeth Higgins FNP-C

children their age to be able to.

It is a privilege to care for this family.

Warmly,

Brianna

Brianna T. Boutin, FNP-C, NLC, BCHNNP

1/14/2026  10:59 AM

---

19 Northbrook Dr              Phone: (802) 523-3054              N█ P███ (9)
Falmouth, ME 04105-1381       Fax: (207) 910-9620               Page 2 of 2
                              Email: brianna@beacondirectprimarycare.com

EXHIBIT L
Page 2 of 2

January 15, 2016

To whom it may concern,

    My name is Paige Richard, and I have a very strong connection with N⬛ and Z⬛ P⬛. Their father, Adrian Powell, is married to my very close cousin, Kylie Powell, who was raised as my sister. Adrian has always spoken lovingly of his children, N⬛ and Z⬛. It was a pleasure to meet the two children in person when they came to the United States in August of 2024. I have regular contact and have quickly bonded with N⬛ and Z⬛; they always love to update me on school, friends, and sports. Upon arrival in the United States, N⬛ and Z⬛ have primarily resided with their father and Kylie. N⬛ and Z⬛ appear to be thriving in their current living situation. Their daily routines, sense of security, and education have been founded on the stability of their current living situation. Z⬛ attends Jameson Hill School, where he is well adjusted and forming healthy friendships, which is crucial for a child of his age. N⬛ attends Loranger Memorial School, where she has also adjusted exceptionally well, and frequently expresses how much she's learned and the strong connections she has with her educational leaders. I fully believe that this positive education experience has strongly affected their sense of belonging and stability.

    In addition to school, both children are involved in extracurricular activities. Z⬛ adored his first season of Football in the Fall of 2024, while N⬛ thoroughly enjoyed her soccer experience. In addition to Fall sports, both children play for their local basketball team during the Winter season. I believe sports are beneficial for children; they learn time-management skills, gain structure, understand the importance of teamwork, and connect more with their community. Each time I see the two of them, they express how excited they are for the upcoming practice/game so they can see their friends and have Adrian and Kylie watch.

EXHIBIT M
Page 1 of 2

Through their school and activities, N⬛ and Z⬛ have developed meaningful friendships and support systems. At their young ages, consistency and stability are crucial to their emotional and developmental well-being.

At home, N⬛ and Z⬛ share a close, secure, and loving bond with Adrian and Kylie. Both are deeply involved in every aspect of the children's lives. Including but not limited to, school routines, hygiene, meals, homework, attending all extra-curricular activities, assisting with homework, supervision at home, and bedtime routines. Adrian and Kylie play a vital role in maintaining Z⬛ and N⬛'s security, comfort, and emotional well-being.

Based on my close and personal involvement in their lives, I believe it is in the best interest of N⬛ and Z⬛ P⬛ to remain in the United States with their biological father, Adrian, and with Kylie, as they are settled, supported, and thriving.

Sincerely,

*Paige Richard* (electronic signature)

To Whom It May Concern,

It has been my absolute pleasure to welcome a niece and nephew into our family. Since meeting Nilay and Zayn, they have brought immense joy into my life. Being "Auntie Sam" to two bright, loving, polite, and cheerful children is truly something special.

Since their arrival in 2024, my relationship with both of them has continued to grow. From frequent summer barbecues to celebrating holidays and birthdays, from talking about school and friends to simply spending everyday moments together — each experience has strengthened our bond. Having girl talks with Nilay, playing chase with Zayn, watching them play in the snow, going sledding, tie-dyeing shirts in the summer, and surprising them after school last year are just a few of the moments that have filled my heart. Seeing their smiles is incredibly rewarding.

Nilay is overjoyed to be a big sister to another brother on the way, and Zayn is equally excited to have a little brother to play with. Watching my sister and Adrian parent them is something I truly admire. Their love, patience, and dedication have brought our entire family closer together.

My little sister has stepped into her role as a stepmom with remarkable grace. She attends their sports games, helps with transportation to and from school, and has created a positive, supportive environment where the children feel safe to rely on her and confide in her. Watching them together, you would never know she is a stepmom. The children thrive within the structure and consistency she and Adrian provide.

We are already looking forward to the year ahead — fishing trips, camping, barbecues, boating, and making new memories together. Nilay has become my little adventurer and adrenaline-seeker, while Zayn is my sweet guy who can be a bit shy at times. Both are excited for all the plans we have in store.

Their family circle continues to grow, surrounded by loving aunts and uncles, cousins, grandparents, and great-grandparents who cherish spending time with them regularly. In addition to Kylie's family, they are also able to maintain a strong relationship with Adrian's family, further enriching their lives with love and support.

In every sense, Nilay and Zayn are surrounded by stability, love, and consistency. They are deeply cherished, well supported, and thriving within their family. It is clear to anyone who spends time with them that their home is one rooted in care, structure, and genuine devotion to their well-being. I am grateful to be part of their lives and fully support the loving family environment they are growing up in.

Thank you for your time.
Samantha Stewart

EXHIBIT N
Page 1 of 1

1/14/26

To Whom It May Concern,

N██ P███ was a student in my 3rd grade class during the 2024/2025 school year. She began the year brand new to the district, having just moved to the area. I kept a close eye on N██ 's social development early in the year and within 2 weeks, she developed a friendship. In September of 2025 I described N██ as respectful and independent. She consistently produced high quality work and had a strength in reading fluency, especially reading with expression. She described her hobbies as sewing, playing with her dog and sports. By March of 2025, she included playing with her brother as one of her hobbies. I noticed growth in her academic skills, creativity and leadership. Her parents attended both spring and fall conferences and were responsive to direct communication. They even invited our class to visit inside their ice cream shop and donated ice cream sundaes to the entire class.

Now N██ is in 4th grade, her classroom is next door to mine, so I see her often. In fact, N██ and two of her peers eat lunch with me in my classroom once a week. It is evident that she has created strong relationships with peers and adults. It would be unusual for 24 hours to pass without at least 2 hugs from N██.

SIncerely,

Sarah Wilder, 3rd Grade
Teacher
Loranger Memorial School

EXHIBIT O
Page 1 of 1

**PATIENT CHART -**
**P██████ , Z**
**4█ ███ AV**
**OLD ORCHARD BEACH ME  04064**
**O: (410) 907-1307(preferred)**

 **DOB:** ███/2020  **AGE: 5 yrs.  Acct#:** █████

## DEMOGRAPHICS

NAME: P██████ . Z
PATIENT ID/#: ███
MRN:
BIRTH DATE: ███/2020
AGE: 5 yrs.
GENDER: M
ADDRESS: 41 FERN AVE
              OLD ORCHARD BEACH ME  04064
Home:
Work:
Cell: (410) 907-1307
EMAIL: POWELLADRIAN02@GMAIL.COM
PROVIDER: MERRILL,STACEY,LCPC
REFERRING PROVIDER: STACEY MERRILL LCPC
2ND FLOOR
11 BAXTER BLVD
PORTLAND ME  04101-1801
(207) 828-4026

## INSURANCE

AETNA
PO BOX 981106
EL PASO, TX  79998

Policy #: █████6032
Group #: ███████00201
Policy Holder: KYLIE  POWELL

## MEDICAL PROBLEM LIST

F43.22 (ADJUSTMENT DISORDER  WITH ANXIETY)   Current 10/3/2025

## Patient Portal Messages

Message: 1/13/2026 11:09:49 AM Other To:*POWELL,ADRIA From:MLANCASTER
  Good Afternoon,
It looks like the only form needed even for medical records would be the release of information. I just sent that form
over. Please call 207-774-8700 option 2 and then option 1 for each front desk if you have any other questions or
concerns.
Thank you!
----------------------------------
Message: 12/1/2025 2:48:08 PM Portal Message To:SMERRILL From:
  Thank you!
-----------------------Original Message-----------------------
yes, I can switch it over to virtual.


----Original Message-------------------------------------
Good afternoon,

Would it be possible for Z███  to have a virtual session tomorrow due to the expected snowfall?

**PATIENT CHART -**
**P⬛⬛⬛⬛, Z**
**4⬛⬛⬛ AV**
**OLD ORCHARD BEACH ME  04064**
**O: (410) 907-1307(preferred)**

**DOB:** ⬛⬛ **2020  AGE: 5 yrs.  Acct#:** ⬛⬛⬛

Kind Regards,
Adrian Powell
-----------------------------------
Message: 12/1/2025 2:44:22 PM RE: Portal Message To:*POWELL,ADRIA From:SMERRILL
  yes, I can switch it over to virtual.


----Original Message-------------------------------------
Good afternoon,

Would it be possible for Z⬛ to have a virtual session tomorrow due to the expected snowfall?

Kind Regards,
Adrian Powell
-----------------------------------
Message: 12/1/2025 2:23:05 PM Portal Message To:SMERRILL From:
  Good afternoon,

Would it be possible for Z⬛ to have a virtual session tomorrow due to the expected snowfall?

Kind Regards,
Adrian Powell
-----------------------------------
Message: 10/22/2025 9:05:30 AM RE: Portal Message To:*POWELL,ADRIA From:SMERRILL
  yes that works. I will put you in for Tuesday the 28th at 4pm in person.

Stacey


----Original Message-------------------------------------
Hi there! Can we do Tuesday 4-5pm, and we can try for in person and see if that is a better fit?

------------------------Original Message--------------------
Hi Adrian, Here is my availability for the week of 10/27:

Tuesday 10/28: 2-3pm; 4-5pm
Wednesday 10/29: 8-11am; 1-2pm

Please let me know if any of these days/times work for you. Thank you.

Stacey


----Original Message-------------------------------------

Hi there, apologies for the delay, I did not recieve this message to my email. If you believe telehealth will not work
for him we are happy to do in person. Could we set up a session for the week of 10/28, again apologies for the delay.

------------------------Original Message--------------------
Hi Adrian, I attempted to call you on Monday after the session, around 5pm but the phone number listed stated that I
could not leave a voicemail due to not having the mailbox set up. I was hoping to be able to schedule the next
appointment for Z⬛. I don't think that telehealth is going to work for him. He struggled with interacting with me
during the session, so I'm feeling at this point that in person might be better. The times for in person next couple of
weeks are the following:

Tuesday 10/14- 8-9am
Wednesday 10/15- 8-9am; 11am-12pm

Print Date 1/13/2026

**PATIENT CHART  -**
**P_____ , Z**
**4____ AV**
**OLD ORCHARD BEACH ME  04064**
**O: (410) 907-1307(preferred)**

**DOB:** ____ **2020  AGE: 5 yrs.  Acct#:** _____

Tuesday 10/21- 8-9am; 10-11am;
Tuesday 10/28- 8-9am; 10-11am; 4-5pm

Please let me know if any of these days/times work for you, if not then we could try telehealth again but I would want you to be present to try to help him in the session.

Stacey
----------------------------------
Message: 10/22/2025 8:35:57 AM Portal Message To:SMERRILL From:
  Hi there! Can we do Tuesday 4-5pm, and we can try for in person and see if that is a better fit?

------------------------Original Message--------------------
Hi Adrian, Here is my availability for the week of 10/27:

Tuesday 10/28: 2-3pm; 4-5pm
Wednesday 10/29: 8-11am; 1-2pm

Please let me know if any of these days/times work for you. Thank you.

Stacey


----Original Message-------------------------------------

Hi there, apologies for the delay, I did not recieve this message to my email. If you believe telehealth will not work for him we are happy to do in person. Could we set up a session for the week of 10/28, again apologies for the delay.

------------------------Original Message--------------------
Hi Adrian, I attempted to call you on Monday after the session, around 5pm but the phone number listed stated that I could not leave a voicemail due to not having the mailbox set up. I was hoping to be able to schedule the next appointment for Z____ . I don't think that telehealth is going to work for him. He struggled with interacting with me during the session, so I'm feeling at this point that in person might be better. The times for in person next couple of weeks are the following:

Tuesday 10/14- 8-9am
Wednesday 10/15- 8-9am; 11am-12pm
Tuesday 10/21- 8-9am; 10-11am;
Tuesday 10/28- 8-9am; 10-11am; 4-5pm

Please let me know if any of these days/times work for you, if not then we could try telehealth again but I would want you to be present to try to help him in the session.

Stacey
----------------------------------
Message: 10/21/2025 7:59:56 AM RE: Portal Message To:*POWELL,ADRIA From:SMERRILL
  Hi Adrian, Here is my availability for the week of 10/27:

Tuesday 10/28: 2-3pm; 4-5pm
Wednesday 10/29: 8-11am; 1-2pm

Please let me know if any of these days/times work for you. Thank you.

Stacey


----Original Message-------------------------------------

Print Date 1/13/2026

**PATIENT CHART -**
**P‌⬛⬛⬛⬛⬛, Z‌⬛**
**4‌⬛⬛⬛ AV**
**OLD ORCHARD BEACH ME  04064**
**O: (410) 907-1307(preferred)**

**DOB:**‌⬛‌**/2020  AGE: 5 yrs.  Acct#:**‌⬛⬛⬛

Hi there, apologies for the delay, I did not recieve this message to my email. If you believe telehealth will not work for him we are happy to do in person. Could we set up a session for the week of 10/28, again apologies for the delay.

------------------------Original Message---------------------
Hi Adrian, I attempted to call you on Monday after the session, around 5pm but the phone number listed stated that I could not leave a voicemail due to not having the mailbox set up. I was hoping to be able to schedule the next appointment for Z‌⬛. I don't think that telehealth is going to work for him. He struggled with interacting with me during the session, so I'm feeling at this point that in person might be better. The times for in person next couple of weeks are the following:

Tuesday 10/14- 8-9am
Wednesday 10/15- 8-9am; 11am-12pm
Tuesday 10/21- 8-9am; 10-11am;
Tuesday 10/28- 8-9am; 10-11am; 4-5pm

Please let me know if any of these days/times work for you, if not then we could try telehealth again but I would want you to be present to try to help him in the session.

Stacey
------------------------------------
Message: 10/20/2025 8:34:52 PM Portal Message To:SMERRILL From:

Hi there, apologies for the delay, I did not recieve this message to my email. If you believe telehealth will not work for him we are happy to do in person. Could we set up a session for the week of 10/28, again apologies for the delay.

------------------------Original Message---------------------
Hi Adrian, I attempted to call you on Monday after the session, around 5pm but the phone number listed stated that I could not leave a voicemail due to not having the mailbox set up. I was hoping to be able to schedule the next appointment for Z‌⬛. I don't think that telehealth is going to work for him. He struggled with interacting with me during the session, so I'm feeling at this point that in person might be better. The times for in person next couple of weeks are the following:

Tuesday 10/14- 8-9am
Wednesday 10/15- 8-9am; 11am-12pm
Tuesday 10/21- 8-9am; 10-11am;
Tuesday 10/28- 8-9am; 10-11am; 4-5pm

Please let me know if any of these days/times work for you, if not then we could try telehealth again but I would want you to be present to try to help him in the session.

Stacey
------------------------------------
Message: 10/9/2025 9:25:03 AM Billing & Payments To:JAMARAL1, MSMITH1, CSTEIGLER1, AJAROSCH2, ABURROWERS, AHUERTA, LMIZELL1, DWILLIAMS1, NDOCTOR From:
  Good morning, I wanted some clarification the the billing, I paid  $365 and an additional bill for $340 based on the sliding scale. I am wondering what is the cost per session, as I thought the price was  $230 for the  52 minute sesson. But my bill is not adding up to account for just the intake and 1 session.

Thank you for your help with this matter
------------------------------------
Message: 10/8/2025 12:59:32 PM Other To:*POWELL,ADRIA From:SMERRILL
  Hi Adrian, I attempted to call you on Monday after the session, around 5pm but the phone number listed stated that I could not leave a voicemail due to not having the mailbox set up. I was hoping to be able to schedule the next appointment for Z‌⬛. I don't think that telehealth is going to work for him. He struggled with interacting with me during the session, so I'm feeling at this point that in person might be better. The times for in person next couple of weeks are the following:

**PATIENT CHART  -**
**P▮▮▮▮ , Z**
**4▮        AV**
**OLD ORCHARD BEACH ME  04064**
**O: (410) 907-1307(preferred)**

**DOB:**  ▮▮ **2020  AGE: 5 yrs.  Acct#:** ▮▮▮▮

Tuesday 10/14- 8-9am
Wednesday 10/15- 8-9am; 11am-12pm
Tuesday 10/21- 8-9am; 10-11am;
Tuesday 10/28- 8-9am; 10-11am; 4-5pm

Please let me know if any of these days/times work for you, if not then we could try telehealth again but I would want you to be present to try to help him in the session.

Stacey
----------------------------------

**APPOINTMENTS DETAIL**

APPTSTART: 1/20/2026 5:30:00 PM
VISITTYPE: THER F/U CHILD
STATUS: Booked
DOCTOR: MERRILL,STACEY,LCPC
LENGTH: 60
FACILITYNAME: BAXTER
SUPPINFO:
----------------------------------
APPTSTART: 1/6/2026 5:30:00 PM
VISITTYPE: THER F/U CHILD
STATUS: Checked In
DOCTOR: MERRILL,STACEY,LCPC
LENGTH: 60
FACILITYNAME: BAXTER
SUPPINFO:
----------------------------------
APPTSTART: 12/23/2025 5:30:00 PM
VISITTYPE: THER F/U CHILD
STATUS: Cancelled
DOCTOR: MERRILL,STACEY,LCPC
LENGTH: 60
FACILITYNAME: BAXTER
SUPPINFO:
----------------------------------
APPTSTART: 12/23/2025 3:00:00 PM
VISITTYPE: THER F/U CHILD
STATUS: Checked In
DOCTOR: MERRILL,STACEY,LCPC
LENGTH: 60
FACILITYNAME: BAXTER
SUPPINFO:
----------------------------------
APPTSTART: 12/9/2025 5:30:00 PM
VISITTYPE: THER F/U CHILD
STATUS: Checked In
DOCTOR: MERRILL,STACEY,LCPC
LENGTH: 60
FACILITYNAME: BAXTER
SUPPINFO:
----------------------------------
APPTSTART: 12/2/2025 4:00:00 PM
VISITTYPE: TELE THER F/U CHILD
STATUS: Checked In
DOCTOR: MERRILL,STACEY,LCPC
LENGTH: 60
FACILITYNAME: BAXTER
SUPPINFO:
----------------------------------
APPTSTART: 11/11/2025 12:00:00 PM
VISITTYPE: THER F/U CHILD
STATUS: Checked In

Print Date 1/13/2026

**PATIENT CHART  -**
**P▇▇▇▇ , Z▇▇▇**
**4▇▇▇▇   AV**
**OLD ORCHARD BEACH ME  04064**
**O: (410) 907-1307(preferred)**

**DOB:**▇▇▇ **2020  AGE: 5 yrs.  Acct#:**▇▇▇▇

DOCTOR: MERRILL,STACEY,LCPC
LENGTH: 60
FACILITYNAME: BAXTER
SUPPINFO:
---------------------------------
APPTSTART: 10/28/2025 4:00:00 PM
VISITTYPE: THER F/U CHILD
STATUS: Checked In
DOCTOR: MERRILL,STACEY,LCPC
LENGTH: 60
FACILITYNAME: BAXTER
SUPPINFO:
---------------------------------
APPTSTART: 10/6/2025 3:00:00 PM
VISITTYPE: TELE THER F/U CHILD
STATUS: Checked In
DOCTOR: MERRILL,STACEY,LCPC
LENGTH: 60
FACILITYNAME: BAXTER
SUPPINFO:
---------------------------------
APPTSTART: 10/3/2025 8:00:00 AM
VISITTYPE: TELE THER IA CHILD
STATUS: Checked In
DOCTOR: MERRILL,STACEY,LCPC
LENGTH: 60
FACILITYNAME: BAXTER
SUPPINFO:
---------------------------------

**LifeStance Health**
**11 BAXTER BLVD 2ND FLOOR**
**PORTLAND, ME 04101-1801**
**(207) 828-4026 Fax: (603) 883-0007**
**Stacey Merrill, LCPC**
**Visit Date: 10/03/2025**

**Z** ▆ **P** ▆                                             Date of Birth: ▆/2020

## Psychiatric Diagnostic Evaluation

If visit was performed using Telehealth, informed consent obtained and patient location verified.
Patient Location: Home.

**Present at Session:** Patient. Stepmother. Father.

Informed consent for treatment obtained and patient's questions answered.
Parent/Legal Guardian Risk Management: Child with unmarried parents.

**Chief Complaint:** difficulty with expressing himself to mother, managing emotions

**History of Present Illness:** ANXIETY symptoms reported as:
          [ X] restlessness, feeling keyed up or on edge
          [ ] easily fatigued
          [ ] mind going blank, difficulty concentrating
          [X ] irritability
          [ ] muscle tension
          [ ] sleep disturbance
[ 2] /6 anxiety symptoms

Duration of current episode is
Severity of symptoms

What makes the symptoms worse?
What makes the symptoms better?

Outcome Measures:
Date Completed: PHQ9:  / GAD7:
GAD-7 =
PHQ-9 =

**PHQ-9 Question 9: Suicidal Ideation: **
**PHQ-9 Question 10: Difficulty:  **

Outcome Measures Not appropriate.

Therapeutic Interventions in Session: intake session, building rapport

**Past Medical, Psychiatric, Family and Social History**
History Provided: Adrian Powell
Relationship to Patient: Parent.
Emergency Contact Name: Kylie Powell
Emergency Contact Cell Phone Number: (410) 907-1907
Do you have a primary care physician? Yes.

Page **1** of **4**

**LifeStance Health**
**11 BAXTER BLVD 2ND FLOOR**
**PORTLAND, ME 04101-1801**
**(207) 828-4026 Fax: (603) 883-0007**
**Stacey Merrill, LCPC**
**Visit Date: 10/03/2025**

**Z      P**                                                           Date of Birth:      /2020

For minor patients, a Caregiver Addendum should be signed for each and every legal guardian, as applicable: No (still need to sign).
For minor patients, a copy of any relevant legal documents should be submitted (such as a divorce decree or custody agreement): No (still need to sign).

Parents/Legal Guardians: Adrian Powell- Father
Sarah Powell- Mother
Kylie Powell- Step-Mother

Current Legal Issues: No.

Psychosocial History: Parent's separated when Client was just over 1 year old. Client moved to America a year ago, grew up with German as a first language, but also speaking English, since moving to America to live with dad full time, no longer speaks German. Client would only have visits with dad twice a year (two weeks during the winter, and then Summer's with dad in America). Mom recently moved to America on a student visa, but has visits every other weekend and then on Wednesday afternoons. Divorce was finalized in Fall of 2024. Dad states that they are still going through the court system for custody.
Cultural/Ethnic/Spiritual Considerations/Identities: No spiritual considerations were identified during this session.
History of Traumatic Events: parent's separation and then divorce. Moving countries. Other forms of trauma was not disclosed during the intake session and will continue to be assessed.
Race: No race saved for patient, Two or More Races (not Hispanic or Latino)
Ethnicity: No ethnicity for patient saved

**Behavioral Health History**
**Current Mental Health Conditions:** None.

**Family Mental Health Conditions:**

**Patient's Current and Past Mental Health Treatments:**

**Medical History**

Patient is currently experiencing pain: No.

**Past and Current Medical Conditions:**

**Family Medical Conditions:**

Problems with the Following:

Cognitive Issues:

Sensory Issues:

**Developmental History**
Prenatal/Birth:

Page **2** of 4

**LifeStance Health**
**11 BAXTER BLVD 2ND FLOOR**
**PORTLAND, ME 04101-1801**
**(207) 828-4026 Fax: (603) 883-0007**
**Stacey Merrill, LCPC**
**Visit Date: 10/03/2025**

**Z**   **P**                                                     Date of Birth:   /2020

Complications During or Following Birth:

Early Development:
At What Age Did the Child Begin:

During the First 3 Years of Life, the Child Frequently Exhibited:

**The following apply to this child:**

**Risk/Protective Assessment**
Patient screened for unhealthy alcohol and drug use at the time of initial assessment: No.
Risk Factors: A risk assessment was conducted during the visit today. The patient was deemed to be at a low risk of harm to self or others in the imminent future. We agreed on a good safety plan that includes paging myself and presenting themselves to the nearest emergency room in case of any self harming urges, suicidal or homicidal thinking.
Protective Factors: At least one loving relationship. Family support. Healthy friend network. Strong attachment to pet.

**Mental Status Exam**
Mood: Anxious.
Affect: Restricted.
General Appearance/Behavior: Appropriate dress, appropriate grooming and hygiene, appears stated age. No acute distress.
Gait/Motor Activity: Modified for telehealth; seated, upright posture, extension of arms. No abnormal movements.
Orientation: Alert and oriented to person, place, time and situation.
Speech: Regular in rate, rhythm and volume.
Language: Names objects appropriately. Demonstrates understanding.
Associations: Intact.
Thought Process: Logical. Goal directed. Organized.
Memory: Good.
Abnormal/Psychotic Thoughts: Not evident.
Fund of Knowledge: Intact. No abnormalities noted.
Attention and Concentration: Focused.
Judgment and Insight: Good insight.

**Diagnoses**
 F43.22 ADJUSTMENT DISORDER  WITH ANXIETY

Start time: 8:00 am
End time: 9:00 am
Total time: 60

**Treatment Plan**
Followup Appointment: Scheduled for followup in 1 week.

Patient has the capacity to benefit from the treatment plan.

**LifeStance Health**
**11 BAXTER BLVD 2ND FLOOR**
**PORTLAND, ME 04101-1801**
**(207) 828-4026 Fax: (603) 883-0007**
**Stacey Merrill, LCPC**
**Visit Date: 10/03/2025**

**Z****    P**                                                    Date of Birth:          /2020

Treatment plan collaboratively established and clearly communicated with the patient/g,uardian who understood and agreed to it.

PCP Coordination Today or In the Interim Since the Last Visit: No.

Presenting Problem #1: Anxiety. Acute.
Severity: Moderate
Functional Impact: Impaired relationship functioning. Emotional dysregulation.
Treatment Goals for Problem #1: Client will be able to decrease anxious symptoms so that they do not impact activities of daily living
Objectives:
1a. Decrease frequency, intensity, and duration of behavioral outbursts per parent report.
1b. Client will be able to learn and practice coping strategies to help with anxious symptoms
1c. Client will learn and practice healthy and appropriate communication techniques
1d. Client will build their emotional vocabulary and how to express their emotions appropriately
Treatment Model/Interventions: ACT, CBT, Play Therapy, Psychoeducation, Mindfulness based CBT
Frequency, Type and Length of Treatment Recommended: weekly for 6 months

Electronically Signed:  STACEY MERRILL LCPC on/at 10/3/2025 10:28:09 AM

**LifeStance Health**
**11 BAXTER BLVD 2ND FLOOR**
**PORTLAND, ME 04101-1801**
**(207) 828-4026 Fax: (603) 883-0007**
**Stacey Merrill, LCPC**
**Visit Date: 10/06/2025**

**Z       P** 

Date of Birth:      /2020

## Psychotherapy Visit

Telehealth visit performed, location was verified and appropriate consent obtained.
Patient Location: Home.

**Present at Session:** Patient. babysitter.

**Modality:** Individual.

**HPI/Session Summary**
Client was able to participate in today's telehealth session to the best of their ability. Clinician and Client started to work on building a therapeutic relationship by starting to identify some emotional vocabulary that Client has. Client struggled with identifying emotions during this session. Client was able to engage with Clinician but struggled with identify different emotions other than happy. Clinician attempted to schedule an in person session, as Client was struggling with telehealth. Babysitter stated that dad and step-mom were at an appointment and not currently available. Clinician attempted to call Father after the session at 5pm (when Clinician was told that he would be available) and was unable to leave a message due to not having a voicemail that it set up. Clinician attempted to send an email, but there is no email identified in the chart.

Outcome Measures:
Date Completed: PHQ9:  / GAD7:
GAD-7 =
PHQ-9 =

**PHQ-9 Question 9: Suicidal Ideation: **
**PHQ-9 Question 10: Difficulty:  **

Outcome Measures Not appropriate.

Therapeutic Interventions in Session: Play Therapy

**Past Medical, Psychiatric, Family and Social History**
No interim changes.
PFSH Summary: Psychosocial History: Parent's separated when Client was just over 1 year old. Client moved to America a year ago, grew up with German as a first language, but also speaking English, since moving to America to live with dad full time, no longer speaks German. Client would only have visits with dad twice a year (two weeks during the winter, and then Summer's with dad in America). Mom recently moved to America on a student visa, but has visits every other weekend and then on Wednesday afternoons. Divorce was finalized in Fall of 2024. Dad states that they are still going through the court system for custody.
Current Living Situation/Psychosocial Stressors:
Trauma History: parent's separation and then divorce. Moving countries. Other forms of trauma was not disclosed during the intake session and will continue to be assessed.

**Risk/Protective Assessment**
Suicidal or Homicidal Ideation: SI/HI not reported.

**LifeStance Health**
**11 BAXTER BLVD 2ND FLOOR**
**PORTLAND, ME 04101-1801**
**(207) 828-4026 Fax: (603) 883-0007**
**Stacey Merrill, LCPC**
**Visit Date: 10/06/2025**

Z     P                                                          Date of Birth:        2020

Risk Factors: A risk assessment was conducted during the visit today. The patient was deemed to be at a low risk of harm to self or others in the imminent future. We agreed on a good safety plan that includes paging myself and presenting themselves to the nearest emergency room in case of any self harming urges, suicidal or homicidal thinking.
Protective Factors: At least one loving relationship. Family support. Healthy friend network. Strong attachment to pet.

**Mental Status Exam**
Mood: Anxious.
Affect: Restricted.
General Appearance/Behavior: Appropriate dress, appropriate grooming and hygiene, appears stated age. No acute distress.
Gait/Motor Activity: Modified for telehealth; seated, upright posture, extension of arms. No abnormal movements.
Orientation: Alert and oriented to person, place, time and situation.
Speech: Regular in rate, rhythm and volume.
Language: Names objects appropriately. Demonstrates understanding.
Associations: Intact.
Thought Process: Logical. Goal directed. Organized.
Memory: Good.
Abnormal/Psychotic Thoughts: Not evident.
Fund of Knowledge: Intact. No abnormalities noted.
Attention and Concentration: Focused.
Judgment and Insight: Good insight.

**Diagnoses**
 F43.22 ADJUSTMENT DISORDER  WITH ANXIETY

Start time: 3:00 pm
End time: 3:53 pm
Total time: 53

**Treatment Plan**
Followup Appointment: Followup appointment has not been scheduled.

Treatment plan collaboratively reviewed and revised as needed, and clearly communicated with the patient/guardian who understood and agreed to it.

PCP Coordination Today or In the Interim Since the Last Visit: No.

Presenting Problem #1: Anxiety. Acute.
Severity: Moderate
Functional Impact: Impaired relationship functioning. Emotional dysregulation.
Treatment Goals for Problem #1: Client will be able to decrease anxious symptoms so that they do not impact activities of daily living
Objectives:
1a. Decrease frequency, intensity, and duration of behavioral outbursts per parent report.

**LifeStance Health**
**11 BAXTER BLVD 2ND FLOOR**
**PORTLAND, ME 04101-1801**
**(207) 828-4026 Fax: (603) 883-0007**
**Stacey Merrill, LCPC**
**Visit Date: 10/06/2025**

**Z**  P                                                          Date of Birth:          /2020

1b. Client will be able to learn and practice coping strategies to help with anxious symptoms
1c. Client will learn and practice healthy and appropriate communication techniques
1d. Client will build their emotional vocabulary and how to express their emotions appropriately
Treatment Model/Interventions: ACT, CBT, Play Therapy, Psychoeducation, Mindfulness based CBT
Frequency, Type and Length of Treatment Recommended: weekly for 6 months


Electronically Signed:  STACEY MERRILL LCPC on/at 10/8/2025 12:53:34 PM

**LifeStance Health**
**11 BAXTER BLVD 2ND FLOOR**
**PORTLAND, ME 04101-1801**
**(207) 828-4026 Fax: (603) 883-0007**
**Stacey Merrill, LCPC**
**Visit Date: 10/28/2025**

**Z**  **P**                                                                Date of Birth: _____/2020

## Psychotherapy Visit

Patient Location: In office.

**Present at Session:** Patient.

**Modality:** Individual.

**HPI/Session Summary**
Client and Clinician were able to engage in therapeutic activities using Adlerian Play Therapy techniques to express their emotions and themes of power and control. Client was able to talk about school, when he was mad and happy. Clinician and Client were also able to start working on developing appropriate coping strategies for when he is feeling frustrated. Client and Clinician were able to practice various types of deep breathing exercises. Client had minimal difficulty during this session.

Outcome Measures:
Date Completed: PHQ9:  / GAD7:
GAD-7 =
PHQ-9 =

**PHQ-9 Question 9: Suicidal Ideation: **
**PHQ-9 Question 10: Difficulty:  **

Outcome Measures Not appropriate.

Therapeutic Interventions in Session: Play Therapy

**Past Medical, Psychiatric, Family and Social History**
No interim changes.
PFSH Summary: Psychosocial History: Parent's separated when Client was just over 1 year old. Client moved to America a year ago, grew up with German as a first language, but also speaking English, since moving to America to live with dad full time, no longer speaks German. Client would only have visits with dad twice a year (two weeks during the winter, and then Summer's with dad in America). Mom recently moved to America on a student visa, but has visits every other weekend and then on Wednesday afternoons. Divorce was finalized in Fall of 2024. Dad states that they are still going through the court system for custody.
Current Living Situation/Psychosocial Stressors:
Trauma History: parent's separation and then divorce. Moving countries. Other forms of trauma was not disclosed during the intake session and will continue to be assessed.

**Risk/Protective Assessment**
Suicidal or Homicidal Ideation: SI/HI not reported.
Risk Factors: A risk assessment was conducted during the visit today. The patient was deemed to be at a low risk of harm to self or others in the imminent future. We agreed on a good safety plan that includes paging myself and presenting themselves to the nearest emergency room in case of any self harming urges, suicidal or homicidal thinking.

**LifeStance Health**
**11 BAXTER BLVD 2ND FLOOR**
**PORTLAND, ME 04101-1801**
**(207) 828-4026 Fax: (603) 883-0007**
**Stacey Merrill, LCPC**
**Visit Date: 10/28/2025**

**Z**     **P**                                                          Date of Birth: ▨▨/2020

Protective Factors: At least one loving relationship. Family support. Healthy friend network. Strong attachment to pet.

**Mental Status Exam**
Mood: Euthymic.
Affect: Full and Appropriate.
General Appearance/Behavior: Appropriate dress, appropriate grooming and hygiene, appears stated age. No acute distress.
Gait/Motor Activity: Modified for telehealth; seated, upright posture, extension of arms. No abnormal movements. Normal gait and upright station. No notable abnormal movements or coordination issues.
Orientation: Alert and oriented to person, place, time and situation.
Speech: Regular in rate, rhythm and volume.
Language: Names objects appropriately. Demonstrates understanding.
Associations: Intact.
Thought Process: Logical. Goal directed. Organized.
Memory: Good.
Abnormal/Psychotic Thoughts: Not evident.
Fund of Knowledge: Intact. No abnormalities noted.
Attention and Concentration: Focused.
Judgment and Insight: Good insight.

**Diagnoses**
 F43.22 ADJUSTMENT DISORDER  WITH ANXIETY

Start time: 4:00 pm
End time: 4:55 pm
Total time: 55

**Treatment Plan**
Followup Appointment: Scheduled for followup in 2 weeks.

Treatment plan collaboratively reviewed and revised as needed, and clearly communicated with the patient/guardian who understood and agreed to it.

PCP Coordination Today or In the Interim Since the Last Visit: No.

Presenting Problem #1: Anxiety. Acute.
Severity: Moderate
Functional Impact: Impaired relationship functioning. Emotional dysregulation.
Treatment Goals for Problem #1: Client will be able to decrease anxious symptoms so that they do not impact activities of daily living
Objectives:
1a. Decrease frequency, intensity, and duration of behavioral outbursts per parent report.
1b. Client will be able to learn and practice coping strategies to help with anxious symptoms
1c. Client will learn and practice healthy and appropriate communication techniques
1d. Client will build their emotional vocabulary and how to express their emotions appropriately
Treatment Model/Interventions: ACT, CBT, Play Therapy, Psychoeducation, Mindfulness based CBT

**LifeStance Health**
**11 BAXTER BLVD 2ND FLOOR**
**PORTLAND, ME 04101-1801**
**(207) 828-4026 Fax: (603) 883-0007**
**Stacey Merrill, LCPC**
**Visit Date: 10/28/2025**

**Z        P**                                                    Date of Birth:         /2020

Frequency, Type and Length of Treatment Recommended: weekly for 6 months


Electronically Signed:  STACEY MERRILL LCPC on/at 10/30/2025 10:57:20 AM

**LifeStance Health**
**11 BAXTER BLVD 2ND FLOOR**
**PORTLAND, ME 04101-1801**
**(207) 828-4026 Fax: (603) 883-0007**
**Stacey Merrill, LCPC**
**Visit Date: 11/11/2025**

**Z** **P**                                                    Date of Birth:      /2020

### Psychotherapy Visit

Patient Location: In office.

**Present at Session:** Patient.

**Modality:** Individual.

**HPI/Session Summary**
Clinician and Client were able to process the past few weeks. Clinician and Client were able to engage in therapeutic activities using Child-Directed Play therapy techniques to express emotions and family dynamics (specifically about mom). Client was able to identify some basic emotions (happy, sad, mad) in regards to recent interactions with their family members. Client had minimal difficulty during this session.

Outcome Measures:
Date Completed: PHQ9:  / GAD7:
GAD-7 =
PHQ-9 =

**PHQ-9 Question 9: Suicidal Ideation: **
**PHQ-9 Question 10: Difficulty:  **

Outcome Measures Not appropriate.

