# UNITED STATES DISTRICT COURT

# DISTRICT OF MAINE

| | |
|---|---|
| SARAH LEYLA POWELL, ) | |
| ) | |
| Petitioner, ) | |
| ) | |
| v.  ) | Case No. 2:25-cv-00641-JAW |
| ) | |
| ADRIAN MAURICE POWELL JR., ) | |
| ) | |
| Respondent.  ) | |

## RESPONDENT'S POST-TRIAL BRIEF

COMES NOW, Respondent Adrian Powell ("Father"), by and through his attorneys of record, Katrina Seipel and Katelyn Skinner, and submits the following Post-Trial Brief in support of his position taken at the trial which was held January 22-23, 2026, before the Honorable John A. Woodcock, Jr.

The court is tasked with making a finding in this case of whether the two minor children of the parties were wrongfully retained away from their country of habitual residence on February 8, 2025, in a manner which breached Petitioner's ("Mother's") rights of custody.

The first question, before any further analysis, that the court must determine is whether there was a wrongful retention at all.

Indeed, there was not. The parties jointly agreed for the children to move to the United States as evidenced in the visa application documents, the messages exchanges between the parties, and the testimony of the parties. And, in August 2024, the children did just that: moving to Maine to live with their Father and step-mother. This fact is not in controversy.

Page 1 – RESPONDENT'S POST-TRIAL BRIEF

Next, there was an understanding that the children's residence in the United States would be conditional upon Mother's successful application for a F-1 student visa. That condition was satisfied, the F-1 visa was granted, and Mother abandoned her residence in Germany, and joined the children in the United States in December 2024. To satisfy her F-1 visa requirements, she started her schooling in January 2025 at York County Community College, where she has been continually enrolled and satisfactorily engaged as a student under the F-1 visa requirements continually since January 2025 to present day. (Tr. 61, lines 16-18)

The inquiry stops there. The parties agreed the children would reside in the United States, and they are doing just that. There was nothing wrongful about the children's presence in the United States on Feb 8, 2025.

The Explanatory Report by Elisa Pérez-Vera is recognized as the official history and commentary to the Hague Convention and is a "source of the background on the meaning of the provisions of the Convention." The Report states that the "fixing of the decisive date in cases of wrongful retention should be understood as that on which the child ought to have been returned to its custodians…" Pérez-Vera Report ¶108.

The retention of a child for the purposes of the Convention is a singular and not a continuing act. *Marks ex rel SM v Hochhauser*, 876 F.3d 416 (2d Cir. 2017).

In this case, the date pled and argued for wrongful retention is February 8, 2025 (ECF 1, page 2, ¶4), and so that is the date on which the court must decide whether there was or was not a wrongful retention

There cannot have been a wrongful retention on February 8, 2025, because the parties agreed that the children would reside in the United States until Mother completed her

Page 2 – RESPONDENT'S POST-TRIAL BRIEF

"Bachelor's degree program and any authorized practical training [she] is authorized for." Ex 5, page 15, ¶19. Mother had not completed her Bachelor's degree as of February 8, 2025, and still today is satisfactorily enrolled and attending school in pursuit of her degree.

The analysis can end there. Courts have held that when a petitioner has consented to the child's travel abroad until a specific date, the child's retention can only become "wrongful" after that date. *See* e.g. Demaj v. Sakaj, 2013 WL 1131418, at *3, *7 (D. Conn. 2013); Velasquez v. Green, 2012 WL 2885662 (E.D. Tex. 2012), *report and recommendation adopted*, 2012 WL 6569792.

Here, that date has not come yet. Mother has not successfully completed her schooling, and she has not concluded her schooling at all. This Hague convention case was filed prematurely, it is not ripe for adjudication and therefore this court has no subject matter jurisdiction and the petition must be dismissed.

In the case of *Simcox v. Simcox*, the court resolved conflicting testimony by determining that the parents had agreed that the child would only stay in New York if the father were accepted into law school there. The court held that there was no apparent time limit to the consent and that the petitioner had the intent to permit the child to remain with her husband once he gained acceptance to law school in New York. *Simcox v. Simcox*, 511 F.3d 594 (6th Cir. 2007). In the instant case, the court does not have to resolve conflicting testimony regarding the parties' intent and agreement as to the duration of the children's residence in the United States. The F-1 visa application paperwork is rife with the specific description of the parties' joint intent.

