## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | |
|---|---|
| **SARAH LEYLA POWELL** )<br><br>      **Petitioner,** )<br><br>**v.** )<br><br>**ADRIAN MAURICE POWELL JR.,** )<br><br>      **Respondent.** ) | **Civil Case No. 2:25-cv-00641-JAW** |

### PETITIONER'S POST-TRIAL BRIEF

NOW COMES the Petitioner, Sarah Leyla Powell, and files this Post-Trial Brief in support of her Verified Petition for Return of Children to Germany.

### SUMMARY OF THE ARGUMENT

As the Court repeatedly emphasized, this trial will not determine custody of N.P. and Z.P. The Court must instead determine *where* those important decisions will be made. The Court must engage in a step-by-step application of the Hague Convention and ICARA. It is a fact-intensive process, which leads to the conclusion that these children must be returned to Germany for a final custody determination.

The purpose behind the Hague Convention is to prevent the situation the Petitioner is currently facing. Leyla allowed her children to come to the United States while she pursued education on a temporary visa (sponsored by her ex-husband, Adrian Maurice Powell Jr.). Only eight weeks after her arrival, Leyla discovered that Adrian intended to permanently retain the

children, and they would be separated from her.  Leyla tried to immediately return to Germany with the children.  However, Adrian blocked her return by withholding the children's passports.

This Court must only consider the circumstances that existed when retention occurred in February 2025.  At that time, the children's habitual residence was Germany, where the children lived almost their entire lives.  They had close family and friends in Germany, where they also had years of formal education. Their parents were divorced only nine months earlier in Germany. Leyla was the children's primary caretaker, and only recently entered the United States.  The visa application declares that the children's status in the United States was intended to be *temporary.* Leyla's own status in the United States was unsettled, because Adrian pulled back his sponsorship at will.  At this crucial point in time, the children's habitual residence was Germany.

The subsequent passage of time and post-retention events do not affect the Court's analysis.  The First Circuit Court of Appeals made the following observation in a similar case:

> We recognize that the child has been living in Puerto Rico for three years now. However, retaining the child in the United States against his father's wishes was a decision Olivero made on his own. If we allow a parent to unilaterally change a child's habitual residence simply due to the passage of time, we would be encouraging the pursuit of this illegal route to custody. To not order the child's return would be to condone that which the Convention seeks to deter: parents crossing international boundaries with their children in order to avoid the jurisdiction of local courts whose rulings they do not -- or believe they will not -- agree with.

*Darín v. Olivero-Huffman*, 746 F.3d 1, 20 (1st Cir. 2014).

This Court can presume that the courts of Germany will make the proper decision in the best interests of N.P. and Z.P.  In fact, those German proceedings have already begun, and they should be allowed to continue by the granting of this Petition.

## FACTS DEVELOPED AT TRIAL

1.      Sarah Leyla Powell is a citizen of Germany.   Adrian Maurice Powell, Jr. is a citizen of the United States.  The parties' two children are N.P. (d.o.b. 2016) and Z.P. (d.o.b. 2020), and they are dual citizens.  (Petition ¶¶ 1-3 and Answer.)

2.      Leyla lived most of her life in the German cities of Schwetzingen and Mannheim, which are about 15 minutes apart. Leyla and the children have close family in that region, including Leyla's grandparents, brother, cousins, aunt, and uncle.[1] (Leyla Tr. 69:23 – 70:11; 160:13 – 160:18.)

3.      The parties met in 2015 while Adrian was serving in the U.S. Air Force in Germany. They were married on March 3, 2016 in Germany.  (Leyla Tr. 72:2 – 72:8; Pet. Ex. 3.) Leyla gave birth to their daughter N.P. later that year in Germany. (Leyla Tr. 69:12 – 69:15; 73:5 – 72:7.)

4.      The couple moved to the United States in September 2017 while Adrian was posted in Georgia. The couple had marital problems and decided to separate.  Leyla returned to Germany with N.P. in December 2018. (Petition ¶12 and Answer; Leyla Tr. 73:11 – 74:6.)

5.      For the next 10 months, Leyla lived alone with their daughter in Germany. Adrian's only contact was by video or telephone. (Leyla Tr. 74:9 – 75:22.)

6.      The couple reconciled by the fall of 2019.  Adrian's service in the Air Force ended, and he returned to Germany in October 2019.  (Leyla Tr. 75:13 – 76:3.) Leyla gave birth to their son Z.P. in 2020 in Germany.  (Pet. ¶14 and Answer; Leyla Tr. 76:11 – 76:12.)

---

[1] Leyla noted that her aunt and uncle were closer in age to her than most families, and their relationships are more like siblings.

7.      In September 2021, the couple decided to separate again.  Adrian finished his work contract and prepared to move back to the United States.  The parents agreed that both children would remain with Leyla in Germany. (Leyla Tr. 77:21 – 78:16; 78:24 – 79:4.)

8.      Because Leyla and Adrian were married, German law automatically gave them joint custody of the children.  Those custody rights included the right to determine the children's residence. (Andreas Hanke Tr. 13:14 – 15:23; Pet. Exs. 14, 15.)

9.      On November 18, 2021, the couple visited a German notary, who prepared a custody power of attorney. (Leyla Tr. 77:18 – 78:16; 78:24 – 79:8; Pet. Ex. 2.)[2]  Through this document, Adrian delegated his child custody rights to Leyla. (Pet. Ex. 2.) This delegation included decisions relating to the children's residence. (Hanke Tr. 15:24 – 17:7.)  Adrian never revoked the document. (Leyla Tr. 92:4 – 92:12.)

10.     Adrian left Germany on November 30, 2021 and returned to his family's home in Baltimore, Maryland. The children remained with Leyla.  (Leyla Tr. 79:9 – 79:24.)

11.     At the time of this final separation, Z.P. was 1 year old and N.P. was 5 years old. They did not see their father for over a year, but they had occasional contact by telephone or video.  The children saw their father again in December 2022 when Adrian made a 10-day visit to Germany. (Leyla Tr. 79:25 – 80:21.)

12.     Leyla continued raising the children alone in Germany.  She supported herself and the children while working for the Mannheim city government. (Leyla Tr. 77:4 – 77:9.)