Therapeutic Interventions in Session: Play Therapy

**Past Medical, Psychiatric, Family and Social History**
No interim changes.
PFSH Summary: Psychosocial History: Parent's separated when Client was just over 1 year old. Client moved to America a year ago, grew up with German as a first language, but also speaking English, since moving to America to live with dad full time, no longer speaks German. Client would only have visits with dad twice a year (two weeks during the winter, and then Summer's with dad in America). Mom recently moved to America on a student visa, but has visits every other weekend and then on Wednesday afternoons. Divorce was finalized in Fall of 2024. Dad states that they are still going through the court system for custody.
Current Living Situation/Psychosocial Stressors:
Trauma History: parent's separation and then divorce. Moving countries. Other forms of trauma was not disclosed during the intake session and will continue to be assessed.

**Risk/Protective Assessment**
Suicidal or Homicidal Ideation: SI/HI not reported.
Risk Factors: A risk assessment was conducted during the visit today. The patient was deemed to be at a low risk of harm to self or others in the imminent future. We agreed on a good safety plan that includes paging myself and presenting themselves to the nearest emergency room in case of any self harming urges, suicidal or homicidal thinking.

**LifeStance Health**
**11 BAXTER BLVD 2ND FLOOR**
**PORTLAND, ME 04101-1801**
**(207) 828-4026 Fax: (603) 883-0007**
**Stacey Merrill, LCPC**
**Visit Date: 11/11/2025**

**Z▮    P▮**                                                    Date of Birth: ▮/2020

Protective Factors: At least one loving relationship. Family support. Healthy friend network. Strong attachment to pet.

**Mental Status Exam**
Mood: Euthymic.
Affect: Full and Appropriate.
General Appearance/Behavior: Appropriate dress, appropriate grooming and hygiene, appears stated age. No acute distress.
Gait/Motor Activity: Modified for telehealth; seated, upright posture, extension of arms. No abnormal movements. Normal gait and upright station. No notable abnormal movements or coordination issues.
Orientation: Alert and oriented to person, place, time and situation.
Speech: Regular in rate, rhythm and volume.
Language: Names objects appropriately. Demonstrates understanding.
Associations: Intact.
Thought Process: Logical. Goal directed. Organized.
Memory: Good.
Abnormal/Psychotic Thoughts: Not evident.
Fund of Knowledge: Intact. No abnormalities noted.
Attention and Concentration: Focused.
Judgment and Insight: Good insight.

**Diagnoses**
 F43.22 ADJUSTMENT DISORDER  WITH ANXIETY

Start time: 12:00 pm
End time: 12:57 pm
Total time: 57

**Treatment Plan**
Followup Appointment: Scheduled for followup in 3 weeks.

Treatment plan collaboratively reviewed and revised as needed, and clearly communicated with the patient/guardian who understood and agreed to it.

PCP Coordination Today or In the Interim Since the Last Visit: No.

Presenting Problem #1: Anxiety. Acute.
Severity: Moderate
Functional Impact: Impaired academic functioning. Impaired relationship functioning. Emotional dysregulation.
Treatment Goals for Problem #1: Client will be able to decrease anxious symptoms so that they do not impact activities of daily living
Objectives:
1a. Decrease frequency, intensity, and duration of behavioral outbursts per parent report.
1b. Client will be able to learn and practice coping strategies to help with anxious symptoms
1c. Client will learn and practice healthy and appropriate communication techniques
1d. Client will build their emotional vocabulary and how to express their emotions appropriately
Treatment Model/Interventions: ACT, CBT, Play Therapy, Psychoeducation, Mindfulness based CBT

**LifeStance Health**
**11 BAXTER BLVD 2ND FLOOR**
**PORTLAND, ME 04101-1801**
**(207) 828-4026 Fax: (603) 883-0007**
**Stacey Merrill, LCPC**
**Visit Date: 11/11/2025**

**Z** ▮ **P** ▮                                                    Date of Birth: ▮/2020

Frequency, Type and Length of Treatment Recommended: weekly for 6 months

Electronically Signed:  STACEY MERRILL LCPC on/at 11/13/2025 10:55:33 AM

**LifeStance Health**
**11 BAXTER BLVD 2ND FLOOR**
**PORTLAND, ME 04101-1801**
**(207) 828-4026 Fax: (603) 883-0007**
**Stacey Merrill, LCPC**
**Visit Date: 12/02/2025**

**Z**    **P**                                                           Date of Birth:        /2020

## Psychotherapy Visit

Telehealth visit performed, location was verified and appropriate consent obtained.
Patient Location: Home.

**Present at Session:** Patient.

**Modality:** Individual.

**HPI/Session Summary**
Client and Clinician were able to process the past few weeks. Clinician and Client were able to engage in therapeutic activities using Adlerian Play Therapy techniques to express themes of family dynamics and seeking nurture. Client did this through a digital dollhouse and digital sand tray activities.

Outcome Measures:
Date Completed: PHQ9:  / GAD7:
GAD-7 =
PHQ-9 =

**PHQ-9 Question 9: Suicidal Ideation: **
**PHQ-9 Question 10: Difficulty:  **

Outcome Measures Not appropriate.

Therapeutic Interventions in Session: Play Therapy

**Past Medical, Psychiatric, Family and Social History**
No interim changes.
PFSH Summary: Psychosocial History: Parent's separated when Client was just over 1 year old. Client moved to America a year ago, grew up with German as a first language, but also speaking English, since moving to America to live with dad full time, no longer speaks German. Client would only have visits with dad twice a year (two weeks during the winter, and then Summer's with dad in America). Mom recently moved to America on a student visa, but has visits every other weekend and then on Wednesday afternoons. Divorce was finalized in Fall of 2024. Dad states that they are still going through the court system for custody.
Current Living Situation/Psychosocial Stressors:
Trauma History: parent's separation and then divorce. Moving countries. Other forms of trauma was not disclosed during the intake session and will continue to be assessed.

**Risk/Protective Assessment**
Suicidal or Homicidal Ideation: SI/HI not reported.
Risk Factors: A risk assessment was conducted during the visit today. The patient was deemed to be at a low risk of harm to self or others in the imminent future. We agreed on a good safety plan that includes paging myself and presenting themselves to the nearest emergency room in case of any self harming urges, suicidal or homicidal thinking.
Protective Factors: At least one loving relationship. Family support. Healthy friend network. Strong attachment to pet.

**LifeStance Health**
**11 BAXTER BLVD 2ND FLOOR**
**PORTLAND, ME 04101-1801**
**(207) 828-4026 Fax: (603) 883-0007**
**Stacey Merrill, LCPC**
**Visit Date: 12/02/2025**

Z      P

Date of Birth:      /2020

**Mental Status Exam**
Mood: Euthymic.
Affect: Full and Appropriate.
General Appearance/Behavior: Appropriate dress, appropriate grooming and hygiene, appears stated age. No acute distress.
Gait/Motor Activity: Modified for telehealth; seated, upright posture, extension of arms. No abnormal movements. 10/28/2025 Normal gait and upright station. No notable abnormal movements or coordination issues.
Orientation: Alert and oriented to person, place, time and situation.
Speech: Regular in rate, rhythm and volume.
Language: Names objects appropriately. Demonstrates understanding.
Associations: Intact.
Thought Process: Logical. Goal directed. Organized.
Memory: Good.
Abnormal/Psychotic Thoughts: Not evident.
Fund of Knowledge: Intact. No abnormalities noted.
Attention and Concentration: Focused.
Judgment and Insight: Good insight.

**Diagnoses**
 F43.22 ADJUSTMENT DISORDER  WITH ANXIETY

Start time: 3:59 pm
End time: 4:52 pm
Total time: 53

**Treatment Plan**

Is the patient currently seeing a psychiatric provider: No.
Would an evaluation by a psychiatric provider be appropriate: No. Referral not clinically indicated.
Followup Appointment: Scheduled for followup in 1 week

Treatment plan collaboratively reviewed and revised as needed, and clearly communicated with the patient/guardian who understood and agreed to it.

PCP Coordination Today or In the Interim Since the Last Visit: No.

Presenting Problem #1: Anxiety. Acute.
Severity: Moderate
Functional Impact: Impaired academic functioning. Impaired relationship functioning. Emotional dysregulation.
Treatment Goals for Problem #1: Client will be able to decrease anxious symptoms so that they do not impact activities of daily living
Objectives:
1a. Decrease frequency, intensity, and duration of behavioral outbursts per parent report.
1b. Client will be able to learn and practice coping strategies to help with anxious symptoms
1c. Client will learn and practice healthy and appropriate communication techniques

**LifeStance Health**
**11 BAXTER BLVD 2ND FLOOR**
**PORTLAND, ME 04101-1801**
**(207) 828-4026 Fax: (603) 883-0007**
**Stacey Merrill, LCPC**
**Visit Date: 12/02/2025**

**Z**　　**P**　　　　　　　　　　　　　　　　　　Date of Birth:　　　/2020

1d. Client will build their emotional vocabulary and how to express their emotions appropriately
Treatment Model/Interventions: ACT, CBT, Play Therapy, Psychoeducation, Mindfulness based CBT
Frequency, Type and Length of Treatment Recommended: weekly for 6 months

Electronically Signed:  STACEY MERRILL LCPC on/at 12/5/2025 12:50:23 PM

**LifeStance Health**
**11 BAXTER BLVD 2ND FLOOR**
**PORTLAND, ME 04101-1801**
**(207) 828-4026 Fax: (603) 883-0007**
**Stacey Merrill, LCPC**
**Visit Date: 12/09/2025**

**Z▮ P▮**                                                    Date of Birth: ▮/2020

**Psychotherapy Visit**

Patient Location: In office.

**Present at Session:** Patient.

**Modality:** Individual.

**HPI/Session Summary**
Client was able to process the past week. Clinician and Client were able to engage in therapeutic activities using Adlerian Play Therapy techniques to express themes of power and control. Clinician and Client were able to talk about different emotions, what they look like, and some things that cause worries. Client was able to identify some of his worries as: is there going to be friends to play with at recess, will his sister play with him at home, and will Santa come at Christmas.

Outcome Measures:
Date Completed: PHQ9:  / GAD7:
GAD-7 =
PHQ-9 =

**PHQ-9 Question 9: Suicidal Ideation: **
**PHQ-9 Question 10: Difficulty:  **

Outcome Measures Not appropriate.

Therapeutic Interventions in Session: Play Therapy

**Past Medical, Psychiatric, Family and Social History**
No interim changes.
PFSH Summary: Psychosocial History: Parent's separated when Client was just over 1 year old. Client moved to America a year ago, grew up with German as a first language, but also speaking English, since moving to America to live with dad full time, no longer speaks German. Client would only have visits with dad twice a year (two weeks during the winter, and then Summer's with dad in America). Mom recently moved to America on a student visa, but has visits every other weekend and then on Wednesday afternoons. Divorce was finalized in Fall of 2024. Dad states that they are still going through the court system for custody.
Current Living Situation/Psychosocial Stressors:
Trauma History: parent's separation and then divorce. Moving countries. Other forms of trauma was not disclosed during the intake session and will continue to be assessed.

**Risk/Protective Assessment**
Suicidal or Homicidal Ideation: SI/HI not reported.
Risk Factors: A risk assessment was conducted during the visit today. The patient was deemed to be at a low risk of harm to self or others in the imminent future. We agreed on a good safety plan that includes paging myself and presenting themselves to the nearest emergency room in case of any self harming urges, suicidal or homicidal thinking.

**LifeStance Health**
**11 BAXTER BLVD 2ND FLOOR**
**PORTLAND, ME 04101-1801**
**(207) 828-4026 Fax: (603) 883-0007**
**Stacey Merrill, LCPC**
**Visit Date: 12/09/2025**

**Z░  P░**                                                      Date of Birth: ░/2020

Protective Factors: At least one loving relationship. Family support. Healthy friend network. Strong attachment to pet.

**Mental Status Exam**
Mood: Euthymic.
Affect: Full and Appropriate.
General Appearance/Behavior: Appropriate dress, appropriate grooming and hygiene, appears stated age. No acute distress.
Gait/Motor Activity: Modified for telehealth; seated, upright posture, extension of arms. No abnormal movements. 10/28/2025 Normal gait and upright station. No notable abnormal movements or coordination issues.
Orientation: Alert and oriented to person, place, time and situation.
Speech: Regular in rate, rhythm and volume.
Language: Names objects appropriately. Demonstrates understanding.
Associations: Intact.
Thought Process: Logical. Goal directed. Organized.
Memory: Good.
Abnormal/Psychotic Thoughts: Not evident.
Fund of Knowledge: Intact. No abnormalities noted.
Attention and Concentration: Focused.
Judgment and Insight: Good insight.

**Diagnoses**
 F43.22 ADJUSTMENT DISORDER  WITH ANXIETY

Start time: 5:29 pm
End time: 6:27 pm
Total time: 58

**Treatment Plan**

Is the patient currently seeing a psychiatric provider: No.
Would an evaluation by a psychiatric provider be appropriate: No. Referral not clinically indicated.
Followup Appointment: Scheduled for followup in 2 weeks.

Treatment plan collaboratively reviewed and revised as needed, and clearly communicated with the patient/guardian who understood and agreed to it.

PCP Coordination Today or In the Interim Since the Last Visit: No.

Presenting Problem #1: Anxiety. Acute.
Severity: Moderate
Functional Impact: Impaired academic functioning. Impaired relationship functioning. Emotional dysregulation.
Treatment Goals for Problem #1: Client will be able to decrease anxious symptoms so that they do not impact activities of daily living
Objectives:
1a. Decrease frequency, intensity, and duration of behavioral outbursts per parent report.

**LifeStance Health**
**11 BAXTER BLVD 2ND FLOOR**
**PORTLAND, ME 04101-1801**
**(207) 828-4026 Fax: (603) 883-0007**
**Stacey Merrill, LCPC**
**Visit Date: 12/09/2025**

Z     P                                                          Date of Birth:      /2020

1b. Client will be able to learn and practice coping strategies to help with anxious symptoms
1c. Client will learn and practice healthy and appropriate communication techniques
1d. Client will build their emotional vocabulary and how to express their emotions appropriately
Treatment Model/Interventions: ACT, CBT, Play Therapy, Psychoeducation, Mindfulness based CBT
Frequency, Type and Length of Treatment Recommended: weekly for 6 months

Electronically Signed:  STACEY MERRILL LCPC on/at 12/11/2025 3:49:24 PM

**LifeStance Health**
**11 BAXTER BLVD 2ND FLOOR**
**PORTLAND, ME 04101-1801**
**(207) 828-4026 Fax: (603) 883-0007**
**Stacey Merrill, LCPC**
**Visit Date: 12/23/2025**

**Z    P**                                                     Date of Birth:    /2020

## Psychotherapy Visit

Patient Location: In office.

**Present at Session:** Patient.

**Modality:** Individual.

**HPI/Session Summary**
Client was able to process the past few weeks. Clinician and Client were able to engage in therapeutic
activities using Adlerian Play Therapy techniques to express themes of power and control. Client and Clinician
were also able to work on identifying emotions, and how to express emotions appropriately to others through
the use of "I statements". Client was able to practice "I statements" with the emotions of happy, mad, and sad.
Client was able to practice healthy and appropriate communication skills to express different events happening
at school and the upcoming holidays. Client had minimal difficulty during this session.

Outcome Measures:
Date Completed: PHQ9:  / GAD7:
GAD-7 =
PHQ-9 =

**PHQ-9 Question 9: Suicidal Ideation: **
**PHQ-9 Question 10: Difficulty:  **

Outcome Measures Not appropriate.

Therapeutic Interventions in Session: Play Therapy

**Past Medical, Psychiatric, Family and Social History**
No interim changes.
PFSH Summary: Psychosocial History: Parent's separated when Client was just over 1 year old. Client moved
to America a year ago, grew up with German as a first language, but also speaking English, since moving to
America to live with dad full time, no longer speaks German. Client would only have visits with dad twice a year
(two weeks during the winter, and then Summer's with dad in America). Mom recently moved to America on a
student visa, but has visits every other weekend and then on Wednesday afternoons. Divorce was finalized in
Fall of 2024. Dad states that they are still going through the court system for custody.
Current Living Situation/Psychosocial Stressors:
Trauma History: parent's separation and then divorce. Moving countries. Other forms of trauma was not
disclosed during the intake session and will continue to be assessed.

**Risk/Protective Assessment**
Suicidal or Homicidal Ideation: SI/HI not reported.
Risk Factors: A risk assessment was conducted during the visit today. The patient was deemed to be at a low
risk of harm to self or others in the imminent future. We agreed on a good safety plan that includes paging

**LifeStance Health**
**11 BAXTER BLVD 2ND FLOOR**
**PORTLAND, ME 04101-1801**
**(207) 828-4026 Fax: (603) 883-0007**
**Stacey Merrill, LCPC**
**Visit Date: 12/23/2025**

**Z**⬚ **P**⬚                                                    Date of Birth: ⬚/2020

myself and presenting themselves to the nearest emergency room in case of any self harming urges, suicidal
or homicidal thinking.
Protective Factors: At least one loving relationship. Family support. Healthy friend network. Strong attachment
to pet.

**Mental Status Exam**
Mood: Euthymic.
Affect: Full and Appropriate.
General Appearance/Behavior: Appropriate dress, appropriate grooming and hygiene, appears stated age. No
acute distress.
Gait/Motor Activity: Modified for telehealth; seated, upright posture, extension of arms. No abnormal
movements. 10/28/2025 Normal gait and upright station. No notable abnormal movements or coordination
issues.
Orientation: Alert and oriented to person, place, time and situation.
Speech: Regular in rate, rhythm and volume.
Language: Names objects appropriately. Demonstrates understanding.
Associations: Intact.
Thought Process: Logical. Goal directed. Organized.
Memory: Good.
Abnormal/Psychotic Thoughts: Not evident.
Fund of Knowledge: Intact. No abnormalities noted.
Attention and Concentration: Focused.
Judgment and Insight: Good insight.

**Diagnoses**
 F43.22 ADJUSTMENT DISORDER  WITH ANXIETY

Start time: 3:00 pm
End time: 3:57 pm
Total time: 57

**Treatment Plan**

Is the patient currently seeing a psychiatric provider: No.
Would an evaluation by a psychiatric provider be appropriate: No. Referral not clinically indicated.
Followup Appointment: Scheduled for followup in 2 weeks.

Treatment plan collaboratively reviewed and revised as needed, and clearly communicated with the
patient/guardian who understood and agreed to it.

PCP Coordination Today or In the Interim Since the Last Visit: No.

Presenting Problem #1: Anxiety. Acute.
Severity: Moderate
Functional Impact: Impaired academic functioning. Impaired relationship functioning. Emotional dysregulation.
Treatment Goals for Problem #1: Client will be able to decrease anxious symptoms so that they do not impact
activities of daily living

**LifeStance Health**
**11 BAXTER BLVD 2ND FLOOR**
**PORTLAND, ME 04101-1801**
**(207) 828-4026 Fax: (603) 883-0007**
**Stacey Merrill, LCPC**
**Visit Date: 12/23/2025**

**Z ▮ P ▮**                                                    Date of Birth: ▮/2020

Objectives:
1a. Decrease frequency, intensity, and duration of behavioral outbursts per parent report.
1b. Client will be able to learn and practice coping strategies to help with anxious symptoms
1c. Client will learn and practice healthy and appropriate communication techniques
1d. Client will build their emotional vocabulary and how to express their emotions appropriately
Treatment Model/Interventions: ACT, CBT, Play Therapy, Psychoeducation, Mindfulness based CBT
Frequency, Type and Length of Treatment Recommended: weekly for 6 months


Electronically Signed:  STACEY MERRILL LCPC on/at 12/29/2025 9:59:34 AM

**MERRILL,STACEY,LCPC**
**11 BAXTER BLVD**                                          **Phone: (207)828-4026**
**PORTLAND, ME 04101-1801**                                 **Fax: (603)883-0007**

**P▓▓▓▓,Z▓▓▓ - DOB: ▓▓▓/2020**
**S▓▓▓er-▓▓cel/No-S▓w-Note - 12/23/2025**

Cancellation DateTime - 12/22/2025 2:55 PM
Cancellation Reason - PT-Same Day Appt Move
Additional Notes:
Client's father requested an earlier appointment. Clinician was able to reschedule appointment for 3pm

The Visit status was changed by SMERRILL.

Signed:    STACEY MERRILL LCPC 12/23/2025 7:33 AM                    Print Date 1/13/2026

EXHIBIT P
Page 29 of 68

**LifeStance Health**
**11 BAXTER BLVD 2ND FLOOR**
**PORTLAND, ME 04101-1801**
**(207) 828-4026  Fax: (603) 883-0007**
**Stacey Merrill, LCPC**
**Visit Date: 12/29/2025**

**Z** ██ **P** ██████                                              Date of Birth: ██/2020

### Miscellaneous Contact Note

**Start Time:** 11:00 am
**End Time:** 11:30 am
**Total Time:** 30

**Participants:** Mother.

**Service Description:** Telephone Contact

**Description of Contact:** Clinician and Client's mother had a virtual call. Client's mother stated that she was not aware that her son was receiving counseling services from Clinician. Clinician discussed with mom how she was not aware that mother did not know about services. Clinician was able to review the treatment plan with mother, Client's progress in sessions, and how the Clinician engages with the sessions. Clinician informed mother that the sessions are individual and that it is only Client and Clinician in the session. Mother stated that she was happy to continue treatment after talking with Clinician. Clinician stated that they could provide Mother with updates on treatment goals when there is progress. Mother thanked Clinician.


Electronically Signed:  STACEY MERRILL LCPC on/at 1/5/2026 6:11:06 AM

**LifeStance Health**
**11 BAXTER BLVD 2ND FLOOR**
**PORTLAND, ME 04101-1801**
**(207) 828-4026 Fax: (603) 883-0007**
**Stacey Merrill, LCPC**
**Visit Date: 01/06/2026**

**Z P**                                            Date of Birth: /2020

**Psychotherapy Visit**

Patient Location: In office.

**Present at Session:** Patient.

**Modality:** Individual.

**HPI/Session Summary**
Client was able to process the past few weeks. Client and Clinician were able to engage in therapeutic activities using Adlerian Play Therapy techniques to express themes of power and control. Client was able to do these through the use of the counseling materials. Client was able to identify different emotions and how they show up in the real world. Client was able to practice communication techniques while talking about his Christmas holidays and different things that he did with both sides of his family.

Outcome Measures:
Date Completed: PHQ9:  / GAD7:
GAD-7 =
PHQ-9 =

**PHQ-9 Question 9: Suicidal Ideation: **
**PHQ-9 Question 10: Difficulty:  **

Outcome Measures Not appropriate.

Therapeutic Interventions in Session: Play Therapy

**Past Medical, Psychiatric, Family and Social History**
No interim changes.
PFSH Summary: Psychosocial History: Parent's separated when Client was just over 1 year old. Client moved to America a year ago, grew up with German as a first language, but also speaking English, since moving to America to live with dad full time, no longer speaks German. Client would only have visits with dad twice a year (two weeks during the winter, and then Summer's with dad in America). Mom recently moved to America on a student visa, but has visits every other weekend and then on Wednesday afternoons. Divorce was finalized in Fall of 2024. Dad states that they are still going through the court system for custody.
Current Living Situation/Psychosocial Stressors:
Trauma History: parent's separation and then divorce. Moving countries. Other forms of trauma was not disclosed during the intake session and will continue to be assessed.

**Risk/Protective Assessment**
Suicidal or Homicidal Ideation: SI/HI not reported.
Risk Factors: A risk assessment was conducted during the visit today. The patient was deemed to be at a low risk of harm to self or others in the imminent future. We agreed on a good safety plan that includes paging myself and presenting themselves to the nearest emergency room in case of any self harming urges, suicidal or homicidal thinking.

**LifeStance Health**
**11 BAXTER BLVD 2ND FLOOR**
**PORTLAND, ME 04101-1801**
**(207) 828-4026 Fax: (603) 883-0007**
**Stacey Merrill, LCPC**
**Visit Date: 01/06/2026**

Z ███   P ███                                          Date of Birth: ███ 2020

Protective Factors: At least one loving relationship. Family support. Healthy friend network. Strong attachment to pet.

**Mental Status Exam**
Mood: Anxious.
Affect: Restricted.
General Appearance/Behavior: Appropriate dress, appropriate grooming and hygiene, appears stated age. No acute distress.
Gait/Motor Activity: Modified for telehealth; seated, upright posture, extension of arms. No abnormal movements. 10/28/2025 Normal gait and upright station. No notable abnormal movements or coordination issues.
Orientation: Alert and oriented to person, place, time and situation.
Speech: Regular in rate, rhythm and volume.
Language: Names objects appropriately. Demonstrates understanding.
Associations: Intact.
Thought Process: Logical. Goal directed. Organized.
Memory: Good.
Abnormal/Psychotic Thoughts: Not evident.
Fund of Knowledge: Intact. No abnormalities noted.
Attention and Concentration: Focused.
Judgment and Insight: Good insight.

**Diagnoses**
 F43.22 ADJUSTMENT DISORDER  WITH ANXIETY

Start time: 5:30 pm
End time: 6:31 pm
Total time: 61

**Treatment Plan**

Is the patient currently seeing a psychiatric provider: No.
Would an evaluation by a psychiatric provider be appropriate: No. Referral not clinically indicated.
Followup Appointment: Scheduled for followup in 2 weeks.

Treatment plan collaboratively reviewed and revised as needed, and clearly communicated with the patient/guardian who understood and agreed to it.

PCP Coordination Today or In the Interim Since the Last Visit: No.

Presenting Problem #1: Anxiety. Acute.
Severity: Moderate
Functional Impact: Impaired academic functioning. Impaired relationship functioning. Emotional dysregulation.
Treatment Goals for Problem #1: Client will be able to decrease anxious symptoms so that they do not impact activities of daily living
Objectives:
1a. Decrease frequency, intensity, and duration of behavioral outbursts per parent report.

**LifeStance Health**
**11 BAXTER BLVD 2ND FLOOR**
**PORTLAND, ME 04101-1801**
**(207) 828-4026 Fax: (603) 883-0007**
**Stacey Merrill, LCPC**
**Visit Date: 01/06/2026**

**Z** ▮▮▮ **P** ▮▮▮                                    Date of Birth: ▮▮▮/2020

1b. Client will be able to learn and practice coping strategies to help with anxious symptoms
1c. Client will learn and practice healthy and appropriate communication techniques
1d. Client will build their emotional vocabulary and how to express their emotions appropriately
Treatment Model/Interventions: ACT, CBT, Play Therapy, Psychoeducation, Mindfulness based CBT
Frequency, Type and Length of Treatment Recommended: weekly for 6 months

Electronically Signed:  STACEY MERRILL LCPC on/at 1/9/2026 10:53:28 AM

Welcome to LifeStance Health! We are excited to have you as a new patient and strive to ensure a seamless healthcare experience. Below you will find important information to help you prepare for your upcoming Visit.

**Appointment Details**

> Date and Time: Oct 3 2025 8:00AM
> Provider: Stacey Merrill

**Preparing for Your Visit**

As early as 7 days before your appointment, you will receive a link via email and/or text to confirm your information including your insurance, upload images of your insurance cards and ID, sign consent forms, and complete your health history questions. Patients are required to have a valid credit card on file.

**Your Appointment**

You will receive a message from us to check in for your appointment and pay any applicable copay. Copays are due at the time of service.

Please have your medical history, medication list, and questions available.

> *For In Office Appointments*

- Details about your visit will be provided in your appointment reminder 5-7 days prior and on the day of your appointment.
- Please arrive 15 minutes early and let the front desk know you have arrived.

> *For Telehealth Appointments*

- 30 minutes prior to your appointment, the link to your telehealth appointment is provided upon confirmation of information on file and payment of applicable copay and/or toward any balance.
- Please arrive 5 minutes early and remain in the virtual waiting room until the time of your appointment.
- Telehealth visits with your provider may require a future in-person visit based on your medical needs.

**Important Information**

- If we are unable to confirm your insurance eligibility your appointment Will be postponed until verification is complete.
- Please add a credit card or debit card to your LifeStance Health account when prompted, using the link sent to you via text and/or email days before your appointment. Having a card on file is required to establish care at LifeStance Health. This step supports timely billing, helps avoid unexpected balances, and ensures we can continue providing uninterrupted care. If a card is not added, your future care may be impacted.
- A parent or guardian must accompany minors during the appointment.
- During the course of your treatment, we send regular "check-in" surveys as part of your digital patient check-in experience. These surveys provide an understanding of your symptoms and the quality of care we are providing you. Please ask your provider about these measurements during your session to help direct our approach to your care.
- Most clinicians require you to be an established patient before accepting paperwork requests.

**Questions or Assistance**

If you have any questions or need assistance, please call the office at (603) 883-0005. See you soon!

Accepted at 10/06/2025 07:31 AM by #AUTOACCEPT

## PATIENT ELECTION TO SELF-PAY FOR SERVICES

The Department of Health and Human Services issued updates to HIPAA privacy regulations. Those updates gave patients more control over who has access to their Personal Health Information (PHI), including their own insurance companies. Under HIPAA, patients may opt out of using their insurance benefits to prevent reporting this service to their insurance carrier. Additionally, on February 18, 2010, the HITECH Act regulated that a healthcare provider is required to honor a patient's request to restrict disclosure of PHI to a health plan for purposes other than carrying out treatment (specifically, payment or healthcare operations) if the patient pays the healthcare provider out of pocket in full. This means that if a patient does not wish to use their health insurance, they can request their insurance not be billed.

**Please note: This does not apply to Medicare patients. Medicare does not allow patients to opt out of their benefits.**

**I, Z▮▮▮  P▮▮▮▮, the undersigned patient, acknowledge that I understand and agree as of  10/03/2025 (effective date), that:**

1. I am ☑ Uninsured ☐ Underinsured, ☐ or I may have insurance in which LifeStance Health is a provider. (Select the appropriate checkbox)
2. The health plan under which I am covered may include benefits for some or all the services provided by LifeStance Health.
3. Despite the above, I do not wish LifeStance Health to submit a claim to my insurance for services provided to me by LifeStance Health.
4. By election to self-pay for services, any payments I make to LifeStance Health will not be credited toward satisfying any deductible I may be subject to under my health insurance.
5. I understand that payment is due at the time of service and if LifeStance Health does not receive my payment, LifeStance Health reservices the right to revoke this Election to Self-Pay and will bill my insurance for all applicable charges. I acknowledge that I will then be responsible for any co-insurance, co-payment or deductible amounts determined by my insurance as my responsibility.
6. Until such time as I may otherwise advise LifeStance Health by submitting a Revocation of Election to Self-Pay. I elect to pay for all services I receive from LifeStance Health at the current self-pay rate.
7. I have read this Election to Self-Pay for Services form and have had the opportunity to ask any questions I may have had about the form. Any questions I may have had about this form have been answered to my satisfaction.
8. I have freely chosen to self-pay for services after having asked LifeStance Health about payment options and having carefully considered these options.

**Patient Name:** Z▮▮▮  P▮▮▮▮
**Patient DOB:** ▮▮▮/2020

**Signature:**

Signed 10/06/2025

**Printed Name of Signer:**  Adrian Maurice Powell Jr

**Relationship of Signer to Patient, if applicable:**   Father

Accepted at 10/06/2025 07:32 AM by #AUTOACCEPT

**LIFESTANCE HEALTH, INC.**
**GOOD FAITH ESTIMATE - PSYCHOTHERAPY & PSYCHIATRY SERVICES**

Patient Name:  P

Patient Date of Birth:   /2020
Patient Address: 41 FERN AVE OLD ORCHARD BEACH, ME 04064
Patient Identification Number:

**Date of Good Faith Estimate:** 09/30/2025

The table set forth below reflects LifeStance Health, Inc., ("LifeStance") current charges for services. As each patient's needs for mental health interventions are unique, the total cost during the year will ultimately be dictated by the number of sessions you receive, and the acuity level of services provided in connection with your specific diagnosis in accordance with the charge table below.

Each episode of care begins with an Assessment. After the Assessment, we may have a clearer picture of how many sessions you might need. However, it is difficult to predict the length of treatment, since it depends upon the complexity or severity of the problem, treatment efficacy, and external factors during the treatment period.

**Details of the Good Faith Estimate**

For psychotherapy services, all episodes of care start with an Assessment to identify your needs, factors around your needs, and potential directions for treatment. This session will also help determine possible diagnoses. The first sessions will cost $340 for a psychologist and $340 for a master's level therapist.

The following shows the expected charges for each session after the assessment. This shows the cost per session. You and your clinician will discuss which of these services makes sense for you. You will be able to decide for yourself whether you want to continue services and how many sessions you will have. The estimated costs below are valid for 12 months from the date of this Good Faith Estimate ("GFE"), unless we send you an updated GFE.

| Service (per Session) | Service Code | Psychologist | Master's Level |
|---|---|---|---|
| Psychotherapy for 16-37 minutes | 90832 | $140 | $130 |
| Psychotherapy for 38-52 minutes | 90834 | $300 | $230 |
| Psychotherapy for 53 or more minutes | 90837 | $365 | $365 |
| Family Therapy without Patient | 90846 | $275 | $245 |
| Family Therapy with Patient | 90847 | $190 | $180 |
| Group Psychotherapy | 90853 | $100 | $95 |
| Crisis Therapy: First 30-74 minutes | 90839 | $375 | $375 |
| Crisis Therapy: Each 30 minutes | 90840 | $250 | $250 |

Psychiatric services focus on medication management but can also include a combination of medication management and psychotherapy. These services are provided by a psychiatrist (MD or DO), a psychiatric nurse practitioner, or a physician assistant. The cost of services may vary depending on the type,

Accepted at 10/06/2025 07:32 AM by #AUTOACCEPT

complexity, and length of care. You and your clinician will discuss which services are best for you, and you will decide whether to continue care.

| Service (per Session) | Service Code | Physician | Nurse Practitioner | Physician Assistant |
|---|---|---|---|---|
| New Patient Psychiatric Assessment | 90792 | $425 | $425 | $425 |
| New Patient Evaluation & Management - Low-Level Care | 99203 | $230 | $220 | $220 |
| New Patient Evaluation & Management - Moderate-Level Care | 99204 | $395 | $335 | $335 |
| New Patient Evaluation & Management - High-Level Care | 99205 | $450 | $450 | $450 |
| Established Patient Evaluation & Management - Low-Level Care | 99213 | $185 | $175 | $175 |
| Established Patient Evaluation & Management - Moderate-Level Care | 99214 | $305 | $235 | $235 |
| Established Patient Evaluation & Management - High-Level Care | 99215 | $425 | $335 | $335 |

Below are the **additional** charges that apply when psychotherapy is provided during the same session as medication management.

| Service (per Session) | Service Code | Physician | Practitioner Nurse | Physician Assistant |
|---|---|---|---|---|
| Brief Psychotherapy with Medication Management (16-37 mins) | 90833 | $170 | $135 | $135 |
| Psychotherapy with Medication Management (38-52 mins) | 90836 | $275 | $195 | $195 |
| Extended Psychotherapy with Medication Management (53+ mins) | 90838 | $385 | $275 | $275 |

The charges reflected above may be modified from time to time in the ordinary course of business.

This GFE does not include Psychological Testing, Substance Use Disorder, Intensive Outpatient, TMS, Ketamine/Esketamine, Applied Behavioral Analysis, or other behavioral health services. Should you need services outside the scope of this GFE, a new GFE will be provided to you.

For individual and families in need, contact us to learn more about eligibility for financial assistance. If you have financial assistance, you can apply the discount percentage to "Cost per Session" above.

**Contact**

If you have questions about this estimate, please contact the Front Desk at your clinician's site or talk to your clinician about it.

**Disclaimer**

This GFE shows the costs of items and services that are reasonably expected for your healthcare needs for an item or service as of the date of this estimate. The estimate is based on information known at the time the GFE was created. The GFE does not include any unknown or unexpected costs that may arise during treatment.

You could be charged more if complications or special circumstances occur. If this happens, federal law allows you to dispute (appeal) the bill.

**If you are billed for more than this Good Faith Estimate, you have the right to dispute this bill.**

You may contact us to let us know that billed charges are higher than the GFE. We will work with you to update the bill to match the GFE, negotiate the bill, or discuss how financial assistance may be available. Please call your LifeStance location or our number at 1-603-689-7890 to discuss this.

You may also start a dispute resolution process with the U.S. Department of Health and Human Services (HHS). If you choose to use the dispute resolution process, you must start the dispute process within 120 calendar days (about 4 months) of the date on the original bill. There is a $25 fee to use the dispute process. If the agency reviewing your dispute agrees with you, you will have to pay the price on this GFE. If the agency disagrees with you and agrees with the healthcare provider or facility, you will have to pay the higher amount.

To learn more and get a form to start the process, go to:
                www.cms.gov/nosurprises or call CMS at 1-800-985-3059.

Accepted at 10/06/2025 07:32 AM by #AUTOACCEPT

For questions or more information about your right to a Good Faith Estimate or the dispute process, visit www.cms.gov/nosurprises or call CMS at 1-800-985-3059.

**Date:**  10/06/2025

**Signature:**

Signed 10/06/2025

**Name of Patient Representative, if applicable:**  Adrian Maurice Powell Jr

**Description of Patient Representative's Relationship to Patient, if applicable:**   Father

Accepted at 10/06/2025 07:32 AM by #AUTOACCEPT

EXHIBIT P
Page 39 of 68

**Minor Child Addendum**

*Form must be completed for all patients seeking treatment age 18 or younger.*

I,  Adrian Powell  [print name here], state and attest that I may legally consent to medical, mental health and/or substance abuse treatment for the minor child [patientname] under the following authority:

☐ Self (if I am of the legal age to consent under state law)    ☑ Biological or Adoptive Parent    ☐ Department of Human Services    ☐ Guardian/Legal Custodian/Other

**Divorce Proceeding or Other Legal Proceedings**
Have there ever been any legal proceedings that affect the decision-making authority regarding the minor child, including but not limited to: divorce, legal separation, paternity, termination or limitation of parental rights, proceedings regarding participation in therapy, or an assignment of legal custody/guardianship?