Page 3 – RESPONDENT'S POST-TRIAL BRIEF

While Father posits the argument may end here, if the court is inclined to analyze any particular conditions that Mother may argue should be met in order for the children to remain in the United States rightfully, those must be analyzed as of the date that Mother alleges that wrongful retention took place: as of February 8, 2025:

1) Mother had obtained her F-1 Visa. She was studying at York County Community College. She was engaging in school satisfactorily and was compliant with the F-1 student visa obligations for an international student. She had an apartment. She was receiving $1,000 cash per month from Father. She had overnight parenting time with the children every other weekend, just as expected. She had a vehicle, auto insurance, and means of transportation. Father was paying over $3,000 per month in total to support Mother in her endeavors, including: $1,700 rent, $1,000 cash, payments on her debt in Germany, auto insurance, and health insurance (Tr at 229-230, lines 15- 13). Father was paying nearly all of the children's needs: food, housing, entertainment, supplies, transportation, etc. (Tr at 232, lines 4 – 7).

While not relevant to the Court's analysis of whether the children were wrongfully retained on February 8, 2025, the Court may also take note that even after February 8, 2025, Mother continued in all of the endeavors and benefits as described, plus she was able to save $500 over the summer in 2025 (Tr. at 213, lines 22-25; 221, lines 2 – 6) because her income was exceeding her expenses.

Again, while not relevant to the Court's analysis of whether the children were wrongfully retained on February 8, 2025, the Court may also take note that as of today, Mother testified that she rents a "really nice condo" (Tr. at 157, lines 20 -23), pays $500 per month in rent, receives $1,000 per month from Father, has health and auto insurance, a vehicle, sees the children, and is enrolled in and attending school satisfactorily.

Mother argues that she revoked her consent for the children to remain residing in the United States due to a disagreement with Father in February 2025. The court in *In Re Kim*, held that if a parent has a change of heart after the child is removed, and does not revoke the

consent until then, it will be too late. The Court found that the petitioner's "post hoc" regret that she had agreed to allow her daughter to remain in New York while she attended school in Canada reflected "an attempt at revocation or modification of the previously-provided consent" to leave the child in New York. The petitioner's change of heart was insufficient to "revive her right to return under the Convention." In re Kim, 404 F. Supp 2d 495 (2005).

Further, although Father argues that whether a wrongful retention occurred must be analyzed first, and because there has been no wrongful retention the analysis must stop there, if the court determines it must make findings on the children's habitual residence at the time of the alleged retention, the court must find that the United States was the children's habitual residence immediately before the alleged breach of rights of custody on February 8, 2025.

In analyzing the children's habitual residence, the United States Supreme Court in Monasky v. Taglieri, 40 S. Ct. 719 (2020), directs the finder of fact to look at the totality of the circumstances. Habitual residency is a factual inquiry as to where the child is "more than just transitory and it is customary, usual, and of the nature of habit." Here, these facts include:

<u>The children's school</u>: The parties' daughter, N.P. completed 3rd grade entirely in the United States. She is now over half-way through 4th grade. The parties' son, Z.P. completed one full year of pre-kindergarten in the United States, and is now in kindergarten. *See* Ex 113 & 114, children's report cards; and Ex 122, Statement from Sarah Wilder, N.P.'s 3rd grade Teacher ("Now, N.P. is in 4th grade, her classroom is next door to mine…It would be unusual for 24 hours to pass without at least 2 hugs from N.P.")

<u>Friends</u>: Ms. Wilder described N.P. developing friendships within two weeks of her arrival in the United States. *See* Ex 122. The court heard testimony from Father about the

children's friendships, and attending birthday parties. (Tr. at 239, lines 1-10; and at 240, lines 4 -6 ). The court received into evidence statements from the parents of the children's friends. *See* Ex 109 & 119.

Family: The court received into evidence statements from the children's family members describing the children's rich connections in the United States. *See* Statements from: Aunt Ex 102; Grandmother Ex 103; Aunt Ex 107; Aunt Ex 108; Relative Ex 116; and Aunt Ex 120. Father testified credibly about these special relationships. (Tr at 241, line 20 to 246, page 11).

Extracurriculars: N.P.'s soccer and basketball coach describes her work ethic and rapport with her teammates. *See* Ex 106. Upon moving to Maine, Father testified the children engaged in karate, soccer, football, and basketball. (Tr. at 240, 16 – 24).

Language spoken: The children speak English in day-to-day life, whether it be at school, at activities, when conversing with friends, and in their home with Father. (Tr. at 238, lines 7-10).

Medical and dental care: The children receive medical, dental and health care in the United States.  *See* Ex 115 Pediatrician records; Ex 129 N.P.'s counselor records.