13.     Leyla was the primary caregiver for both children since their births.  (Leyla Tr. 84:3 – 86:5.)

---

[2] Andreas Hanke explained that a notary in Germany is a specialist attorney who drafts important legal documents and records them in a deed roll. This roll includes, among other things, custody and divorce agreements. (Hanke Tr. 11:4 – 13:3.)

14.     The first language of both children is German. Both children also learned English. The children learned their English while in Germany, because it is a standard part of German education from early childhood. (Leyla Tr. 83:15 – 84:9.)

15.     The children obtained most of their schooling in Germany.  An early education program starts at age 1, followed by kindergarten for ages 3-6, and then elementary school.  N.P. completed five years of her education in Germany, and Z.P. completed three years of his education in Germany. (Leyla Tr. 86:6 – 88:12.)

16.     The children were raised in a tight-knit neighborhood in Mannheim where they had close friends. Neighbors would help each other with babysitting and their children played together. The neighborhood had many cultural activities, festivals, athletic and educational facilities. The children also visited their extended family frequently, seeing many on a weekly or biweekly basis. (Leyla Tr. 88:13 – 90:12.)

17.     The children only hold active German passports. (Leyla Tr. 212:11 – 212:21.)

18.     The children visited the United States in the summer of 2023, staying with Adrian for approximately five weeks in Baltimore.  Leyla gave Adrian the children's German passports and a notarized travel authorization. Adrian returned the passports when the trip was over. (Leyla Tr. 80:22 – 82:25.)

19.     This was the same period when the couple began to formalize their divorce. Leyla's petition for divorce was served in July 2023. (Leyla Tr. 90:19 – 91:25.)  On September 6, 2023, the parties entered into a written divorce agreement, which was drafted and recorded by a German notary.  The agreement was presented to the German family court on September 7, 2023. (Leyla Tr. 90:19 – 91:25, Pet. Ex. 3.)

20.     The divorce agreement stated that the children had their permanent residence with Leyla in Germany. (Pet. Ex. 3, p. 2.) The agreement also obligated Adrian to pay child support in the amount of 784 Euros per month, and spousal support in the amount of 485 Euros per month. (Pet. Ex. 3, p. 3.)[3] A final divorce judgment would come several months later in May 2024 to formally dissolve the marriage and divide pension rights. (Hanke Tr. 18:14 – 19:18; Pet. Ex. 4)

21.     During the years 2023 and 2024, Leyla had difficulties with her job, and she considered leaving Mannheim to go to the United States. Leyla learned that she was unlikely to obtain a green card, so she dropped the idea. When Adrian visited again in December 2023, his fiancée Kylie proposed that they look into bringing Leyla and the children to the United States. The ideas lapsed again after Leyla resolved the disputes at her job. (Leyla Tr. 94:19 – 99:2.)

22.     By the spring of 2024, Adrian and Kylie moved from Maryland to Old Orchard Beach, Maine, where they began running a business. Adrian contacted Leyla in April 2024 to report that he had consulted an attorney, and he proposed that Leyla come to the United States to go to York County Community College. (Leyla Tr. 93:18 – 100:12.)

23.     Meanwhile on May 16, 2024, the German family court in Mannheim granted the final divorce between Adrian and Leyla. (Pet. Ex. 4.)

24.     Leyla was accepted at York County Community College to pursue an associate's degree in human studies. Adrian and Kylie submitted a sponsorship letter to the school in May 2024, confirming they would provide financial support for the duration of Leyla's schooling. This included tuition, fees, food and housing. (Pet. Ex. 5 p. 14, Pet. Ex. 34.)

---

[3] By ordering child support, the divorce agreement recognized that the children lived with Leyla and Adrian had visitation. (Hanke Tr. 18:7 – 18:13.)

25.     Leyla, Adrian, and Kylie also began the process of applying for an F-1 Student Visa.  (Pet. Exs. 5, 34.)  All three were all involved in preparing and approving the package before it was submitted to the U.S. government.[4]  Notably, the visa application contained the following features and statements:

a.     Leyla was coming to the United States "temporarily" for a full program of study at York County Community College. (Pet. Ex. 5, p. 60.)

b.     Both Leyla *and the children* would be returning to Germany when she finished her studies.  (Adrian Tr. 255:19 – 256:2; 257:17 – 257:20; Pet. Ex. 5, pp. 9, 15).

c.     If the visa was denied, the children would also return to Germany, with N.P.'s return being delayed until after the completion of her school year. (Pet. Ex. 5 p. 17.)

d.     Adrian declared that he and Kylie would provide "full financial support" for Leyla during her schooling, and would pay for an apartment lease. Adrian further declared:

> I intend to furnish room and board for the duration of her stay, provide her with a weekly allowance $500, pay all of her school fees provide her with all of her basic needs, meals, toiletries, provide full financial support for our mutual children, and my partner Kylie intends to gift her with a 2014 Honda Accord car, which has been paid off.  (Pet. Ex. 5 pp. 17, 79.)

e.     While the application stated that Leyla wished to obtain a bachelor's degree, her then-current academic program was only expected to last about two years, through December 2026. (Pet. Ex. 5, p. 60.)[5]

---

[4] Leyla testified that Kylie drafted many of the written submissions. Adrian testified that the package was a "collaborative effort" of Kylie, Leyla and the attorney.  All three individuals signed documents and declarations that appear in the visa package.  There was no dispute that it was circulated and approved by both parties before submission. (Leyla Tr. 100:13 – 103:17; Adrian Tr. 234:2 – 234:7; Pet. Ex. 5.)

[5] Adrian later denied any obligation to pay for four years of schooling. (Leyla Tr. 214:24 – 214:20.)

26.     Financial support is essential for F-1 visa holders, because federal law requires the students to study full time, and severely restricts their employment.  Each school has a designated official who is required to monitor the status of international students and report non-compliance to the U.S. Department of Homeland Security.  A report is made if a student works illegally, or fails to carry the required load of classes. A student will also be forced to leave the United States if she goes too long without paying tuition, because she will be blocked from enrolling in classes.  (Jessica Masi Tr. 40:6 – 42:16; 43:14 – 44:25; Pet. Ex. 6.)

27.     Adrian knew that Leyla had to remain in school, and had work limitations, when he agreed to become her sponsor. (Adrian Tr. 254:13 – 254:18; 255:3 – 255:8.)