☑ Yes    ☐ No

**Documentation**
Do legal documents exist that in any way address or affect the legal authority to make medical/health decisions for the minor child or that in any way address participation in therapy, contact between a minor child and a parent, or provision for payment of medical or therapy bills? Such documents may include court orders, parenting agreements, separation agreements, etc.

☐ Yes    ☑ No

The person signing this statement should attach documents verifying their legal authority to make medical decision for the minor child, unless the person signing is the child or if the person signing is the biological or adoptive parent of the child and there have been no legal proceedings or actions that have affected their decision-making authority regarding the minor child.

Names of all other persons with medical decision-making authority:  Sarah Leyla Powell

*I attest that the information communicated in this form is complete and accurate to the best of my understanding.*

**Date:**  12/23/2025

**Parent/Guardian/Patient Signature:**

Signed 12/23/2025

**Printed Name of Signer:**  Adrian Maurice Powell Jr

Accepted at 12/23/2025 12:08 PM by #AUTOACCEPT

**Relationship of Signer to the Minor Child:** __Father__

(A signature is required for the information on this form to be considered valid)

**Date:** _____

**Parent/Guardian/Patient Signature:**

_____

**Printed Name of Signer:** _____

**Relationship of Signer to the Minor Child:** _____

**Date:** _____

**Parent/Guardian/Patient Signature:**

_____

**Printed Name of Signer:** _____

**Relationship of Signer to the Minor Child:** _____

**Date:** _____

**Parent/Guardian/Patient Signature:**

_____

Accepted at 12/23/2025 12:08 PM by #AUTOACCEPT

**Printed Name of Signer:** _____

**Relationship of Signer to the Minor Child:** _____

Accepted at 12/23/2025 12:08 PM by #AUTOACCEPT

Z     P
DOB:        /2020
Age: 5 years
Gender: Male

**Patient Services Agreement**



Date of Visit: 01/06/2026 5:30 PM

### PATIENT SERVICES AGREEMENT

**Legal Name: ZAYN**

**Patient Name: Z     P**
**Patient Date of Birth:        /2020**

By having provided LifeStance my email address, I agree that we may send notices related to appointments, information on LifeStance services available, notices regarding online health portal messages, outstanding tasks, follow-up care, prescription, referrals, billing/account balance, and other operational and informational messages.

By having provided LifeStance my phone number, I agree to receive calls and text messaging (SMS) notifications to send notices related to appointments, information on LifeStance services available, notices regarding online health portal messages, outstanding tasks, follow-up care, prescription, referrals, billing/account balance, and other operational and informational messages.

## INFORMED CONSENT TO TREATMENT

1. **Mental Health, Behavioral Health, and Specialty Services.** I am consenting to participate in and give Lifestance[1] and its staff and employees permission to perform all necessary care and treatment involved in the mental or behavioral health care services provided to me including therapy and/or specialized services. I understand and acknowledge that engaging in such services involve assessment and treatment through various therapeutic approaches, which may help relieve symptoms but could also involve risks such as experiencing uncomfortable emotions, discomfort, and emotional distress, and I understand I am encouraged to discuss any such symptoms with my clinician immediately. I also understand that any lifestyle and/or behavioral changes I choose to make from these services could adversely affect my romantic, family, and other relationships. However, I understand that these services also have many benefits, and I am willing to put forth the effort required, maintain an open and motivated approach to sessions, and tell my clinician(s) if I believe an aspect of services needs to change. I understand that there are no guarantees about what will happen and that additional referrals to better address the presenting challenges may be warranted. I recognize that outcomes vary and depend on my active participation in treatment. No specific results are guaranteed. My provider will discuss recommended treatments, their risks and benefits, and reasonable alternatives with me, and I have the right to ask questions, refuse any treatment, or withdraw consent at any time. I understand that I will no longer be considered a patient of LifeStance if I have 1) not been seen by a LifeStance clinician in the past 90 days, 2) no future appointment scheduled, and 3) not expressed a desire to continue services. We may change the Services provided and/or advertised at any time without notice. I agree that my relationship with my LifeStance clinician will at all times remain professional and that I may review their qualifications and credentials on the LifeStance website or by asking directly. If I have concerns about my care, I may share feedback with my clinician or through LifeStance's Patient Feedback Form.
2. **Minor Patients.** If the patient is a minor unable to consent to treatment independently, I represent to LifeStance that I am the patient's parent or legal guardian, and I understand that the challenges described above
pertain to my child/adolescent and may also apply to me as the parent/guardian, and I acknowledge the
potential increase in behavioral issues that may arise as difficult issues are processed and strategies to modify the behaviors are implemented. I understand there is a risk of disagreement between parents or between
parents and mental or behavioral health services providers regarding treatment. LifeStance will work to resolve these differences in the interest of my child/adolescent's mental health. However, parents/guardians ultimately decide whether services will continue. I have received the Minor Patient Addendum and understand it must be completed prior to the first service appointment. I have received the Caregiver Policy Acknowledgment and understand it must be completed prior to the first service appointment. I understand that a minor able to consent to treatment independently under state law will be deemed to have done so. I understand that once a minor is legally able to consent to treatment independently, I will only have access to the minor's mental and behavioral health care records and information if the minor consents to that access, or as otherwise required by law or a Court order. I agree to provide LifeStance Health with a copy of all legal documents, including Divorce orders, Custodial agreements and Parenting agreements, that specify or authorize individuals responsible for Medical Decision-Making (including Medication Management) for the minor, at or before the first appointment, and to supplement those documents as new orders or agreements are received. I also understand that if 60 days elapse following a request for these records without a response, LifeStance Health may discontinue treatment.
3. **Couples, Family, or Group Therapy.** I understand that if I participate in couples, family, or group therapy, the couple, family, or group (rather than myself, individually) will be considered the patient for confidentiality and other purposes. Accordingly, I acknowledge that the following will apply in such circumstances:
    a. During couples, family or group therapy, the therapist will not reveal any individual's confidences to others in the couples, family, or group therapy without the prior permission of that individual.
    b. If one participant in the couples or family therapy requests the records from the therapy, those records will **NOT** be provided to that individual without receipt of a written authorization from all individuals participating in that the therapy who are legally able to consent to disclosure of those
records under applicable state law. Group therapy records are individualized, so the patient or their representative may request and receive those records with appropriate authorization.



Z____ P____
DOB: ____/2020
Age: 5 years
Gender: Male

**Patient Services Agreement**



Date of Visit: 01/06/2026 5:30 PM

   c. If a request is made for couples or family therapy records as part of a court proceeding, those records will **NOT** be provided without written authorization from all individuals participating in that the
therapy who are legally able to consent to disclosure of those records under applicable state law unless subpoenaed, or court-ordered to do so. If my records are subpoenaed or if a judge issues a court order for the therapy records, my therapist is legally obligated to comply. In the case of a subpoena, we will contact all individuals participating in the therapy so I (and/or my attorneys) can take steps to contest the subpoena. If I do not contest the subpoena after being notified, we will obey it.

   d. While LifeStance encourages all participants in couples, family or group therapy to keep such
matters confidential outside of the therapy, LifeStance is not responsible for one group participant's disclosure of another's confidential information. LifeStance does not permit participants in couples, family, or group therapy to record the session without express permission of all participants in the session.

4. **Risk of In-Person Services.** I understand I may have the option to receive treatment by telehealth and that by coming to the office, I assume the risk of exposure to airborne infections like COVID-19, the Flu, and other public health risks.

5. **Telehealth Services.** I understand that LifeStance clinicians may provide me with services via telehealth, and I authorize my LifeStance clinicians to do so at times in lieu of an in-person practitioner-patient office visit,
when permitted by state and federal law. I also understand that telehealth is the delivery of healthcare services using technology when the healthcare provider and the patient are not in the same physical location. I acknowledge and agree to the following with respect to telehealth services:

   a. Telehealth-based services and care may not be as complete as face-to-face services for certain patient needs and circumstances. LifeStance therapy services are not intended for and should not be used for urgent or emergency situations.

   b. There are potential risks associated with telehealth technology, including interruptions, unauthorized access and technical difficulties, and neither LifeStance nor my healthcare provider will be liable for technology failures.

   c. My healthcare provider or I may unilaterally choose to discontinue the telehealth encounter if it is determined the technology is not appropriate under the circumstances.

   d. I have the right to withhold or withdraw my consent to the use of telehealth and/or telehealth services during my care at any time, without affecting my right to be referred for future care or treatment from a qualified provider who provides in-person care.

   e. A variety of alternative methods of health care may be available to me from other healthcare providers, such as an in-person encounter in lieu of a telehealth encounter, and I may choose one or
more of those options at any time from a provider who may, or may not, be affiliated with LifeStance.

   f. Telehealth may involve electronic communication of my personal healthcare information to other
healthcare practitioners who may be located in other areas, including out of state or internationally when appropriate for providing me with care that I request.

   g. All existing confidentiality protections apply to telehealth encounters, and I have the right to access
all healthcare information related to telehealth encounters and to receive copies of such information at cost upon request.

   h. There will be no further dissemination of any of my protected health information to other entities without my further written consent, or as otherwise permitted by law.

   i. People other than my healthcare provider may be present in order to facilitate the telehealth consultation, and I will be informed of their presence.

   j. I have the rights to access healthcare records created as a result of a telehealth encounter in accordance with applicable state and federal patient privacy laws, and all records will be maintained in a manner that complies with state and federal patient privacy laws.

   k. My telehealth encounters will not be recorded without my express written consent.

   l. When using technology to facilitate healthcare delivery, there may be cultural or language differences that may affect the delivery of services.

   m. There is the possibility of the denial of insurance benefits for telehealth encounters.

   n. If requested, I will be provided with information regarding my healthcare provider(s)' license number, physical location and contact information.

   o. If requested, I will be provided with LifeStance's social media policy, encrypting policy, policies on the collecting, documentation, tracking, and storage of my personal information.

   p. It is my duty to inform my healthcare provider of electronic or in-person interactions regarding my care that I may have with other healthcare providers.

   q. I may ask my healthcare provider any questions I may have regarding this consent before proceeding with a telehealth encounter.

6. **Medication Data.** I understand that information regarding medications currently in use can assist providers in tailoring therapy to be more effective and to assist in avoiding side effects or adverse reactions due to conflicting prescriptions. As an exercise of my individual right of access, I authorize my provider to access and import into LifeStance's electronic patient record, all available information regarding drugs dispensed to me at any time in the past (collectively, "Dispensed Drug History"), regardless of source or circumstance. I understand that LifeStance will incorporate my Dispensed Drug History into its legal patient record and will only use or disclose my Dispensed Drug History as described in its Notice of Privacy Practices or as permitted or required by applicable law.

---



**Patient Services Agreement**



DOB: /2020
Age: 5 years
Gender: Male

Date of Visit: 01/06/2026 5:30 PM

7. **State Addendum.** I acknowledge that I have accessed and reviewed the state-specific addendum applicable to the LifeStance location(s) providing my care.

8. **Communication via Patient Portal.** I understand that the best way to communicate with LifeStance providers and staff is via the secure and safe patient portal. I understand and appreciate that communication via the patient portal is strongly encouraged, so I agree to utilize the portal for communication as much as possible and as necessary. I understand that LifeStance requires seventy-two (72) business hours' notice to respond to medication refill requests.

9. **Text/Email Communication.** Prompt communication is paramount to addressing my mental health needs and as a result LifeStance utilizes multiple avenues of communication to ensure engagement. I understand that LifeStance may need to communicate with me about its services, my health, and my appointments via email or text messages. By providing my email address and telephone number, I hereby authorize LifeStance (and its service providers) to send me emails and texts regarding appointments, information on LifeStance services available, notices regarding online health portal messages, outstanding tasks, follow-up care, prescription, referrals, billing/account balance, service offerings, educational information, other operational and informational messages during my active care and after my last session, treatment until I unsubscribe or opt out of communications. I understand that I can opt out of receiving that type of text messages by texting "STOP" to the phone number from which I received the text message, and I can opt out of receiving emails by clicking the unsubscribe link in the email. I also understand that sending this information over unencrypted email or text creates the potential for unauthorized parties to intercept the information and that if someone else has access to my email or text account, they may see this information. I acknowledge that these kinds of unauthorized access could allow someone to know that I am receiving mental and/or behavioral health care or, in extreme cases, when combined with other information that may be available about me from other sources, lead to medical identity theft. I understand that LifeStance requires seventy-two (72) business hours' notice to respond to medication refill requests. I understand that message and data rates may apply for any messages sent between myself and LifeStance. I have been made aware that if I have any questions about my text plan or data plan, it is best to contact my wireless provider.

10. **Health Information Exchange.** I understand that my medical information may be accessed and shared with a health information exchange (HIE) in the state that I reside. The HIE allows health care providers and patients to securely share and access medical information electronically to improve patient outcomes. I have the option to opt-out and prevent my health information from being shared or viewed in my state's HIE system. If I choose to opt-out, my providers may not have immediate access to all the important information needed to make the best decision about my healthcare. I understand that more information is available on the sharing and accessing information in the HIE upon request. By signing this Patient Services Agreement, I agree to HIE access, sharing of all my medical information including sensitive health information, and understand that if I opt-out, I may request to opt back in at any time. To opt-out complete the opt-out form which is available upon request from Compliance@LifeStance.com or through the Patient Feedback Form located on the Company website, Contact Us page.

11. **Consent for Recorded Communications and Appointments.** By signing below and engaging with LifeStance via phone or during clinical appointments, I consent to the recording of these interactions. Phone calls may be recorded for clinical assessments, quality assurance, and internal training purposes, while appointments may be recorded through a digital note taker to create an accurate and timely record of care. This allows clinicians to focus fully on the conversation, enhancing the quality of care. Recordings of appointments may capture my voice and are transcribed shortly after the session, after which the audio is permanently deleted. All recordings, storage, and use of my data will comply with the Health Insurance Portability and Accountability Act (HIPAA) and LifeStance's Online Privacy Policy. If I do not agree to these terms, I must notify LifeStance in writing to opt out. My continued engagement signifies my acceptance of these conditions. I understand that I have the right to withdraw my consent at any time and am encouraged to discuss any questions or concerns with my clinician.

12. **Training Organization Consent.** I understand that LifeStance is a training organization dedicated to education and development of future mental health professionals. As part of this mission, students, residents, clinical interns, fellows, preceptors, observers, or provisionally licensed clinicians may be present during my sessions and/or treatment. I consent to their participation in my care under supervision, even if they are unlicensed, provisionally licensed, or in training. I retain the right to withdraw this consent at any time, even temporarily, without affecting the quality of my care, my relationship with LifeStance or my clinician.

13. **Treatment Plan Acknowledgment.** By executing this Patient Services Agreement, I acknowledge and agree to the Treatment Plan developed by my treating clinician. This plan will be reviewed with me periodically, and I agree to actively participate in these discussions. I will communicate any concerns, updates, or desired changes to ensure the Treatment Plan accurately reflects my goals and needs. I acknowledge that my involvement is essential to maintaining a collaborative and effective treatment process.

14. **Patient Rights and Acknowledgments.** By signing below, I acknowledge that I have received and had an opportunity to ask any questions about LifeStance's Notice of Privacy Practices and the Patient's Rights and Responsibilities. I agree and acknowledge that I have received, reviewed, and agree to abide by the Rights and Responsibilities document which outlines mutual expectations, including but not limited to: participation in care, not recording care sessions, respectful interactions with staff, etc. I understand that violations of these terms may result in corrective action, up to and including termination of services.

15. **Non-Discrimination, Disability Assistance, and Limited English Proficiencies Support.** I understand that LifeStance complies with applicable federal civil rights laws and does not discriminate, exclude, or treat any person differently on the bases of race, color, national origin, age, religion, disability, physical gender, sexual orientation, gender identity, or health status. LifeStance complies with Americans with Disabilities Act of 1990 or ADA (42 U.S.C. § 12101), and I understand that if I need assistance or tools, that I should let my LifeStance care center know so they can provide the appropriate accommodations and

EXHIBIT P
Page 45 of 68



**Patient Services Agreement**



Date of Visit: 01/06/2026 5:30 PM

Z____ P____
DOB: ____ 2020
Age: 5 years
Gender: Male

tools. I understand that I can call toll-free 1-800-308-0094 ext 6 or email Compliance@LifeStance.com for assistance and escalation. LifeStance desires to provide language assistance to individuals with limited English proficiency, so if I require translation or interpretation services or documents in another language, I should please inform the health care center. I understand an outside vendor is used for these services and consent to their support as LifeStance's HIPAA compliant business associate.

16. **Digital Communications.** I understand that LifeStance offers virtual care services and the ability to send and receive emails to and from the care team via the online health portal. Virtual care uses technology to enable LifeStance providers to evaluate and treat patients as an alternative to an in-person office visit. I understand that my provider will determine whether a virtual care visit is clinically appropriate. During my appointment, details of my medical history, examinations and diagnoses will be discussed. There are potential risks and technical failures when using virtual care including interruption and/or disconnection of audio/video. I understand that patients have the option to withhold/withdraw consent to treat virtually at any time. While LifeStance takes many precautions to protect my information and the security of the emails it sends and virtual care appointments, I appreciate that there are still risks and LifeStance cannot guarantee all digital communications are secure and confidential. I understand that LifeStance recommends that I do not send sensitive information through mobile text messages. Text messages can remain stored on portable mobile devices for an indefinite period and may be exposed to unauthorized third parties. I am responsible for protecting my email account password, mobile device or other means of access to my email and virtual care appointments. LifeStance is not liable for improper disclosure of confidential information that is not caused by LifeStance's misconduct. I understand that I am responsible for informing LifeStance Member Services if I want to cease or limit communications with LifeStance. I may do so at any time without reason or explanation. By signing this agreement, I acknowledge that I have read this section and understand the risks and benefits of using LifeStance's digital communication methods. LifeStance's electronic communications are secure and designed with the Health Insurance Portability and Accountability Act (HIPAA) standards in mind. However, transmitting sensitive information electronically has the inherent risk of a third-party's unauthorized access. By permitting digital communications, I acknowledge and agree that I am aware of and accept these risks.

17. **Website and Patient Portal.** I understand that I must not attempt to bypass security protections on the LifeStance websites, introduce viruses or other harmful code, or use LifeStance website to attack other websites or services. By registering for a user account on a LifeStance website, I understand and agree to keep my password confidential and not allow other people to use my account. I understand that if I input, send or upload information to a LifeStance websites, that information may be used for any purpose, including commercial uses, product development, and advertising. Personal information will be handled in accordance with our Online Privacy Policy. I understand that I should not provide information that I want to keep confidential or that I do not have the rights to post.

18. **International Vendors.** To support efficient response times on billing and administrative issues for patients, LifeStance Health may from time-to-time partner with international administrative vendors. This means my Protected Health Information (PHI), including claims data and demographic information, may be accessed by vendors outside the United States for processing purposes. All data continues to be stored securely within U.S. systems. I agree that by receiving care from LifeStance, I acknowledge and consent to this arrangement unless I choose to opt out. LifeStance maintains strict contractual safeguards with all vendors to protect your PHI in accordance with all applicable HIPAA and privacy requirements.

19. **Reviews and Social Media Consent.** By posting reviews, testimonials, or social media content related to my experience with LifeStance, I understand that any public posting (e.g., on review platforms, social media, or forums) may disclose my status as a LifeStance patient or the status of another individual under my legal authority. I acknowledge and agree that LifeStance may, in its sole discretion, reproduce, modify, or display my publicly posted reviews, testimonials, or feedback (collectively, "Content") for promotional, marketing, or informational purposes, including but not limited to, third-party review platforms (e.g., Zocdoc, Google Reviews), LifeStance's official website, brochures, or advertisements, or welcome materials or communications for prospective patients. LifeStance will make reasonable efforts to avoid associating my full name with reused Content if my original post discloses such information. However, I acknowledge that other identifying details (e.g., usernames, partial names, or treatment specifics) may remain visible. I agree that LifeStance may use the Content without obligation to provide attribution, payment, or additional consent. LifeStance affirms that its use of Content will adhere to applicable laws, including HIPAA regarding protected health information and FTC guidelines for endorsements and testimonials. Requests to remove or modify Content must be via the Patient Feedback Form located on the Company website, Contact Us page. LifeStance will comply with such requests where feasible but cannot guarantee removal from third-party platforms. I confirm that I have read and voluntarily agree to these terms.

### B.   FEES, THIRD-PARTY PAYORS AND SELF-PAY TIERS

I agree to pay LifeStance for all charges incurred for services LifeStance renders to me, and I assign to LifeStance any monies due and owing under my health insurance plan or other third-party payor, including government payors, worker's compensation payors, personal injury case defendants, and medical benefits accident insurance payors ("Med Pay"). I understand that LifeStance may amend the fee schedule and its Terms of Service from time to time in its sole and absolute discretion and without prior notice but understand it will be available on the company's webpage or upon request. I also understand and agree that:

1. **Primary Payment Responsibility.** I understand I am responsible for payment for all services provided by LifeStance and understand that some services may not be covered by insurance. It is my responsibility to ensure your health plan benefits can

EXHIBIT P
Page 46 of 68



**Z      P**
DOB:      /2020
Age: 5 years
Gender: Male

**Patient Services Agreement**



Date of Visit: 01/06/2026 5:30 PM

be used for our services. To verify, please call the number on the back of your insurance card. All LifeStance invoices for services and costs are due upon receipt, and all copay, coinsurance, and deductible amounts are due at the time service is delivered. LifeStance accepts credit and debit card (collectively "credit card") payments. I understand that LifeStance uses a third-party service that facilitates in-person and online payment transactions and that LifeStance will not directly keep my credit card information on file. I grant LifeStance the right to automatically charge my credit card on file in each of the circumstances specifically identified in this agreement through the third-party service that LifeStance uses to facilitate credit card transactions.

2. **Authorization to Bill Credit Card on File.** I authorize LifeStance Health to charge the credit/debit card provided (the "Card") for all outstanding balances, including but not limited to, co-payment and co-insurance amounts, self-pay fee schedule amounts, no-show/cancellation fees, other administrative fees, and any balance remaining after insurance adjudicates the claim relating to services provided to the patient. I understand that it is my responsibility to ensure that the information for the Card on File is current at the time of service, as necessary, and that if payment is declined, LifeStance Health may decline to provide new services until payment is received or a new Card is put on file. I certify that I am an authorized signer for the Card with all necessary rights to authorize the charges. While most charges will usually occur within ninety (90) days after care is rendered, this timeline may vary depending on insurance claim processing. The Card will be used to collect any unpaid co-payments due, on or within three (3) days of the date of service. All other balance payments will be charged to the Card or other payment methods as decided by the patient after adjudication with the patient's insurance company. Patients with a Card on file may receive an electronic notification detailing their outstanding balance at least five (5) calendar days before processing the charge. Terms may be updated periodically. The most current billing policies can be found in the online Credit Card On File and Financial Responsibility Policy. The exception to this process is for balances exceeding $500 will follow a separate collections process and will not be automatically charged to your card without additional authorization. This process is subject to change and notice will be provided on the company's website. Payments paid via a credit card may no longer be considered medical debt and are not subject to certain protections. I understand that I must notify LifeStance of card changes/expirations. I may cancel this authorization in writing with thirty (30) days' notice but understand that may disqualify me from receiving services at LifeStance as permissible under state law. **THE CARDHOLDER NAMED ON THE CREDIT CARD ON FILE WITH US, OR ANY AUTHOIRZED USER OF THAT CARD, IS ULTIMATELY RESPONSIBLE FOR THE PAYMENT OF ANY OUTSTANDING BALANCE ON THE ACCOUNT.**

3. **Patient Responsibility and Commitment, Cancellations and Missed Appointments.** I understand that it is important to show up for my appointments with my clinicians, and to show up on time. A minimum of two (2) business days' notice is required to avoid any fees for cancelled and missed appointments. If this notice is not received or if the patient fails to show for the appointment within the first fifteen (15) minutes of a scheduled therapy appointment or five (5) minutes of a scheduled medication appointment, I agree to be personally responsible for payment for the full amount for the time reserved for the appointment. I agree to and understand my obligation to pay the Late Cancellation/No Show Appointment fee stated in the State-Specific Addendum to this Patient Services Agreement. I grant LifeStance the right to charge my credit card on file for that fee if applicable. I understand that health insurance does not pay for fees incurred for missed appointments. If unforeseen situations beyond my control arise, such as illness, bereavement, and accidents, etc., I
will promptly provide LifeStance with documentation of same to avoid being billed for the full amount of the fee.

4. **Third-Party Payors, Generally.** I am responsible for all monies due and owing for services rendered by LifeStance that are not paid by a third-party payor. LifeStance will use the insurance information on file to bill for its services, as applicable. It is ultimately my responsibility to ensure that any third-party payor covers, and makes timely payment for, LifeStance's services. If any monies received by LifeStance from a third-party payor are later recouped from LifeStance any time after their receipt, I will be responsible for those monies recouped. I grant LifeStance the right to charge my credit card on file for all requested services or tests: (i) at the time of service; (ii) upon notice from a third-party payor that any full or partial charges are not covered by the third-party payor and/or (iii) if any previously paid amounts are recouped by the third-party payor.

5. **Self-Pay Only with Health Insurance Coverage.** If I have health insurance coverage that may cover some or all the services provided by LifeStance, but I choose to self-pay and not use insurance to cover any LifeStance services, I understand that I will be fully responsible for payment of all services at the time of service. I grant LifeStance the right to charge my credit card on file for all requested services or tests. By choosing this self-pay only option, I agree to not submit claims for LifeStance services to my health plan for reimbursement, and I understand that any payments I make to LifeStance will not be credited toward satisfying any deductible or cost-sharing obligations I may have under my health insurance plan.

6. **Self-Pay Combined with In-Network Health Insurance Coverage.** I understand that if my LifeStance provider is an in-network provider for my health insurance plan, LifeStance may not bill me directly for any services that are otherwise covered under my health insurance plan. I certify that I have verified that any self- pay services I request of my LifeStance provider are not covered services under my health plan. For any services or tests that are not covered by my health insurance plan, I grant LifeStance the right to charge my credit card on file for all requested services or tests at the time of service or upon insurance denial of coverage. For cost sharing, the right to charge my credit card on file for all requested services or tests at the time of service delivery or upon notice from the health insurance company that any LifeStance charges are the patient's responsibility.

7. **Self-Pay and Government Payors.** I understand that most LifeStance clinicians are participating providers for government-sponsored health plans and that LifeStance may not bill me directly for any services that are otherwise covered for me by government payors. I certify that I have verified that any self-pay services I request of my LifeStance clinician are not covered services under any government-sponsored health plans under which I am a covered participant. I grant LifeStance the right to charge my credit card on file for all requested services or tests at the time of service or upon notice from the government payor that any LifeStance charges are the patient's responsibility.

---

EXHIBIT P
Page 47 of 68



**Z    P**
DOB:    /2020
Age: 5 years
Gender: Male

**P a t i e n t   S e r v i c e s   A g r e e m e n t**



Date of Visit: 01/06/2026 5:30 PM

8. **Self-Pay and No Health Insurance.** If I do not have health insurance or qualify for government payor benefits for LifeStance services, I understand that I will be fully responsible for payment of all services at the time of service, and I grant LifeStance the right to charge my credit card on file for all requested services or tests. I understand that being a Medicare beneficiary disqualifies me from being a self-pay patient for LifeStance services unless my clinician has opted out of participation and I sign an annual private-pay services agreement.

9. **Right to a Good Faith Estimate.** I understand that if I am not enrolled in a health benefits plan or choose to not use my health benefits to pay for therapy services I have the right to receive a Good Faith Estimate for the total expected cost of services. Please submit make a request for a Good Faith Estimate by calling LifeStance's Billing Office. I agree that if I receive a bill from LifeStance that is at least $400 more than the Good Faith Estimate, I can dispute the bill by calling the LifeStance Billing Office. For questions or more information about my right to a Good Faith Estimate, visit www.cms.gov/nosurprises or call 844-256-9902.

10. **Off-Label Treatments and Tests, Generally.** Many clinically appropriate medications, assessments or treatments are not currently FDA-approved or are considered experimental by third-party payors and may not be reimbursable from third-party sources. I grant LifeStance the right to charge my credit card on file for all requested off-label treatment or tests not covered by third-party payors at the time of service or upon notice of denial of payment by a third-party payor.

1. **Full Coverage for Testing and Assessments.** Coverage and cost for psychological and psychiatric assessments and tests vary across different third-party payors, and I am responsible for the costs for the tests regardless of whether the costs are reimbursable by third-party payors on my behalf. This is because not all psychological testing services are covered by third-party payors. At times, third-party payors do not fully reimburse psychological testing services, even if provided by an in-network provider. There are a variety of situations when this occurs; for example, when: (a) the third-party payor does not consider psychological testing "medically necessary" for "experimental" or "investigational" diagnoses; or (b) when the third-party payor reimburses for fewer hours than billed by LifeStance. I understand that I will be fully responsible for payment of all services upon service delivery or upon notice of denial of payment by a third-party payor. I grant LifeStance the right to charge my credit card on file for all requested services or tests not covered by third- party payors at the time of service or upon notice of denial of payment by a third-party payor.

2. **Collections.** If my account is turned over to an attorney or agency for collection, I agree to pay all costs of collection including, but not limited to, court costs and legal and collection fees. If my account is not paid when due, a service fee and/or interest will accrue as permitted by law.

3. **Other Insurance or Litigation Payor Sources.** Regarding any administrative or personal injury cases, I am responsible for fees incurred when due regardless of the outcome of pending litigation. The fees incurred will be in accordance with LifeStance's standard fees for court testimony, depositions, and other litigation support as itemized in LifeStance's then-current chargemaster. I grant LifeStance the right to charge my credit card on file for all requested services, fees or tests at the time-of-service delivery. If there are any remaining balance(s) due at the time of case settlement, I authorize and will require my attorney to pay my outstanding accounts with LifeStance in first priority for payment from the settlement proceeds. LifeStance does not accept contingency fee arrangements.

4. **Med Pay Coverage.** If I have Med Pay coverage, I permit LifeStance to classify and treat the Med Pay payor as the primary insurer over any other third-party payors. I irrevocably agree to a waiver permitting payment of Med Pay funds directly to LifeStance first in priority over me personally and any other potential claimant to the funds.

5. **Forensic Legal Requests.** I understand that forensic legal requests, conferences, and telephone calls involve additional time and record-keeping for LifeStance, and I am responsible for all direct costs and expenses incurred by LifeStance, and its attorneys and agents, in responding to discovery requests (including depositions and subpoena duces tecum time and labor costs) and relating to conferences (including, but not limited to court appearances, preparation of reports, photocopying, faxes, long-distance telephone calls, out of office travel, overnight delivery, and courier services). I grant LifeStance the right to charge my credit card on file for all such requested forensic legal services and documentation time.

6. **Assignment of Benefits.** I acknowledge and agree that LifeStance may receive payments directly from any third party for the non-covered health care services provided to me by LifeStance. I authorize LifeStance to release any information needed to determine benefits payable by a third party or their agents. In the event that I receive any payment from a third party for a non-covered health care service, I agree to turn over the payment in full to LifeStance. In addition to assigning all payments to LifeStance for services rendered, I hereby agree to assign all of my related rights and obligations under my insurance plan to LifeStance and its representatives, grant this limited power of attorney, including specifically the right to file claims, litigate and appeal claim denials and pursue causes of action under the Employee Retirement Income Security Act (ERISA) or other laws. I hereby permit a signature on file or copy of this Agreement to be used in place of my original signature.

7. **Health Savings Account.** Per IRS regulations, if I participate in a high-deductible health plan with a health savings account (HSA) feature, I may be required to pay a fair market value fee for certain available non-preventive and urgent services until my deductible has been satisfied. I understand that if I have an HSA and I do not pay on a fee-for-service basis for these services, I may lose my ability to contribute to my HSA.

8. **Your Information.** You agree to provide and update LifeStance with accurate personal information including but not limited to contact information and insurance information. Your failure to update this information may result in denied payments or

---

**LifeStance Health**

Provider: STACEY MERRILL

EXHIBIT P
Page 48 of 68



**Z      P**
DOB:      /2020
Age: 5 years
Gender: Male

**P a t i e n t   S e r v i c e s
A g r e e m e n t**



Date of Visit: 01/06/2026 5:30 PM

inaccurate charges.

### C. LEGAL PROCEEDINGS OR LITIGATION

1. **Denial of Requests for Minor Records.** I understand and agree that my child(ren) deserve to have a safe place to talk about his/her/their thoughts, feelings, concerns, and mental health. I understand that to the extent permitted by law, LifeStance and its employees will honor my child's privacy to the extent it is possible to do so and will treat anything said in a session between a LifeStance clinician and my child(ren) as confidential. While I, as the parent, may be legally entitled to some information about my child's therapy, especially if there are any safety risks to my child or others, I understand that LifeStance has the right to deny any request from me for a copy of my child(ren)'s confidential mental health care records, if in the good faith opinion of the recipient of the request, circumstances warrant denial and/or that denial is permitted or required by applicable state or federal laws.
2. **No Subpoenas.** Should there be legal proceedings (including but not limited to divorce and custody disputes), neither I, my attorneys nor anyone acting on my behalf will subpoena records from LifeStance or subpoena a LifeStance employee to testify in court, or in any legal proceeding such as, but not limited to, a deposition. If LifeStance or its employee is subpoenaed to provide records or give testimony in violation of this agreement, I understand that LifeStance will obey the subpoenas as required by law. However, I understand that this may present a conflict of interest for LifeStance, so LifeStance may terminate its professional, therapeutic relationship with me immediately and refer me and/or my child(ren) to other mental/behavioral health providers.
3. **No Custody Evaluations or Recommendations.** If a LifeStance employee is subpoenaed to give testimony in violation of this agreement, LifeStance and its employees will **NOT** provide custody evaluations or recommendations regarding access to or visitation with minor children. LifeStance employees will **NOT** provide legal advice or provide expert testimony or opinions.
4. **Payment for Legal Work.** I understand that if a LifeStance employee is subpoenaed to provide testimony in a court proceeding related to LifeStance services provided to me and/or my family, I will pay LifeStance for all of the employee's services relating to that subpoena and testimony, including, but not limited to: travel, reasonable expenditures (copies, parking, meals, and the like), time spent speaking with attorneys, reviewing records, subpoenas, and other documents, and otherwise preparing for the testimony, as well as the time spent waiting to testify and testifying, at the rate of $75 per 15-minutes. The minimum rate for deposition and hearing testimony will be 3 hours or $900. I understand that while LifeStance may try to secure some payment from the requesting attorney for those fees, that assistance is not guaranteed, and I am obligated to pay any difference between what is recovered from the requesting attorney and the total amount I am billed for the LifeStance employee's time on that legal matter.
5. **Terms of Service.** By using the LifeStance website, signing this Agreement and consenting to ongoing care, I understand that LifeStance has the right to revise the terms of this Agreement at any time in our sole discretion by posting the revised Agreement on the LifeStance.com website, without notifying patients before or after the changes. I agree that continued use of the Service after any such changes constitutes my acceptance of the revised Agreement.  When changes are made to this Agreement, they will become immediately effective when published unless otherwise noted. I understand I should periodically review to see if changes have been made that may affect me. I have bene informed that if I do not agree to the Agreement as modified, then I must discontinue my use of LifeStance and its services and website. I agree that LifeStance may assign this Agreement at any time with or without notice. I understand that I may not assign or sublicense this Agreement or any of my rights or obligations under this Agreement without LifeStance's prior written consent.
6. **US Residents Only.** The Services provided by LifeStance are only available to US residents and in the territory in which LifeStance has licensed clinicians. Those who choose to access a LifeStance website do so on their own initiative and at their own risk, and are responsible for complying with all local statutes, orders, regulations, rules, and other laws. I am subject to United States export controls and are responsible for any violations of such controls, including without limitation any United States embargoes or other federal rules and regulations restricting exports. LifeStance may limit a LifeStance's website availability, in whole or in part, to any person, geographic area or jurisdiction it chooses, at any time and in its sole discretion. This Agreement, as well as all other documents related to it, including notices and correspondence, will be in the English language only unless otherwise requested.

### A. PATIENT DISCHARGE OR TERMINATION

1. **Discharge by a LifeStance Clinician.** I understand that if any of the following occurs, my clinician *MAY* discharge me as a patient and provide referrals to other mental health professional(s), within LifeStance and/or at other health care facilities: (A) my provider believes that their approach, skills, and/or training are no longer appropriate for my (or my child/ren's) specific concerns; (B) my provider believes that the goals of my (or my child/ren's) treatment have been met and further services are no longer needed; (C) my provider believes that my continued failure to adhere to clinical advice creates a conflict of care for my provider, and/or has damaged my provider-patient relationship; (D) I (or my child/ren) move to a state where my provider is not licensed to practice; (E) I schedule a session, and then I (or my child/ren) do not show up for that session, and then do not call my provider within 14 days of that session, or if I (or my child/ren) frequently cancel or do not attend sessions with my provider; (F) I choose to involve LifeStance or my provider in legal proceedings by issuing a subpoena for treatment records or testimony in court or in a deposition, or otherwise involving LifeStance or its employees in a lawsuit that I am a party to, and LifeStance determines that this creates a conflict of interest, or otherwise could damage the provider-patient relationship. In addition to any right or remedy



Z   P
DOB   2020
Age: 5 years
Gender: Male

**Patient Services Agreement**



Date of Visit: 01/06/2026 5:30 PM

that may be available to LifeStance under applicable law, LifeStance may suspend, limit, or terminate all or a portion of my access to services or its website or any of its features at any time with or without notice and with or without cause, including without limitation, if LifeStance believes that I have violated or acted inconsistently with the letter or spirit of this Agreement or the LifeStance Patient's Rights and Responsibilities. LifeStance may be protected for liability from these actions under the Communications Decency Act, 47 U.S.C. § 230. This is not an exclusive list of the reasons why a LifeStance clinician may discharge me from their services.