Place of residence: Questions the court may pose to determine whether the United States became the children's habitual residence as of February 8, 2025, when they had been living in the United States for six months at that time: Is the child in a stable environment in the new country? Are they settled in a stable residence or are they transient or merely "camped out"? Along with testimony of the witnesses at trial, the statements of friends, family members, coaches, and teachers, Father presented photographic evidence of the children's idyllic life in

Maine. Trial Exhibit 125 has a snippet of photographs showing the children's lives in Maine from arrival in August 2024 through February 2025. In particular, pages 110, 112, 117, 124, 129, 133, 135, 164, 167, 168, 173, 180 depict photographs of the children at the river, pool, school, with their dog, at home, at the beach, park, pumpkin patch, reading at home, etc. *See* Ex 125.

The children traveled to the United States in August 2024 on a one-way plane ticket. (Tr. 232, lines 17-18) All of the children's belongings were either sold in Germany or brought with them to United States when they moved from Germany to Maine. (Tr. 232, lines 19-25) They have no residence in Germany to return to. Their bedrooms in Germany do not exist anymore. They were disenrolled from school in Germany (Tr. at 186, lines 21-22). Mother packed up her and the children's life in Germany. She sold her car, she ended her lease, and she quit her job. The court heard not one line of testimony from Mother about any of the children's continued connections to Germany, no testimony about face-timing with great-grandparents, or aunts, or cousins, or about writing letters, etc. Certainly nothing connecting the children to Germany as of February 8, 2025, much less evidence they felt "at home" in Germany on February 8, 2025 as opposed to the United States.

The court must also consider whether the children had become acclimatized to the new country. The children's habits and customary day-to-day life was unequivocally American as of February 8, 2025. Courts have consistently held that children can be habitually resident in a new country within months of arrival. In *Jenkins*, the court affirmed that the child was acclimatized to life in the United States after only five months since he was attending preschool, was "doing well in that environment, having attained both Hebrew and English

Page 7 – RESPONDENT'S POST-TRIAL BRIEF

skills commensurate with his age and learning opportunities," and "enjoyed a weekly routine that involved visits to the Air Force museum in Dayton, frequent summertime visits to fountains in a nearby waterpark…attendance at numerous birthday parties for friends.." Jenkins v. Jenkins, 569 F.3d 549 (6th Cir. 2009). In *Karkkainen*, the court found acclimatization after less than three months in the United States because the child had enrolled in school, attended extracurricular classes, and had developed relationships with her American family. Karkkainen v. Kovalchuk, 445 F.3d 280, 293-94 (3d Cir. 2006). In *Feder*, the court cited to the four-year-old child's attendance in preschool and upcoming enrollment in kindergarten during the family's stay in Australia for less than six months as evidence that Australia had become the child's habitual residence. Feder v. Evans-Feder, 63 F.3d 217 (3d Cir. 1995).

A significant guiding principle from the Supreme Court in *Monasky* follows: "The Hague Convention does not define the term 'habitual residence.' A child 'resides' where she lives. See Black's Law Dictionary 1176 (5th ed. 1979)." Monasky at 726.

*Monasky* also clarified that the text of the Hague Convention does not say that habitual residence depends on an actual agreement between a child's parents. *Id.* "We hold that the determination of habitual residence does not turn on the existence of an actual agreement." And, "[The text of the Convention] surely does not say that habitual residence depends on an actual agreement between a child's parents."

*Monasky* further says that what makes a child's residence "habitual" is "some degree of integration by the child in a social and family environment." *Id. Monasky*, in citing to *Karkkainen*, says: "The place where a child is at home, at the time of removal or retention,

ranks as the child's habitual residence." *Id.* Considering the totality of the circumstances, the children were at home in the United States on February 8, 2025.

The instant case is very similar to that in *Goldstein*, a 2024 case (post-*Monasky*), where the 11th Circuit considered the impact on the determination of habitual residence of the parents' intention to return to Isreal after the passage of some time, as compared to the passage of a few months of having lived in Florida. The court found evidence that the parties had agreed to stay in Florida until the end of the war in Isreal, or for six months to one year. The mother filed for return of the children four months after the children arrived in Florida. The 11th Circuit upheld the district court decision to deny the petition for return finding that the children were habitually residence in Florida because there was evidence that they were in school in Florida, had doctors and therapists there, and participated in a thriving social community. The court stressed that the shared intent of the parties is not dispositive as to habitual residence, but that the parties' intent to remain in Florida for a period of 6 – 12 months, or until the end of the war, was a factor that supported finding habitual residence in Florida. The district court's opinion noted that a relatively short stay can be sufficient to establish a new habitual residence, regardless of the parents' thought of returning someday to their prior residence. The district court noted further that the parties' dispute as to whether the evidence was sufficient to establish that the children had previously been habitually resident in Isreal was not sufficient because the relevant issue is where the child is at home at the time of the removal or retention. Goldstein v Simon, 2024 WL 4284921 (11th Cir Sept 25, 2024).