28.     If the visa was granted, Leyla expected to travel to the United States in December, and begin classes in January.  Leyla and Adrian agreed that the children would travel to Maine first, and enroll in school while the visa application was pending.  Adrian came to Germany to pick up the children on August 6, 2024.  Leyla handed Adrian the children's passports, and gave him another written authorization for travel, which expired in December 2024. Leyla also gave him the children's registered German documents relating to health and education.  Adrian told Leyla he would return the passports and other documents when she arrived in December. (Leyla Tr. 113:3 – 119:11; 176:23 – 177:20.)[6]

29.     The children were sad about leaving Germany and the separation from their family and friends, and especially their mother.  Leyla and the children had frequent video contact during this period and Leyla observed their distress. (Leyla Tr. 119:12 – 120:5.)

---

[6] Adrian denied that they had a discussion about him returning the passports. (Adrian Tr. 259:23 – 260:3). Petitioner contends that her testimony should be credited over the Respondent's.

30.     Leyla's student visa application was completed September 30, 2024 and was granted on October 8, 2024. Leyla then followed her children to the United States on December 14, 2024.  (Leyla Tr. 120:6 – 120:20.) [7]

31.     Leyla maintained ties to Germany, including her bank account, insurance coverage, and bills she was continuing to pay. Leyla also held a German Driver's License and International Driver's License. (Leyla Tr. 111:5 – 113:2; Pet. Ex. 7, 8, 9.)

32.     Adrian and Kylie arranged for Leyla to move into a winter rental in Saco, close to their home.  Adrian promised Leyla she would have access to the children (and a key to the house) so she could see the children daily throughout the week.  The children were also able to stay at Leyla's apartment, which was about 5 minutes away.  (Leyla Tr. 120:23 – 121:22.)

33.     There were already signs of strain before Leyla started classes in January.   Leyla and Adrian argued over parenting time, nutrition and other matters affecting their children.  Their son Z.P. was experiencing emotional and behavioral problems after arriving the United States, which were still present in February 2025. (Leyla Tr. 122:21 – 123:10; 171:19 – 172:5; Adrian Tr. 261:16 – 262:23.)  He wanted to live primarily with his mother.  (Leyla Tr. 171:19 – 172:5.)

34.     Adrian cut the $500 weekly allowance as soon as Leyla arrived. He told Leyla he would pay it twice monthly, explaining that they would share meals together to reduce expenses. Leyla searched for work on campus that January, but found nothing available at that time. (Leyla Tr. 121:25 – 124:21.)

35.     Problems reached a head on February 7, 2025 during a meeting between Leyla, Adrian and Kylie.  Adrian and Kylie told Leyla she needed to find a job by mid-March and pay

---

[7] On Exhibit 5, the first page of the cover letter to Leyla contains a date in April, but that appears to be an error because the application itself is dated September 30, 2024.

half the rent, or she would have to share housing with roommates or other students. They suggested that Leyla work off campus, which would violate her visa. Crucially, when Leyla raised the sponsorship agreement, Adrian and Kylie stated that their sponsorship was voluntary and could be withdrawn by them. (Leyla Tr. 124:22 – 129:17; Adrian Tr. 251:19 – 252:1.)[8]

36.     Leyla realized the gravity of the situation and felt she had been tricked. She told Adrian she was going back to Germany with the children.  Adrian said she could leave, but the children would stay with him. (Leyla Tr. 198:18 – 131:14.)

37.     The following day, February 8, 2025, Leyla sent a text message to Adrian to demand return of the passports.  Adrian refused. (Leyla Tr. 131:14 – 135:24, Pet. Ex. 18.)

38.     On February 9, 2025, Leyla texted Adrian to again demand the return of the travel documents, reminding him of the custody agreements and visa. Leyla stated she wanted to leave with the children to go back to Germany "as soon as possible." (Leyla Tr. 135:25 – 137:21, Pet. Ex. 18, p. 17.)

39.     On, February 10, 2025, Adrian emailed Leyla and again told her he would not give her the passports. Leyla met with Adrian in person the same day, and repeated that she wanted to go home to Germany with the children. Adrian refused, and said he would keep the children with him in the United States. (Leyla Tr. 138:3 – 140:19; 141:2 – 143:19; Pet. Ex. 20.)

40.     On February 22, 2025, Leyla again texted Adrian that she wanted to go back to Germany with the children, noting that circumstances were not sustainable. In a telephone call on February 24, 2025, Adrian told Leyla he would prevail in any custody dispute because she had no resources.  (Leyla Tr. 144:23 – 145:24; 146:4 – 146:23; Pet. Ex. 21.)

---

[8] Adrian corroborated Leyla's testimony about his meeting. He denied suggesting she should work "under the table" but he admitted that there were suggestions she do work similar to people on J-1 work visas. (Adrian Tr. 259:8 – 259:22.)

41.     Leyla would have returned to Germany with the children immediately in February 2025 if Adrian had released the passports to her. (Leyla Tr. 137:16 – 137:21; 143:13 – 132:19; 171:6 – 171:21; Adrian Tr. 249:9 – 249:14; 249:19 – 250:13).

42.     Adrian withheld the passports in order to prevent Leyla from returning to Germany with the children. (Adrian Tr. 260:8 – 261:12.)

43.     In February 2025, the children had been in the United States only six months.  For most of that time, their mother was still in Germany.  Leyla attempted to return only eight weeks after arriving in the United States.  The children had completed one semester of schooling in the United States, after years of previous schooling in Germany.

44.     The children began seeing their U.S. doctor in June 2025. (Adrian Tr. 241:9 – 241:15; Resp. Ex. 115.)  The children began seeing their U.S. therapists in October 2025. (Resp. Ex. 123, p. 6, Ex. 129, p. 31.)  The children engaged in most of their sporting activities after February 2025, particularly the following summer and fall. (Adrian Tr.  240:16 – 240:25.) [9]

45.     Adrian's side of the family does not live in Maine. (Adrian Tr. 241:20 – 241:23; Leyla Tr. 79:17 – 79:24.).  Adrian told Leyla he hopes to eventually relocate back to Baltimore. (Leyla Tr. 161:23 – 162:1.)