2. **Termination by LifeStance.** I understand that if any of the following occurs, my clinician *MAY* terminate my (and/or my child/ren's) care with that clinician *AND* with LifeStance, and LifeStance will provide referrals to other mental health professional(s) at other health care facilities: (A) LifeStance believes that I (or my child/ren's) behavior, communications, and/or actions are oppressive, violent, abusive, a safety threat to LifeStance employees or patients, or constitutes harassment, stalking, discrimination, or a violation of federal or state laws; (B) LifeStance believes that I have failed to comply with LifeStance's financial policies and procedures. This is not an exclusive list of the reasons why LifeStance may terminate my care with that clinician and/or with LifeStance.

3. **Final Decision.** I understand that my provider's discharge or termination decision will be final. If I request and authorize it in writing, my provider will confer with my new provider(s) to help with the transition.

4. **Death, Incapacity, or Disability**. I understand that in the event of my provider's death, incapacity or disability, LifeStance will arrange for another provider to meet with me (or my child/ren), and to make appropriate referrals to other providers, if necessary, and will provide me with written notification of that transition and transfer.

**Informed Consent, Patient Services and Financial Agreement Signature Page**

Date: 01/06/2026

Printed Name of Signer: Adrian Powell

Relationship of Signer to Patient, if applicable: Patient's parent

"LifeStance" includes LifeStance Health, Inc., and its subsidiaries and affiliates, including the mental and behavioral healthcare entities that LifeStance Health, Inc. manages and/or controls from time to time.

---

☑ I Accept      *Adrian M Powell Jr*



Z    P
DOB:      /2020
Age: 5 years
Gender: Male

**P a t i e n t   S e r v i c e s
A g r e e m e n t**



Date of Visit: 01/06/2026 5:30 PM

### PROVIDER- PATIENT ARBITRATION AGREEMENT

**WHY ARBITRATION?** At LifeStance Health ("LifeStance"), patient care is paramount – the driving force in all we do. To focus our time, attention, and resources on patient care, while providing opportunities for dispute resolution, we have implemented a Provider Patient Arbitration agreement to allow an efficient forum to resolve any disputes. The arbitration process streamlines and simplifies disputes and offers financial savings to patients and LifeStance if a dispute arises and more timely resolution of billing, care and other disputes, supporting our ability to provide compassionate, high quality mental and behavioral healthcare for all patients.

Article 1: **Agreement to Arbitrate:** It is understood that any dispute as to medical malpractice, that is as to whether any medical services rendered under this contract were unnecessary or unauthorized or were improperly, negligently or incompetently rendered, will be determined by submission to arbitration as provided by the law of the state in which the services were delivered, and not by a lawsuit or resort to court process except as such state law provides for judicial review of arbitration proceedings. Both parties to this contract, by entering into it, are giving up their constitutional right to have any such dispute decided in a court of law before a jury, and instead are accepting the use of arbitration. It is the intention of the parties that this agreement bind all parties whose claims may arise out of or relate to services rendered by LifeStance or its affiliates, including current or future spouses, parents, heirs, executors, representatives, successors, or assigns of the parties.

Article 2: **All Claims Must be Arbitrated:** The parties intend and agree that any dispute that does not relate to medical malpractice, including disputes arising out of or relating to this agreement or its subject matter, or the services rendered by LifeStance or its affiliates, or any breach of this agreement, including any dispute regarding the scope of this clause, will be determined by submission to binding arbitration as provided by the law of the state in which the services were delivered, and not by a lawsuit or resort to court process except as state law provides for judicial review of arbitration proceedings. All claims for monetary damages exceeding the jurisdictional limit of small claims court against LifeStance or its affiliates must be arbitrated including, without limitation, claims for loss of consortium, wrongful death, emotional distress, injunctive relief, or punitive damages. Filing of an action in court by LifeStance or its affiliates to collect fees from the patient shall not waive the right to compel arbitration of any malpractice claim.

Article 3: **Procedures and Applicable Law:** Arbitration shall be administered by the American Health Law Association Dispute Resolution Service and conducted pursuant to AHLA Rules of Procedure for Arbitration. Judgment on the award may be entered and enforced in any court with jurisdiction. Claims will be heard by a single arbitrator, who will determine the appropriate location for the hearing, and establish rules for discovery and evidence. The Arbitrator may not certify a class action but otherwise may award any relief authorized by law. This agreement shall be governed by and construed in accordance with the laws of the state in which services were delivered, without regard to choice or conflict of law provisions or rules. The parties acknowledge they are giving up their constitutional right to have a dispute decided in a court of law before a jury and agree to arbitration. The parties agree to keep the arbitration confidential but may disclose the existence of this arbitration, information about what has taken place or may take place in this arbitration, the award, or information about the outcome of this arbitration, only as needed to: (a) present claims and defenses in arbitration; (b) pursue or oppose legal remedies in court pertaining to this arbitration, including enforcement of an award; (c) comply in good faith with applicable laws, rules, regulations, court orders, or other legal requirements; or (d) comply with the award. The parties reserve the right to enter into, or request from the arbitrator, a more detailed confidentiality agreement or protective order.

If any provision of this Arbitration Agreement is held invalid or unenforceable, the remaining provisions shall remain in full force and shall not be affected by the invalidity of any other provision. I have the right to receive a copy of this Arbitration Agreement. Questions about this agreement should be sent to arbitrationFAQ@lifestance.com and we will respond.

*__THIS CONTRACT CONTAINS A BINDING ARBITRATION PROVISION WHICH MAY BE ENFORCED BY THE PARTIES. NOTICE: BY SIGNING THIS CONTRACT, YOU ARE AGREEING TO HAVE ANY ISSUE OF MEDICAL MALPRACTICE DECIDED BY NEUTRAL ARBITRATION AND YOU ARE GIVING UP YOUR RIGHT TO A JURY OR COURT TRIAL. SEE ARTICLE 1 OF THIS CONTRACT.__*

**Legal Name:** Z

**Date:** 01/06/2026

**Patient Signature:** Z    F    **Adrian Powell**

**Indicate relationship if signing for patient:** Patient's parent

☑ I Accept          *Adrian M Powell Jr*
☐ I Decline

---

**ZAYN POWELL**
DOB: 07/23/2020
Age: 5 years
Gender: Male

**Minor Child Addendum**



Date of Visit: 01/06/2026 5:30 PM

---

### MINOR CHILD ADDENDUM

*Form must be completed for all patients seeking treatment age 18 or younger.*

I, Adrian Powell, state and attest that I may legally consent to medical, mental health and/or substance abuse treatment for the minor child ZAYN POWELL under the following authority:

[ ] Self (if I am of the legal age to consent under state law)

[X] Biological or Adoptive Parent

[ ] Department of Human Services (DHS)

[ ] Guardian/Legal Custodian/Other

**Divorce Proceedings or Other Legal Proceedings**

Have there ever been any legal proceedings that affect the decision-making authority regarding the minor child, including but not limited to: divorce, legal separation, paternity, termination or limitation of parental rights, proceedings regarding participation in therapy, or an assignment of legal custody/guardianship?

[ ] Yes

[X] No

**Documentation**

Do legal documents exist that in any way address or affect the legal authority to make medical/health decisions for the minor child or that in any way address participation in therapy, contact between a minor child and a parent, or provision for payment of medical or therapy bills? Such documents may include court orders, parenting agreements, separation agreements, etc.

[ ] Yes

[X] No

The person signing this statement should attach documents verifying their legal authority to make medical decisions for the minor child, unless the person signing is the child or if the person signing is the biological or adoptive parent of the child and there have been no legal proceedings or actions that have affected their decision-making authority regarding the minor child.

Names of all other persons with medical decision-making authority:

I attest that the information communicated in this form is complete and accurate to the best of my understanding.

**Date: 01/06/2026**

**Printed Name of Signer: Adrian Powell**

**Relationship of Signer to the Minor Child: Patient's parent**

(A signature is required for the information on this form to be considered valid.)

Adrian M. Powell Jr

---

LifeStance Health                                        Provider: STACEY MERRILL

EXHIBIT P
Page 52 of 68



**Z P**
DOB: /2020
Age: 5 years
Gender: Male

**M i n o r  C h i l d**
**A d d e n d u m**



Date of Visit: 01/06/2026 5:30 PM

☑ I Accept



**Z   P**
DOB:    /2020
Age: 5 years
Gender: Male

**S t a t e   A d d e n d u m**



Date of Visit: 01/06/2026 5:30 PM

---

### STATE-SPECIFIC ADDENDUM FOR: NEW HAMPSHIRE AND MAINE

#### Disclosure Statement

LifeStance's professional staff consists of Psychiatrists, Psychologists, Advanced Practice Nurses, Registered Nurses, Licensed Mental Health Counselors, Licensed Professional Counselors, Licensed Marriage and Family Therapists, and Licensed Social Workers. The credentials and affiliations of your specific provider are available under the "find a provider menu" here: https://lifestance.com/

#### Patient Rights

1. You are entitled to receive information about your diagnosis, your provider's methods of therapy, techniques used, expected duration of therapy, and the cost of treatment.

2. You can seek a second opinion from another licensed professional, refuse recommended treatment, withdraw consent for treatment or terminate therapy at any time.

3. You are entitled to an explanation of the risks and benefits of treatment and the potential consequences of any decision you may make to decline or stop treatment.

4. Sexual intimacy is not appropriate in the context of a professional relationship and, if it occurs, must be reported to applicable state regulators.

#### Appointment Cancellation

Regular attendance at scheduled appointments is a key component of successful counseling. If you cannot attend an appointment, you must cancel 48 hours/2 business days in advance to avoid being charged a cancellation fee. Please note that Saturdays, Sundays and national holidays are not considered business days and notice of cancellation provided on those days will be deemed received on the next business day. If we do not receive notice of cancellation sufficiently in advance of your appointment, you will be responsible for the cancellation fee. Our cancellation fees vary by provider and service. This policy will be applied in all circumstances unless prohibited by law or our agreement with your insurer.

#### Fees

LifeStance maintains a fee schedule for each provider and nonclinical personnel identifying the price of various services. If you have insurance and are receiving service covered by your insurance, the fee schedule may not accurately reflect our agreement with your insurer, which may affect the amount you are responsible for.

#### Late Cancellation/No Show Appointment Fee

| Service | Late Cancellation Fee* (less than 48 hours) | No Show Appointment Fee* |
|---|---|---|
| Appointment (MD) | $100 for new patients | $100 for new patients |
| | $100 for established patients | $100 for established patients |
| Appointment (NP) | $100 for new patients | $100 for new patients |
| | $100 for established patients | $100 for established patients |
| Appointment (PHD) | $100 for new patients | $100 for new patients |
| | $100 for established patients | $100 for established patients |
| Appointment (MS) | $100 for new patients | $100 for new patients |
| | $100 for established patients | $100 for established patients |
| Testing Appointment | $350 | $350 |
| Group Therapy | $50 | $50 |

**Other Potential Fees**

---

EXHIBIT P
Page 54 of 68



Z    P
DOB:    /2020
Age: 5 years
Gender: Male

**State Addendum**



Date of Visit: 01/06/2026 5:30 PM

| Service | Description | Fee ($) |
|---|---|---|
| Collateral Service (MD) | Participation in meeting or conference, letters | $75 per 15 minutes |
| Collateral Service (NP) | Participation in meeting or conference, letters | $70 per 15 minutes |
| Collateral Service (PHD) | Participation in meeting or conference, letters | $60 per 15 minutes |
| Collateral Service (MS) | Participation in meeting or conference, letters | $50 per 15 minutes |
| Legal Fees | Testimony, responding to subpoena, all other legal-related work for client or third party | $75 per 15 minutes |
| Record Release | Medical records release | $6.50 |
| Prescription Refills | Urgent requests for medication refills without an office visit | $25 |
| Prescription Refills for Controlled Substances | Requests for refills for controlled substances without an office visit | $25 |
| Prior Authorization | Prior authorization for medication when insurance requires | $15 |
| Late Copay Fee | Copays paid after scheduled visit | $8 |
| Returned Check Fee | Checks returned/unpaid | $20 |

*The Company may update these charges from time to time in its sole discretion.

Please note, if psychological or neuropsychological evaluation testing or assessments are provided, you may incur charges and co-payments for dates of services different than the dates the evaluations were actually administered. For example, charges related to scoring and interpreting test or assessment results, integrating other sources of data, and report writing.

**Testing and Assessment Services**

Evaluation-only services, such as tests and assessments, are intended to help diagnose and guide treatment, but are not considered therapeutic treatment services themselves. The clinician conducting the evaluation is not available to provide treatment services, including emergency response or crisis intervention. Should your evaluation suggest the need for any therapeutic treatment services, your clinician will refer you to a provider as appropriate.

**Professional Relationship**

To maintain an appropriately professional and therapeutic relationship, LifeStance providers will not socialize or spend time with clients outside of treatment. This also helps to maintain confidentiality for clients regarding their treatment relationship. Mutually respectful engagement is critical to a successful therapeutic relationship. Treatment can be uncomfortable and sometimes can create misunderstandings that lead to hurt feelings. If you have concerns about how your provider is treating you, please raise them and the provider or other LifeStance personnel will address them directly. Similarly, LifeStance does not tolerate rude, disrespectful, threatening or violent behavior. If your behavior causes our staff or professionals concern, we will remind you of our behavior standards. Excessive or repeated violations of these standards may result in transfer or discontinuation of therapy in accordance with applicable legal requirements.

**Privacy, Confidentiality and Records**

Communications in the context of a therapist-patient relationship are generally confidential and record will be maintained in accordance with the strictest level of confidentiality applicable under federal or state law. This means that your provider generally cannot be

---

**LifeStance Health**                                                                 Provider: STACEY MERRILL



**Z   P**
DOB:   /2020
Age: 5 years
Gender: Male

**S t a t e   A d d e n d u m**



Date of Visit: 01/06/2026 5:30 PM

required to disclose information about you or your care without your consent. Nonetheless, these laws provide numerous exceptions to confidentiality of information where information may be disclosed. Some of the most common situations where this can occur include the following:

- The patient signs a Release of Information permitting disclosure to a specific person, organization or group of persons;
- A professional determines that a patient poses a significant and immediate threat of harm to themselves, another identifiable person, or national security;
- A judge issues a court order requiring the disclosure of client records;
- A professional suspects that child or elder abuse or neglect has occurred;
- Criminal or delinquency proceedings where assessment or therapy is ordered by the court;
- You are determined to be gravely disabled due to a mental disorder.

In addition, it may be necessary to share information or records with other providers as part of your treatment or if you transfer your care.

Records of your sessions, communications with and other documentation regarding your relationship with your treating provider will be maintained during treatment and after for the time period required by law. Records for couples seeking counseling as a couple will be maintained in a single record under the name of the financially responsible member. In the event that the financially responsible member is also, separately, a client receiving treatment as an individual, the record will be segregated and the other member of the couple will be able to access only the records from joint sessions.

**Emergency Services**

LifeStance does not provide emergency services. If you find yourself or a family member in a life-threatening situation, call 911 or go to an emergency room (at your cost).

988 Suicide and Crisis Lifeline: 988

Maine Statewide Crisis Hotline: 1-888-568-1112 (voice) or 711 (Maine Relay)

**Date: 01/06/2026**

**Legal Name:**

**Printed Name of Signer:** Z    F

**Relationship of Signer to Patient, if applicable:**

☑ I Accept              Adrian M Powell Jr

EXHIBIT P
Page 56 of 68



Z P
DOB:     /2020
Age: 5 years
Gender: Male

**LIFESTANCE NOTICE OF PRIVACY PRACTICES**



Date of Visit: 01/06/2026 5:30 PM

### LIFESTANCE NOTICE OF PRIVACY PRACTICES

Last modified: February 2025

Legal Name: Z

Patient Name:        F

Patient DOB:      /2020

**THIS NOTICE DESCRIBES HOW MEDICAL AND TREATMENT INFORMATION ABOUT YOU MAY BE USED AND DISCLOSED, HOW YOU CAN GET ACCESS TO THIS INFORMATION, AND YOUR RIGHTS WITH REGARD TO YOUR MEDICAL INFORMATION.  PLEASE REVIEW IT CAREFULLY. QUESTIONS CAN BE DIRECTED TO Patient Feedback Form.**

Your health information is personal, and we are committed to protecting it.  If you have questions or concerns, please contact your care center or the LifeStance Privacy Office using the contact information provided at the end of this document.

We are providing you with this notice, as required by the Health Insurance Portability and Accountability Act of 1996 (HIPAA). As a health care provider, HIPAA requires LifeStance to respect and protect patient "protected health information" or "PHI" and requires us to be transparent with you regarding our practices concerning our collection, use and sharing of PHI obtained from or about you. HIPAA also requires us to make you aware of your privacy rights, including your ability to exercise your choice (i.e., "consent," also referred to as an "authorization") and provide your permission for us to collect, use, or share your PHI.

For purposes of this Notice, "LifeStance" and the pronouns "we," "us" and "our" refer to LifeStance Inc., its subsidiaries and affiliates under common ownership or operational control, and its contracted or employed care providers which operate as a HIPAA single affiliated covered entity (LifeStance SACE).

LifeStance uses and discloses health information about you for treatment, to obtain payment for treatment, for administrative purposes, to evaluate the quality of care that you receive, and for other purposes permitted by HIPAA and applicable law.  LifeStance is required by law to maintain the privacy of your health information and provide you a notice of our legal duties and privacy practices with respect to that information and to provide you with notice of a disclosure or breach of your unsecured protected health information.  This Notice explains how LifeStance use and manage your health information, as well as what rights and choices you have related to that information. This Notice applies to all medical records about your care that are created, and/or maintained by LifeStance.  Your health information is contained in a medical record that is the physical property of LifeStance.  LifeStance reserves the right to update its Notice of Privacy Practices without directly notifying individuals or providing them with updated copies. Instead, patients or users are expected to proactively check the LifeStance webpage for the most current version of the notice.

If you are a patient insured by the United States Department of Veteran Affairs, you may be entitled to additional rights and restrictions regarding the use and disclosure of your protected health information other than as set forth in this Notice. At all times, we will comply with the applicable requirements of the Department of Veteran Affairs regarding the use and disclosure of your protected health information.

**Protections in HIPAA for psychotherapy notes**

Psychotherapy notes mean notes recorded by a health care provider who is a mental health professional documenting or analyzing the contents of conversation during a private counseling session or a group, joint, or family counseling session and that are separated from the rest of the individual's medical record. The legal definition of psychotherapy notes under HIPAA excludes medication prescription and monitoring, counseling session start and stop times, the modalities and frequencies of treatment furnished, results of clinical tests, and any summary of the following items: Diagnosis, functional status, the treatment plan, symptoms, prognosis, and progress to date.

Psychotherapy notes may be treated differently from other mental health information both because they contain particularly sensitive information and because they are the personal notes of the therapist that typically are not required or useful for treatment, payment, or health care operations purposes, other than by the mental health professional who created the notes. Therefore, with few exceptions, the Privacy Rule requires a covered entity to obtain a patient's authorization prior to a disclosure of psychotherapy notes for any reason, including a disclosure for treatment purposes to a health care provider other than the originator of the notes. Unlike other PHI, a healthcare provider may deny a patient or their personal representative access to psychotherapy notes.

**Substance Use Disorder Medical Records**



Z    P
DOB:    /2020
Age: 5 years
Gender: Male

**LIFESTANCE NOTICE
OF PRIVACY
PRACTICES**



Date of Visit: 01/06/2026 5:30 PM

LifeStance offers substance use disorder (SUD) treatment. These SUD treatment records cannot be used to investigate or prosecute the patient without written patient consent or a court order. Records obtained in an audit or evaluation of LifeStance's program cannot be used to investigate or prosecute patients, absent written consent of the patients or a court order that meets the additional privacy requirements. A separate and specific patient consent for the use and disclosure of SUD counseling notes is required and available by contacting as outline at the bottom of this Notice.

LifeStance may use a single SUD records authorization for all future uses and disclosures for treatment, payment, and health care operations (TPO). HIPAA covered entities and business associates that receive records under this SUD records authorization may redisclose the records in accordance with the HIPAA regulations.  SUD records are permitted to be disclosed without patient consent to public health authorities, provided that the records disclosed are de-identified according to the standards established in the HIPAA Privacy Rule. The privacy law governing SUD records, restricts the use of records and testimony in civil, criminal, administrative, and legislative proceedings against patients, absent patient consent or a court order. Any disclosure or breach of unauthorized SUD records will be reported in accordance with this Notice and applicable law.

SUD patient's rights align with the rights provided under the HIPAA Privacy Rule, including the right to request restrictions of disclosures to a patient's health plan for services the patient has paid for in full or disclosures made with prior consent for purposes of TPO, obtain an accounting of disclosures, including for TPO made through an electronic health record in the past 3 years, and elect not to receive fundraising communications. The Company and its clinicians are vested with discretion about providing patients with access to their SUD records. Patients have a right to file a complaint directly with the HHS Secretary for an alleged violation of Part 2 and/or may also concurrently file a complaint with the Part 2 program.

**Health Information Exchange**

LifeStance may participate in a non-profit, non-governmental health information exchange (HIE) as required under state law. Participation does not cost patients anything and can help health care providers better coordinate a patient's care and treatment by securely sharing health information. By opting in during your engagement signing the Patient Services Agreement, you have allowed your health information to be shared through the HIE, your provider is able to access it electronically in a secure and timely manner to ensure the most appropriate care and treatment. The types of health information on the exchange includes, but is not limited to, hospital records, medical history, clinic and doctor visit information, medications, allergies, and other information helpful for your treatment. Only providers involved in your care can access your health information and medical examiners, public health authorities, organ procurement organizations, and others may also access health information for certain approved purposes.

HIE does receive behavioral health information, including substance abuse treatment records. Federal law gives special confidentiality protection to substance abuse treatment records from some substance abuse treatment programs. HIE keeps protected substance abuse treatment records separate from the rest of your health information. HIE will only share these protected substance abuse treatment records it receives from these programs in two cases 1) medical personnel may access this information in a medical emergency, and 2) upon receiving sign a consent form giving your healthcare provider or others access to this information.

**Updates to this Notice**

LifeStance reserves the right to change its privacy practices, as reflected in this Notice, to revise this Notice, and to make the new provisions effective for all protected health information it maintains.  A revised Notice will be available on our website or upon your request.

**How LifeStance May Use or Disclose Your Health Information:**

We may use or disclose your health information, in certain situations, without your consent or authorization.  Below we describe examples of how we may use or disclose your health information as permitted under or required by federal law, including instances where we will obtain your authorization.  Such uses or disclosures may be in oral, paper or electronic format.

**For Treatment.** LifeStance may use and disclose your health information to provide you with mental health treatment or services or to assist in the coordination, continuation or management of your care and any related services. This includes the coordination or management of your health care with a third party.  For example, a health care provider, such as a licensed professional counselor, or other person providing health services to you, will record information in your record that is related to your treatment and may share that information with other providers.This information is necessary for other health care providers to determine what treatment you should receive.

**For Payment.** LifeStance may use and disclose your health information to others for purposes of obtaining payment for treatment and services that you receive. For example, a bill may be sent to you or to a third-party payer, such as an insurance company or health plan, for services provided to you. The information on the bill may contain information that identifies you, your diagnosis, and treatment.

**For Health Care Operations.** LifeStance may use and disclose health information about you for operational purposes.



**LIFESTANCE NOTICE OF PRIVACY PRACTICES**



DOB    /2020
Age: 5 years
Gender: Male

Date of Visit: 01/06/2026 5:30 PM

**Communications.** LifeStance may use and disclose your information to provide appointment reminders, leave a message on your answering machine, or leave a message with an individual who answers the phone at your residence. We may, from time to time, contact you to provide information about treatment alternatives and services that may be of interest to you.  We may also provide you with informational materials including information about LifeStance.  Material may come from a third party.

**Required or Permitted by Law** LifeStance may use and disclose information about you as required or permitted by law. If a use or disclosure is required by law, the use or disclosure will be made in compliance with the law and will be limited to the relevant requirements of the law.  If required by law, you will be notified of any such uses or disclosures. For example, LifeStance may use and/or disclose information for the following purposes:

**Public Health.** Your health information may be used or disclosed for public health activities such as: (1) assisting public health authorities or other legal authorities to prevent or control disease, injury, or disability; (2) reporting child abuse or neglect to a public health authority or other governmental authority that is authorized by law to receive such reports; and (3) notifying a person who may be at risk of contracting or spreading a disease, if such disclosure is authorized by law.

**Individuals involved in your care.** We may provide information about you to a family member, friend, or other person involved in your health care or in payment for your health care.  If you are deceased, we may disclose medical information about you to a friend or family member who was involved in your medical care prior to your death, limited to information relevant to that person's involvement, unless doing so would be inconsistent with your written wishes you previously provided to us.  If we disclose information to a family member, relative or close personal friend, we will disclose only information that we believe is relevant to that person's involvement with your health care or payment related to your health care.

HIPAA permits LifeStance to disclose to other health providers any PHI contained in the medical record about an individual for treatment, case management, and coordination of care and, with few exceptions, treats mental health information the same as other health information. HIPAA generally does not limit these disclosures except that LifeStance must obtain individuals' authorization to disclose separately maintained psychotherapy session notes for such purposes. LifeStance will abide by all applicable state law and professional practice standards that place additional limitations on disclosures of PHI related to mental health.

**Patient's Family.** Where a patient is present and has the capacity to make health care decisions, your LifeStance health care providers may communicate with a patient's family members, friends, or other persons the patient has involved in his or her health care or payment for care, so long as the patient does not object.  Your treating provider may ask the patient's permission to share relevant information with family members or others, may tell the patient he or she plans to discuss the information and give them an opportunity to agree or object, or may infer from the circumstances, using professional judgment, that the patient does not object. A common example of the latter would be situations in which a family member or friend is invited by the patient and present in the treatment room with the patient and the provider when a disclosure is made.

**Health Oversight Activities.** To a health oversight agency for audits, investigations, inspections, licensing purposes, or as necessary for certain government agencies to monitor the health care system, government programs, and compliance with civil rights laws.

**Health and Safety: Duty to Warn.**  We may, consistent with applicable law and standards of ethical conduct, use or disclose health information about you if we believe that the use or disclosure is necessary to prevent or lessen a serious threat to the health or safety of a person or the public; provided that, if a disclosure is made, it must be to a person(s) reasonably able to prevent or lessen the threat and is permissible by law.

HIPAA permits LifeStance to notify a patient's family members of a serious and imminent threat to the health or safety of the patient or others if those family members are in a position to lessen or avert the threat. To the extent that a provider determines that there is a serious and imminent threat of a patient physically harming self or others, HIPAA would permit the provider to warn the appropriate person(s) of the threat, consistent with his or her professional ethical obligations and State law requirements.  Even where danger is not imminent, HIPAA permits a covered provider to communicate with a patient's family members, or others involved in the patient's care, to be on watch or ensure compliance with medication regimens, as long as the patient has been provided an opportunity to agree or object to the disclosure and no objection has been made.

We may also use or disclose your health information if we believe that the use or disclosure is necessary for law enforcement authorities to identify or apprehend an individual who: (i) admits to participation in a violent crime that we reasonably believe caused serious physical harm to the victim, (ii) appears to have escaped from a correctional institution or lawful custody, or (iii) to the extent State law require providers to make certain disclosures.

**Notification and Disaster Relief.** We may use or disclose your health information to notify or assist in notifying your family, a personal representative, or another person responsible for your care, of your location, condition, or death.  We may disclose your health information to disaster relief authorities so that your family can be notified of your location and condition.

**Decedents.** Health information may be disclosed to funeral directors, medical examiners or coroners to enable them to carry out their lawful duties.  Once you have been dead for 50 years (or such other period as may be specified by law), we may use and disclose your

EXHIBIT P
Page 59 of 68



Z    P
DOB:      /2020
Age: 5 years
Gender: Male

**LIFESTANCE NOTICE OF PRIVACY PRACTICES**


Date of Visit: 01/06/2026 5:30 PM

health information without regard to the restrictions set forth in this Notice.

**Government Functions.** We may disclose your health information for specialized government functions, such as military and veteran's activities, national security and intelligence activities, and protection of public officials.

**Research.** For research purposes under certain limited circumstances. Research projects are subject to a special approval process designed to protect your privacy and ensure ethical standards are met. We will not use or disclose your PHI for research purposes until the specific research project has been approved through this process. This approval process may include:

•   Review by an Institutional Review Board (IRB) or Privacy Officer approval to ensure the research meets ethical, legal and privacy standards.

•   Obtaining your written authorization, if required by law or the research protocol.

•   Implementing safeguards to protect your privacy and confidentiality throughout the research process.

In some cases, your information may be used for research without your authorization if the research meets specific regulatory criteria, such as when it is de-identified or part of a limited data set with a data use agreement and/or privacy business associate agreement in place.

**Coroners, Medical Examiners and Funeral Directors.** To a coroner or medical examiner, (as necessary, for example, to identify a deceased person or determine the cause of death) or to a funeral director, as necessary to allow him/her to carry out his/her activities.

**Organ and Tissue Donation.** If you are an organ or tissue donor, to organizations that handle organ procurement or organ, eye or tissue transplantation, or to an organ donation bank, as necessary to facilitate a donation and transplantation.

**Workers' Compensation.** Your health information may be used or disclosed in order to comply with laws and regulations related to Workers' Compensation. For workers' compensation or similar work-related injury programs, to the extent required by law.

**Lawsuits and Disputes.** In response to a subpoena or a court or administrative order, if you are involved in a lawsuit or a dispute, or in response to a court order, subpoena, warrant, summons or similar process, if asked to do so by law enforcement.

**Military and Veterans.** As required by military command or other government authority for information about a member of the domestic or foreign armed forces, if you are a member of the armed forces.

**National Security; Intelligence Activities; Protective Service.** To federal officials for intelligence, counterintelligence, and other national security activities authorized by law, including activities related to the protection of the President, other authorized persons or foreign heads of state, or related to the conduct of special investigations.

**Inmates.** To a correctional institution (if you are an inmate) or a law enforcement official (if you are in that official's custody) as necessary (i) for the institution to provide you with health care; (ii) to protect your or others' health and safety; or (iii) for the safety and security of the correctional institution.

**Business Associates.** We may contract with one or more third parties, our business associates, in the course of our business operations. We may disclose your health information to our business associates so that they can perform the job we have asked them to do. We require that our business associates sign a business associate agreement and agree to safeguard the privacy and security of your health information.

**Social Services.** LifeStance may disclose a patient's PHI for treatment purposes without having to obtain the patient's authorization when treatment includes the coordination or management of health care by a health care provider with a third party. Health care means care, services, or supplies related to the health of an individual in which the disclosing provider believe that disclosures to certain social service entities are a necessary component of, or may help further, the individual's health or mental health care may disclose the minimum necessary PHI to such entities without the individual's authorization. For example, LifeStance may disclose PHI about a patient needing mental health care supportive housing to a service agency that arranges such services for individuals.

LifeStance may also disclose PHI to such entities pursuant to a signed authorization. Thus, LifeStance could in one authorization identify a broad range of social services entities that may receive the PHI if the individual agrees. For example, an authorization could indicate that PHI will be disclosed to "social services providers" for purposes of "supportive housing, public benefits, counseling, and job readiness."

**Abuse.** LifeStance may disclose protected health information about an individual whom we reasonably believe to be a victim of abuse, neglect, or domestic violence to a government authority, including a social service or protective services agency, authorized by law to receive such reports.

EXHIBIT P
Page 60 of 68



Z      P
DOB:        2020
Age: 5 years
Gender: Male

**LIFESTANCE NOTICE
OF PRIVACY
PRACTICES**



Date of Visit: 01/06/2026 5:30 PM

**Emergency.** A health care provider, when a patient is not present or is unable to agree or object to a disclosure due to incapacity or emergency circumstances, to determine whether disclosing a patient's information to the patient's family, friends, or other persons involved in the patient's care or payment for care, is in the best interests of the patient.  Where a provider determines that such a disclosure is in the patient's best interests, the provider would be permitted to disclose only the PHI that is directly relevant to the person's involvement in the patient's care or payment for care.

### Authorizations for Other Uses and Disclosures:

While we may use or disclose your health information without your written authorization as explained above, there are other instances where we will obtain your written authorization.   Except as otherwise provided in this Notice, we will not use or disclose your health information without your prior written authorization.  You may revoke an authorization at any time, except to the extent LifeStance has already relied on the authorization and taken action.

**Examples of uses and disclosures that require your authorization are: Psychotherapy Notes.**

If Psychotherapy Notes are created for your treatment, we must obtain your prior written authorization before using or disclosing them, except (1) if the creator of those notes needs to use or disclose them for treatment, (2) for use or disclosure in our own supervised training programs in mental health, or (3) for use or disclosure in connection with our defense of a proceeding brought by you.  "Psychotherapy Notes" means notes recorded (in any medium) by a health care provider who is a mental health professional documenting or analyzing the contents of conversation during a private counseling session or a group, joint, or family counseling session and that are separated from the rest of the individual's medical record. "Psychotherapy Notes" excludes medication prescription and monitoring, counseling session start and stop times, the modalities and frequencies of treatment furnished, results of clinical tests, and any summary of the following items: diagnosis, functional status, the treatment plan, symptoms, prognosis, and progress to date. Note that if, in the sole discretion of your health care provider, providing you with copies of your Psychotherapy Notes could be harmful or detrimental, we have the right to deny your request for such records.

**Marketing.**

As outlined in our Privacy Policy, we may contact you with newsletters, educational materials, marketing, or promotional materials and other information that may be helpful to you. By agreeing to our Privacy Policy, you authorize us to contact you for marketing purposes.

**No Sale of Your Health Information.**

We will never sell your identifiable or de-identifiable health information to any third parties.

**Uses and Disclosures of Your Highly Confidential Information.**

Some federal and/or state laws require special privacy protections for certain highly confidential health information, relating to: (1) psychotherapy services; (2) mental health and developmental disabilities services; (3) substance use disorder diagnosis, treatment and referral; (4) HIV/AIDS testing, diagnosis or treatment; (5) venereal disease(s); (6) genetic testing; (7) child abuse and neglect; (8) domestic abuse of an adult with a disability; and/or (9) sexual assault. Unless a use or disclosure is permitted or required by law, we will obtain your written consent or authorization prior to using or disclosing your highly confidential health information to third parties.

### Your Health Information Rights:

When it comes to your health information, you have certain rights. This section explains your privacy rights and our responsibilities to help you. Unless otherwise specified, you may exercise the rights listed below by contacting us at Patient Feedback Form to obtain the proper forms or make requests.

**You have the right to:**

**Request a restriction.** You may request that we limit the way we use or share your personal information. Please make your request to us in writing. We will consider your request but are not required to agree to it.

**Request restriction to a health plan/to not submit claims.** You may request that certain health care services or items that you pay for fully at the time of service not be shared with your health plan. Please let your provider know before, or at the time of service or we may not be able to fulfill your request.

**View, Inspect and obtain a copy of your health and billing records.** All requests to inspect or copy your health information or to access your medical records or obtain a copy of HIE information must be in writing. You can direct us to transmit the copy directly to



**LIFESTANCE NOTICE OF PRIVACY PRACTICES**



DOB: /2020
Age: 5 years
Gender: Male

Date of Visit: 01/06/2026 5:30 PM

another person or entity using the same form. At this time, we are not able to prepare summaries, attestations, certifications, notarized or witnessed copies. Please note that LifeStance will only respond to requests for records from you or your personal representative. If your PHI is stored electronically, you may request a copy in an electronic format offered by LifeStance. You may also make a specific written request to transmit the electronic copy to a designated third party. We will respond to your request, usually within 15 days. We may charge a reasonable, cost-based fee. You may see your record or get more information about it at your LifeStance care center location. In certain circumstances, we may deny your request for inspection or copying, but if we do, we will notify you in writing of the reason(s) for the denial and explain your right to have the denial reviewed.

**Request a correction to your health information.** You may request that your health record or HIE information be amended if you believe that the health information about you is incomplete or inaccurate. Requests to amend your health information must be in writing. We may deny your request and if we do, we will notify you in writing of the reason for the denial and your right to submit a statement disagreeing with the denial.

**Request confidential communications.** You have the right to ask LifeStance to communicate with you using alternative means or at a different mailing address. Such requests must be in writing. We will accommodate reasonable requests and will notify you if we are unable to agree to your request. We may condition our agreement on information as to how payment will be handled and specification of an alternate address or other method of contact.

**Receive an accounting of disclosures of your health information.** You have the right to obtain a list of instances in which LifeStance has disclosed your health information except in certain instances and a list of people who have viewed your information through HIE. These instances include, but are not limited to, disclosures for treatment, payment and health care operations; disclosures made to you; disclosures incident to a use or disclosure permitted or required by the Federal HIPAA Privacy Rule; disclosures authorized by you; and disclosures occurring more than six years prior to the date of your request. Your request must be in writing. The first disclosure list in any 12-month period is free; if you request additional lists in any year we may charge you a fee.

**Obtain a paper copy of this Notice.** You may obtain a paper copy of this Notice by contacting us as provided below. The Notice is also available on our website, www.LifeStance.com.

**Opt-Out of Health Information Exchange.** LifeStance care providers participate in health information exchange. When you enrolled you agreed to opt into the health information exchange. You can opt out at any time and decline to have your health information shared through health information exchange. By making this choice, your health information will not be accessible to providers who use our health information exchange tools in providing wholistic care to you. To opt out contact us as provided below.

### Contact Us

To ask questions or comment about this privacy policy and our privacy practices, or if you would like us to update information, we have about you or your preferences, please reach out to us using the list of privacy contacts below:

- Patient Feedback Form
- Written communication can be directed to **LifeStance Health, Attn: Privacy Officer, 4800 N. Scottsdale Road, Scottsdale, AZ 85251**

### Complaints

You may complain to LifeStance and to the Department of Health and Human Services if you believe your privacy rights have been violated. You will not be retaliated against for filing a complaint. If you have any questions, complaints, need forms, or wish to make are request as outlined herein this Notice, please contact us as provided below. Patients wishing to make a complaint may contact the Officer for Civil Rights at https://ocrportal.hhs.gov/ocr, ocrprivacy@hhs.gov, or call us toll-free: (800) 368-1019, TDD toll-free: (800) 537-7697.