While not dispositive of the habitual residence analysis, courts are tasked with considering the totality of the circumstances, including the parties' intentions. The First Circuit has ruled that consent prior to the removal of the child is sufficient for the purposes of establishing a change of habitual residence, even if one parent revokes the consent prior to the child's relocation. Thus, where the last shared intention of the parties was that the child should be relocated to the United States from Argentia, the fact that he father changed his mind and sought to prevent the child from leaving after the mother had relocated in anticipation of the planned relocation of the child, did not vitiate the fact that the last shared intention of the parents was that the child would move to the United States. Mendez v. May, 778 F.3d 337 (1st Cir. 2015).

Ultimately, the court must determine the answer to this question when analyzing habitual residence: where did the children feel at home?

If the court nonetheless finds that the children were retained in the United States away from their country of habitual residence, Mother's case still fails. She cannot prove, by a preponderance of the evidence, that her rights of custody were breached by virtue of the fact that the children remained in the United States on February 8, 2025. Both parties testified that they shared custody as of February 8, 2025. Mother testified that at the 2023 divorce hearing in Germany the parties agreed verbally to share custody. Further, in the text communications Mother's communications are replete with "we have shared custody." Mother testified that shared custody means the parties will jointly make decisions about major issues with the kids (Tr. at 184, lines 21-25; at 186, lines 9 – 11, and 13 - 15) She testified that the decision to have the children move to the United States during her period of studies, was

Page 10 – RESPONDENT'S POST-TRIAL BRIEF

a joint custody decision (Tr. at 186, lines 16 – 20). As such, she did not have the authority to make a unilateral decision to retract her agreement for the children to remain in the United States.

It must then follow that any decision to have the children move back to Germany prior to the agreed upon time period of end of schooling, must be a joint custodial decision. Therefore, the children remaining in the United States is not in breach of mother's custodial rights because she does not have the sole right to retract her agreement for the children to remain in the United States.

Father asks the court to dismiss the petition, finding:

1) There was no wrongful retention as of February 8, 2025. End of analysis.
2) Mother's rights of custody were not breached, because the decision to move the children from the United States back to Germany must be a joint decision.
3) Only if the court makes a finding that there was a retention, that the children's habitual country of residence when retained (on February 8, 2025) was the United States.

## CONCLUSION

There was no wrongful retention of the children in the United States on February 8, 2025. The children were rightfully residing in Maine, per the agreement of the parents, and will continue to do so, at least until Mother completes her Bachelor's degree and any allowed post-graduate work.

Mother's rights of custody were not breached. The parties jointly agreed for the children to move to and reside in the United States, and they would need to decide jointly for the children to move back to Germany.

The children were habitually resident in the United States as of February 8, 2025.

For the foregoing reasons, this Court must refuse to return the children to Germany and immediately dismiss Mother's Petition for Return.

| | |
|---|---|
| Date: February 18, 2026 | /s/ Katelyn D. Skinner<br>Katrina A. Seipel, OSB #164793<br>Katelyn D. Skinner, OSB #105055<br>Buckley Law, P.C.<br>5300 Meadows Road, Suite 200<br>Lake Oswego, OR  97035<br>kas@buckley-law.com; kds@buckley-law.com<br>Telephone: 503-620-8900<br>Of Attorneys for Respondent - *Pro Hac Vice*<br><br>Nicole Milam, Esq. (Bar No. 6369)<br>Milan Law Collective<br>PO Box 237<br>Cumberland Center, ME  04021<br>nicole@milamcollective.com<br>Of Attorneys for Respondent<br>*Local Counsel* |

**CERTIFICATE OF SERVICE**

I certify that a true and correct copy of the foregoing was served by e-mail and e-filing via CM/ECF, on counsel for Petitioner, Bradley C. Morin, to: bmorin@bourqueclegg.com, and Joshua Burgess Narey, to: jnarey@bourqueclegg.com, at their office address of 949 Main Street, PO Box 1068, Sanford, ME  04073, on February 18, 2026.

/s/ Katelyn D. Skinner
Katelyn D. Skinner, OSB #105055
Of Attorneys for Respondent, *Pro Hac Vice*