46.     Leyla continued to protest that Adrian was violating his agreements relating to the visa and custody throughout the spring, summer and fall of 2025. (Leyla Tr. 151:8 – 152:11; 153:12 – 153:21; Adrian Tr. 249:18 – 250:13; Pet. Exs. 24, 25; 26, 28.) [10]  Leyla continued

---

[9] Adrian testified that the children started karate in "late 2024," but did not like it and then did football and soccer the following summer and fall of 2025.

[10] Adrian and Kylie also moved with the children to another residence in Old Orchard Beach without providing the address to Leyla. (Leyla Tr. 154:9 – 154:24.) Leyla's time with the children was also restricted by Adrian. (Leyla Tr. 155:10 – 156:2.)

attending classes after February 2025 because it was her only way to avoid deportation and separation from her children. (Leyla Tr. 149:6 – 151:7.)

47.     Unknown to Leyla, Adrian began preparing post-divorce litigation in July 2025. He registered the German divorce in the Biddeford District Court, and served Leyla with a motion to modify in October 2025. Adrian seeks primary residence of the children, decision-making authority and termination of child support. Adrian claimed that modification was necessary because of Leyla's threats to take the children back to Germany. (Adrian Tr. 250:22 – 251:4; Pet. Ex. 10, p. 3.) Leyla objected to the Motion. (Leyla Tr. 155:7 – 155:9; Pet. Ex. 11.)

48.     Adrian notified the landlord for Leyla's apartment in November 2025 that he would no longer pay her rent. Leyla began looking at options for shelter housing, until a friend's parents allowed her to stay at their condominium on a short-term basis for very modest rent. (Leyla Tr. 156:3 – 157:19; Pet. Ex. 29.)

49.     Adrian also stopped paying for school. (Adrian Tr. 231:9 – 231:13.) Leyla resumed classes a few weeks before this trial to maintain her visa, but she has no means to pay the bill. She will eventually lose the ability to stay enrolled and will have to return to Germany. (Leyla Tr. 157:24 – 159:3; 167:2 – 167:14.) [11]

50.     On December 4, 2025, Leyla filed a petition with the family court in Mannheim Germany to adjudicate the custody dispute. Adrian filed an objection, and both parties are represented by German counsel. The matter remains stayed while awaiting a decision from this Court. (Pet. Ex. 13; Hanke Tr. 20:7 – 21:3.) If the matter proceeds in Germany, the court will appoint a guardian ad litem and decide the custody dispute. (Pet. Ex. 14; Hanke T. 21:4 – 21:3.)

---

[11] Leyla only earns about $17 per hour for 13 hours a week or less. (168:13 – 168:17.) She gets food assistance from a local pantry. (Leyla Tr. 174:24 – 175:5.)

51.    Leyla filed this Petition on December 22, 2025.[12]

**ARGUMENT**

**I.    Elements of the Petitioner's Case, and Burdens of Proof.**

The primary sources of law for this Petition are The Convention on the Civil Aspects of International Child Abduction, done at the Hague on October 25, 1980[13] (hereinafter, the "Hague Convention" or "Convention") and the International Child Abduction Remedies Act, 22 U.S.C. §§ 9001 - 9011 (hereinafter, "ICARA").[14]

In this proceeding, the Court cannot decide matters of child custody. The Hague Convention only authorizes the District Court to decide whether to return the children to their country of habitual residence to make a final determination. "The Convention's return requirement is a 'provisional' remedy that fixes the forum for custody proceedings . . . . Upon the child's return, the custody adjudication will proceed in that forum." *Monasky v. Taglieri*, 589 U.S. 68, 72 (2020). The courts of the child's habitual residence must make the appropriate custodial and family law determinations. *Da Silva v. De Aredes*, 953 F.3d 67, 77 (1st Cir. 2020). "[*T*]he *overriding intent is 'to restore the pre-removal status quo* and to discourage a parent from engaging in international forum shopping.'" *Darín v. Olivero-Huffman*, 746 F.3d 1, 7 (1st Cir. 2014.) (*emphasis added*)

Under ICARA, the petitioner bears the burden of proving, by a preponderance of the evidence, "that the child has been wrongfully removed or retained within the meaning of the

---

[12] Leyla testified that if the petition was granted, she could go back to Germany immediately, where she will have housing and employment, and the children can attend school. (Leyla Tr. 159:15 – 161:5; 162:10 – 162:23.)

[13] T.I.A.S. No. 11,670 at 1, 22514 U.N.T.S. at 98, reprinted in 51 Fed. Reg. 10493 (1986).

[14] Formerly 42 U.S.C. §11601 *et. seq*.

Convention." 22 U.S.C. § 9003(e)(1)(a).  A retention is "wrongful" where the child was habitually resident in a foreign state immediately before the retention, the retention breached petitioner's rights of custody under the law of that state, and the petitioner was exercising those rights at the time of retention. Hague Convention Art. 3.  Accordingly, Leyla must show that (1) Germany was the children's habitual residence immediately prior to the retention; (2) she had German custody rights over the children at the time of the retention; and (3) she was exercising her custody rights. *See Darín*, 746 F.3d 1, 9.

Children who are wrongfully removed or retained within the meaning of the Hague Convention are to be returned promptly unless one of the "narrow" exceptions applies. *See* 22 U.S.C. § 9001(a)(4); *Kufner v. Kufner*, 519 F.3d 33, 38 (1st Cir. 2008).  The Respondent bears the burden of proof to establish any of his defenses. 22 U.S.C. § 9003(e)(2).

## II.    Adrian retained the children in the United States in February 2025.

The Court's first task is to determine the date of retention, because that date controls the habitual residence analysis.  To determine a child's habitual residence, the Court must examine the circumstances "immediately before" any breach of custody or access rights.  *See* Convention Arts. 3 and 4.  "[T]he text of the Convention directs courts to *only one point in time* in determining habitual residence: the point in time 'immediately before the removal or retention.'" *Falk v. Sinclair*, 692 F. Supp. 2d 147, 158 (D. Me. 2008) (*quoting Silverman v. Silverman*, 338 F.3d 886, 897 (8th Cir. 2003) and Convention Art. 3).