### In Case of Emergency

If you are experiencing a life-threatening emergency, please call 911. If you are experiencing a mental health emergency, please call 988 for the Suicide and Crisis Lifeline.

### Additional Information on Mental Health Record Privacy Rules

https://www.hhs.gov/sites/default/files/hipaa-privacy-rule-and-sharing-info-related-to-mental-health.pdf 

### Additional Information on Sensitive Health Information Privacy Rules

EXHIBIT P
Page 62 of 68



Z   P
DOB:        2020
Age: 5 years
Gender: Male

# LIFESTANCE NOTICE OF PRIVACY PRACTICES



Date of Visit: 01/06/2026 5:30 PM

| Unless we obtain your specific authorization, we may disclose the following types of protected health information only in limited circumstances and to specific recipients: | Applicable States*** |
|---|---|
| (a) HIV/AIDS diagnosis or treatment | GA, FL, MA, MO, NH, NY, TX, OH, PA, WA |
| (b) Alcohol/Drug Abuse | CA, GA, FL, MA, MO, NH, NY, OH, PA, TX, VA |
| (c) Communicable Disease (including STDs) diagnosis or treatment | MA, TX, WA |
| (d) Reproductive Health information such as pregnancy or use of birth control | CA, FL, NY, WA |
| (e) Genetic | FL, GA, MA, MO, NH, NY, TX |
| (f) Mental Health | CA, FL, GA, IN, MA, MO, NH, NY, OH, PA, TX, VA, WA |

***Above is a list of some of the state which may have even more restrictive/protective privacy laws beyond the federal HIPAA Law. Please note that the table above does not provide an exhaustive list and may be updated from time to time. Even if it is not indicated as such on the table above, if a State has an applicable "stricter" privacy laws, then we will comply with the state's "stricter" privacy laws with regard to protecting your protected health information.

*I acknowledge that I have received a copy of LifeStance's HIPAA Notice of Privacy Practices.*

*Date: 01/06/2026*

*Name of Patient Representative, if applicable: Adrian Powell*

*Description of Patient Representative's Relationship to Patient, if applicable: Patient's parent*

☑ I acknowledge receipt
☐ I do not acknowledge receipt

---

EXHIBIT P
Page 63 of 68



**Z P**
DOB: /2020
Age: 5 years
Gender: Male

**Caregiver Consent**



Date of Visit: 01/06/2026 5:30 PM

## DIVORCED, SEPARATED, AND MULTIPLE CAREGIVERS ACKNOWLEDGEMENT

*Form must be completed for all patients seeking treatment age 18 or younger*

*For this policy's purposes, divorced or separated parents, as well as multiple adult caregivers, guardians, etc., are called "parent(s)." In addition to this Acknowledgement, for all clients under the age of 18, LifeStance Health ("LifeStance") requires completion of the Minor Child Addendum to the Patient Services Agreement.*

Prior to beginning treatment, it is important for you to understand our approach to therapy with children and to agree to some rules about your child's confidentiality during your child's treatment.

### Confidentiality

Therapy is most effective when a trusting relationship exists between the counselor and the client. Privacy is especially important in securing and maintaining that trust. It is often necessary for children to develop a "zone of privacy" whereby they feel free to discuss personal matters with greater freedom. This is particularly true for adolescents who are naturally developing a greater sense of independence. We ask that parents respect their child's privacy and not question them unnecessarily about treatment.

Your child deserves to have a safe place to talk about his/her/their thoughts, feelings, concerns, and mental health. To the extent permitted by law, LifeStance and its employees will honor your child's privacy to the extent it is possible to do so and will treat anything said in a session between a LifeStance clinician and your child as confidential. While you, as the parent, may be legally entitled to some information about your child's therapy, especially if there are any safety risks to your child or others, LifeStance reserves the right to deny any request from you for a copy of your child's confidential mental health care records, in the good faith opinion of the recipient of the request, circumstances warrant denial and/or that denial is permitted under or required by applicable state or federal laws.

Subject to a signed Release of Information, LifeStance will cooperate with other professionals by providing information as appropriate. The priority of the clinician shall be to preserve confidentiality and the ability to continue working in a healing relationship with the child and family.

### Parental Involvement and Communications

LifeStance will attempt to involve all parents in the child's care except in the following circumstances:

- Cases of abuse or serious impairment on the part of the parent;
- Where restricted by court order, parenting plan or other legal restriction;
- When, in the good faith judgment of the provider, the involvement would be detrimental to the child's mental health or would interfere with the child's treatment.

Any written or oral communication from any parent *may* be shared - at the discretion of the LifeStance clinician and when deemed appropriate given the circumstances - with other parents or with the child. Written communications, emails, and telephone messages **are part of the child's "designated medical record set"** which is available and accessible to the child and the child's authorized representative(s). Psychotherapy notes are not included in a patient's designated record set.

LifeStance expects parents to inform each other about scheduled appointments. A cancellation fee will apply if an appointment is missed regardless of which parent scheduled the appointment.

LifeStance is not responsible for routine communication with parents who do not attend appointments. For example, LifeStance Health will not routinely contact a non-custodial parent after each appointment. Our baseline expectation is that parents will communicate with each other openly regarding treatment, and that each parent will cultivate a healthy relationship and open communication with their child.

LifeStance welcomes the involvement of stepparents, siblings, grandparents, chosen family and other persons, but participation in mental health services and treatment, and access to professional communication will be determined based on the child's needs, the guardians' wishes, previously granted permission to communicate with non-guardian parties, and the family's particular circumstances, including any applicable court orders/custody agreements.

### In Case of Minor Consent to Treatment

I understand that a minor child able to consent to treatment independently under state law will be deemed by LifeStance to have done so. I understand that once my child is legally able to consent to treatment independently, I will only have access to my child's mental and behavioral health care records and information if my child consents to that access and involvement, or as otherwise required by law or a Court order.

### Payment

The guardian who registers the child for services as a client with LifeStance is the guarantor for the Patient Services Agreement and is

---

EXHIBIT P
Page 64 of 68



Z  P
DOB: /2020
Age: 5 years
Gender: Male

**Caregiver Consent**



Date of Visit: 01/06/2026 5:30 PM

responsible for payment of the account. When parents have agreed to share healthcare expenses, the guarantor is responsible for paying the fee and collecting reimbursement from the other parent(s). If there is a missed appointment, the guarantor is responsible for payment of the cancellation fee. All details regarding payments must be agreed upon, documented, and signed before the initial appointment. If necessary, a consultation session may be arranged to address these issues.

**Legal Proceedings and Litigation**
Legal issues may arise after therapy has begun. Please refer to the **Patient Services Agreement and State-Specific Addendum** for the limitations and costs associated with LifeStance and its employees' participation in these circumstances.

This agreement is effective immediately and stays effective during and after the provision of mental/behavioral health services and treatment has concluded. This agreement is binding on all individual(s) who sign the agreement.

I agree with and understand all the terms and conditions in this agreement and am accepting those terms and conditions voluntarily.

Date: 01/06/2026

Printed Name of Signer: Adrian Powell

Relationship to the Child: Patient's parent

---

☑ I Accept          Adrian M Powell Jr

---

LifeStance Health                                                    Provider: STACEY MERRILL

EXHIBIT P
Page 65 of 68

**LIFESTANCE HEALTH**

<u>AUTHORIZATION TO RELEASE CONFIDENTIAL & PROTECTED HEALTH INFORMATION</u>

1. <u>Patient Information:</u>
    Patient Name: ▒▒▒▒▒▒    Patient DOB: ▒▒ /2020
    Patient Preferred Name (if any): _____

2. <u>I request that LifeStance **RECEIVE** my health information **FROM**</u>:
    Organization(s)/Company name: _____
    **AND/OR** Individual(s) name: First name: _____    Last name: __P▒▒▒__
    Address: _____
    City: _____    State _____    Zip Code _____
    Phone **(required)** _____    Fax **(required)** _____
    Email address (optional) _____

**AND/OR**

3. <u>I request LifeStance **RELEASE** my health information **TO**</u>:
    Organization(s)/Company name: Buckley Law
    **AND/OR** Individual(s) name: First name: __Adrian__    Last name: __Powell__
    Address: 41 Fern Ave
    City: __OOB__    State __ME__    Zip Code __04064__
    Phone **(required)** 410-907-1307    Fax **(required)** Email Instead
    Email address (optional) powelladrian02@gmail.com

4. <u>Information for LifeStance to **RELEASE** under Section 3, or **RECEIVE** under Section 2:</u>
    ☐ **ONLY** Verbal Communications with LifeStance – **NO Records** to be sent or received *(skip section regarding medical records below if applicable)*
    ☐ **ONLY Treatment** or **Other Clinical Letter**, please specify: _____ *(skip section regarding medical records below, if applicable)*

    **Medical Records** as follows:
    ☑ All Medical Records for All Dates Available (not including billing) **OR**
    ☐ All Medical Records (not including billing) for these dates of treatment: _____

    **AND/OR** to at this time only release portions of your Medical Record, IF SO, indicate the categories to be released (check all that apply):
    ☑ Appointments List
    ☑ Diagnosis/Problem List
    ☑ Therapy Records
    ☑ Psychiatric Records
    ☑ Psychological Testing Reports
    ☑ Substance Abuse Records
    ☑ Lab Results
    ☑ Medication
    ☑ Provider Progress Notes
    ☑ Billing Summary
    ☐ Other: _____

*NOTE: I understand information about any of the following may be included in the release of information: behavioral health, sexuality and reproductive health, HIV/AIDS, sickle cell anemia, communicable diseases, drug and alcohol use, and treatment for a substance use disorder.

Accepted at 01/13/2026 11:55 AM by MLANCASTER

**NOTE: Selecting the release of "All Medical Records" in section 4 means the complete patient designated record set under HIPAA, which includes **all patient portal messages**. If you do not want LifeStance to release the patient portal messages with this request, check here: ☐ .

***NOTE: LifeStance will not release couples/family therapy records without written authorization from ALL individuals participating in that therapy able to consent to disclosure under state law.

****NOTE: When you give permission for LifeStance to receive health information from or release health information to a person, you give permission for LifeStance to speak with that person about your health information.

5. <u>Reasons for releasing information</u> (**REQUIRED –select at least ONE**):
- ☐ Doctor/Clinician Coordination
- ☐ Patient Request
- ☑ Legal/Court
- ☐ Insurance Company
- ☐ Family Participation in Services
- ☐ Financial or Billing
- ☐ Other (please specify): _____

6. Revocation and Expiration: I may revoke this Authorization at any time, except to the extent information has already been disclosed or obtained in reliance on it. The revocation must be in writing. Unless sooner revoked, this authorization expires 365 days after the date signed, 90 days after the completion of course of treatment or payment in full for service, or as otherwise provided by state law, whichever date is latest, unless an earlier date is specified here ___AP___ .

<u>No conditions</u>: I understand LifeStance will not condition my treatment, payment, enrollment, or eligibility for benefits on whether I sign this authorization, unless this Authorization is necessary for my participation in a research study, or the purpose of the treatment is to provide information to the individual/entity identified in this Authorization.

<u>Redisclosure</u>: I understand that when the health information specified in section 4 is released to the third party named in section 3, the information, except for information about a substance use disorder, *could* be re-disclosed by the third party that receives it and *may* no longer be protected by federal or state privacy laws. However, records about a substance use disorder will continue to be protected under federal law after disclosure and cannot be disclosed or re-disclosed without my written consent unless otherwise provided for in the relevant laws (42 CFR part 2). 42 CFR part 2 prohibits unauthorized disclosure of substance use disorder patient records.

**Authorization:** My signature below means I understand and accept the terms of this Authorization. I am aware and understand that I have a clinician-patient privilege to confidentiality in my protected health information and records and that by releasing any such information or records pursuant to this authorization, I am waiving that privilege but **ONLY** with respect to the specific protected health information and/or records selected above **AND ONLY** with respect to the release of that information and/or records to the specific person(s) identified by me in this authorization. A copy of this Authorization is as valid as the original. I have the right to receive a copy.

**Date:** 1/13/2026

**Signature of Patient or Authorized Representative**:



Signed 01/13/2026

**Name of Patient or Authorized Representative**:  Adrian Maurice Powell

(If applicable) Relationship of Authorized Representative to Patient:  __Father__

*If Additional Signature is Necessary/Applicable Under State Law:*

**Date**:  1/13/2026

**Signature of Patient or Authorized Representative**:



Signed 01/13/2026

**Name of Patient or Authorized Representative**:  Adrian Maurice Powell

(If applicable) Relationship of Authorized Representative to Patient:   __Father__

**NOTICE TO RECIPIENTS:**
If the information has been disclosed to you from records protected by federal confidentiality rules (42 CFR part 2), the federal rules prohibit you from making any further disclosure of information in this record that identifies a patient as having or having had a substance use disorder either directly, by reference to publicly available information, or through verification of such identification by another person unless further disclosure is expressly permitted by the written consent for the release of medical or other information is NOT sufficient for this purpose (see § 2.31). The federal rules restrict any use of the information to investigate or prosecute with regard to a crime any patient with a substance use disorder, except as provided at §§ 2.12(c)(5) and 2.65. 42 CFR part 2 prohibits unauthorized disclosure of substance use disorder patient records.

*Document Updated: 11/5/2024*

# Choi v. Kim (In re Kim)

United States District Court for the Southern District of New York

December 8, 2005, Decided ; December 9, 2005, Filed

Case No. 05-CV-7141

**Reporter**
_404 F. **Supp**. **2d 495**_ *

In Re SOL IRIS KIM; YOO KYUNG CHOI, Petitioner, v CHEE KWAN KIM, Respondent.

**Counsel:** Counsel for Petitioner: Robert D. Arenstein, Esq., Christopher S. Weddle, Esq., New York, N.Y.

Counsel for Respondent: Bonnie Rabin, Esq., Harriet Newman Cohen, Esq., Timothy James, Esq., Cohen Hennessey & Bienstock P.C., New York, N.Y.

**Judges:** KENNETH M. KARAS, UNITED STATES DISTRICT JUDGE.

**Opinion by:** KENNETH M. KARAS

## Opinion

[*496] OPINION AND ORDER

KENNETH M. KARAS, District Judge:

Sol Iris Kim is a four-year-old girl who is the subject of a brewing custody battle between her estranged parents. Before this Court is the Petition of Sol Iris's mother, Yoo Kyung Choi ("Petitioner"), which she brought pursuant to the Hague Convention on the Civil Aspects of International Child Abduction, art. 2, Oct. 25, 1980, T.I.A.S. No. 11,670, 1343 U.N.T.S. 89, reprinted in 51 Fed. Reg. 10,494 (Mar. 26, 1986) [hereinafter Hague Convention], and the International Child Abduction Remedies Act, 42 U.S.C. § 11601-11611 (2005) ("ICARA"). The Petition seeks an order requiring that Sol Iris return to Toronto, Ontario. On September 21, 2005, the Court dismissed the Petition, promising [*497] that a written opinion would be forthcoming. This is that written opinion.

I. Background

 On August 12, 2005, Petitioner filed in this Court a Petition for the Return of Child to Petitioner pursuant to the Hague Convention and ICARA ("Petition"). Accompanying the Petition, was an Emergency Petition for a Warrant in lieu of a Writ of Habeas Corpus ("Emergency Petition"). The Emergency Petition sought an order from this Court for the immediate return of Sol Iris to Petitioner without notice to Chee Kwan Kim ("Respondent"). In support of the Emergency Petition, Petitioner submitted a sworn affidavit complete with several attachments. [1]

In addition to the exhibits to the Emergency Petition, the Court heard sworn testimony from the Petitioner and considered additional statements from counsel for Petitioner. During the _ex parte_ proceeding on August 12, 2005, Petitioner, through her sworn statements, and her counsel, through his comments, represented that: (i) Petitioner is a lawful permanent resident of Canada and intends to become a Canadian citizen and live there permanently (Tr.

---

[1] Because the judge to whom this matter was randomly assigned was not available, this Court heard the Emergency Petition in its "Part I" capacity. Also, because the Hague Convention on the Civil Aspects of International Child Abduction ("Hague Convention") and ICARA require courts considering petitions such as the one at bar to do so expeditiously, this Court has continued to preside over the case. _See_ Hague Convention, _supra_, art. 2.

404 F. Supp. 2d 495, *497

20, Aug. 12, 2005) [2]; (ii) Sol Iris was born in Toronto, Ontario, where Petitioner resides with her parents, and lived there from August 2004 until May 2005 (Tr. 21-23, Aug. 12, 2005); (iii) Respondent agreed that while he was in law school Petitioner was to be the primary caregiver (Tr. 23, Aug. 12, 2005); (iv) Respondent provided written consent to permit Petitioner to travel with Sol Iris from Toronto to Cambodia and back to Toronto beginning in May 2005 (Tr. 3, Aug. 12, 2005); (v) on her return trip from Cambodia to Toronto, Petitioner brought Sol Iris to New York on August 2, 2005, for a four-day stay to permit Sol Iris to visit with Respondent (Tr. 25, Aug. 12, 2005); (vi) upon arrival in New York on August 2, 2005, Petitioner was told that she could not stay in the apartment where Respondent resided with his aunt (Tr. 26, Aug. 12, 2005); (vii) Petitioner had not seen or talked to Sol Iris since, and was barred by Respondent from seeing or speaking with Sol Iris after, August 6, 2005 (Tr. 8, 25, Aug. 12, 2005); (viii) on August 5, 2005, Petitioner sent Respondent an email insisting that she be allowed to take Sol Iris "home" to Toronto (Tr. 27-28, Aug. 12, 2005); (ix) after sending the August 5 email, Petitioner spoke to Respondent who told Petitioner that she would never see Sol Iris again and that Sol Iris's home was Korea and not Canada (Tr. 14, 28, Aug. 12, 2005); (x) after Petitioner's arrival in New York on August 2, Respondent on several occasions asked for Sol Iris's Korean passport (Tr. 14, Aug. 12, 2005); (xi) Respondent filed a custody action in New York State Family Court with an unknown return date (Tr. 4, Aug. 12, 2005) and; (xii) Respondent has a history of physically abusing Petitioner, and because of Respondent's "depression problem," Petitioner believed that it was "very reasonable to suspect" that Respondent might engage in physical violence toward Sol Iris. (Tr. 29, Aug. 12, 2005)

**[*498]**   Based on these representations, the Court entered an Order and issued a warrant directing the United States Marshals Service to remove Sol Iris from Respondent's custody and turn her over to Petitioner. [3] Petitioner was directed to surrender her passport, as well as Sol Iris's passport, to stay within the confines of the Southern and Eastern Districts of New York, and to provide the Marshals Service with her local address. [4] (Tr. 48, Aug. 12, 2005; Order, Aug. 12, 2005) The Court scheduled a hearing on the matter for the next business day, which was Monday, August 15, 2005.

At the August 15, 2005 hearing, both Petitioner and Respondent appeared through counsel. Cognizant that Respondent had not yet had an opportunity to present his case, the Court gave Respondent an opportunity to summarize his position and inquired of Respondent as to when he would be prepared to conduct an evidentiary hearing. Respondent noted that he had filed an Order to Show Cause in New York State Family Court seeking temporary emergency jurisdiction to prevent harm to Sol Iris. [5] (Tr. 6, Aug. 15, 2005) Ultimately, Respondent indicated that he would consent to a stay of the state court action, [6] that he would be prepared to proceed with an evidentiary hearing by August 17, 2005, and that he and Petitioner would agree to a custody arrangement of Sol Iris until that time. [7] (Tr. 52, 91, 93, 100, 106)

---

[2] The Court held two hearings -- an *ex parte* proceeding on August 12, 2005 and an evidentiary hearing on August 17, 19, 23, 24, 25, 31 and September 1, 2005. Where there is an overlap in the page numbers of the transcripts, the relevant date is provided.

[3] The Court denied Petitioner's request for a stay of any proceedings in state court. (Tr. 50, Aug. 12, 2005)

[4] The Marshals Service was also directed to place Petitioner's name in a customs "lookout" that would further restrict her ability to leave the country. (Order, Aug. 12, 2005)

[5] It was during the discussion surrounding Respondent's application that the Court learned for the first time that Petitioner, before filing the Petition in this Court, had sought to bring an action in New York State Family Court. (Tr. 28, Aug. 12, 2005) This proved to be an omen as the Court would later learn of several other material omissions and misrepresentations made by Petitioner and her counsel during the August 12, 2005 *ex parte* proceeding. *See infra* Part III.C.

[6] This Court indicated that it would not enter an order staying any divorce or custody proceedings in Ontario, Canada.

[7] As was true of Petitioner, Respondent was required to surrender his passport to the United States Marshals Service and to provide the Marshals Service with the address where Sol Iris would live while in his custody. Respondent was limited to travel

EXHIBIT Q
Page 2 of 21

404 F. Supp. 2d 495, *498

The Court then conducted an evidentiary hearing on August 17, 19, 23, 24, 25, 31 and September 1, 2005. During this hearing, Petitioner and Noah Novogodsky, a professor at the University of Toronto Law School, testified on behalf of Petitioner. Respondent, Gwin Joh Chin (Respondent's aunt), and Chee Wan Kim (Respondent's brother), testified on behalf of Respondent. Respondent also called, as a hostile witness, Timothy Pfeifer, a New York attorney with whom Petitioner appears to have had an extramarital affair during the preceding months.

II. Findings of Fact

A. Credibility

Before turning to the Court's findings of fact, it is important to note that some of these findings involve facts about which there is agreement between the parties. Other facts, however, are the subject of sharp disagreement, including, of course, those facts most crucial to the resolution of the dispute. Thus, to resolve the dispute, the Court is required to make certain findings **[*499]** regarding the credibility of the witnesses.

Broadly speaking, the Court finds that Respondent and those who testified on his behalf were credible and that Petitioner was not. First, Petitioner's testimony was proven to be demonstrably false on several occasions. For example, during the *ex parte* hearing on August 12, 2005, Petitioner testified that it was made clear to her that she could not stay at Ms. Chin's apartment upon her arrival in New York on August 2, 2005, and that she was not allowed to speak or see Sol Iris after August 6, 2005. (Tr. 4, 8, 25, Aug. 12, 2005) Yet, the credible evidence presented at the hearing was directly to the contrary. Ms. Chin specifically invited Petitioner to stay with her upon her arrival on August 2, 2005, but Petitioner declined claiming that she was going to stay with a "friend." (Tr. 575) Later that day, Petitioner confided to Ms. Chin that her "friend" was a "man," and that Respondent did not know that Petitioner's friend was a man. (Tr. 575) That man, it turned out, was Mr. Pfeifer. (Tr. 872). Under the circumstances, it is no stretch to imagine that Petitioner had every interest in staying with Mr. Pfeifer during her visit to New York, and therefore, that the decision not to stay at Ms. Chin's was entirely Petitioner's.

Moreover, the evidence conclusively proved that Respondent did not block Petitioner from speaking with or seeing Sol Iris. Indeed, the evidence demonstrated that Sol Iris refused to speak with Petitioner on the phone, in part because she was distracted by the toys she happened to be playing with when Petitioner called Respondent. (Tr. 720) Moreover, after being pressed on cross-examination, Petitioner finally admitted that she never even asked to visit Sol Iris at Ms. Chin's apartment. (Tr. 366-68)

Second, based on Petitioner's demeanor during her testimony, and particularly on cross-examination, it was clear to the Court that Petitioner was not truthful. On several occasions, Petitioner fumbled her answers to simple questions and feigned memory loss regarding events that had happened only days before her testimony. For example, Petitioner initially claimed memory loss when asked about her comment on August 2, 2005 that Sol Iris would be a New Yorker -- which was suspect given that she had only made the comment two weeks earlier -- but she then changed her testimony and admitted making the statement. (Tr. 238-39) On another occasion, Petitioner claimed language difficulty as a reason for struggling with a cross-examination question (Tr. 129, 229), but Petitioner, a third-year law student who has lived in North America since 2000, did not appear to the Court to have much difficulty with the English language.

Third, Petitioner's credibility was undercut by the numerous instances where she contradicted her own testimony. For example, Petitioner admitted that she did not tell the truth when she testified at the *ex parte* hearing that the first time Respondent indicated he wanted a divorce was on August 2, 2005, the day that Petitioner arrived in New York from Cambodia. (Tr. 231-33) Petitioner also admitted on cross-examination that the portion of her sworn statement submitted in support of her *ex parte* request for a warrant stating that she had not filed any other action was untrue

---

within the Southern and Eastern Districts of New York. The Marshals Service also placed Respondent's name in a customs "lookout" to prevent his surreptitious departure from the country.

404 F. Supp. 2d 495, *499

as she had filed a custody action in New York State Family Court the day before she brought this Petition. [8] (Tr. 83-84)

**[\*500]**    In contrast to Petitioner, the Court found the testimony of Respondent, his aunt, and his brother to be credible. The testimony of each witness was corroborated by the documentary evidence in the case, limited as it was, as well as the testimony of the other witnesses. Each witness carried him or herself in the same manner on direct as on cross-examination, and the collective testimony of the three witnesses was far more logical than that of Petitioner. Thus, where there was a clash between the testimony of Petitioner and Respondent and those who testified on his behalf, the Court invariably found Respondent's version to be credible. [9] With this backdrop, the Court now turns to its findings of fact.

B. <u>The Chronology of Events</u>

**Petitioner's and Respondent's Relationship Begins and Sol Iris is Born**

There is no disagreement about the beginnings of the relationship between Petitioner and Respondent, or the chronology of Sol Iris's whereabouts since her birth. Petitioner and Respondent, both Korean citizens, were married under Korean law in 2000. (Petr.'s Aff. P 4, Aug. 8, 2005; Pet. Ex. C) Before Petitioner was pregnant with Sol Iris, she was accepted into Stonybrook Law School in New York. (Tr. 476) In January 2001, Respondent and Petitioner (then pregnant) left Korea and moved so Petitioner could attend law school. (Tr. 476) For the first month, they lived with Ms. Chin in New York City, and then moved to Stonybrook. (Tr. 476-77) However, soon after their arrival in New York, Petitioner and Respondent changed their plans, largely because they did not think it was practical to have Petitioner attend law school while pregnant. Therefore, they moved to Toronto, Ontario, where Petitioner's parents lived. (Tr. 477)

Sol Iris was born in Toronto, Ontario on March 22, 2001. (Pet. Ex. C) Thereafter, Petitioner and Respondent attended the LL.M. program at the University of Toronto Law School, all the while living with Petitioner's parents and caring for Sol Iris. (Tr. 480) After receiving their LL.M. degrees in 2002, Petitioner and Respondent **[\*501]** returned to Korea with the idea of making enough money to attend law school in the United States, preferably in New York. (Tr. 481) In Korea, Petitioner and Respondent taught English while living with Respondent's parents and caring for Sol Iris. (Tr. 481)

---

[8] This Court also found the testimony of Mr. Pfeifer not to be worthy of belief. Indeed, the Court was gravely disappointed with Mr. Pfeifer's conduct throughout these proceedings. For example, Mr. Pfeifer ignored email and voicemail communications from counsel for Respondent, who were attempting to ascertain the most efficient and discrete means of serving him with a subpoena to testify at the hearing. (Tr. 863-66) In fact, it became clear that Mr. Pfeifer ignored these communications up and through the day he believed the Court would conclude taking testimony in this case, in the hope of avoiding the witness stand. (Tr. 865-66) All the while, Mr. Pfeifer was in daily telephone contact with counsel for Petitioner -- contact which was often initiated by Mr. Pfeifer himself. (Tr. 868)

As for his conduct during the trial, Mr. Pfeifer, like Petitioner, stumbled through simple questions regarding conduct that had happened no more than a month before the hearing. For example, Mr. Pfeifer claimed that he did not even remember the day that counsel for Respondent first left him a message, although she had done so less than two weeks before his testimony. (Tr. 863-66)

More importantly, Mr. Pfeifer changed his story regarding an August 7 email from Petitioner to Respondent. Initially, Mr. Pfeifer indicated that he only "looked at" the email before it was sent. (Tr. 907) Later, he allowed for the possibility that he "gave comments" about the email to Petitioner. (Tr. 909-10) Then, upon further questioning, Mr. Pfeifer admitted that he "may have sat down and edited" the email, but that he was not sure if he remembered exactly what he had done. (Tr. 910-11)

[9] The Court recognizes that it credited Petitioner's testimony after the *ex parte* hearing and indeed relied on that testimony to order that Sol Iris be taken from Respondent on August 12, 2005. Obviously, the Court did not have the benefit either of observing Petitioner under cross-examination, or hearing Respondent's version of events, both of which exposed Petitioner's misrepresentations and omissions.

EXHIBIT Q
Page 4 of 21

404 F. Supp. 2d 495, *501

**Petitioner Pursues Her Legal Career in New York City while Respondent Cares for Sol Iris in Korea**

Petitioner stayed in Korea for only one year, having been accepted into law school at University at Buffalo, the State University of New York ("SUNY Buffalo"). (Tr. 481) She began her first year in August 2003, while Respondent stayed behind in Korea. (Tr. 481) Initially, Sol Iris lived with Petitioner's parents in Toronto. (Pet. Ex. C; Tr. 482) However, by November 2003, Respondent and Petitioner agreed that Respondent should take Sol Iris to live with Respondent and his family in Korea. (Pet. Ex. C; Tr. 483) From November 2003 until August 2004, Respondent and his family cared for Sol Iris in Korea. (Pet. Ex. C; Tr. 483-84)

After her first year at SUNY Buffalo, Petitioner spent the summer of 2004 as an intern at the Legal Aid Society in New York City. [10] (Tr. 487) While working at Legal Aid, Petitioner lived with Ms. Chin. [11] (Tr. 487) By all accounts, it appeared to be an amicable arrangement. Indeed, Ms. Chin did not ask Petitioner to pay rent during her stay. (Tr. 563) It was during her summer in New York that Petitioner became enamored with the idea of becoming an associate at one of the City's big law firms. (Tr. 491) In fact, by August 2004, Petitioner had become "crazy" about New York, in part, because of the high salaries paid by New York law firms. [12] (Tr. 491) This ambition was consistent with discussions that Respondent and Petitioner had earlier in their marriage about pursuing a long-term plan to practice law and live in New York. (Tr. 485, 489, 637) Indeed, by August 2004, Petitioner and Respondent agreed that if Petitioner was accepted as a transfer student to either Columbia or NYU Law School for the academic year 2004-05, she and Sol Iris would live with Respondent's aunt (Ms. Chin) in New York. [13] (Tr. 489-90)

Although Petitioner failed to gain acceptance at either school (but was accepted at the University of Toronto) (Tr. 108), Petitioner took advantage of her summer in New York by applying to several dozen New York law firms for a job in the summer of 2005. (Tr. 491, 564-65) According to Ms. Chin, Petitioner received correspondence from 30 to 40 law firms. (Tr. 564-65) Though she interviewed at several firms, Petitioner was unable to secure employment from any of them. [14] (Tr. 109, 498-99, 896)

 **[*502] The Academic Year of 2004-2005: Petitioner and Respondent Attend Law School and Plan for the Future**

In 2004, Respondent was accepted to law school at SUNY Buffalo and attended as a first-year student during the academic year from August 2004 until May 2005. (Tr. 490) Meanwhile, Petitioner attended the University of Toronto Law School as a second-year student. During this time, Sol Iris lived with Petitioner and Petitioner's parents in Toronto. (Pet. Ex. C; Tr. 496) However, Respondent visited Petitioner and Sol Iris on several occasions in Toronto, the last visit occurring in April 2005. [15] (Tr. 496-97)

Respondent had his own career interest in New York. Indeed, from the moment he arrived at SUNY Buffalo, Respondent planned to transfer to a law school in New York, preferably NYU or Columbia. (Tr. 489) In the shorter term, Respondent applied for, and ultimately obtained, an internship in New York. (Tr. 487) From his perspective,

---

[10] Petitioner learned about the Legal Aid job at a public interest job fair at NYU. (Tr. 186, 487)

[11] During the summer of 2004, Sol Iris continued to live with Respondent in Korea. (Tr. 487)

[12] Conversely, Petitioner complained about the lower salaries of Toronto lawyers and the high taxes in Canada. (Tr. 555)

[13] Respondent's testimony to this effect was corroborated by Ms. Chin's testimony. For example, Ms. Chin testified that during the summer of 2004, while Petitioner was working in New York and staying at Ms. Chin's lower Manhattan apartment, Petitioner told Ms. Chin that she wanted to live and work in New York and that Sol Iris would live in New York as well. (Tr. 574)

[14] One firm that interviewed Petitioner also employs Mr. Pfeifer as an associate. (Tr. 893) In fact, it appears as though Mr. Pfeifer met Petitioner at a job fair during the summer of 2004 and helped arrange her interview at that firm. (Tr. 893)

[15] In late March or early April 2005, Petitioner took Sol Iris to Montreal to visit with Mr. Pfeifer. (Tr. 898)

EXHIBIT Q

Respondent believed that his wife could earn the salary she desired at a New York firm and he could do public interest work, all the while living with or near his family in Manhattan. (Tr. 489, 491-92) To that end, Respondent and Petitioner discussed the plan that both he and Petitioner would live and work in New York City during the summer of 2005. Thereafter, Respondent could attend NYU or Columbia, while Sol Iris lived with him at his aunt's apartment. (Tr. 492, 500-01) Under this plan, Petitioner could join them upon her graduation from the University of Toronto Law School. (Tr. 492, 500-01)

**Planning for Sol Iris to Live in New York City in the Fall of 2005**

Petitioner and Respondent had numerous discussions about where Sol Iris would live after the summer of 2005. These discussions focused on where Respondent might be attending law school. At Petitioner's suggestion, Respondent applied to Georgetown University (in Washington, D.C.), because that school would consider his transfer application after only one semester and because it would be a good test case of his ability to transfer. (Tr. 501) Columbia and NYU, on the other hand, would only consider Respondent's application after he completed his entire first year of law school. (Tr. 501) Thus, he could not apply, let alone hear from, these schools until at least June or July 2005. (Tr. 501)

In mid-April 2005, Respondent called Petitioner to advise her that he had been accepted at Georgetown. (Tr. 508) After this call, Respondent visited Toronto in late April. (Tr. 508) During this visit, Respondent inquired about having Sol Iris live with him while he attended Georgetown. (Tr. 509) Petitioner expressed concern about Respondent's ability to finance the expenses of caring for Sol Iris, including child care for her in Washington, particularly since there was no family support structure in that city. (Tr. 508-09) In the end, Respondent and Petitioner did not come to an agreement regarding the Georgetown scenario. (Tr. 509) Instead, they agreed that the best option was for Respondent to gain acceptance to NYU or Columbia. [16] (Tr. 509, 531, 638) If he did, then Sol Iris would live with Respondent in New York and Petitioner could move to **[*503]** New York after graduating from the University of Toronto. (Tr. 500-01, 508)

To permit Sol Iris to live for a lengthy period of time with Respondent, who was in the United States on an F-1 visa, Sol Iris would need to obtain an F-2 visa. (Tr. 514) This was discussed during the late April 2005 visit in Toronto. [17] (Tr. 515) Petitioner also mentioned the F-2 visa several other times, including in a June 2005 email to Respondent, where she inquired if Respondent had "prepared" the F-2 visa for Sol Iris's "extended stay in New York City," or wherever Respondent ended up attending law school. [18] (Tr. 236)

---

[16] As of late April 2005, Respondent did not know where he would be attending law school in the fall. Consequently, Petitioner and Respondent pre-registered Sol Iris for junior kindergarten in Toronto. (Tr. 118-19, 442)

[17] Petitioner gave conflicting testimony as to the necessity of an F-2 visa. At one point during her testimony, Petitioner claimed that Sol Iris would require an F-2 visa to enter the United States with Respondent, who had only an F-1 visa. (Tr. 222) Yet, when pressed on cross-examination, Petitioner ultimately admitted that an F-2 visa was not required for Sol Iris to enter the United States when traveling with Respondent. (Tr. 435)

Indeed, Petitioner's direct testimony makes little sense in the context of the discussions between Respondent and Petitioner during late April 2005. For example, even though Respondent had been living in the United States during his first year at SUNY Buffalo, Sol Iris never went to visit him. All the visits during the 2004-2005 academic year involved Respondent traveling to Toronto. It was only after Petitioner and Respondent discussed Sol Iris living with Respondent that the F-2 issue arose. Thus, Respondent's explanation -- that Sol Iris would need the F-2 visa to stay in the United States longer than six months -- not only makes sense, but supports his side of the story. His explanation is also consistent with the law, as Sol Iris, a Canadian citizen, would not require an F-2 visa to enter the United States, but would require one if she intended to stay longer than six months. *See* 8 C.F.R. § 212.1 (noting that a Canadian citizen may enter the United States without a visa); 8 U.S.C. §§ 1101(a)(15)(B), 1101(a)(15)(F)(ii) (discussing requirements of F-2 visa for extended stay in the United States).

[18] Counsel for Petitioner attempted to score points by getting Respondent to admit that as of the hearing he had not yet procured the F-2 visa. (Tr. 672) This is a red herring. Respondent could not have applied for the visa until his acceptance at a law school.