A key issue before this Court is whether the parties were bound by any fixed date for the children's return to Germany. For guidance, this Court might consider the official Explanatory Report to the Hague Convention, prepared by Professor Elisa Pérez-Vera. *See* 1980 Conférence de La Haye de droit international privé, Enlèvement d'enfants, E. Pérez-Vera, Explanatory

Report, in 3 Actes et Documents de la Quatorzième Session, pp. 425–473 (1982) (hereinafter, the "Pérez-Vera Report").[15]

With respect to wrongful retention, the Pérez-Vera Report explains:

> The fixing of the decisive date in cases of wrongful retention should be understood as that on which the child ought to have been returned to its custodians or on which the holder of the right of custody refused to agree to an extension of the child's stay in a place other than that of its habitual residence.

Pérez-Vera Report, p. 458. Courts in the United States have adopted this understanding, recognizing that wrongful retention may occur either when a child is not returned on the agreed-upon date or when a custodial parent refuses to consent to an extension of the child's stay abroad. *See, e.g., Demaj v. Sakaj*, No. 3:09 CV 255 (JGM), 2013 U.S. Dist. LEXIS 36725, at *28 (D. Conn. Mar. 18, 2013).

Adrian suggests that no wrongful retention ever occurred. Adrian relies chiefly on *Toren v. Toren*, 191 F.3d 23 (1st Cir. 1999), to suggest that retention cannot be wrongful before a fixed return date has passed. Adrian argues that retention could not be wrongful if Leyla had not completed her education in February 2025.

*Toren* is distinguishable because the parents were bound by a court-ordered date of return (July 21, 2000). *Toren*, 191 F.3d at 25. When the respondent manifested her intention to retain the children beyond the future return date, her "retention" was merely anticipatory. *See id.* at 28. Wrongful retention could only occur once the official return date *elapsed*. *See id*. The analysis in *Toren* depends entirely upon the existence of a clearly defined return deadline.

---

[15] The United States Supreme Court has recognized that "the Executive Branch considers the Perez-Vera Report the 'official history' for the Convention and a source of background on the meaning of the provisions of the Convention available to all States becoming parties to it." *Abbott v. Abbott*, 560 U.S. 1, 24 n.1 (2010) (internal citation omitted).

Here, by contrast, Leyla demonstrated that the children's stay in the United States was not subject to a fixed return date. Leyla's visa sets a maximum amount of time that Leyla is permitted to be in the United States (subject to conditions); but there was no minimal amount of time where Leyla was required to be in the United States. In fact, Adrian did not believe he was bound to any fixed timelines for his promises or support.[16]

When no return date is fixed, courts have held that the wrongful retention occurs when the petitioner "withdraws his or her consent to the child being retained away from the habitual residence." 4 Jeremy Morley, *The Hague Abduction Convention: Practical Issues and Procedures for Family Lawyers*, § 3.06.3 (2025). The Third Circuit addressed this issue in *Karkkainen v. Kovalchuk*, holding that where a parent permitted a child to travel to the United States without a specific return date, retention became wrongful on the date the petitioner had "unequivocally communicated her opposition to [the child's] presence in the United States." 445 F.3d 280, 290 (3d Cir. 2006). The Third Circuit later refined this principle in *Blackledge v. Blackledge*, holding "that the retention date is the date beyond which the noncustodial parent no longer consents to the child's continued habitation with the custodial parent and instead seeks to reassert custody rights, as clearly and unequivocally communicated through words, actions, or some combination thereof." 866 F.3d 169, 179 (3d Cir. 2017).

The District of Massachusetts articulated a slightly different formulation in *Zuker v. Andrews*, 2 F. Supp. 2d 134 (D. Mass. 1998). There, the petitioner withdrew his consent in July

---

[16] Adrian seems to want to hold Leyla to an "agreement" that he himself breached. He almost immediately reneged on his promise to provide her with a $500 weekly allowance, unilaterally trimming the amount. (Leyla Tr. 121:23 – 122:20.) Moreover, in early February 2025, Adrian began threatening to withdraw his commitments regarding housing and pressured Leyla to obtain employment, despite knowing that her opportunities were limited by her visa status. (Leyla Tr. 126:14 – 128:7; Masi Tr. 41:1 – 43:14; Adrian Tr. 254:10 – 255:12.)

1996 and requested the child's return. However, the court found that retention did not occur until February 1997, when the respondent clearly communicated her refusal to return the child by moving into her own apartment and thereby demonstrating that she would not return to the child's habitual residence. *Id*. at 140. Under *Zuker*, retention becomes wrongful when the petitioner unequivocally withdraws consent *and* the respondent clearly manifests an intent not to return the child.

Thus, under the Third Circuit's approach, retention is wrongful upon the petitioner's unequivocal withdrawal of consent and demand for return. Under the *Zuker* approach, retention is wrongful when that withdrawal is met with a clear refusal to return.

Wrongful retention occurred here under either formulation. Leyla consented to the children remaining in the United States only on certain conditions, including (1) that she attend college and (2) that Adrian provide financial assistance, the terms of which were reflected in the visa application materials and the parties' discussions. There was no agreed-upon, official date on which the children were required to return to Germany, and Leyla was always free to withdraw from school.

On February 7, 2025, Leyla told Adrian she wanted to take the children back to Germany, and Adrian refused. On, February 8, Leyla demanded that Adrian return the children's passports, and Adrian refused.  Under either the *Karkkainen*/*Blackledge* framework or the *Zuker* framework, wrongful retention occurred in early February 2025. Leyla's February 8th demand for the children's passports to return to Germany constitutes an "unequivocal communication" that she had withdrawn her consent for the children remaining in the United States. If the Court employs the *Karkainnen*/*Blackledge* approach, the analysis ends there: February 8th is the date of wrongful retention. If the Court employs the *Zuker* approach, the conclusion is the same.

17

Adrian's refusal to surrender the passports on February 8th clearly manifested his intent not to permit the children's return. Adrian's testimony confirmed that he withheld the passports to prevent their departure, and establishes February 8, 2025 as the date of retention.[17]

Finally, the Second Circuit has held that retention under the Convention "is a singular and not a continuing act." *Marks ex rel. S.M. v. Hochhauser*, 876 F.3d 416 (2d Cir. 2017). Accordingly, once Adrian wrongfully retained the children on February 8, 2025, the violation was complete as of that date. After the wrongful retention, "the parents' discussions about subsequent return dates will not create a new act of wrongful retention and will not toll the relevant date of wrongful retention or create a new date of wrongful retention." 4 Jeremy Morley, *The Hague Abduction Convention: Practical Issues and Procedures for Family Lawyers*, § 3.06 (2025) (citing *Swett v. Bowen*, 2024 WL 2034713 (S.D.N.Y. May 7, 2024). The Court must evaluate the children's habitual residence and Leyla's custody rights on the day of wrongful retention, February 8, 2025.