EXHIBIT Q
Page 6 of 21

404 F. Supp. 2d 495, *503

**The Summer of 2005: Internship in Cambodia and Acceptance into Columbia**

The initial plan to live together in New York during the summer of 2005 faltered after Petitioner could not gain employment at a New York firm. In February 2005, Petitioner turned her attention to an internship in Cambodia. (Tr. 502) Initially, Respondent was opposed to Petitioner traveling to Cambodia and leaving Sol Iris behind in Canada. [19] (Tr. 502) When Petitioner's parents refused to care for Sol Iris that summer, Petitioner asked Respondent if he would join them in Cambodia. Respondent **[*504]** was unwilling to do so. (Tr. 121, 504) Failing that, Petitioner asked Respondent to live in Toronto and care for Sol Iris there. (Tr. 504) Initially, Respondent resisted that idea as well, but later relented. (Tr. 504) By the time he changed his mind, however, Petitioner indicated that she would take Sol Iris with her to Cambodia for the summer. [20] (Tr. 505)

Petitioner left for Cambodia on May 16, 2005, reluctantly bringing Sol Iris with her. [21] (Petr.'s Ex. 11; Tr. 203) Prior to the trip, Petitioner and Respondent agreed they would stay in touch, mostly through email. (Tr. 203, 510) Within weeks of Petitioner's arrival in Phnom Penh, Cambodia, Sol Iris became very sick, suffering from such a high fever that Petitioner and Respondent considered options for her removal from Cambodia. (Tr. 205-06, 510-11) One possibility was to have Respondent's brother bring Sol Iris from Cambodia to New York. In an email dated June 11, 2005, Petitioner rejected that idea in part because she was unsure that Respondent's brother would be able to enter the United States without securing a tourist visa for Sol Iris. (Respt.'s Ex. E) On that topic, Petitioner asked Respondent if he had Sol Iris's "paperwork ready," referring to the F-2 visa (Tr. 219-20), and specifically noted that she would "drop her [Sol Iris] at nyc anyway on Aug.2." [22] (Tr. 223) In the June 11, 2005 email, Petitioner also stated that she was "upset" that Respondent now wanted to relieve Petitioner of having to care for Sol Iris in light of

---

(Tr. 516) Because this process required extensive paperwork and Sol Iris's passport, which Respondent could not have obtained prior to Petitioner's arrival on August 2, 2005, there is nothing significant about the fact that Respondent had not yet obtained the F-2 visa for his daughter.

Indeed, Respondent testified at length about the efforts he made to complete the paperwork and otherwise satisfy the requirements for the F-2 visa. (Tr. 516-17, 524) This credible testimony supports Respondent's case as it shows that he was acting diligently to carry out the plan he and Petitioner made in April 2005.

[19] In response to Respondent's complaints about taking Sol Iris to Cambodia, Petitioner sent Respondent an email where she expressed her belief that it was not "completely bad" for Sol Iris "to travel around the world with' her mother." (Respt.'s Ex. D) According to Petitioner, "I want to show her the world, and as I said, I have no intention to raise her here in Canada." (Respt.'s Ex. D) Before being shown this email, Petitioner testified that she intended to work and live in Toronto after graduating from law school and that she intended to raise Sol Iris in Canada. (Tr. 116) Petitioner's February 19, 2005 email demonstrates that her testimony to this Court was false.

[20] Ms. Chin agreed to have Respondent and Sol Iris live with her, and she even researched day care centers near her apartment. (Tr. 506-07)

[21] Before Petitioner and Sol Iris departed, Respondent signed a "Parental Consent Letter," stating in essence that he was the father of Sol Iris and that he consented to her travel with Petitioner from Canada to Cambodia between May 16, 2005 and August 3, 2005. (Petr.'s Ex. J) Petitioner contends that this reflects Respondent's consent to have Petitioner return to Canada with Sol Iris. (Petr.'s Aff. P 5, Aug. 8, 2005; Petr.'s Mem. of Law on the Hague Convention on the Civil Aspects of Int'l Child Custody 3, Aug. 30, 2005 [hereinafter Petr.'s Post-Hr'g Mem.]) However, this form was merely meant to reflect Respondent's consent for Sol Iris to travel with Petitioner to Cambodia. In fact, Respondent recounted his difficulties entering Canada with Sol Iris without such a consent form. (Tr. 515) Furthermore, there is nothing in the form reflecting Respondent's consent for Sol Iris to live with Petitioner beyond the duration of the Cambodia trip. In fact, at the time he signed the consent, Respondent did not yet know if he had been accepted into NYU or Columbia, thus there would have been no reason for him to give such consent.

[22] This email further undercuts Petitioner's efforts to limit the F-2 visa as relating only to Respondent's ability to enter the United States with Sol Iris. If that was the sole purpose of the F-2 visa, and if Petitioner already had determined that *she* would "drop off" Sol Iris with Respondent in New York, then there would be no need for an F-2 visa. Instead, the more logical conclusion is that this email reflects the prior agreement that Respondent would obtain an F-2 visa for Sol Iris so she could stay with him for a period longer than six months while he attended law school in New York.

his earlier suggestion that Petitioner should bring Sol Iris "to this lawless, isolated place without a realiable [sic] medical facility . . . where [Petitioner] has to think about the possibility of malaria and danngue [sic] fever for every single mosquito bite." (Respt.'s Ex. E) She ended the June 11, 2005 email by providing Respondent with telephone contact information.

After this email, Respondent lost contact with Petitioner and his daughter for several weeks. [23] (Tr. 511) This is because Mr. **[*505]** Pfeifer came to visit Petitioner for a week in Phnom Penh (Tr. 214), and then Petitioner, Mr. Pfeifer, and Sol Iris traveled to the Northern Territory of Cambodia together. [24] (Tr. 215-16) Petitioner did not tell Respondent about this trip, or of her relationship with Mr. Pfeifer. (Tr. 215) Instead, after her sojourn with Mr. Pfeifer, Petitioner sent an email to Respondent saying that she wanted a divorce. (Tr. 511) In response, Respondent suggested that they talk about a divorce in person in New York. (Tr. 512) Petitioner tersely replied that there was no need to discuss the topic, that she wanted a divorce by October, and that if Respondent did not comply, Petitioner would take Respondent to criminal court in Ontario. (Tr. 512) Petitioner also told Respondent that she would not be reachable for the next three weeks. (Tr. 518) At some point thereafter, Petitioner sent Respondent an email indicating that she would arrive in New York on August 2, 2005. (Tr. 518)

 In late July, Respondent learned that he had been accepted into Columbia Law School. (Tr. 516) Within a week, he began to make arrangements to procure the F-2 visa for Sol Iris. (Tr. 516) For example, Respondent inquired about documents he would need to complete and secured the necessary funding from his father. (Tr. 516-17) One document Respondent needed to procure was Sol Iris's passport. (Tr. 524)

While Respondent was pursuing Sol Iris's F-2 visa, Ms. Chin and her husband visited a day care center near their lower Manhattan residence. (Tr. 517-18, 567-68) To accommodate Sol Iris's indefinite stay in New York while Respondent attended Columbia law school, Ms. Chin also made substantial alterations to her apartment. (Tr. 518, 569) For example, she moved out of her larger bedroom, moved Sol Iris's bed into that bedroom, had Sol Iris's bedroom thoroughly cleaned, and she and her daughter (Andrea) bought books and toys for Sol Iris. (Tr. 569)

### August 2, 2005: Petitioner Drops Sol Iris Off in New York City

As planned, Petitioner and Sol Iris flew into JFK International Airport on August 2, 2005. Respondent and his brother met them at the airport. (Tr. 237) From the airport, Respondent,  his brother, Petitioner, and Sol Iris took a taxi to Ms. Chin's apartment in lower Manhattan. During this ride, Respondent commented on the physical condition of Sol Iris. She appeared to be missing most of a toenail and had numerous large mosquito bites on her legs. [25] (Tr. 519) Respondent then insisted that Sol Iris see a doctor in New York the next day. (Tr. 521)

Respondent thereafter advised Petitioner that he had been accepted into Columbia Law School. Respondent then asked Petitioner if she still agreed to Sol Iris living with Respondent in New York. (Tr. 519-20) Petitioner agreed. (Tr. 519-20) In fact, Petitioner said, "wow she's [Sol Iris] going to be a New Yorker now." (Tr. 239)

---

[23] The loss of contact greatly concerned Respondent, who did not know if Sol Iris had recovered fully from her high fever. On June 19, 2005, he wrote in an email:

How is Sol?? Still running a fever?? I am worried so much; I assume you are as well. How much would it cost for you to bring Sol to the States?? I would think that's the best option, and I would at least like to know if it is feasible. Thanks for taking care of Sol.

    (Respt.'s Ex. F)

[24] Apparently, this trip had been planned as far back as April 2005. (Tr. 215)

[25] Petitioner claimed that Sol Iris hurt her toe when she slipped. (Tr. 519) The toenail had been manicured during a visit by Petitioner to a beauty salon in Cambodia. (Tr. 519, 296)

EXHIBIT Q
Page 8 of 21

404 F. Supp. 2d 495, *505

During the same ride, Respondent asked Petitioner how long she was planning to stay in New York. (Tr. 520) Petitioner  **[\*506]** indicated she would be staying until that Saturday (August 6, 2005). (Tr. 520) Respondent then asked Petitioner if she would be staying with Respondent's family at Ms. Chin's apartment, but Petitioner indicated that she would be staying with a friend. (Tr. 520)

Eventually, Respondent, Petitioner, Sol Iris, and Respondent's brother arrived at Ms. Chin's apartment. (Tr. 520) Petitioner stayed approximately three to four hours. (Tr. 286, 520) During this visit, Petitioner presented gifts to Respondent's family that she brought from Cambodia. (Tr. 285-86, 522) Respondent and his brother unpacked Sol Iris's belongings into a cabinet in the room that Ms. Chin had set up for Sol Iris's indefinite stay. (Tr. 521-22) At some point during this brief visit, Ms. Chin showed Petitioner the changes she made to the apartment to accommodate Sol Iris. Ms. Chin also told Petitioner about her research about the neighborhood day care center. (Tr. 577)

During this visit, Respondent and Petitioner had another brief conversation about the care of Sol Iris. According to both Respondent and Ms. Chin, Petitioner agreed that Respondent would care for Sol Iris in New York while she lived with Respondent and his family at Ms. Chin's apartment. (Tr. 523-24, 579) Petitioner's version is different, but not credible. She testified that she told Ms. Chin that she "will be the one who takes Iris back to Toronto, that whoever gets the custody order . . . should have the full custody . . . and . . . divorce and custody are separate issue[s]." (Tr. 286-87) To the extent one can decipher the precise meaning of Petitioner's testimony on this point, it appears that she believes she never agreed to give *permanent* custody of Sol Iris to Respondent. [26] (Tr. 284)

 After this conversation, Respondent and his brother took Sol Iris to a local playground. (Tr. 524) At some point thereafter, Ms. Chin, upon being told by Petitioner that she planned to be in New York for  **[\*507]** four more days, invited Petitioner to stay with her or her daughter. (Tr. 575) Petitioner declined, stating that she had a friend who was expecting her. (Tr. 575) When Ms. Chin asked about the friend, Petitioner told Ms. Chin that her friend lived in Chelsea and that he was a man. Petitioner whispered to Ms. Chin that Respondent did not know that her friend was a man. [27] (Tr. 575) Also, while Ms. Chin and Petitioner were alone in Ms. Chin's apartment, Petitioner spoke to her parents over the telephone. After this conversation, Petitioner told Ms. Chin that she had falsely told her mother during that conversation that she was not going to divorce Respondent. (Tr. 578-79)

---------------------------------

[26] Also, at some point on August 2, 2005, Respondent asked Petitioner to give him Sol Iris's passport, which he needed for the F-2 visa application. (Tr. 524) Petitioner said she would provide it to Respondent. (Tr. 524) This testimony is entirely credible since it is obvious that Respondent would need Sol Iris's passport to obtain the F-2 visa.

Respondent's credible explanation is in stark contrast to Petitioner's incredible testimony about the passport. At the *ex parte* hearing, Petitioner attempted to portray the passport request as part of some nefarious plot by Respondent to abscond with Sol Iris to Korea. Indeed, Petitioner tried to cast a dark cloud over the passport request by testifying that Respondent asked for the passport immediately upon her arrival on August 2, 2005 and again on August 3, 2005 in order to take Sol Iris to the doctor, something that Petitioner then suggested was an obvious pretext. (Tr. 27, Aug. 12, 2005) Petitioner went on to insinuate that Respondent only asked for the passport in connection with the F-2 visa for the first time on August 5, 2005. (Tr. 27, Aug. 12, 2005) This testimony, however, is difficult to square with the email Petitioner sent to Respondent in June 2005, two months before her arrival in New York, in which she specifically asked Respondent about the "paperwork" (the F-2 visa). (Respt.'s Ex. E) It is also contrary to the credible testimony of Respondent and common sense that the passport was necessary for the F-2 visa.

Concealing the fact that Respondent was interested in obtaining Sol Iris's passport in order to obtain the F-2 visa does more than just undermine Petitioner's credibility; it also supports an inference that she misled the Court because she knows the F-2 visa is proof that she consented to let Sol Iris live with Respondent in New York upon his acceptance to Columbia. *Cf. United States v. Aleskerova*, 300 F.3d 286, 297 (2d Cir. 2002) (stating that lying to customs officials regarding possession of paintings tends to prove plaintiff's consciousness of guilt); *S.E.C. v. Cassano*, 61 F. Supp. 2d 31, 34 (S.D.N.Y. 1999) (finding that lying to SEC investigators about the circumstances of stock trades evidences knowledge of guilt).

[27] Mr. Pfeifer admitted that Petitioner stayed with him that night. (Tr. 872)

EXHIBIT Q

404 F. Supp. 2d 495, *507

Petitioner gave different versions of her story that she was not allowed to stay with Ms. Chin. At the *ex parte* hearing on August 12, 2005, Petitioner claimed that "they said there is no room for me to stay in that house." (Tr. 26, Aug. 12, 2005) During cross-examination, however, she altered her story, claiming that Ms. Chin told her in 2004 that while Petitioner was always welcome in her house as the mother of Sol Iris, she would not let Petitioner stay in her two-bedroom apartment when Respondent's brother "comes in." (Tr. 282-83) Thus, according to Petitioner, when she arrived at Ms. Chin's apartment on August 2, 2005, Ms. Chin asked Petitioner where she was "going," and that when Petitioner said she was going to a friend's house, Ms. Chin said "good." (Tr. 283) Petitioner evidently told her parents another story, claiming that Ms. Chin asked Petitioner to leave her apartment on August 2, 2005. (Tr. 580)

Petitioner's story is simply not credible. The claim that Ms. Chin and Petitioner had an apparently hypothetical conversation -- one year before the August 2 visit -- about Petitioner being allowed to stay with Ms. Chin except in the event that Respondent's brother just happened to be visiting from Korea is absurd. Thus, even if Petitioner had not changed her story, this initial tale is not credible on its face. Further, Petitioner changed her story both to this Court and evidently to her parents (to whom she also lied about her intentions to divorce Respondent). Petitioner's testimony was no match for the credible, even if angry, denials by Ms. Chin that she never told Petitioner she was unwelcome at her home. [28] In the end, it is readily apparent that Petitioner never intended to stay with Ms. Chin and instead was eager to stay and visit with her boyfriend, Mr. Pfeifer. [29]  **[*508]** Indeed, Petitioner told Respondent *before* she arrived at Ms. Chin's apartment that she would be staying with a friend. (Tr. 520) Thus, Petitioner's decision to stay with Mr. Pfeifer had nothing to do with anything Ms. Chin said to her. [30]


### August 3 and 4, 2005: Sol Iris Visits the Doctor and Petitioner Disappears

On August 3, 2005, Respondent took Sol Iris to the emergency room at NYU Hospital, but she was refused care. (Tr. 525) Thereafter, Petitioner called Respondent, learned about the failed ER visit, and indicated she would try to find the name of a doctor. (Tr. 525) Petitioner later met Respondent at Ms. Chin's apartment, where she provided the name of a doctor (given to her by Mr. Pfeifer). (Tr. 525, 305-06) While at Ms. Chin's apartment, Petitioner spoke

---

[28] Upon learning that Petitioner had told her parents that Ms. Chin had asked Petitioner to leave her apartment, Ms. Chin sent Petitioner's parents an email categorically rejecting Petitioner's claims. (Respt.'s Ex. N) It is noteworthy that this email, written on August 11, 2005, and before Petitioner initiated this case, describes the August 2 conversation between Ms. Chin and Petitioner almost identically to Ms. Chin's testimony on the same topic. (Respt.'s Ex. N) ("I invited her to bunk with us but she said, my friend is expecting me.' Then, she whispered to me later that her friend' is a man.")

[29] There is no question that Petitioner was carrying on an extramarital affair with Mr. Pfeifer from as far back as 2004 until August 2005. Indeed, Mr. Pfeifer admitted to: (i) interviewing Petitioner in the fall of 2004 for a law job and maintaining contact with her thereafter (Tr. 892, 897); (ii) traveling to Montreal to spend a weekend with Petitioner (and Sol Iris) in late March 2005 (Tr. 898); (iii) traveling to Cambodia to spend a week with Petitioner, all the while staying with her (and Sol Iris) at a bed and breakfast and at Petitioner's apartment (Tr. 875-76); (iv) having Petitioner stay with him during her visit to New York between August 2 and August 12, 2005 (Tr. 872-74); and (v) hugging Petitioner in front of Sol Iris. (Tr. 892) Thus, although Mr. Pfeifer repeatedly invoked his right against self-incrimination (because of a fear of prosecution under New York's adultery statute) (Tr. 881, 882, 884, 897), the Court fairly can draw the inference that Mr. Pfeifer and Ms. Choi were engaged in an affair for nearly one year. *See Baxter v. Palmigiano*, 425 U.S. 308, 318, 96 S. Ct. 1551, 47 L. Ed. 2d 810 (1976) ("The Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them."); *Nolan v. Nolan*, 107 A.D.2d 190, 486 N.Y.S.2d 415, 418 (App. Div. 1985) ("Because plaintiff availed herself of her Fifth Amendment right against self-incrimination when questioned regarding an alleged adulterous relationship, we believe that Trial Term properly inferred marital misconduct on her part."). While Petitioner did not invoke her Fifth Amendment right, her counsel indicated she would invoke the right if asked direct questions about any sexual relations with Mr. Pfeifer. (Tr. 175, 183)

[30] This recitation is significant because, in support of Petitioner's request for a Warrant in lieu of a Writ for Habeas Corpus, Petitioner attempted to paint a picture in which Respondent had blocked Petitioner from having any contact with Sol Iris, thus, in effect, kidnaping her. (Tr. 8, 14, 28, Aug. 12, 2005) Yet, after a full hearing, it seems clear that there was no such effort by Respondent or his family.

EXHIBIT Q

404 F. Supp. 2d 495, *508

with Ms. Chin and told her that she wanted to find a job in New York during her visit, and that she was interested in returning to Cambodia during the summer of 2006. (Tr. 575-76)

Later that day, Respondent, Petitioner, and Respondent's brother took Sol Iris to the doctor, who prescribed medicine for Sol Iris's wounds. (Tr. 526) Respondent filled the prescription. [31] (Tr. 526) At some point during that day, Respondent again asked for Sol Iris's passport, which Petitioner said she would provide. (Tr. 532) Also on August 3, Respondent, Petitioner, and Respondent's brother took Sol Iris to a department store to purchase some clothes. (Tr. 532) Petitioner left her daughter and Respondent at the department store, saying that she had dinner plans. (Tr. 532) Continuing the same pattern of behavior, Petitioner did not call or visit Respondent or Sol Iris on August 4, 2005.

**August 5 and 6, 2005: Petitioner Changes Her Mind**

On August 5, 2005, Petitioner had no contact with Respondent until she sent an email at approximately 9 p.m. The email in its entirety reads as follows:

> I may extend my stay till Tuesday, as i haven't had anytime to sit down and talk about iris. i am fully booked today with lunch and dinner meetings. i will be free from tomorrow.
>
> my heart is breaking to part her, and that is my personal interest. honestly, i don't know whether it is good for her to stay here. the more i get to know nyc, i believe that it may be better for her to stay with me till she reaches age of 5 **[*509]** and after you have fully settled with your school and live in nyc. but i don't want to argue over ths over the internet and i would like to talk or at least express my thoughts.
> i also think it would be better to finalize divorce while i am here rather than make double, triple trips. please let me know whether it is okay to book an appointment on Monday or Tuesday with the consulate office.
> I hope her wounds are now better and hope to see you soon.

(Respt.'s Ex. I) (errors in original)

The next morning, Petitioner called Andrea Chin, the daughter of Ms. Chin, to request a meeting with Respondent. (Tr. 533-34) Andrea Chin told Petitioner that the family was going to have lunch at a Korean restaurant. (Tr. 534) Petitioner thereafter met Respondent, Sol Iris, and Respondent's family at the restaurant. (Tr. 534) The lunch was followed by a conversation between Respondent and Petitioner. Petitioner led by saying that she wanted to take Sol Iris back to Toronto and that Sol Iris could return to New York after her fifth birthday (in March 2006). (Tr. 536) Respondent expressed his frustration with Petitioner changing her mind and explained why it was in Sol Iris's interest that she not move back and forth between the parents. (Tr. 536-37) Respondent also told Petitioner that he had adequate financial support from his father, something that seemed to put Petitioner somewhat at ease. (Tr. 537) Petitioner then conceded that Sol Iris would stay in New York, but she wanted to have joint custody over her. (Tr. 537) Respondent rejected this suggestion, claiming that it was impractical for Petitioner to have custody rights from a distance. (Tr. 537) At this point, Petitioner indicated that she wanted to move to New York to be close to Sol Iris and, in fact, that she had been trying to meet with people during her stay in New York to obtain employment. (Tr. 537-38)

**August 7 to 11, 2005: Petitioner Turns up the Heat**

On August 7, 2005, Petitioner and Respondent had no meetings or conversations. Petitioner sent another email to Respondent late in the evening of August 7, which reads as follows:

> After careful thought, I am going back home with Iris this Saturday or earlier. As you know, my family and I have already prepared housing and Iris' junior kindergarten.
> I appreciate your relatives' love and care this week. Thank you.
> If you decide to interfere, I will contact the appropriate authorities and inform my legal counsel.

---

[31] The parties dispute who paid for the prescription, a clash that need not be resolved for these purposes.

404 F. Supp. 2d 495, *509

I trust that you would not take a wrongful step which may jeopardize all three of our lives.
We can talk about the detailed arrangement after me and Iris go back to Canada and settle in.
If you will not finalize the divorce this week in New York, I will initiate divorce proceedings in Canada.
Because you mentioned you are available to go to consulate on Wednesday, I look forward to speaking to you
there and then. [32]
(Petr.'s Ex. 5)

The next day, Respondent and Petitioner spoke by phone. (Tr. 341) During the call, Petitioner told Respondent that she **[\*510]** was coming to Ms. Chin's residence to get Sol Iris. (Tr. 544) Respondent said that Petitioner could come to the apartment, but not if her intention was to take Sol Iris. (Tr. 544) He also objected to Petitioner's threat to bring law enforcement officials to Ms. Chin's apartment, particularly because she had been nice to Petitioner. (Tr. 341, 543) Petitioner indicated that she would call back, but she did not, either that night or the next day. Instead, Petitioner contacted the police. (Tr. 341-42) The police met Petitioner out on the street, near Respondent's residence. (Tr. 345, 874) They referred Petitioner to the appropriate precinct. (Tr. 345)

The next day, August 9, 2005, Petitioner went to the Canadian consulate. (Tr. 347) Petitioner also called the 1st Precinct on August 9, but they offered no assistance. (Tr. 347) Petitioner had no contact with Respondent on August 9. (Tr. 544)

On August 10, Michael D. Stutman, an attorney, apparently retained by Petitioner, had a letter served on Respondent. (Tr. 545) Mr. Stutman began his letter by commenting that in light of Respondent's "circumstances (present in this country on a student visa and hoping to apply for admission to the Bar of New York)," he found Respondent's conduct "to be astonishing." (Petr.'s Ex. 7) Mr. Stutman further wrote that certain "proceedings" could be brought under "Federal and State statutes to obtain custody of" Sol Iris and to "punish" Respondent for his actions. (Petr.'s Ex. 7) The letter warned Respondent that these proceedings would be public and would be considered when Respondent applies for "a license to practice law in this or any other State." (Petr.'s Ex. 7) The letter ended by demanding that Respondent return Sol Iris to Petitioner on August 11, 2005 at a Starbuck's in midtown Manhattan, or else Petitioner would be advised "to pursue every single remedy available to her." (Petr.'s Ex. 7)

Upon receiving this letter, Respondent contacted a law professor and attempted to retain a family lawyer. (Tr. 545) Later that night, Respondent called Petitioner asking her about the letter he received. (Tr. 546) Petitioner repeatedly insisted that Respondent agree to give Sol Iris back to her. (Tr. 546) Toward the end of the conversation, Petitioner asked to speak with Sol Iris. However, when Respondent asked Sol Iris to speak with Petitioner Sol Iris refused because, contrary to Petitioner's testimony, Sol Iris was preoccupied with her toys. (Tr. 546, 720)

August 11 found both Respondent and Petitioner in New York State family court filing competing actions for custody over Sol Iris. (Tr. 547) Petitioner, represented by counsel in this action, filed both a Hague Convention petition and an amended petition for custody of Sol Iris. (Respt.'s Ex. A; Ex. B) Respondent, representing himself, filed a custody petition. (Tr. 547-48; Respt.'s Ex. M) Both parties appeared briefly before a referee, who adjourned the matter until August 17, 2005. [33] (Tr. 550-51)

III. Conclusions  of Law

A. General Principles

---

[32] Notwithstanding his waffling during the hearing (Tr. 907-11), it is evident that Mr. Pfeiffer assisted Petitioner with this email. Indeed, a cursory comparison of the August 5 and August 7, 2005 emails leaves no doubt, as the former is filled with typographical and grammatical errors and the latter is not.

[33] During the *ex parte* hearing, Petitioner's counsel failed to mention to the Court that he had filed an action in New York Family Court and he represented to this Court that he was unaware of the return date for Respondent's Family Court action. Obviously, this omission and false statement are troubling.

EXHIBIT Q

404 F. Supp. 2d 495, *510

The Hague Convention on the Civil Aspects of International Child Abduction, as implemented through ICARA, was created with the stated purpose "to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure **[\*511]** their prompt return to the State of their habitual residence, as well as to secure protection for rights of access." Hague Convention, *supra*, at intro. The Convention was designed to restore the pre-retention *status quo* and to discourage parents from crossing international borders in search of a more sympathetic forum. *See Gitter v. Gitter*, 396 F.3d 124, 129-30 (2d Cir. 2005) (citing Paul R. Beaumont & Peter E. McEleavy, *The Hague Convention on International Child Abduction* 1-3 (P.B. Carter ed 1999) [hereinafter Beaumont & McEleavy]). To dissuade family members from removing children to jurisdictions perceived to be more favorable to their custody claims, the Hague Convention attempts "to deprive [their] actions of any practical or juridical consequences." *Gitter*, 396 F.3d at 130 (quoting *Hague Convention on the Civil Aspects of Int'l Child Abduction: Explanatory Report*, P 16, Acts and Documents of the 14th Session, vol. III (1980) (*prepared by* Elisa Perez-Vera) [hereinafter *Perez-Vera Report*].

A court considering a Hague Convention petition has jurisdiction only over the wrongful removal or retention claim. *See* Hague Convention, *supra*, at art. 16; 42 U.S.C. § 11601(b)(4); *Diorinou v. Mezitis*, 237 F.3d 133, 140 (2d Cir. 2001). The merits of any underlying custody case are of no concern in a Hague Convention case. *See Blondin v. Dubois*, 189 F.3d 240, 245 (2d Cir. 1999) (citing *Friedrich v. Friedrich*, 983 F.2d 1396, 1400 (6th Cir. 1993) ("*Friedrich I*")); Hague Convention, *supra*, art. 19. "Put differently, the court's inquiry in a Hague Convention case is not the best interests of the child,' as it is in a state custody case; rather it is the specific claims and defenses under the Convention, namely whether a child has been wrongfully removed to, or retained in, a country other than the child's habitual residence and, if so, whether any of the Convention's defenses apply to bar the child's return to his habitual residence." *Hazbun Escaf v. Rodriquez*, 200 F. Supp. 2d 603, 610-11 (E.D. Va. 2002).

ICARA, enacted in 1988, establishes procedures for the implementation of the Hague Convention in the United States. *See Croll v. Croll*, 229 F.3d 133, 138 (2d Cir. 2000). ICARA allocates the burdens of proof for various claims and defenses under the Convention. *See* 42 U.S.C. § 11601-11611 (2005); *Koc v. Koc*, 181 F. Supp. 2d 136, 146 (E.D.N.Y. 2001). Specifically, ICARA requires that a petitioner establish, by a preponderance of the evidence, that the child whose return is sought has been "wrongfully removed or retained within the meaning of the Convention." 42 U.S.C. § 11603(e)(1)(A). In this respect, the Convention reflects "a strong presumption favoring return of a wrongfully removed child." *Danaipour v. McLarey*, 286 F.3d 1, 13 (1st Cir. 2002). If a petitioner makes out a *prima facie* case of wrongful removal or retention, the court must return the child unless **[\*512]** the respondent can establish one of the Convention's enumerated defenses. *Hazbun Escaf*, 200 F. Supp. 2d at 611.

To establish a *prima facie* case of wrongful retention under the Hague Convention, a petitioner must show by a preponderance of the evidence that: (1) the habitual residence of the child immediately before the date of the alleged wrongful retention was in a foreign country; (2) the retention is in breach of custody rights under the foreign country's law; and (3) the petitioner was exercising custody rights at the time of the alleged wrongful retention. *See* 42 U.S.C. § 11603(e)(1)(A); *Gitter*, 396 F.3d at 130-31.

If the petitioner satisfies this burden, then the child must be returned to his or her state of habitual residence unless the respondent can establish one of the following affirmative defenses: (1) the proceeding was commenced more than one year after the removal of the child and the child has become settled in his or her new environment; (2) the person seeking return of the child consented to or subsequently acquiesced in the removal or retention; (3) there is a grave risk that the return of the child would expose it to physical or psychological harm; or (4) the return of the child would not be permitted under the fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms. [34] *See Blondin*, 189 F.3d at 245-46; *Furnes v. Reeves*, 362 F.3d 702, 712 (11th Cir. 2004).

---

[34] The first two affirmative defenses require a preponderance of the evidence, the last two affirmative defenses require clear and convincing evidence. *Blondin*, 189 F.3d at 245-46.

404 F. Supp. 2d 495, *512

However, as is clear from ICARA, these affirmative defenses are meant to be narrow. *Blondin*, 189 F.3d at 246. Indeed, these defenses "do not authorize a court to exceed its Hague Convention function by making determinations, such as who is the better parent, that remain within the purview of the court with plenary jurisdiction over the question of custody." *Id.*; *see also Nunez-Escudero v. Tice-Menley*, 58 F.3d 374, 377 (8th Cir. 1995) ("It is not relevant to this Convention exception [Article 13(b)] who is the better parent in the long run. . . ."). To view the defenses more broadly would frustrate the core purpose of the Hague Convention -- to preserve the *status quo* and deter parents from seeking custody of their child through forum shopping. *See Perez-Vera Report, supra*, P 34.

B. The Prima Facie Case of Wrongful Retention

1. Habitual Residence

A petitioner can invoke the protection of the Hague Convention only if the child to whom the petition relates is "habitually resident" in a State signatory to the Convention and has been removed to or retained in a different State. *See Holder v. Holder*, 392 F.3d 1009, 1014 (9th Cir. 2004); *Diaz Arboleda v. Arenas*, 311 F. Supp. 2d 336, 342 (E.D.N.Y. 2004). The Hague Convention itself, however, does not provide any definition of "habitually resident." *Gitter*, 396 F.3d at 131; Beaumont & McEleavy, *supra*, at 89; *Perez-Vera Report, supra* P 53 ("Following a long-established tradition of the Hague Conference, the Convention avoided defining its terms. . . .").

Although "habitual residence" is not defined in the Convention, the text of the Convention directs courts to the time "immediately before the removal or retention. " Hague Convention, *supra*, art. 3; *see also Slagenweit v. Slagenweit*, 841 F. Supp. 264, 268 (N.D. Iowa 1993) ("In determining habitual residency, a court must look back in time, not forward. . . . Future plans are irrelevant to our inquiry.'") (quoting *Friedrich I*, 983 F.2d at 1401) (ellipses in original).

In focusing on the pre-retention period, the relevant inquiry is the shared intention of those responsible for fixing the child's place of residence, which typically will be the child's parents. *See Gitter*, 396 F.3d at 132. The Court may also look to other factors in determining the child's habitual residence. *Id.* at 133. ("Parental intent alone cannot establish a child's habitual residence.") "First, a change in geography is a necessary condition to a child acquiring a new habitual residence." *Gitter*, 396 F.3d at 133; *see also Diaz Arboleda*, 311 F. Supp. 2d at 342. Second, there **[*513]** must be evidence that "points unequivocally to the conclusion that the child has become acclimatized to his new surroundings and that his habitual residence has consequently shifted." *Gitter*, 396 F.3d at 133; *see also Mozes v. Mozes*, 239 F.3d 1067, 1075 (9th Cir. 2001) ("The first step toward acquiring a new habitual residence is forming a settled intention to abandon the one left behind."). However, so as not to undermine the goal of the Hague Convention to deter "gamesmanship" among adversarial parents, the courts should be "'slow to infer' that the child's acclimatization trumps the parents' shared intent." *Gitter*, 396 F.3d at 134 (quoting *Mozes*, 239 F.3d at 1079).

Petitioner claims that Sol Iris is a habitual resident of Canada. [35] (Petr.'s Post-Hr'g Mem. 9-14) In support of this claim, Petitioner points to the birth of Sol Iris on Canadian soil and broadly asserts that she has been "mostly raised in Canada." (Petr.'s Post-Hr'g Mem. 10) Beyond these points, Plaintiff claims, and Respondent does not dispute, that as of August 2004 there was a shared intent between Petitioner and Respondent to have Petitioner care for Sol Iris during the academic year from August 2004 until May 2005 in Canada. (Petr.'s Post-Hr'g Mem. 9) Petitioner further contends, however, that she and Respondent also agreed, as of April 2005, that Petitioner would take Sol Iris to Cambodia during the summer and then the two would return to Canada for the academic year August 2005 through May 2006. (Petr.'s Post-Hr'g Mem. 9-10) In support of this contention, Petitioner points to Respondent's acquiescence to two of Petitioner's decisions in April 2005 -- one registering Sol Iris for junior kindergarten in Toronto beginning in September 2005 and the other traveling with Sol Iris to Cambodia and back to Canada. (Petr.'s Post-Hr'g Mem. 9-10)

---

[35] There is no dispute that Canada and the United States are signatories to the Hague Convention. *See Hague Conference on Int'l Law: Report of the Second Special Commission Meeting to Review the Operation of the Hague Convention on the Civil Aspects of Int'l Child Abduction*, 1980, 33 I.L.M. 225, 225 (1994).

404 F. Supp. 2d 495, *513

Respondent posits a different theory. His claim is that Petitioner has simply failed to meet her burden of demonstrating that Canada is Sol Iris's habitual residence and that, in fact, she is without any habitual residence. Respondent disputes Petitioner's claim that she always intended to raise Sol Iris in Canada, insists that they had agreed Sol Iris would live in New York with Respondent should he be accepted into law school there, points to Petitioner's emails discussing the procurement of an F-2 visa for Sol Iris and Petitioner's intention to "drop" Sol Iris in New York, and highlights Petitioner's comment about Sol Iris becoming a New Yorker on August 2, 2005. [36] (Respt.'s Ex. E; Tr. 236, 239, 282) The weight of this evidence, according to Respondent, demonstrates, at a minimum, that the parties did not share an intent that Sol Iris would live in Canada beyond August 2005. Thus, Respondent contends the evidence reveals that "Sol Iris does not have a habitual residence **[*514]** within the meaning of the Convention." (Respt.'s Post-Hr'g Mem. 17)

 While Respondent may be correct in asserting that there is "no legal barrier to reaching [the conclusion that Sol Iris has no habitual residence] on appropriate facts" (Respt.'s Post-Hr'g Mem. 17), the Court does not find the facts of this case appropriately support Respondent's claim. To begin, the legal authority cited by Respondent is distinguishable. For example, Respondent cites to two circuit decisions, *Holder*, 392 F.3d at 1020; *Delvoye v. Lee*, 329 F.3d 330, 334 (3d Cir. 2003), *cert. denied*, 540 U.S. 967, 124 S. Ct. 436, 157 L. Ed. 2d 312 (2003), both of which were limited to the question of when a newborn acquires a habitual residence. Indeed, the court in *Delvoye* acknowledged this "unique" question "differs from the run of decisions under the Convention where the child is assumed to have a habitual residence initially and the controversy is over a change of that residence." 329 F.3d at 334.

Furthermore, while Sol Iris may have had multiple habitual residences over the course of her short life, there is no question that at least one of those residences has been Canada (the other potentially being South Korea). Even Respondent's version of the story tacitly acknowledges that between August 2004 and May 2005, Sol Iris was a habitual resident of Canada. She lived with her mother and her maternal grandparents, attended day care, and had some friends there during this period. Moreover, the 2004-05 period is not the first time that Sol Iris could be considered a habitual resident of Canada, as she spent the first 16 months of her life in that country as well. Of course, the Court recognizes that Sol Iris also spent considerable time in South Korea with either or both of her parents -- from July 2002 until August 2003 and again from November 2003 until August 2004 -- but this does not mean that as of August 2005 she had no habitual residence. Thus, whatever may be said of the theoretical possibility of a child being stuck in habitual purgatory, the facts of this case do not support Respondent's claim.