### III.     Germany was the children's habitual residence at the time of retention in February 2025.

To determine habitual residence, this Court must consider the totality of the circumstances specific to the case. *Monasky v. Taglieri*, 589 U.S. 68, 71 (2020). "The Hague Convention does not define the term "habitual residence." A child "resides" where she lives… Her residence in a particular country can be deemed 'habitual,' however, only when her residence there is *more than transitory*." *Id.* at 76 (emphasis added). "'Habitual' implies

---

[17] Alternatively, the Court could find that Leyla "unequivocally communicated" her intent to leave with the children on either February 7, 2025, or February 9, (Leyla Tr. 135:25 – 137:21, Pet. Ex. 18, p. 17), and Adrian clearly manifested his intent to not return the children by his email and statements on February 10th.  (Leyla Tr. 138:3 – 140:19; 141:2 – 143:19; Pet. Ex. 20.)

'[c]ustomary, usual, of the nature of a habit.'" *Id.* at 76 (*quoting* Black's Law Dictionary 640

(5th ed. 1979)).  The Supreme Court has rejected rigid formulas, and requires trial courts to

consider many factors and common sense in making the determination, as described below:

> Because locating a child's home is a fact-driven inquiry, courts must be *sensitive to the unique circumstances of the case and informed by common sense*. For older children capable of acclimating to their surroundings, courts have long recognized, facts indicating acclimatization will be highly relevant. Because children, especially those too young or otherwise unable to acclimate, depend on their parents as caregivers, the intentions and circumstances of caregiving parents are relevant considerations. *No single fact, however, is dispositive across all cases*. Common sense suggests that some cases will be straightforward: Where a child has lived in one place with her family indefinitely, that place is likely to be her habitual residence. But suppose, for instance, that an infant lived in a country only because a caregiving parent had been coerced into remaining there. Those circumstances should figure in the calculus.

*Monasky v. Taglieri*, 589 U.S. 68, 78 (2020) (internal citations omitted) (emphasis added).

The Supreme Court in *Monasky* resolved the attempts by Circuit Courts of Appeal to

give precedence to a child's acclimatization over shared parental intent (or vice-versa).  The

overall theme was that trial courts must examine the *totality* of the circumstances and make a

*common sense* determination of habitual residence considering the unique facts of each case. For

this reason, *Monasky* applied a deferential standard of review. *Monasky*, 589 U.S. 68, 84.

In this case, the Court should consider the children's *young ages* at the time of the

retention in February 2025.  At that time, N.P. was only 8 years old and Z.P. was only 4 years

old.  The young ages of these children increases the relevancy of the intentions of the parents.

The Court should also consider the children's *limited time* in the United States and *lack

of roots* at their current location. Prior to their travel on August 6, 2024, the children had only

spent brief periods of time in the United States, and none of those visits were to Maine.  N.P.

had lived in Georgia roughly 15 months from September 2017 to December 2018 while she was

1 and 2 years old.  Z.P. had never lived in the United States before.  Both children visited

Baltimore for about five weeks in the summer of 2023.

From the children's perspective, there was no history or attachment to Adrian's home in Old Orchard Beach, Maine or the surrounding community.  In fact, Adrian told Leyla he planned to eventually leave Maine and move back to Baltimore. Adrian's side of the family does not live in Maine.[18]  The place where the children had always lived closest to their extended family and friends was in Germany. The letters and photographs offered by Leyla confirm these close relationships.

Once the children arrived, they only had six months in Maine before the retention occurred.  However, for most of that time they still had *one foot in each country*. Their primary caretaker since birth, Leyla Powell, was still in Germany for most of the relevant period. This situation persisted for four out of the six months that elapsed prior to the retention in February 2025.  During that time, the children spoke with their mother in Germany regularly by phone and video.  They also demonstrated emotional distress at the separation. There can be no clearer evidence of the children's continued ties Germany than this relationship with their lifelong primary caretaker.  The retention occurred only *eight weeks* after their mother arrived.

At the time of retention, the children had completed only one semester of school in Maine, and had barely started a second semester.  This stands in contrast to the lengthy education they had already obtained *in Germany*.  N.P. had five years of school in Germany as of the time of retention. Z.P. had three years of school in Germany as of the time of retention.

The children's first language is German. Their proficiency in English is not indicative of habitual residence in the United States, because they learned their English *in Germany*.

---

[18] Adrian testified that his wife Kylie had family in Maine. They were engaged when the children arrived and married sometime after (honeymooning after Leyla arrived).

The children retained other connections to their home in Germany. When the children arrived, they traveled on their German passports (and they had no U.S. passports). Leyla had given Adrian the passports to travel, and he had agreed to return them when Leyla arrived in the United States. Furthermore, Leyla had given an authorization to Adrian to travel with the children which *expired in December 2024*. These facts demonstrate that the children's habitual residence continued to be in Germany, and their stay in the United States was temporary.

The divorce and custody documents from Germany are also evidence of habitual residence in Germany. The custody power of attorney from 2021 had delegated rights of decision making (including residence) to Leyla, further confirming her status as primary caretaker. The divorce agreement from 2023 also recognized that the children had their permanent residence with Leyla. The divorce agreement was referenced in the divorce judgment finalized in May 2024. That judgment entered only three months before the children arrived in August 2024, and only nine months before the retention in February 2025. There were no custody proceedings underway in the United States at the time of retention.

The children's mother also retained ties to Germany. She is a German citizen, and still has her German driver's license, bank accounts in Germany, creditor relations in Germany, and an insurance policy in Germany. Like many typical college students, Leyla had not abandoned her true "home" in Germany.

At trial, Adrian offered evidence of the children's connections to the United States, but most of his evidence involved post-retention events. The children's primary care physician began treating them in June 2025, four months after the retention. The children were enrolled with therapists in October 2025, about eight months after retention. Most of the children's sporting activities began after retention in February 2025.

21

Perhaps the most critical piece of evidence was Leyla's visa application. (Pet. Ex. 5). Both parties represented in this application that *the children would return to Germany* with Leyla when she completed her schooling.  Leyla also had to demonstrate her continued ties to Germany by attaching evidence of her finances and family relations. Leyla had to sign an acknowledgement that her stay in the United States was temporary.  Adrian adopted all of these representations as part of the "collaborative effort" in preparing the application for Leyla's visa.