While Respondent did not press the point, the Court also has considered his suggestion that Sol Iris could be a habitual resident of New York. Though analytically similar to Respondent's claim that Petitioner consented to Sol Iris living with Respondent in New York upon his acceptance to Columbia, the law puts the same facts in a different light when considering the question of habitual residence. More specifically, even though, as discussed below, the Court finds that Petitioner did consent to Sol Iris living with her father in New York, this does not by itself instantaneously shift the habitual residence from Canada to New York. Indeed, even if Petitioner's consent could be construed as pre-retention evidence of shared intent that Sol Iris would *become* a New Yorker, the law requires more before this Court can find that she *was* a New Yorker as of August 2005. *Friedrich I*, 983 F.2d at 1401. Moreover, even if there is some evidence that the parties intended to shift the habitual residence of Sol Iris, the law requires both a change in geography and that the child become acclimatized to the new residence for a shift in habitual residence. *See Gitter*, 396 F.3d at 133; *see also Ruiz v. Tenorio*, 392 F.3d 1247, 1253 (11th Cir. 2004) ("Although the settled intention of the parents is a crucial factor, it cannot alone transform the habitual residence. In addition, there must be an actual change in geography and the passage of a sufficient length of time for the child to have become acclimatized."). While it is true, as Respondent suggests, that the amount of time for a four-year-old

---

[36] Respondent persuasively discredits Petitioner's testimony that her parents would care for Sol Iris even if Petitioner did not stay there upon graduating from law school. (Tr. 416-17) As Respondent notes, this testimony is thoroughly undermined by other testimony that Petitioner's parents did not even want to care for Sol Iris during the summer of 2005, apparently on the belief that Sol Iris should always be in the care of either Respondent or Petitioner (Tr. 122), and that Respondent flew from Korea to Canada to retrieve Sol Iris and care for her back in Korea during Petitioner's first year in law school at SUNY Buffalo. (Tr. 483)

404 F. Supp. 2d 495, *514

to acclimatize to a new residence is less than that **[\*515]** for an older child, the overwhelming weight of authority suggests the minimum time needed is far greater than the handful of days she was in New York before the allegedly unlawful retention. *See, e.g., Slagenweit*, 841 F. Supp. at 269 (noting that the three-and-a-half year-old girl acclimatized for nine months in United States); Beaumont & McEleavy, *supra*, at 112 ("It is suggested that, in the case of children, six months should be treated as a guideline figure when considering the length of time necessary before residence might be classified as habitual."). [37] Thus, the Court finds that Petitioner has met her burden of showing that Sol Iris was a habitual resident of Canada just before her visit to New York.

2. Respondent's Alleged Unlawful Retention and Breach of Petitioner's Custody Rights

The second and third elements of a *prima facie* case under the Hague Convention are that the Petitioner was exercising rights of custody at the time of retention and that the retention was a breach of those custody rights. Here, there is no dispute that Petitioner was exercising her rights of custody at the time of the alleged retention. Furthermore, the Court finds that Petitioner has made a *prima facie* case that her custody rights were aggrieved. [38]

C. Enumerated Defense of Consent

As noted, once a Hague Convention petitioner establishes a *prima facie* case, the child must be returned to the place of habitual residence unless the respondent can establish one of four narrow defenses. *See Blondin*, 189 F.3d at 246. The only defense at issue in this case is that of consent, which is discussed in Article 13 of the Convention. [39] Under this defense, the Respondent carries the burden of persuading **[\*516]** the Court, by a preponderance of the evidence, that Petitioner consented to the removal and retention of Sol Iris. *See* 42 U.S.C. § 11603(e)(2)(B).

 While the parties agree that Respondent's burden is one of preponderance, they disagree as to the type of proof that can meet that test. Citing a Sixth Circuit decision, Petitioner asserts that to prove consent to removal and retention, Respondent must show either a formal statement by Petitioner, such as testimony in a judicial

---------------------------------

[37] At least one court has observed that "technically, habitual residence can be established after only one day as long as there is some evidence that the child has become settled' into the location in question." *Brooke v. Willis*, 907 F. Supp. 57, 61 (S.D.N.Y. 1995). However, that comment appears to have been overtaken by subsequent developments in the law, which makes clear that courts should be "slow to infer" a change in habitual residence. *See Gitter*, 396 F.3d at 134. Following this axiom, "a prior habitual residence should be deemed supplanted only where the objective facts point unequivocally to this conclusion." *Mozes*, 239 F.3d at 1082 (quotation omitted).

[38] As noted by two academic commentators, there is an apparent tension in finding that an act of retention is unlawful and yet the product of consent, as the defense is defined in Article 13 of the Hague Convention. *See* Beaumont & McEleavy, supra, at 131 ("If a custodian consents to a removal or retention, can those acts be described as wrongful?"). The Court has found no case in American law that squarely addresses this conundrum. One approach may be to view the question as one of burden. That is, that the initial question is only whether a Hague Convention petitioner has established a *prima facie* case of unlawful retention, which can be rebutted by proof offered by Respondent. *See id.* at 133. If nothing else, by placing the question of consent in the context of Article 13 of the Convention, the courts preserve the ability to grant a petition even if consent is found to have been given. *See id.* at 132 ("There remains strong justification for not letting prior consent legitimise a removal or retention. If legitimisation were accepted, a return petition where consent was proved would be rejected under the terms of Article 3; if it were not, the petition would be dealt with under Article 13(1)(a). The latter would then allow the court to exercise its discretion as to whether or not to make a return order.").

[39] Throughout the hearing, Respondent explored the possibility of also pressing a separate defense that return of Sol Iris to Canada would present a "grave risk" of "physical or psychological harm." *See* 42 U.S.C. § 11603(e)(2)(A) (defense must be established by clear and convincing evidence). Respondent cited the apparently poor condition of Sol Iris upon her return from Cambodia -- *e.g.*, the mosquito bites and missing toenail (Respt.'s Ex. H1, H2, H3) -- as well as allegations, apparently originating from statements made by Sol Iris to her father, that Petitioner and Mr. Pfeifer had engaged in improper conduct with Sol Iris or in Sol Iris's presence. (Tr. 791-96) In the end, however, Respondent did not ask this Court to deny the petition on the grounds of grave risk of harm to Sol Iris and, therefore, the Court has not addressed this defense.

EXHIBIT Q

404 F. Supp. 2d 495, *516

proceeding, or a "consistent attitude of acquiescence over a significant period of time." (Petr.'s Post-Hr'g Mem. 10) (quoting *Friedrich v. Friedrich*, 78 F.3d 1060, 1070 (6th Cir. 1996) ("*Friedrich II*") ("Although we must decide the matter without guidance from previous appellate court decisions, we believe that acquiescence under the Convention requires either: an act or statement with the requisite formality, such as testimony in a judicial proceeding; a convincing written renunciation of rights; or a consistent attitude of acquiescence over a significant period of time.")).

The Court finds this argument unpersuasive. The statement from *Friedrich II* only relates to the defense of acquiescence, which is "analytically distinct" from the consent defense being tendered here. *See Baxter v. Baxter*, 423 F.3d 363, 371 (3d Cir. 2005). "The consent defense involves the petitioner's conduct prior to the contested removal or retention, while acquiescence addresses whether the petitioner subsequently agreed to or accepted the removal or retention." *Id.* Thus, while the "consent and acquiescence inquiries are similar," consent "need not be expressed with the same degree of formality as acquiescence in order to prove the defense under article 13(a)." *Id.*

The key to the consent inquiry is the petitioner's subjective intent, including the nature and scope of the alleged consent. *See id.* For example, it is often the case that a parent consents to the removal of a child to a foreign location for a temporary visit, but not to a longer or even indefinite stay in that country. *See, e.g., Fabri v. Pritikin-Fabri*, 221 F. Supp. 2d 859, 871-72 (N.D. Ill. 2001) ("Many cases begin with a parent's taking the child away from home for a vacation or visit with the consent of the other parent, but nevertheless result in a Hague Convention order compelling the child's return."); *Hazbun Escaf*, 200 F. Supp. 2d at 612-13 (finding that mother granted permission for the child to "*visit* his father in the United States for a brief period; she did not . . . consent to his retention in the United States."). Accordingly, to make out a consent defense, Respondent must establish by a preponderance of the evidence that Petitioner had the "subjective intent" to permit Respondent to remove *and* retain the child for an indefinite or permanent time period.

Here, Respondent did not remove Sol Iris from Canada -- Petitioner brought her to Respondent in New York. Furthermore, the Court finds that the evidence clearly establishes that Petitioner had the subjective intent to permit Respondent to retain Sol Iris in New York. Specifically, this intent was formed when Respondent and Petitioner met in Toronto in April 2005 and agreed that Sol Iris would live with Respondent in New York should he **[*517]** be accepted into Columbia Law School. There was no apparent time limit to this consent.

The Court's finding rests not just on a credibility assessment of Respondent's and Petitioner's testimony about the April 2005 meeting, but also on the other evidence that places the April 2005 meeting in its proper context. Specifically, there was other credible evidence that Petitioner herself wanted to live in New York when she was done with law school. For example, Petitioner had spent the preceding summer working and living in New York. Having become enamored with the apparently lucrative lifestyle of a New York lawyer, Petitioner engaged in a scorched earth effort to find employment in New York's many law firms. Indeed, there was evidence that Petitioner had imagined herself living in New York several years before attending the University of Toronto. Thus, the April 2005 agreement between Petitioner and Respondent regarding Sol Iris becoming a New Yorker was not an snap decision, but was part of a deliberate, if not direct, path that Petitioner intended to take to New York.

The overwhelming evidence of Petitioner's desire to practice law in New York exposes Petitioner's shaky testimony to the contrary as incredible. For example, Petitioner's claim at the hearing that she intended to stay in Toronto after law school and raise Sol Iris there is contradicted by, among other things, her own email to Petitioner in February 2005 where she unequivocally pronounced that she had "no intention to raise [Sol Iris] . . . in Canada." (Respt.'s Ex. D) And while Petitioner offered the testimony of Professor Novogodsky in an effort to establish some post-law school plan to practice law in Toronto, that morsel of proof merely demonstrated that in late June 2005 Professor Novogodsky was aware that Petitioner wanted to apply for a single job at Amnesty International in Canada. (Tr. 156) There was nothing about this brief testimony, however, that demonstrated that this was the only job Petitioner was interested in pursuing, or that she intended to raise Sol Iris in Canada. Indeed, other evidence presented at the hearing suggested that Petitioner was also interested in possibly returning to Cambodia after graduation to complete the project she had begun in the summer of 2005. Given her initial reluctance to bring Sol Iris to

404 F. Supp. 2d 495, *517

Cambodia in 2005, and the serious health problems that Sol Iris suffered during her brief stay in that country, it is more than fair to infer that any future travel to Cambodia by Petitioner would not include Sol Iris.

Aside from the history that pre-dates and explains the April 2005 agreement, the subsequent conduct and statements of Petitioner and Respondent (and others) further demonstrate Petitioner's consent to Respondent's retention of Sol Iris. For example,  Respondent did in fact only apply to NYU and Columbia and to no other law schools after he was accepted into Georgetown, thus demonstrating his commitment to live in New York. Moreover, soon after his acceptance to Columbia in late July, Respondent promptly met with a Columbia official who could assist him in obtaining the F-2 visa Sol Iris would need to live in the United States for longer than six months. The official advised Respondent that he needed to secure certain financial commitments, which he did through his father, and to procure other documents, such as Sol Iris's passport, which he tried to obtain from Petitioner when she dropped Sol Iris off in early August.

The credible evidence also demonstrated that while Respondent pursued the F-2 visa for his daughter, Ms. Chin conducted some due diligence of a neighborhood day **[*518]** care center for Sol Iris and made substantial alterations to her apartment to allow Sol Iris to live with her and Respondent for the foreseeable future. In addition, Ms. Chin and her daughter bought books and toys for Sol Iris before her arrival in New York on August 2, 2005. Ms. Chin did all these things because she believed that Sol Iris was coming to live with her and Respondent indefinitely. (Tr. 518, 569)

Respondent and his family were not alone in believing that Sol Iris would be living in New York. While in Cambodia, Petitioner maintained email contact with Respondent. In one email exchange in early June, 2005, Respondent suggested that his brother could pick up Sol Iris, who was then ill, on his way from South Korea to New York. Petitioner rejected Respondent's suggestion saying that she "will drop [Sol Iris] at NYC anyway," and instructed Respondent to get Sol Iris's "paperwork" ready, referring to the F-2 visa. (Respt.'s Ex. E) Approximately one month later, after Petitioner's visit with Mr. Pfeifer and after telling Respondent that she wanted a divorce, Petitioner sent Respondent another email stating: "I just hope you prepared the F-2 for Sol Iris, for her extended stay in New York City and for her future travel to D.C." [40] (Tr. 236)

 Further evidence of Petitioner's consent is found in the sequence of events following Petitioner's and Sol Iris's arrival in New York on August 2. First, there is the obvious fact that Petitioner brought Sol Iris to Respondent to stay with him at Ms. Chin's apartment. Thus, there can be no claim that Respondent somehow kidnaped Sol Iris and subsequently hid her from Petitioner. Petitioner not only knew where Sol Iris would be living, but was shown and informed of the preparations Ms. Chin made to accommodate Sol Iris's extended stay in New York, including the alterations in the apartment and the investigation of the nearby day care center. Nor can there be any claim by Petitioner of hostility between her and Respondent's family. The morning she came to Ms. Chin's apartment, the entire family ate breakfast together and Petitioner distributed gifts she had brought back from Cambodia. These facts effectively eliminate any suggestion by Petitioner that Respondent acted unilaterally or with hostility in retaining Sol Iris, or that he intended to block Petitioner's access to Sol Iris. *See Gonzalez-Caballero v. Mena*, 251 F.3d. 789, 793 (9th Cir. 2001) (noting that father "did not fear [mother's] visit, as he likely would have if he was wrongfully retaining" child).

Second, there is the admission by Petitioner in the taxi ride from the airport to Ms. Chin's apartment. Both Respondent and Petitioner (albeit reluctantly) testified that during the taxi ride, Respondent advised Petitioner that he had been accepted into Columbia and upon learning this, Petitioner stated: "wow, she's [Sol Iris] going to be a New Yorker now." (Tr. 239, 282) If the facts were as Petitioner testified, there would be no reason for her to make

---

[40] At the time this email was sent, Respondent had not yet heard from Columbia, but the email reflects Petitioner's intent to leave Sol Iris with Respondent in New York, and the possibility that Sol Iris might go with Respondent to Washington should he attend Georgetown. At a minimum, this email fatally undercuts Petitioner's claim that she intended to allow Sol Iris only a four-day visit with Respondent between August 2 and August 6.

EXHIBIT Q
Page 18 of 21

404 F. Supp. 2d 495, *518

that comment. Instead, the comment can only be explained as an acknowledgment of the earlier agreement that Sol Iris would live with Respondent if he attended law school in New York.

After she attended Sol Iris's doctor's visit on August 3 to address the mosquito **[*519]** bites and missing toenail, Petitioner made no contact with Respondent until August 5 (the day before Petitioner was supposedly going to leave with Sol Iris). It was on this date that Petitioner first expressed a change of heart about leaving Sol Iris in New York. This expression of regret came in the form of an email in which Petitioner informed Respondent that she wanted to extend her stay in New York until August 9 in order "to sit down and talk about Iris." (Respt.'s Ex. I) Noting that she was "fully booked today with lunch and dinner meetings," Petitioner indicated she would be free to meet with Respondent the next day. (Respt.'s Ex. I) Petitioner then went on to say that her "heart is breaking to part her [Sol Iris], and that is my personal interest," and that she did not "know whether it is good for her to stay here." (Respt.'s Ex. I) Petitioner then suggested that "it may be better for [Sol Iris] to stay with me till she reaches age of 5 and after" Respondent has "fully settled" in New York. (Respt.'s Ex. I)

While this email may show that Petitioner regretted her decision to allow Sol Iris to live with Respondent while he attended law school in New York, it powerfully demonstrates that Petitioner had, in fact, consented to leave Sol Iris in New York with Petitioner. *See Gonzalez-Caballero*, 251 F.3d at 794 ("Conduct after removal can be useful in determining whether consent was present at the time of removal."). Otherwise, there would be nothing to regret. Put another way, Petitioner's expression of regret "makes no sense if [Sol Iris] was to have been [in New York] only briefly. . . ." *Id.* at 793. Indeed, if Respondent had in effect abducted Sol Iris, as Petitioner would have this Court believe, Petitioner would not be weeping about "parting" with her daughter, but instead would be insisting on her immediate return, noting among other things, that she was supposed to be leaving for Canada the next day and that Sol Iris had to go home to attend junior kindergarten. Moreover, Petitioner's suggestion in the email that Sol Iris stay with Petitioner until her fifth birthday (aside from being nonsensical given that her March birthday would mean moving in the middle of the school year) is only further evidence of Petitioner's *post hoc* regret and a vain effort to alter the agreement. At most, then, this email is an attempt at revocation or modification of the previously-provided consent to have Sol Iris live with Respondent. As such, it does not "revive her right to return under the Convention." *Gonzalez-Caballero*, 251 F.3d at 794. [41]

 Any doubt about the significance and meaning of the August 5 email is erased by the meeting between Petitioner and Respondent on August 6 during which Petitioner initially repeated her demand to take Sol Iris back to Toronto but ultimately conceded that Sol Iris would stay in New York. Petitioner then expressed her interest in joint custody over Sol Iris and to move to New York to be near her, indicating that Petitioner had been trying to meet with people during her stay in New York to obtain employment.

Aside from her own version of the events, which the Court has found is not to be believed, Petitioner points to several other facts to rebut the consent defense. None is persuasive. For example, Petitioner cites the fact that she and Respondent had pre-registered Sol Iris for junior kindergarten in Toronto beginning in September **[*520]** 2005 as proof that there was no plan to have Sol Iris live in New York. (Petr.'s Post-Hr'g Mem. 11) However, the Court accepts Respondent's testimony on this point, which was that he agreed to pre-register Sol Iris for junior kindergarten in April 2005 as a backup plan in the event that he was not accepted into law school at either Columbia or NYU.

Petitioner also points to the consent-to-travel form that Respondent signed in April 2005. (Petr.'s Ex. 3) According to Petitioner, this form demonstrates that Respondent consented to allowing Sol Iris to return to Canada with Petitioner upon completion of the Cambodian internship. (Petr.'s Post-Hr'g Mem. 10) However, this form merely reflected Respondent's consent to allow Petitioner to take Sol Iris with her to Cambodia. Nothing about this form reflects any consent on Respondent's part that Sol Iris would live with Petitioner during the academic year 2005-

---

[41] The Court recognizes that, with the help of Mr. Pfeifer, Petitioner sent a second email on August 7, this time threatening legal action (Petr.'s Ex. 2), and that she later followed through with legal action. However, nothing about this conduct alters the consent Petitioner gave to Respondent as of August 2. *See Gonzalez-Caballero*, 251 F.3d at 794-95.

404 F. Supp. 2d 495, *520

2006. Moreover, even if this form could be interpreted as Petitioner wishes, it merely would reflect Respondent's consent before he was accepted into Columbia.

Petitioner also points to the facts that Respondent had not secured Sol Iris's passport or her F-2 visa as supporting her claim that she did not consent. Yet, Respondent testified that he could not obtain, let alone apply for the F-2 visa, until after he was accepted at Columbia and after he obtained Sol Iris's passport, the latter of which he was dependent upon Petitioner to provide and which she offered to give. (Tr. 312-13, 532) Therefore, Respondent can hardly be blamed for the fact that he did not have Sol Iris's F-2 visa upon her arrival on August 2.

Finally, Petitioner notes that Sol Iris had very few belongings (and none of her winter clothes) when she and Petitioner arrived in New York on August 2, thus purportedly undercutting any claim that there was an agreement that she would live indefinitely with Respondent. This is a specious claim since it would have made no sense for Petitioner to lug all of Sol Iris's belongings (including her winter clothes) to Cambodia in the summer, particularly before it was known where Respondent would be attending law school. (Tr. 431-32) Moreover, this claim ignores Ms. Chin's testimony that she and her daughter purchased a number of items for Sol Iris before her arrival (Tr. 569), Respondent's testimony that he purchased other clothing for Sol Iris after her arrival (Tr. 532), as well as the testimony that Respondent offered to make arrangements with Petitioner's family to have Sol Iris's belongings sent to New York. (Tr. 431-32)

Thus, based largely on the Court's assessment of the credibility of the witnesses, the Court finds that Respondent has met his burden of showing by a preponderance of the evidence that Petitioner consented to the child's removal and retention as of August 2, 2005. However, the Court recognizes that this finding does not require that the petition be denied. Rather, it only grants the Court the discretion to deny the petition. *See Hague International Child Abduction Convention: Text and Legal Analysis*, 51 Fed. Reg. 10,494, 10,509 (Mar. 26, 1986); *Friedrich II*, 78 F.3d at 1067. Though the Court inquired as to the standard the Court should apply in exercising its discretion (Tr. 17, Sept. 21, 2005), the parties failed to provide any authority. [42] Nonetheless, it seems clear **[*521]** that the Court, in applying the narrow Article 13 defenses when a petitioner established a *prima facie* case for return of the child, is to grant a petition if return of the child to the place of habitual residence would further the aims of the Convention. *See Friedrich II*, 78 F.3d at 1067; *Pesin v. Osorio-Rodriguez*, 77 F. Supp. 2d 1277, 1288 (S.D. Fla. 1999); *Wanninger v. Wanninger*, 850 F. Supp. 78, 81 (D. Mass. 1994). As previously noted, the Hague Convention is "primarily concerned with the use offeree to establish artificial jurisdictional links on an international level, with a view to obtaining custody of a child.'" *Gitter*, 396 F.3d at 129 (quoting *Perez-Vera Report, supra*, P 11). Thus, the principal goal of the Hague Convention is to deprive would-be abductors of the perceived advantages of "removing children to jurisdictions more favorable to their custody claims. . . ." *Id.*

 Given this objective, the Court has little difficulty in finding that return of Sol Iris to Petitioner would not be appropriate to further the goals of the Hague Convention. Respondent did not cross international borders, kidnap his daughter, and bring her back to New York in order to gain a jurisdictional home court advantage. Indeed, it was Petitioner who brought Sol Iris to Respondent, who himself was just beginning to settle in his new home city to attend law school. Thus, there is nothing from the record that would suggest Respondent behaved as he did because he believed New York would be a more hospitable forum to have a custody battle. Therefore, the Court does not believe that return is necessary, or even appropriate, to further the objectives of the Hague Convention. To the contrary, while the Convention seeks to preserve the *status quo* in order to discourage parents from ripping children from their settled lives, the *status quo* here, at the time of Respondent's retention, was that Sol Iris was to

---

[42] In her post-hearing Memorandum of Law, Petitioner discussed the exercise of the Court's discretion in the context of the Article 13 defense dealing with a grave risk of harm to the child. In that context, Petitioner indicated that the Court could consider the best interests of the child, prompting the Court to comment during its oral ruling that even that test would not cause the Court, in the exercise of its discretion, to order the return of the child. (Tr. 62) However, so there is no confusion, the Court does not base its decision to decline to order the return of the child on any finding regarding the best interests of the child. The Court fully understands that this calculus is not for this Court to make, even in the exercise of its discretion under Article 13 as it relates to the consent defense. *See Blondin*, 189 F.3d at 246.

404 F. Supp. 2d 495, *521

live with her father in New York. Thus, the Court declines to exercise its discretion and order the return of Sol Iris to Canada.

III. Conclusion

For the reasons stated on the record of September 21, 2005 and herein, the Court hereby dismisses the Petition.

SO ORDERED.

Dated: December 8, 2005

New York, New York

KENNETH M. KARAS

UNITED STATES DISTRICT JUDGE

---

**End of Document**

EXHIBIT Q

# Gonzalez-Caballero v. Mena

United States Court of Appeals for the Ninth Circuit

March 23, 2001, Argued and Submitted, Tempe, Arizona ; May 30, 2001, Filed

No. 00-15822

**Reporter**

*251 F.3d 789* \*; 2001 Cal. Daily Op. Service 4345; 2001 Daily Journal DAR 5347

EVELYN GONZALEZ-CABALLERO, Plaintiff-Appellant, v. RAMON EDUARDO MENA, Defendant-Appellee.

**Prior History:** Appeal from the United States District Court for the District of Arizona. D.C. No. CV-00-00248-JMR. John M. Roll, District Judge, Presiding.

**Disposition:** District court's denial of Gonzalez-Caballero's Petition for Return of Child AFFIRMED.

**Counsel:** Hector M. Figueroa, Hector M. Figueroa and Associates, Tucson, Arizona, for the plaintiff-appellant.

Joseph J. DeFrancesco, Sierra Vista, Arizona, for the defendant-appellee.

**Judges:** Before: Thomas G. Nelson, Michael Daly Hawkins, and Richard C. Tallman, Circuit Judges. Opinion by Judge Hawkins.

**Opinion by:** Michael Daly Hawkins

# Opinion

 **[\*790]** HAWKINS, Circuit Judge:

Evelyn Gonzalez-Caballero appeals the district court's denial of her petition to return her daughter, Danelsy, to her custody in Panama. The district court found that Gonzalez-Caballero consented to the removal and retention of Danelsy from Panama to Arizona by Danelsy's father, Ramon Mena, an American citizen. Because this decision was based on a correct application of the Hague Convention on the Civil Aspects of International Child Abduction ("the Hague Convention"), incorporated into United States law as the International Child Abduction Remedies Act ("the Act"), 42 U.S.C. §§ 11601 -11610, our review is limited to determining whether the district court's findings of fact were in clear error. Because they were not, we affirm the denial of Gonzalez-Caballero's petition.

### FACTS AND PROCEDURAL HISTORY

Danelsy Sofia Mena-Gonzalez was born in Panama on March 14, 1997, to Evelyn Gonzalez-Caballero, a Panamanian citizen, and Ramon Mena, an American citizen. Gonzalez-Caballero and Mena were not married at her birth, and have not married since. They met, and briefly lived together, **[\*791]** while Mena was stationed in Panama. Mena left Panama before Danelsy's birth, and was not named as Danelsy's father on her original birth certificate; but, upon learning of her birth, Mena traveled to Panama where both he and Gonzalez-Caballero acknowledged his paternity and amended Danelsy's birth certificate to list him as her father.

While in Panama, Mena acquired a certificate of" Consular Report of Birth Abroad," which secured Danelsy's United States citizenship, began the process to obtain Danelsy's United States passport, and secured a military identification card so Danelsy could receive military dependency privileges. From her birth through October 1999, Danelsy lived with Gonzalez-Caballero in Panama; during this time, Mena sent clothing and support from the United States.

251 F.3d 789, *791

In late September or early October 1999, Mena and Gonzalez-Caballero conversed about Danelsy over the telephone. According to Mena, Gonzalez-Caballero told him that she was pregnant again, that the father of her unborn child had left her, and that she could no longer adequately care for Danelsy. According to Gonzalez-Caballero, she and Mena discussed plans for Mena, Gonzalez-Caballero, and Danelsy to travel to the United States together.

At the time of this telephone conversation, Mena was just about to sign a contract to work in Honduras. Upon signing the contract, Mena was to receive a $ 1500 advance for travel expenses. After speaking with Gonzalez-Caballero, Mena signed the contract and used the advance to purchase a round-trip ticket for himself to Panama and a one-way ticket from Panama to the United States for Danelsy.

Upon his arrival in Panama City in early October 1999, Mena was met by Gonzalez-Caballero and Danelsy, who traveled there by bus from Gonzalez-Caballero's hometown. They stayed together in a hotel, where Mena told Gonzalez-Caballero that he would try to help her legally immigrate to the United States if she made the preliminary arrangements through her sister, who lives in Georgia as a resident alien. According to Mena, they also discussed Danelsy's welfare, concluding that she would have a better life in the United States.

Gonzalez-Caballero's account of the events at the hotel is somewhat confused. At various times, Gonzalez-Caballero has claimed that she agreed to allow Mena to take Danelsy to the United States for two weeks until she could get the proper paperwork to join her daughter; at other times, she claims an agreement with Mena under which she allowed him to remove and retain Danelsy provided he help her immigrate to the United States, at which time she would reassume custody. It is undisputed that Gonzalez Caballero gave Mena all of Danelsy's legal documents --her birth certificates, the Consular Report, her United States passport, and her military identification card.

The next day, Gonzalez-Caballero accompanied Mena and Danelsy to Panamanian government offices to obtain the paperwork required for Danelsy's exit from Panama. Gonzalez-Caballero then saw Mena and Danelsy off at the Panama City airport, as they departed for the United States.

 According to Gonzalez-Caballero, she became worried the day after Mena and Danelsy left when Mena did not call upon his arrival in the United States, as he had promised. Concerned, Gonzalez-Caballero consulted Panamanian child custody authorities and the police. A few days later, upon returning home from Panama City, Gonzalez-Caballero also contacted her local police department for advice. When **[*792]** Gonzalez-Caballero and Mena spoke telephonically a few days later, Mena reiterated his willingness to help Gonzalez-Caballero immigrate to the United States, but also told her that she needed to arrange her immigration through her sister.

Gonzalez-Caballero testified that the next day she went to the Panama City police, the United States Judge Advocate General Corps liaison, and the Institute for Children. Gonzalez-Caballero said that she learned she was pregnant on October 14. [1] Around November 19, Gonzalez-Caballero went to the office of the Panamanian President, Panamanian radio stations, and the Children's Commission seeking assistance in recovering Danelsy. The office of the President gave Gonzalez-Caballero permission to travel to the United States and provided her with an airline ticket.

Gonzalez-Caballero arrived at a Houston, Texas airport on March 9, 2000. Upon her arrival, I.N.S. contacted Mena and told him that, as Gonzalez-Caballero was without money or domestic travel tickets, she would be returned to Panama unless he provided funds for her further travel. [2] Mena immediately arranged for Gonzalez-Caballero to fly to his brother's home in San Antonio, Texas, where she stayed for about a week.

---

[1] Mena claims that she told him she was pregnant during the earlier initial telephone conversation that prompted his trip to Panama.

[2] I.N.S. initially contacted Gonzalez-Caballero's sister, who stated that she was unable to provide any funds for Gonzalez-Caballero's travel.

EXHIBIT R
Page 2 of 5

251 F.3d 789, *792

Mena then arranged for Gonzalez-Caballero to travel by bus from San Antonio to Tucson, Arizona, where she was met by another of Mena's brothers, who took her to his home. [3] When Mena met Gonzalez-Caballero later that day, she told him she wanted to take Danelsy and, if she could stay in the United States, he could visit her. Mena told Gonzalez-Caballero that Danelsy was doing well in her new home and refused to allow her to take Danelsy back to Panama.

On April 6, 2000, Gonzalez-Caballero filed a Petition for Return of Child in the district court pursuant to the Hague Convention and under the Act. The district court held an evidentiary hearing and issued a brief, preliminary order denying Gonzalez-Caballero's petition. About four weeks later, the district court issued a longer, more detailed order reaching the same result. Gonzalez-Caballero timely appealed both the denial of her petition and the district court's refusal to amend its order. We have jurisdiction under 28 U.S.C. § 1291.

## STANDARDS OF REVIEW

The district court's conclusions of law are reviewed de novo. *Cigna Prop. and Cas. Ins. Co. v. Polaris Pictures Corp.*, 159 F.3d 412, 418 (9th Cir. 1998). Conclusions of international law are also reviewed de novo. *Shalit v. Coppe*, 182 F.3d 1124, 1127 (9th Cir. 1999). A district court's findings of fact are reviewed under the clearly erroneous standard. Fed. R. Civ. P. 52(a); *Diamond v. City of Taft*, 215 F.3d 1052, 1055 (9th Cir. 2000). An appellate court must accept the lower court's findings of fact unless the appellate court is left with the definite and firm conviction that a mistake has been committed. *United States v. Beard*, 161 F.3d 1190, 1194 (9th Cir. 1998).

## ANALYSIS

Article 3 of the Hague Convention states, in pertinent part:

> **[*793]**
> The removal or the retention of a child is to be considered wrongful where --
> a. it is a breach of rights of custody attributed to a person … under the law of the State in which the child was habitually resident immediately before the removal or retention; and
> b. at the time of the removal or retention those rights were actually exercised … or would have been so exercised but for the removal or retention.
> The rights of custody mentioned in sub-paragraph a above, may arise in particular by operation of law or by reason of a judicial or administrative decision, or by reason of an agreement having legal effect under the law of that State.

It is not disputed that Mena removed Danelsy from Panama and retained her in the United States or that Gonzalez-Caballero was exercising custody rights in Panama at the time of the removal and retention. Nevertheless, Gonzalez-Caballero's petition must be rejected if an exception found at Article 13 of the Hague Convention applies:

> The judicial or administrative authority … is not bound to order the return of the child if the person … [who] opposes the return establishes that --
>
> a. the person … having the care of the person of the child was not actually exercising the custody rights at the time of removal or retention, *or had consented to* or subsequently acquiesced in *the removal or retention* ….

(emphasis added). This defense is established by a preponderance of the evidence, with the burden of persuasion on the defendant. 42 U.S.C. § 11603 (e)(2)(B).

The district court found that a preponderance of the evidence showed that Gonzalez-Caballero consented to Mena's removal and retention of Danelsy, triggering Article 13.

The district court undertook a careful parsing of the evidence to support this conclusion. First, there was no evidence that Gonzalez-Caballero objected to Danelsy becoming an American citizen. Second, Mena's testimony

---

[3] Mena testified that he attempted to meet Gonzalez-Caballero personally, but could not be away from work when she arrived.

EXHIBIT R
Page 3 of 5

251 F.3d 789, *793

that Gonzalez-Caballero told him that she had a problem --that she was pregnant and her boyfriend had left her -- was believable. Third, none of the witnesses other than Gonzalez-Caballero (including Gonzalez-Caballero's own mother and sister) testified that they knew anything about Danelsy's visit being temporary. Fourth, it made no sense for Mena to use his travel advance to come to Panama to get Danelsy for just a short visit. Fifth, Gonzalez-Caballero provided Mena with all of Danelsy's paperwork, not just the paperwork necessary for her to travel to the United States for a brief visit, and assisted Mena in procuring exit papers for Danelsy from the Panamanian authorities. Sixth, Gonzalez-Caballero's testimony about "regretting" her decision to let Mena take Danelsy immediately after their departure and visiting the authorities so soon after their departure makes no sense if Danelsy was to have been gone only briefly and Mena's lone transgression was neglecting to telephone her upon their arrival in the United States. Seventh, Gonzalez-Caballero's mother testified that Gonzalez-Caballero told her that she regretted turning over custody to Danelsy but was desperate due to her pregnancy. Finally, Mena's intervention to keep Gonzalez-Caballero in the United States shows that he did not fear her visit, as he likely would have if he was wrongfully retaining Danelsy.

The district court found Gonzalez-Caballero's claim that she only authorized a temporary removal inconsistent with the facts, and determined that Mena's testimony was both credible and consistent. Gonzalez-Caballero argues that the district **[*794]** court's finding of fact as to her consent to Mena's removal and retention of Danelsy was clearly erroneous in light of her conduct after Danelsy's departure. She contends that her post-departure conduct shows that she rescinded or revoked her consent to Mena's removal and retention of Danelsy. [4]

Gonzalez-Caballero's argument is flawed. It conflates ex ante consent and ex post acquiescence when either alone extinguishes a right of return under the Hague Convention. Under Article 13, the right to a child's return secured by the Hague Convention is extinguished if "the person … having the care of the child," here Gonzalez-Caballero," consented to *or* subsequently acquiesced in the removal or retention …." (emphasis added). Under the Hague Convention's plain, unambiguous language, consent before the removal and retention *or* subsequent acquiescence extinguishes the right of return.

Here, the district judge specifically found that Gonzalez-Caballero consented ex ante to Danelsy's removal and retention by Mena. Thus, the district court did not err by not addressing Gonzalez-Caballero's argument that she did not subsequently acquiesce or that she revoked her consent --once the district court found ex ante consent, its inquiry was complete because even ex post non-acquiescence could not revive her right of return under the Convention.

The few published cases construing the Convention support this result. [5] In *Friedrich v. Friedrich*, 78 F.3d 1060, 1069 (6th Cir. 1996), the Sixth Circuit explicitly divided the consent and acquiescence inquiries, proceeding to analyze subsequent acquiescence only after concluding that "the district court did not abuse its discretion in finding that Mrs. Friedrich took [the child] to America without Mr. Friedrich's consent." Likewise, in *Levesque v. Levesque*, 816 F. Supp. 662, 667 (D. Kan. 1993), the district court focused solely on ex post acquiescence, maintaining a division between the ex ante consent and ex post acquiescence analyses.

Of course, conduct after removal can be useful in determining when consent was present at the time of removal. The court in *Wanninger v. Wanninger*, 850 F. Supp. 78, 81-82 (D. Mass. 1994), engaged in just this inquiry, looking

---

[4] Though Gonzalez-Caballero's story shifts, one version advanced in her brief is that she had a conditional agreement with Mena under which she allowed him to remove and retain Danelsy in exchange for his assistance in her immigration to the United States. As discussed above, the district judge made a factual finding rejecting the existence of such an agreement.

[5] One case, *Currier v. Currier*, 845 F. Supp. 916, 922 (D. N.H. 1994), implicitly conflates the consent and subsequent acquiescence inquiries, losing the ex ante focus of the consent inquiry and ex post focus of the subsequent acquiescence inquiry. ("Respondent argues that the agreement at least evidenced petitioner's intent to relinquish her custody rights and obligations, which should be construed as consent to or acquiescence in the removal."). Based on the plain language of the Convention, and in accord with the other scarce precedent construing this Article, we reject *Currier's* implicit conflation of consent and subsequent acquiescence.

EXHIBIT R
Page 4 of 5

251 F.3d 789, *794

to a father's post-removal letters to determine whether he had consented ex ante to retention by the mother. *Wanninger's* methodology was followed in this case --the district judge considered Gonzalez-Caballero's post-removal conduct and nevertheless found that, under the preponderance of the evidence, Gonzalez-Caballero consented to Danelsy's removal and retention by Mena. Gonzalez-Caballero disputes this factual finding, but the district judge properly considered Gonzalez-Caballero's post-removal conduct insofar as it spoke to her ex **[*795]** ante consent. The district court employed the correct methodology under the Convention and, given all of the evidence before the district court, we cannot say that its factual finding of consent was clearly erroneous.