Adrian even wrote in his declaration that the children would be returned to Germany if the visa was not granted.  In fact, Adrian was promising to return N.P. after the completion of her *following* semester (which was even later than the February retention date). This written declaration serves as an admission by Adrian that Germany remained the country of the children's habitual residence in February 2025.

The immigration status of a parent is relevant to the habitual residence analysis. *See Monasky*, 589 U.S. at 78 n. 3.  In this case, Leyla had no ability to remain in the United States on a permanent basis, *and both parents knew this*.  Leyla was here to study and had no ability to support herself by working. It would have been impossible for Leyla to put down roots when Adrian could unilaterally withdraw support and force her to leave the country.[19]

As *Monasky* states, each case will be unique. However, it is helpful to consider other recent cases where habitual residence was hotly contested. For example, the District of Massachusetts recently decided that children were habitually resident in Canada, even though the family spent 20 months in the United States, and one child was in preschool. *See Giguere v. Tardif*, 2025 U.S. Dist. LEXIS 165575, *36 (D. Mass, Aug. 26, 2025, *appeal filed* No. 25 –

---

[19] The events after retention only confirm that Leyla's stay in the United States was transitory. Adrian controlled Leyla's housing and ultimately forced her to leave her apartment in January.  She is now faced with a loss of visa status due to her inability to remain in school.

1831). The case involved detailed discussion of the parties' immigration status and intent. *Id*.

In *Argueta v. Argueta-Ugalde*, 2023 U.S. App. LEXIS 18632, *10-11 (6th Cir. July 20, 2023) four months of schooling in the United States was not sufficient to establish habitual residence. The Court noted as follows:

> The district court then determined that the four months that M.A. spent in the United States were not sufficient to "overcome the overwhelming evidence suggesting that Brazil remained M.A.'s habitual residence." … The district court noted that, although there was some evidence that M.A. had developed meaningful connections with her classmates, there was no evidence these connections were more meaningful than those she had developed in either Mexico or China, and M.A. had spent less time in the United States than she had in either of those two countries. *Id*.

In *Horacius v. Richard*, 2024 U.S. App. LEXIS 18819, *2 (11th Cir. July 30, 2024) a child was in the United States for a year and attended school, but other evidence established that the habitual residence was Canada.

These cases just show how the Court must take into account a multitude of factors. In our case, the totality of these circumstances demonstrate that Germany remained the children's country of habitual residence in February 2025.

## IV.    **Leyla had custody rights over the children and was exercising her rights at the time of retention.**

Leyla had child custody rights under German law, and she was exercising those rights at the time of retention. Dr. Andreas Hanke explained that German Civil Code §1626 includes the right to determine the residence of the children, and this law has formed the basis for returning children to Germany under the Hague Convention.[20]

---

[20] Dr. Hanke's testimony is corroborated by other reported cases. *See, e.g. Kufner v. Kufner*, 519 F.3d 33, 39-40 (1st Cir. 2008) (citing German joint custody law in ordering return of children); *Friedrich v. Friedrich*, 78 F.3d 1060, 1064 (6th Cir. 1996) (citing German Civil Code §1626 in affirming return).

Dr. Hanke also explained that the custody power of attorney from 2021 was a delegation of Adrian's joint custody rights, so they could be exercised by Leyla.   This fact reinforces the argument that Adrian had no right to unilaterally retain the children in the United States when Leyla attempted to return.  Article 3 of the Hague Convention states that custody rights "may arise in particular by operation of law or by reason of a judicial or administrative decision, or by *reason of an agreement having legal effect* under the law of the State."  Hague Convention, Art. 3

Article 3 of the Hague Convention makes it clear that Leyla does not actually have to prove that she has *superior* rights of custody.   Article 3 describes wrongful retention as a breach of custody rights held either "jointly or alone." *Id.*  For example, Dr. Hanke testified that it would be a violation of German law for one parent to retain the child outside of the country without consent of the other joint custody holder.

Dr. Hanke's testimony, together with his affidavit and text of German law, is more than sufficient to establish Leyla's custody rights.  *See, e.g.*, Fed. R Civ. P. 44.1 ("…In determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence…").  *See also*, *Whallon v. Lynn*, 230 F.3d 450, 458 (1st Cir. 2000) (affidavits may establish rights of custody). Adrian did not controvert the evidence of foreign law provided by the Petitioner.

Finally, the parties do not dispute that Leyla was exercising her rights of custody in February 2025. [21]

### V.    Adrian cannot prove any of the narrowly construed defenses under the Hague Convention.

---

[21] *See* Respondent's Pre-Trial Brief, Doc. 29, p. 8.   The exercise of custody is a low bar, and a petitioner only fails to meet that burden when she essentially abandons a child.  *Falk v. Sinclair*, 692 F.Supp.2d. 147, 157-58 (D. Me. 2010).

Adrian may argue the affirmative defenses of consent or acquiescence. "The consent defense involves the petitioner's conduct prior to the contested removal or retention, while acquiescence addresses whether the petitioner subsequently agreed to or accepted the removal or retention." *Baxter v. Baxter*, 423 F.3d 363, 371 (3d Cir. 2005). The affirmative defenses are narrowly construed. *See Da Silva v. Da Silva*, 141 F.4th 355, 358 (1st Cir. 2025). In this trial, Adrian did not meet his burden on either defense.

The First Circuit has held that "[c]onsent may be evinced by the petitioner's statements or conduct, which can be rather informal. What the petitioner actually contemplated and agreed to, as well as the nature and scope of the petitioner's consent -- including any conditions or limitations -- should be taken into account." *Darín v. Olivero-Huffman*, 746 F.3d 1, 15 (1st Cir. 2014) (internal citations omitted).

Adrian did not prove that Leyla consented to permanent retention of the children in the United States. This Court should take into account what Leyla "actually contemplated and agreed to," which was outlined in her F-1 Student Visa application. (Pet. Ex. 5.) Those documents were prepared as a collaborative effort that included Adrian and his wife. The documents include specific assurances that Adrian would provide financial support to Leyla. Leyla did not consent to sending her children to the United States without support and housing for herself. When Adrian reneged on those commitments, the children's continued stay in the United States extended beyond the limited and conditional consent Leyla had given.