**CONCLUSION**

This case is tragic --we have two parents who both appear to love and cherish their daughter. Under the Convention, Gonzalez-Caballero lost her right to petition for Danelsy's return when she consented to Mena's removal and retention of her. Though Gonzalez-Caballero vigorously contests the district court's factual findings, under these circumstances we cannot say that the district court clearly erred in finding her consent. The district court considered all of the facts, both those arising before Danelsy's removal from Panama and those arising after, and made a considered decision in line with the Convention.

The district court's denial of Gonzalez-Caballero's Petition for Return of Child is AFFIRMED.

---

**End of Document**

EXHIBIT R
Page 5 of 5

# Mendez v. May

United States Court of Appeals for the First Circuit

February 13, 2015, Decided

No. 15-1126

**Reporter**
_778 F.3d 337_ *

FEDERICO MENDEZ, Petitioner, Appellee, v. MAYA K. MAY, Respondent, Appellant.

**Subsequent History:** US Supreme Court certiorari denied by Mendez v. May, 2015 U.S. LEXIS 5751 (U.S., Oct. 5, 2015)

**Prior History:** APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS. Hon. Leo T. Sorokin, U.S. District Judge.

Mendez v. May, 85 F. Supp. 3d 539, 2015 U.S. Dist. LEXIS 3161 (D. Mass., 2015)

**Counsel:** David H. Chen, with whom John A. Sten and McDermott Will & Emery LLP were on brief, for appellant.

Amber R. Cohen, with whom Cohen Cleary, P.C. was on brief, for appellee.

**Judges:** Before Lynch, Chief Judge, Souter, Associate Justice,* and Stahl, Circuit Judge.

**Opinion by:** STAHL

# Opinion

 **[*340] STAHL, <u>Circuit Judge</u>.** Petitioner-Appellee Federico Mendez filed a petition pursuant to the Hague Convention on the Civil Aspects of Child Abduction ("the Convention"), as implemented by the International Child Abduction Remedies Act, 22 U.S.C. § 9001 et seq., to return his seven-year-old son C.F.F.M. to Argentina. Petitioner claims that Respondent-Appellant Maya K. May, the child's mother, wrongfully removed the child to the United States in February 2014. After a three-day bench trial, the district court granted the father's petition and ordered the child's return, reasoning that, inter alia, C.F.F.M.'s habitual residence lay in Argentina because Petitioner never fully agreed to allow C.F.F.M. to move to the United States. We disagree, and reverse the district court's grant of the petition and order returning the child to Argentina.

## I. Background

Petitioner is a citizen of Argentina who resides in Buenos Aires. Respondent is a U.S. citizen and permanent resident of Argentina. The two began dating in 2005 and lived in the U.S. for a brief period of time before settling in Buenos Aires in 2006. Respondent gave birth to their child, C.F.F.M., in Buenos Aires on December 3, 2007. C.F.F.M. is a citizen of both Argentina and the United States. He attended school in Buenos Aires from 2010 through the end of the Argentine school year in December 2013.

---

* Hon. David H. Souter, Associate Justice (ret.) of the Supreme Court of the United States, sitting by designation.

778 F.3d 337, *340

Though Petitioner and Respondent never married, the family lived together until 2009, when the couple's romantic relationship deteriorated and Petitioner moved out.[1] That summer, the parties reached a child custody agreement which provided that C.F.F.M. would reside with his mother and granted the father visitation from Thursday evenings until Sunday nights. Per the 2009 agreement, Respondent could travel outside Argentina with C.F.F.M. for fifteen days in the Argentine winter and up to forty-five days during the Argentine summer; the agreement required Petitioner to authorize Respondent's travel with C.F.F.M. in accordance with that plan. **[*341]** Respondent took C.F.F.M. on multiple trips to the United States in accordance with this plan.

The parties experienced difficulties in their parenting relationship after they ceased cohabiting. In 2011, they argued outside Respondent's apartment the day she returned from a forty-five day trip to the United States with C.F.F.M. Although he was not entitled to visitation that day, Petitioner asked to see the child, and Respondent told him it was not a good time. Petitioner forced his way into her apartment and pushed her to the ground in the process. Later that year, the two engaged in a yelling match in C.F.F.M.'s presence during a car ride. Petitioner called Respondent "trash" and locked her out of the car, driving away with the child. After that argument, Respondent denied Petitioner visitation for four months. Petitioner sought judicial intervention and the Argentine family court restored his visitation rights. Additionally, the parties filed domestic violence complaints against each other. After an investigation, an Argentine board issued a report finding that Respondent was the victim of Petitioner's physical and psychological violence and that C.F.F.M. was a victim insofar as he witnessed the fight in the car.

In December 2012, the parties negotiated and executed a new coparenting agreement. Respondent retained custody and the agreement reduced Petitioner's visitation. The 2012 agreement permitted Respondent to travel abroad with the child for up to forty-five days each year; Petitioner would execute trip-specific authorization each time.

In spring 2013, Respondent began to consider leaving Argentina to find work elsewhere. She discussed her interest in moving with Petitioner, who opposed her leaving Argentina with C.F.F.M. The district court found that Respondent had "raised such an interest" before and that "the parties had various discussions prior to this time about [Respondent] relocating out of the country." The parties were unable to come to an agreement, even after mediation in July 2013.

The next month, Respondent accepted a job offer in Boston with a September 2013 start date. The parties discussed her upcoming move shortly after she accepted the job offer. During an August 13, 2013 Skype conversation, Respondent urged Petitioner to pursue work or educational opportunities in Boston. Petitioner expressed openness to potentially moving to Massachusetts along with Respondent and C.F.F.M., but the parties reached no agreement during the conversation.

The two met in person three times in August and September 2013 to discuss potential arrangements if C.F.F.M. were to relocate to the United States. During the third meeting, Petitioner agreed to allow C.F.F.M. to move to Massachusetts with Respondent. Respondent proposed that C.F.F.M. could travel back to Argentina during U.S. school vacations and agreed to increase Petitioner's visitation time in anticipation of the move. The same day, the two relayed these plans to C.F.F.M.

In accordance with their discussions, Respondent left Argentina to begin her job in mid-September 2013. C.F.F.M. remained in Argentina in the care of Respondent's mother, and Petitioner assumed the agreed-upon increased visitation schedule. The parties corresponded by email after her departure to discuss a new coparenting agreement and to set an exact date for C.F.F.M.'s move. Petitioner preferred a January 2014 move so that the child could complete his school year in Argentina; Respondent wanted him to move before the December holidays so that he could spend time with her family before beginning school in Boston. Petitioner objected to **[*342]** the December departure, reasoning that Respondent's family could see C.F.F.M. any time now that the child was moving to the United States, but confirmed a January 8, 2014 move date.

---

[1] C.F.F.M. and Petitioner have not resided together since Petitioner moved out of the family residence in 2009.

EXHIBIT S
Page 2 of 7

778 F.3d 337, *342

In their correspondence, Respondent expressed frustration that even though the two had agreed that C.F.F.M. should move to the United States and Respondent had relocated to Boston with that decision in place, Petitioner had yet to draft or sign a new coparenting agreement. After an acrimonious Skype exchange on October 23, 2013, Respondent emailed Petitioner and asserted that she would invoke her forty-five days per year vacation time in order to allow C.F.F.M. to leave for Boston in early December.

After that email, the parties' communication broke down. Petitioner initiated multiple court proceedings, including an emergency petition to obtain temporary custody of C.F.F.M. and criminal complaints against Respondent and her mother. The district court found that Petitioner included numerous unfounded statements about Respondent in these filings, which stated, among other falsehoods, that she had "abandoned" C.F.F.M. and left for the United States "without any notice" to Petitioner. Respondent returned to Argentina in late November and again in late December to attend court proceedings. At a hearing on Petitioner's criminal complaints, a criminal court judge reduced Petitioner's visitation and prohibited him from having overnight visits with C.F.F.M.

Respondent returned to Boston and then came back to Argentina on February 9, 2014. The family court judge held a hearing the next day to address Petitioner's temporary custody proceeding and Respondent's filing to obtain travel authorization for C.F.F.M. to visit the U.S. for forty-five days, pursuant to the parties' 2012 agreement. The judge ordered the parties to confer and resolve the latter issue; shortly after the hearing, they informed the judge that they were unable to agree on a resolution. On February 14, the judge issued a decision denying Respondent's request for travel authorization, reasoning that the evidence presented to him indicated "an environment of disagreements and hostilities between [the parties]" which would make a trip disfavorable to C.F.F.M.

That same day, Respondent left Argentina with her mother and C.F.F.M. The district court found that Respondent knew of the Argentine family court's order denying her travel authorization before she left Buenos Aires that day. She drove to a border town near Brazil and Paraguay, and on February 15, made three trips into Brazil and Paraguay in search of an airport where C.F.F.M. could travel to the United States without scrutiny of his visa. On February 16, 2014, Respondent and C.F.F.M. flew out of Paraguay to the United States. Respondent did not inform Petitioner that she had left Argentina; he discovered that C.F.F.M. was no longer in the country when the child did not attend his first week of school in March. Petitioner found Respondent's work phone number and repeatedly called her office. She confirmed that C.F.F.M. was in Boston under her care. Soon after, Respondent obtained an abuse prevention order against Petitioner from the Suffolk County Probate and Family Court.

Petitioner notified the Argentine family court judge that Respondent had left the country and filed a criminal complaint for child abduction with the Argentine police. On April 11, Petitioner filed for Hague Convention remedies with a central authority in Argentina. On July 15, the Argentine family court judge issued an opinion finding that Respondent wrongfully **[*343]** removed C.F.F.M. under the Hague Convention and that C.F.F.M.'s habitual residence at the time of removal was Argentina.

C.F.F.M. and Respondent have lived in Roslindale, Massachusetts since February 2014. C.F.F.M. attends a Boston public school. Respondent presented expert testimony and a report to the district court from a child psychologist who interviewed C.F.F.M.; the psychologist wrote in his report that the child "spoke adamantly and specifically about not wanting to return to Argentina." The expert opined in his report that removal to Argentina would "sever[] . . . the bonded relationships" with Respondent, her fiancé, and her mother and thus "expose him to psychological harm."

Petitioner filed this action in the district court on October 6, 2014. The court heard three days of evidence in December 2014, and issued its order granting the petition and ordering the child's return on January 16, 2015. This expedited appeal followed.

## II. Analysis

778 F.3d 337, *343

## A. The Hague Convention

The Hague Convention on the Civil Aspects of International Child Abduction is a multilateral agreement among approximately ninety countries, including the United States, intended to combat international child abductions during domestic disputes. Abbott v. Abbott, 560 U.S. 1, 8, 130 S. Ct. 1983, 176 L. Ed. 2d 789 (2010). The Convention seeks to enforce custody rights and "'secure the prompt return of children wrongfully removed to or retained in any Contracting State.'" Chafin v. Chafin, 133 S. Ct. 1017, 1021, 185 L. Ed. 2d 1 (2013) (quoting Hague Convention, art. 1). The Convention's underlying principle is that the courts of a child's country of habitual residence should be the entities to make custody determinations in the child's best interest. E.g., Lozano v. Montoya Alvarez, 134 S. Ct. 1224, 1228-29, 188 L. Ed. 2d 200 (2014); Mauvais v. Herisse, 772 F.3d 6, 10-11 (1st Cir. 2014).

A petitioner seeking the return of a child under the Convention must establish the child's wrongful removal by a preponderance of the evidence. 22 U.S.C. § 9003(e)(1)(A); Sánchez-Londoño v. Gonzalez, 752 F.3d 533, 539 (1st Cir. 2014). The petitioner must show that he or she (1) seeks to return the child to the child's country of habitual residence, (2) had custody rights immediately prior to the child's removal, and (3) was exercising those rights. Hague Convention, art. 3; Sánchez-Londoño, 752 F.3d at 539-40. If these three elements are met, and the petitioner has commenced judicial or administrative proceedings within one year of the date of wrongful removal, the Convention commands that the court reviewing the petition "shall order the return of the child forthwith." Hague Convention, art. 12. The respondent may counter the presumption of return by establishing the application of one or more of the exceptions or defenses to return enumerated in Articles 12, 13, and 20 of the Convention. 22 U.S.C. § 9003(e)(2); Chafin, 133 S. Ct. at 1021. "Notably, an order of return pursuant to the Hague Convention is not a final determination of custody rights. It simply ensures that custodial decisions will be made by the courts of the children's country of habitual residence." Neergaard-Colón v. Neergaard, 752 F.3d 526, 530 (1st Cir. 2014).

On appeal, Respondent disputes that Petitioner established his custody rights prior to removal or that Argentina was C.F.F.M.'s country of habitual residence. She argues that even if Petitioner established a presumption of removal, he consented **[*344]** to the child's relocation to Massachusetts, satisfying the exception to return described in Article 13(a) of the Convention.

We review the district court's findings of fact for clear error, mindful that any "plausible interpretation of the facts cannot be rejected just because the record might sustain a conflicting interpretation." Darin v. Olivero-Huffman, 746 F.3d 1, 8 (1st Cir. 2014). Interpretations of the Convention and the application of the Convention to the facts are afforded de novo review. Yaman v. Yaman, 730 F.3d 1, 10 (1st Cir. 2013).

## B. Habitual Residence

We begin and end with the question of C.F.F.M.'s habitual residence at the time of removal. See Redmond v. Redmond, 724 F.3d 729, 742 (7th Cir. 2013) ("[E]very Hague Convention petition turns on the threshold determination of the child's habitual residence; all other Hague determinations flow from that decision."); Tsai-Yi Yang v. Fu-Chiang Tsui, 499 F.3d 259, 271 (3d Cir. 2007) (same).

Removal under the Hague Convention is only appropriate if the child is being retained in a country other than his or her place of habitual residence. Sánchez-Londoño, 752 F.3d at 540. The Convention itself does not define "habitual residence," leaving the interpretation of the term to the judicial and administrative bodies of signatory nations. See Nicolson v. Pappalardo, 605 F.3d 100, 103-04 (1st Cir. 2010); Redmond, 724 F.3d at 742-43; Mozes v. Mozes, 239 F.3d 1067, 1071-72 (9th Cir. 2001). In determining a child's habitual residence, this circuit looks first to the shared intent or settled purpose of the persons entitled to determine the child's permanent home; as a secondary factor, we

778 F.3d 337, *344

may consider the child's acclimatization to his or her current place of residence.[2] Sánchez-Londoño, 752 F.3d at 540, 542. Typically, evidence of acclimatization alone cannot establish a child's habitual residence in the face of shared parental intent to the contrary. Neergaard-Colón, 752 F.3d at 532.

The question of habitual residence is a highly fact-specific inquiry that turns on the particular circumstances of each unique case. In discerning the parties' intentions, this court will look "specifically to the last moment of the parents' shared intent." Mauvais, 772 F.3d at 12. Where a child has moved with a parent from one country to another, the record must evidence the parties' latest settled intention for the child to abandon a former place of habitual residence and acquire a new one. Darin, 746 F.3d at 11. In other words, the court "'must determine from all available evidence whether the parent petitioning for return of a child has already agreed to the child's taking up habitual residence where it is.'" Id. (citing Mozes, 239 F.3d at 1076). The district court's ultimate determination of habitual residence is a mixed question of law and fact reviewed de novo, with subsidiary findings of the parties' intent reviewed for clear error. Neergaard-Colón, 752 F.3d at 530.

As the district court found in its opinion, during a meeting at a Buenos Aires restaurant in early September 2013, Petitioner agreed to let C.F.F.M. move to Boston after the close of the child's school year in Argentina. The same day, the parties together **[*345]** told their son that he would move to Massachusetts with Respondent. Nevertheless, the district court found that Petitioner and Respondent "came close to forming . . . a shared intent, [but] did not actually do so."

This finding constitutes clear error. The record is replete with Petitioner's own statements acknowledging and planning for the child's upcoming move, particularly during September and October of 2013, after Respondent moved to Boston and before the parties' relations broke down and Petitioner initiated civil and criminal proceedings against Respondent and her mother. For example, on September 30, 2013, in response to Respondent's request for C.F.F.M. to fly to the United States that December, Petitioner wrote in an email, "I would prefer if you can wait until he moves to you by the end of the year. . . . I really do not see the point of him going there when it would be just two or three weeks before he moves there." On October 10, Petitioner suggested that Respondent meet him and C.F.F.M. in Miami in January 2014 and then take the child back to Boston, since Petitioner and his family had planned to be in Florida for a family trip that month. After Respondent suggested that Petitioner and C.F.F.M. meet her in New York to celebrate the New Year, Petitioner said he would check with his family but stated, "For now, what is sure is January the 8th." Even during a tense Skype exchange on October 23, 2013, Petitioner expressed his understanding that C.F.F.M. would permanently move to the United States at the turn of the new year. Respondent renewed her request for C.F.F.M. to move before January 8, 2014, alluding to her family's holiday celebration in New York; Petitioner responded that "[C.F.F.M.] will be in the us [sic] in january [sic]" and that Respondent's family "will have plenty of time [to spend with the child] know [sic] that [C.F.F.M.] is going to be in the us [sic] living there." After this Skype exchange, Respondent emailed Petitioner and stated that she would invoke her forty-five day travel authorization in order to take C.F.F.M. with her to Boston on December 4, 2014, triggering the breakdown in the parties' communications.

Even though Petitioner changed his mind and decided that he did not want C.F.F.M. to move to Boston, the record establishes that the last *shared* intent of the parties was for their son to relocate permanently with his mother soon after C.F.F.M. finished the Argentine school year in December 2013. The "unilateral wishes of one parent are not sufficient" to overcome the last settled purpose of the parents. Sánchez-Londoño, 752 F.3d at 540 (internal quotation marks omitted). Indeed, in Re Bates, a United Kingdom decision considered a leading case on habitual residence, the parents' intention for the child to live in New York for a set period of time governed even where the parents made the decision while touring the Pacific Northwest, and had borrowed a New York apartment for later that spring only on a temporary basis. Re Bates, No. CA 122/89, High Court of Justice, Family Div. Ct. Royal Courts of Justice, United Kingdom (1989), available at 1989 WL 1683783. The mother brought the child from the West

---

[2] This circuit's framework accords with the approach of the majority of our sister circuits, though other circuits differ in the weight given to the parents' intent versus the child's perspective on his or her settled place of residence. See generally Redmond v. Redmond, 724 F.3d 729, 744-46 (7th Cir. 2013) (citing and describing cases).

Coast to New York while the father, an Englishman, continued on to Asia. A few days later, the father telephoned his daughter's nanny and told her to take the child to London, where the father owned a house. The mother filed a petition under the Hague Convention in the British courts immediately after she discovered that the child and nanny were gone. The British court found the child habitually resident in New York, reasoning that the "arrangements that had been agreed, however acrimoniously" by the **[*346]** parties "amounted to a purpose with a sufficient degree of continuity to enable it properly to be described as settled," though at the time the parents made the decision the child had only briefly visited New York before. Here, the district court erroneously reasoned that Petitioner never signed a written agreement memorializing the parties' new parenting plan, and refused to issue a travel authorization permitting C.F.F.M. to leave Argentina. But the parties did not make their joint decision for C.F.F.M. to move to the United States contingent on signing an official instrument; like in <u>Re Bates</u>, the parties verbally agreed to the plan. While in some circumstances, written evidence of a parties' agreement may inform a court's decisionmaking, we reject the idea that such formal documentation is required to establish the settled intention of the parties.

Additionally, the district court misapplied the governing law of this circuit when it held that a change in habitual residence "requires an actual 'change in geography,'" citing a case from the Ninth Circuit. <u>See Mozes</u>, 239 F.3d at 1078 ("While the decision to alter a child's habitual residence depends on the settled intention of the parents, they cannot accomplish this transformation by wishful thinking alone. First, it requires an actual 'change in geography.'") (quoting <u>Friedrich v. Friedrich</u>, 983 F.2d 1396, 1402 (6th Cir. 1993)). This circuit has never added such a requirement in the context of the habitual residence test. To the contrary, we have explicitly described a change in the child's geography as but one "consideration[] for the court" and "one factor in our [habitual residence] analysis," not as a full-fledged prerequisite. <u>Darin</u>, 746 F.3d at 12-13; <u>see also Mauvais</u>, 772 F.3d at 14 ("'[F]actors evidencing a child's acclimatization to a given place -- like a change in geography combined with the passage of an appreciable period of time -- *may* influence our habitual residence analysis.'") (emphasis added) (quoting <u>Sánchez-Londoño</u>, 752 F.3d at 542). To be sure, there may be situations in which an actual change in the child's geography factors heavily in the habitual residence analysis. Lest there be confusion, a child's presence in a new country of habitual residence is not required to effectuate his parents' settled intention to abandon his old place of residence and acquire a new one. A contrary requirement would incentivize a feuding parent to move his or her child immediately upon the formation of an agreement even if, as here, it would be better for the child to finish out a school year or wait until the parent has settled the family's living situation before the child joins her.

Finding clear error in the district court's factual findings concerning the parties' intent, and errors of law in the district court's application of the Convention to the facts of this case, we hold that the United States was the child's habitual residence at the time of removal based on his parents' mutual and settled agreement to move him there.[3] No actual change in the child's **[*347]** geography is required to effectuate that last shared intent, nor must the parties' intent be memorialized in a written document. Mindful that the question of parents' shared intent "is not a uniformly applicable 'test' for determining habitual residence," we caution that our holding rests of the particular facts of this case. Cf. Redmond, 724 F.3d at 732, 744, 747 (holding that despite parents' initial agreement to raise their baby in Ireland, the U.S.-born child's habitual residence was Illinois given that respondent had sole custody under Irish law at the time she brought him back to the United States and child's life was "firmly rooted" in Illinois at time of petition; "shared intent has less salience when only one parent has the legal right [to fix the child's place of residence]").

---

[3] We do not discuss the question of C.F.F.M's acclimatization to the United States, as neither the district court nor the parties addressed the issue. In any event, acclimatization is "rarely, if ever, a significant factor when children are very young," <u>Neergaard-Colón v. Neergaard</u>, 752 F.3d 526, 533 (1st Cir. 2014), and courts typically inquire into evidence of acclimatization when the party opposing return avers that the child's life is so firmly embedded in his or her new country that acclimatization should overcome the parties' past shared intent for the child to live elsewhere, <u>Mauvais v. Herisse</u>, 772 F.3d 6, 14 (1st Cir. 2014). We do note, however, that Respondent submitted a report, dated December 5, 2014, from a child psychologist who had met with and observed C.F.F.M. and had spoken with his caretakers and teacher. The psychologist opined in his report that C.F.F.M. is "reciprocally bonded" to Respondent, her fiancé, and her mother; that the child's "anxiety and fearfulness in the school setting have largely abated" since his arrival in Boston; and that "there is a grave risk that [the child's] return to Argentina would expose him to psychological harm."

EXHIBIT S
Page 6 of 7

778 F.3d 337, *347

After review of the record, we conclude that Petitioner did not prove that he seeks to return C.F.F.M. to the child's country of habitual residence, one of the three elements of a prima facie case of wrongful removal. Because Petitioner did not meet his burden to establish a presumption of wrongful removal, we will not reach other arguments raised by the parties, including the affirmative defense of consent. Cf. Sánchez-Londoño, 752 F.3d at 543 n.4 (citing Redmond, 724 F.3d at 742).

**III. Conclusion**

In reviewing Hague Convention petitions, courts must grapple with difficult factual circumstances in which no outcome may appear ideal. We emphasize that our decision today is not the final word on the parties' ongoing custody dispute; rather, it puts the onus on the requisite Massachusetts court to resolve future questions of custody and access rights. Nor should this opinion be taken as an endorsement of Respondent's actions in February 2014. Because the district court erred in its habitual residence analysis, we reverse both the grant of the father's petition and the order of return to Argentina.

---

**End of Document**

EXHIBIT S
Page 7 of 7

© 2016,
Scienceline Publication
www.science-line.com

ISSN: 2322-4770

Journal of Educational and Management Studies
J. Educ. Manage. Stud., 6(2): 57-61, June 25, 2016



# Greenberger Psychosocial Maturity Model: A Brief Review

**Mina Khatibi[1]✉ and Razieh Sheikholeslami[2]**

[1]PhD Student, Department of Educational Psychology, College of Education and Psychology, Shiraz University, Shiraz, Iran
[2]PhD, College of Education and Psychology, Shiraz University, Shiraz, Iran
✉Corresponding author's Email: mi.khatibi@gmail.com

**ABSTRACT:** This brief review focuses on the Greenberger Psychosocial Maturity Model. Greenberger and Sørensen (1974) have observed that except at the college level, assessment of the school experience has focused almost exclusively on academic achievement. Schools below the college level traditionally have been preoccupied with only one outcome of education: growth in measurable cognitive skills. While there is at present a growing recognition of the school's actual and potential role in promoting personal and social growth, a convincing model of nonacademic objectives is lacking, as is a tool for assessing children's progress toward nonacademic objectives. Greenberger and Sørensen construct a model of psychosocial maturity which specifies measurable attitudes and dispositions. Adolescent development is hindered by the separation of young people from adults and from the life of the community beyond the school. Opportunities must be made for adolescents to take responsible roles in their communities as part of their education. Theoretical models of psychosocial maturity have been proposed by many psychologists. The scientists' approach to measuring psychosocial maturity is based on a model advanced in the 1990s, which suggested that during adolescence and early adulthood, three aspects of psychosocial maturity develop: (1) Temperance: The ability to control impulses, including aggressive impulses, (2) Perspective: The ability to consider other points of view, including those that take into account longer term consequences or that take the vantage point of others, and (3) Responsibility: The ability to take personal responsibility for one's behavior and resist the coercive influences of others. This brief review discusses these issues. The conclusion drawn from this brief review can be used as input for a quantitative study with a larger sample of maturity models. Propositions that can guide such a quantitative research can build on the basis of the findings presented in this review.
**Key words:** Greenberger, Psychosocial Maturity Model

ORIGINAL ARTICLE
PII: S2322477016000106
Received 06 Mar. 2016
Accepted 24 Apr. 2016
Revised 28 May. 2016

## INTRODUCTION

Greenberger and Sørensen (1974) have observed that except at the college level, assessment of the school experience has focused almost exclusively on academic achievement. Serious widespread concern for the impact of the school experience on children's personal and social growth awaits both a compelling formulation of "nonacademic" development and the creation of (psychometric) devices that permit its assessment (Greenberger and Sørensen, 1975). An interdisciplinary model of psychosocial development, based on the concept of psychosocial maturity, has been described by Greenberger and Sørensen (1974). Briefly, the model attempts to integrate goals of socialization (i.e., attributes of individuals required to make a society function smoothly) with goals of development (i.e., attributes which represent the optimal growth of the individual in his own right). Thus, the concept of psychosocial maturity is concerned with the survival of both the person and the society. The model proposes that psychosocial maturity is reflected in three general capacities, which correspond to three general demands made by all societies on individuals. They are:

(1) The capacity to function effectively on one's own, or individual adequacy.

(2) The capacity to interact adequately with others, or interpersonal adequacy.

(3) The capacity to contribute to social cohesion, or social adequacy.

That is, in all societies "socialized" and "developed" individuals should have the following:

(1) Should be self-sufficient in some degree and take responsibility for their own survival.

(2) Should be able to relate to others in stable and predictable ways.

(3) Should be able to meet threats to the integrity of the social group with efforts to restore social solidarity.

In different societies, the specific attributes which serve as indicators of these general capacities may vary considerably. For this society, it has been argued that the nine attributes listed and described briefly in the Table below are indicators of the three general capacities of mature individuals.

To cite this paper: Khatibi M and Sheikholeslami R. 2016. Greenberger Psychosocial Maturity Model: A Brief Review. *J. Educ. Manage. Stud.*, 6(2): 57-61.
57

EXHIBIT T
Page 1 of 5

Khatibi and Sheikholeslami, 2016

The major purpose of the Greenberger et al.'s study was to report on the development of a Psychosocial Maturity Inventory based on the integrative concept of psychosocial maturity. With a view toward the eventual usefulness of these scales for research purposes, the objective of their study has been to devise scales that are manageable in length as well as acceptable in psychometric properties. A second purpose of the study was to test the theoretical relationships specified by their model of psychosocial maturity against empirical data concerning the relationships among subscales (Greenberger et al., 1975).

Hamilton et al. (1993) studied the use of the Psychosocial Maturity Inventory in evaluations of Youth Conservation Corps Programs. Although work experience has been widely recommended as beneficial to adolescent development, there is little empirical support for this recommendation. Adolescent development is hindered by the separation of young people from adults and from the life of the community beyond the school. Opportunities must be made for adolescents to take responsible roles in their communities as part of their education.

Camps and Moralis-Vives (2013) determined the relative importance of psychological maturity, indirect aggression, and the personality traits in predicting academic achievement in adolescents. The results showed that intelligence and impulsivity are important predictors of academic performance. As far as psychological maturity was concerned, only the work orientation component was related to academic performance. However, indirect aggression was not related to academic performance (Camps and Moralis-Vives, 2013).

### Models of Psychosocial Maturity

Theoretical models of psychosocial maturity have been proposed by many psychologists (Greenberger et al., 1974). The scientists' approach to measuring psychosocial maturity is based on a model advanced in the 1990s (Steinberg and Cauffman, 1996), which suggested that during adolescence and early adulthood, three aspects of psychosocial maturity develop:

(1) Temperance: The ability to control impulses, including aggressive impulses.

(2) Perspective: The ability to consider other points of view, including those That take into account longer term consequences or that take the vantage point of others.

(3) Responsibility: The ability to take personal responsibility for one's behavior and resist the coercive influences of others (Steinberg, et al., 2015).

### Measuring Psychosocial Maturity

Psychosocial maturity consists of three separate components: temperance, perspective, and responsibility (Steinberg and Cauffman, 1996). Each of these components was indexed by two different measures (Steinberg, et al., 2015). For more detail on the psychometric properties of the measures, see Monahan and colleagues (2009). Temperance: The measures were self-reported impulse control and suppression of aggression, both of which are subscales of the Weinberger Adjustment Inventory (Weinberger and Schwartz, 1990).

Perspective: The measures were self-reported consideration of others and future orientation (Cauffman and Woolard, 1999). Responsibility: The measures were self-reported personal responsibility from the Psychosocial Maturity Inventory (Greenberger et al., 1974), and resistance to peer influence (Steinberg and Monahan, 2007). In addition to examining each indicator of psychosocial maturity independently, the researchers also standardized each measure across the age distribution and then calculated the average to create a global measure of psychosocial maturity.

### DISCUSSION

The educational community has expressed growing interest over the past several years in the assessment of children's personal and social development. The construction of the Psychosocial Maturity Inventory is pertinent to this objective. A strength of the inventory is its derivation from an explicit model of maturity which integrates desired end products of socialization with goals of human development.

With a few exceptions, the nine subscales of the Psychosocial Maturity Inventory have adequate internal consistency at all grade levels in the range cited above. The degree of homogeneity within scales

58

EXHIBIT T
Page 2 of 5

*J. Educ. Manage. Stud.*, 6(2): 57-61, 2016

makes them appropriate for use in studying (or comparing) groups of individuals, but not for analysis or diagnosis at the level of the single individual. Validity evidence to date is promising, particularly concerning the subscales representing Individual and Social Adequacy. A theoretical model of psychosocial maturity was discussed in an earlier paper (Greenberger and Sørensen, 1974) and is outlined below. This model has been empirically tested in the studies described by Greenberger and Sørensen (1975).

Evidence from the inter-correlations among the nine subscales and from the factor analyses of items and scales supports the use of the unifying construct of Psychosocial Maturity to describe the nine attributes that the subscales assess. At the same time, evidence from both the validity studies and the factor analyses supports the distinctiveness and meaningfulness of the Individual and Social Adequacy dimensions of the model.

There is evidence to suggest that there is a relationship between maturity and educational attainment: those students with fewer educational aspirations tend to be less mature (Greenberger, 1982). Therefore, psychological maturity may lead to greater interest in academic content and learning, as well as higher aspirations in life.

Moreover, according to Galambos et al. (2005) there is a relationship between cognitive ability and psychological maturity. They found that psychological maturity is related to a higher crystallized intelligence and better performance on some executive tasks. Taking into account that crystallized intelligence depends on learning processes, psychological maturity and academic performance are expected to be related. The very few studies on this issue suggest that this is the case (Steinberg et al., 1989; Oh-Hwang, 1994). However, these studies do not assess intelligence, so other studies need to be made to determine whether this result can be explained simply by the relationship that psychological maturity and academic performance have with intelligence.

Camps and Morales-Vives (2013) define psychological maturity as the ability to take on obligations, to make responsible decisions that take into account one's own characteristics and needs, and to accept the consequences of one's own actions. This definition refers specifically to the individual adjustment proposed by Greenberger et al. (Greenberger, 1984; Greenberger and Sørensen, 1973) within their model of psychosocial maturity, which is divided into three components: Work Orientation, Self-Reliance, and Identity. Work Orientation is defined as the individual's willingness to fulfill his or her own obligations (for example, adolescents start their homework and do not stop until they finish). Self-Reliance is defined as a person's willingness to take the initiative, without allowing others to exercise excessive control. And finally, Identity is defined as the adolescent's knowledge of him or herself (Camps and Morales-Vives, 2013).

**A Model of Psychosocial Maturity**
- Individual adequacy
- Self-reliance
- Absence of excessive need for social validation
- Sense of control
- Initiative
- Identity
- Clarity of self-concept
- Consideration of life goals
- Self-esteem
- Internalized values
- Work orientation
- Standards of competence
- Pleasure in work
- General work skills
- Interpersonal adequacy
- Communication skills
- Ability to encode messages
- Ability to decode messages
- Empathy
- Enlightened trust
- Rational dependence
- Rejection of simplistic views of human nature
- Awareness of constraints on trustworthiness
- Knowledge of major roles
- Role-appropriate behavior
- Management of role conflict
- Social adequacy
- Social commitment
- Feelings of community
- Willingness to work for social goals
- Readiness to form alliances
- Interest in long-term social goals
- Openness to sociopolitical change

EXHIBIT T
Page 3 of 5

Khatibi and Sheikholeslami, 2016

- General openness to change
- Recognition of costs of status quo
- Recognition of costs of change
- Tolerance of individual and cultural differences
- Willingness to interact with people who differ from the norm
- Sensitivity to the rights of people who differ from the norm
- Awareness of costs and benefits of tolerance

**CONCLUSION AND RECOMMENDATION**

While there is at present a growing recognition of the school's actual and potential role in promoting personal and social growth, a convincing model of nonacademic objectives is lacking, as is a tool for assessing children's progress toward nonacademic objectives. The conclusion drawn from this brief review can be used as input for a quantitative study with a larger sample of maturity models. Propositions that can guide such a quantitative research can build on the basis of the findings presented in this review.

**Competing interests**

The authors declare that they have no competing interests.

**REFERENCES**

Camps, E., and Morales-Vives, F. (2013). The contributions of psychological maturity and personality in the prediction of adolescent academic achievement. IJEP, Vol 2, No 3: 246-271.

Cauffman, E., and Woolard, J. (1999). The Future Outlook Inventory. Measure developed for the MacArthur Network on Adolescent Development and Juvenile Justice. Unpublished manuscript.

Galambos, N.L., MacDonald, S.W.S., Naphtali, C., Cohen, A.L., and de Frias, C.M. (2005). Cognitive performance differentiates selected aspects of psychosocial maturity in adolescence. Developmental Neuropsychology, 28: 473-492.

Greenberger, E. (1982). Education and the acquisition of psychosocial maturity. In: McClelland D (Ed.), The Development of Social Maturity (pp.155-189). New York: Irvington.

Greenberger, E. (1984). Defining psychosocial maturity in adolescence. Advances in Child Behavioral Analysis & Therapy, 3: 1-37.

Greenberger, E., and Sørensen, A.B. (1973). Educating Children for Adulthood: A Concept of psychosocial Maturity. Center for Social Organization of Schools, 159.

Greenberger, E., and Sørensen, A.B. (1974). Toward a concept of psychosocial maturity. Journal of Youth and Adolescence, Vol 3, No 4: 329-358.

Greenberger, E., Josselson, R., Knerr, C., and Knelt, B. (1975). The measurement and structure of psychosocial maturity. Journal of Youth and Adolescence, Vol 4, No 2:127-143.

Hmilton, S.F., Richards, F.A., Stewart, S.K., Frankel, W.B., and Caracelli, V. (1983). The use of the psychosocial maturity inventory in evaluations of youth conservation corps programs. Children and Youth Services Review. Vol 5: 357-373.

Oh-Hwang, Y. (1994). A cross-cultural study: Linkages among intelligence, psychosocial maturity, parenting practices, and academic of adolescents. Unpublished doctoral dissertation, Purdue University, Indiana, United States.

Steinberg, L., and Cauffman, E. 1996. Maturity of judgment in adolescence: Psychosocial factors in adolescent decision making. Law and Human Behavior 20:249–272.

Steinberg, L., and Monahan, K.C. (2007). Age differences in resistance to peer influence. Developmental Psychology 43:1531–1543.

Steinberg, L., Cauffman, E., and Monahan, K.C. (2015). Prevention, psychosocial maturity, and desistance from crime in a sample of serious juvenile offenders. U.S. Department of Justice Office of Justice Programs Office of Juvenile Justice and Delinquency. Retrieved on March 4, 2016. http://www.ojjdp.gov/pubs/248391.pdf.

Steinberg, L., Elmen, J.D., and Mounts, N.S. (1989). Authoritative parenting, psychosocial maturity, and academic success among adolescents. Child Development, 60 (6): 1424-1436.

Weinberger, D.A., and Schwartz, G.E. (1990). Distress and restraint as superordinate dimensions of self-

EXHIBIT T
Page 4 of 5

*J. Educ. Manage. Stud.*, 6(2): 57-61, 2016

reported adjustment: A typological perspective.
Journal of Personality 58:381–417.