The evidence at trial also did not support an acquiescence defense, which depends on post-retention events. "Acquiescence tends to require more formality than consent -- e.g., testimony in a judicial proceeding, a convincing written renunciation of rights, or a consistent attitude over a significant period of time." *Darín v. Olivero-Huffman*, 746 F.3d 1, 16 (1st Cir.

2014).  The evidence in this case showed that Leyla repeatedly asserted her rights, telling Adrian he had no right to retain the passports, and the children were supposed to go back with her to Germany.  In fact, Adrian's sworn statements show the *opposite* of acquiescence by Leyla. Adrian filed a motion asking the Biddeford District Court to grant him custody, based on Leyla's threats *to take the children back to Germany*.

None of the other recognized defenses are applicable.[22]

## VI.    **Respondent's counterclaim must be denied, and the Court must award attorneys fees, costs and travel expenses to the Petitioner under ICARA.**

If the Court grants the Petition, Leyla requests leave to submit her claim for attorney's fees, costs and expenses of travel pursuant to ICARA §9007.  ICARA §9007 mandates that the Court will award such fees and costs to the prevailing Petitioner unless the Respondent establishes that the award is clearly inappropriate.

Notably, Adrian has filed a counterclaim against Leyla, seeking an award of his own attorney's fees and costs.[23]  However, Respondent's counterclaim runs contrary to *Mata-Cabello v. Thula*, 67 F.4th 5, 8 (1st Cir. 2023) and the underlying trial court decision *Mata-Cabello v. Thula*, 2021 U.S. Dist. LEXIS 136685, *10-11 (D. P. R. June 8, 2021) . In that case, the District Court denied a motion for attorney's fees and costs requested by a prevailing *respondent* in a Hague Convention petition.  The First Circuit quoted the trial court's decision as follows: "Respondent is not entitled to an award of fees under ICARA, because [§9007], provides for fees

---

[22] Respondent raised the "mature child" defense in his answer and a pre-trial Motion. However, that claim was withdrawn before trial and N.P. did not testify.  The Respondent's grave risk of harm defense is not before the Court, because it was tied to the "mature child" defense (and the possibility of separating the children).  The "well-settled child" defense does not apply because Petitioner commenced this action less than a year after the retention.

[23] Petitioner contends that the counterclaim does not state a cause of action but is a request for relief.

only to a prevailing petitioner; the section does not provide for fees to a prevailing respondent, and indeed, does not even mention prevailing respondents" *Mata-Cabello.* 67 F.4th at 8. While a successful Petitioner is allowed to recover fees under 22 U.S.C. §9007, there is no similar right to recovery from a successful Respondent. [24] This Court should therefore enter judgment in favor of the Petitioner on the counterclaim of Adrian Maurice Powell Jr.

### VII.    Requests for Relief and Proposed Orders

Petitioner requests that the Court issue an order that provides as follows:

1.      Petitioner may immediately retrieve the passports from this Court;

2.      Petitioner may immediately retrieve custody of the children from their Father;

3.      Respondent shall immediately return to Petitioner any other travel documents, educational or medical records that were provided by Petitioner or are otherwise necessary for government or educational purposes for the children in Germany;

4.      Petitioner may immediately travel back to Germany with the children;

5.      Proceedings in Biddeford District Court shall remain stayed pending an order from a court of competent jurisdiction in Germany; and

6.      Petitioner may submit a motion for award of fees and costs within 14 days. Respondent may file any response within 14 days and Petitioner may reply within 7 days.

*See, e.g., Charalambous v. Charalambous*, 2010 U.S. Dist. LEXIS 109101, *37 (D. Me., Oct. 12, 2010); *Giguere v. Tardif*, 2025 U.S. Dist. LEXIS 165575, *47 (D. Mass,. Aug. 26, 2025).

---

[24] This is not a case where fees could be assessed based on vexatious litigation or bad faith. *Mata-Cabello.* 67 F.4th 5, 11 (1st Cir. 2023).

Petitioner further requests that the Court direct the U.S. Marshals Service to assist in the execution of the order. *See, e.g.*, *Nelson v. Petterle*, 782 F. Supp. 2d 108, 1095 (E.D. Cal. 2011).

## CONCLUSION

Leyla has met her burden under the Hague Convention and ICARA by a preponderance of the evidence. First, the children were wrongfully retained on February 8, 2025, when Adrian refused to return their passports and expressly prevented their return to Germany. As of that date, Germany was the children's habitual residence, where they spent most of their lives. Adrian's evidence of post-retention events does not change the analysis. Further, Leyla possessed rights of custody under German law, and she was exercising those rights at the time of retention. Adrian failed to establish any of the Convention's narrowly construed defenses.

The purpose of the Convention is to restore the pre-retention status quo and to deter unilateral forum shopping. Allowing this retention to stand would undermine that purpose. The appropriate remedy is not a custody determination in Maine, but a prompt return of the children to Germany so that the courts of their habitual residence may resolve any custody disputes.

WHEREFORE, Petitioner prays that this Honorable Court will grant her Petition, order return of the children to Germany, award her reasonable attorneys fees, costs and expenses of travel, and grant such further relief as this Court deems just and appropriate.

Dated this    18th  day of February, 2026.


_/s/ Bradley C. Morin_
Bradley C. Morin, Bar No. 004268

_/s/ Joshua B. Narey_
Joshua B. Narey, Bar No. 11451

Attorneys for Petitioner
**BOURQUE CLEGG**
**CAUSEY & MORIN LLC**
P.O. Box 1068
949 Main St.
Sanford ME 04073
Tel. 207-324-4422
Fax 207-324-9556
bmorin@bourqueclegg.com


CERTIFICATE OF SERVICE

I hereby certify that on this date I electronically filed this Post-Trial Brief on behalf of Petitioner, Sarah Leyla Powell, through the ECF system and the same will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) as follows:

KATELYN D. SKINNER          kds@buckley-law.com
KATRINA ANNE SEIPEL         kas@buckley-law.com
NICOLE A. MILAM             nicole@milamcollective.com

Dated this    18th day of February, 2026.

_/s/ Bradley C. Morin_
Bradley C. Morin, Bar No. 004268
Attorney for Petitioner