## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| **SARAH LEYLA POWELL** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **Civil Case No. 2:25-cv-00641-JAW** |
| | ) | |
| **ADRIAN MAURICE POWELL JR.,** | ) | |
| | ) | |
| **Respondent.** | ) | |

### PETITIONER'S REPLY TO RESPONDENT'S POST-TRIAL BRIEF

NOW COMES the Petitioner, Sarah Leyla Powell, and replies to Respondent's Post-Trial Brief as follows:

### DATE OF WRONGFUL RETENTON

Adrian contends that "[t]here cannot have been a wrongful retention on February 8, 2025, because the parties agreed that the children would reside in the United States until [Leyla] completed her 'Bachelor's degree program and any authorized practical training [she] is authorized for." (Resp. Brief 2-3 (*quoting* Pet. Ex. 5, page 15, ¶19)). The evidence, however, establishes that this was not the parties' full agreement. Leyla's and the children's presence in the United States was expressly conditioned on Adrian providing the financial support he promised in the F-1 visa application and declaration of finances.

Adrian implies that Leyla experienced mere "post hoc" regret, like the petitioner in *In re Kim,* 404 F. Supp 2d 495 (S.D.N.Y. 2005) (Resp. Brief 4-5.[1])  That comparison is misplaced. In *In Re Kim*, the petitioner's consent for the child to remain in New York was subject to a single condition precedent: that the respondent be accepted to Columbia Law School. *In Re Kim*, 404 F. Supp 2d at 516-17. Once the condition was satisfied, there were no further limitations to the petitioner's consent. *Id*. at 517. The petitioner's subsequent "change of heart" could not revoke valid, unconditional consent, and the retention was therefore not wrongful. *Id*. at 519-21.

In this case, Leyla's consent was different. Adrian correctly identifies that approval of Leyla's F-1 visa was a condition precedent to the children's stay in the United States. (Resp. Brief 4-5.) However, once that condition precedent was satisfied, Leyla's consent was not without limitation. Leyla's consent to the children's temporary relocation to Maine was conditioned on her status as a student *and* Adrian's financial support.

This case more closely resembles *Morales v. Restrepo*, 2025 U.S. Dist. LEXIS 59036 (E.D.N.Y. Mar. 28, 2025), than *In re Kim*. In *Morales*, a petitioner's consent to his child moving to the United States from Colombia was subject to specific limitations and conditions, including that the respondent and child live in Florida and that the child travel back to Colombia in May of 2024. *Morales*, 2025 U.S. Dist. LEXIS at *35. The court found that the "petitioner's consent was limited in time and geography" and held that wrongful retention occurred when those conditions were not satisfied and the petitioner demanded return of the children. *Id* at *24, *35.

Similarly, Leyla's limited consent was dependent on multiple conditions set forth in the F-1 student visa documents. Adrian himself acknowledges that "[t]he F-1 visa application

---

[1] Adrian cites a Sixth Circuit decision, *Simcox v. Simcox*, 511 F.3d 594 (6th Cir. 2007), to support his assertion that there was no wrongful retention. (Resp. Brief 3.) However, the facts he describes do not derive from *Simcox*; rather, they appear to reference a district court decision, *Choi v. Kim (In re Kim)*, 404 F. Supp 2d 495 (S.D.N.Y. 2005), which he cites later in his brief. (Resp. Brief 4-5.)

paperwork is rife with the specific description of the parties' joint intent." (Resp. Brief 3.) That paperwork reflects a mutual understanding of reciprocal obligations with respect to the children's temporary relocation to Maine.

Yet after Leyla and the children arrived in the United States, Adrian disavowed those obligations. (Leyla Tr. 129:8 – 129:17.)  He immediately reduced the number of payments that he promised, which Leyla relied on for daily necessities for herself and her children. (Leyla Tr. 121:23 – 122:20.)  He now seeks to hold Leyla to an alleged duty to remain enrolled in school despite his failure to provide the financial support that made such enrollment (and her visa) possible in the first place.  Leyla attempted to go back to Germany with her children in February 2025 when she learned that Adrian did not consider himself bound to the promises he made to her, testifying that "[e]verything was a lie." (Leyla Tr. 143:13 – 143:19.)

Additionally, Adrian correctly notes that Leyla's post-retention efforts to subsist and avoid separation from her children are "not relevant to the Court's analysis of whether the children were wrongfully retained on February 8, 2025." (Resp. Brief 4.)  Adrian does not provide any reason as to why the Court should consider the irrelevant facts.[2] The presentation of these facts is particularly incongruous given Adrian's assertion that "[t]he retention of a child for the purposes of the Convention is a singular and not a continuing act." (Resp. Brief. 2 (citing *Marks ex rel SM v. Hochhauser*, 876 F.3d 416 (2d Cir. 2017))).

---

[2] Further, Adrian omits several facts, including that Leyla relies on food from a church food pantry. (Leyla Tr. 118:24 – 119:11.)  Leyla's subsequent financial struggles are only relevant for the purpose of showing that her fears on February 8, 2025 *were grounded in reality*. Adrian's financial support was absolutely critical to her ability to remain in the United States.

## HABITUAL RESIDENCE

Adrian relies far too much upon *post-retention* events to support his claim that the children's habitual residence was the United States.  The children's relationships with their doctor and counselors developed after the retention in February 2025. (Adrian Tr. 241:9 – 241:15; Resp. Exs. 115, 123 p. 6, 129 p. 31.)  Adrian also notes that the children participated in karate, soccer, football and basketball.  With the exception of karate lessons starting in late 2024, all of those sporting activities took place after February 2025. (Adrian Tr. 240:16 – 240:24.).

Adrian also asks the Court to consider that N.P. completed third grade, and is in the middle of fourth grade. However, N.P. was only halfway through third grade when the retention occurred in February 2025.  Z.P. was only halfway through pre-kindergarten when the retention occurred.  By contrast, the children were educated in Germany for 5 years and 3 years, respectively.  The report cards presented by Adrian describe only a small snippet of the children's pre-retention education, because almost all of their education had taken place in Germany.  In fact, Adrian has a package of the children's German education records, which he has refused to return to Leyla. (Leyla Tr. 117:18 – 118:7.)[3]

Adrian notes that the children have friends in the United States. However, the children only had six months to make friends in Maine, after years of close friendships and family in Germany.[4]  Leyla described a close-knit community, which the children were sad to leave. The friendships that these two children formed in a period of six months (while only 4 and 8 years old) are not more significant than the relationships forged over years in Germany.

---

[3] Adrian's argument on habitual residence also emphasized the children speaking English. However, the children learned English while in Germany, so that fact does not demonstrate habitual residence in the United States.

[4] Furthermore, the evidence offered by Adrian was filled with information about post-retention events. The references to "summer barbecues" and sporting activities are examples.

It is obvious that there are many family members on both sides of this dispute who want to see these children live with one parent versus the other.  However, the letters offered by Adrian are not helpful in establishing that the children's habitual residence changed, especially considering that the children have been wrongfully retained in the United States for more than a year now. The letters contain many generalized statements of how the authors believe the children are doing well and adjusting, which includes post-retention events.  Several of those authors also had limited opportunities to visit with the children, because they came on holidays or vacations from Maryland.  (Adrian Tr. 241:20 – 243:15.)  The place where the children lived the longest, with the most contact with extended family, was *in Germany*.  Leyla's family members have close relationships with the children, which were never lost.  (Leyla Tr. 159:18 – 160:3; Pet. Exs. 16, 35.)[5]  In fact, their family will help support Leyla and the children if the Court grants the petition to return. (*Id*.)

The children have a home in Germany. They have a family home in Schwetzingen and Leyla intends to return to Mannheim.  (Leyla Tr. 159:18 – 160:3.)  The fact that Leyla quit her job and ended her lease in Germany does not change habitual residence. She had to give those things up if she was going to study in the United States.

In February 2025, Germany was the place where the children were still "at home." The parties recognized this fact in the visa submission of September 30, 2024.  That shared intent had not changed when Leyla attempted to return only eight weeks after her arrival.

Adrian relies upon *Jenkins v. Jenkins*, 569 F.3d 549 (6th Cir. 2009) to argue that the Court should consider acclimatization of N.P. and Z.P.  *Jenkins* was decided before *Monasky*, when Sixth Circuit precedent required focus on the child, not the parents or their intentions. 569 F.3d at

---

[5] Leyla noted that her grandparents call frequently. (Leyla Tr. 159:18 – 160:3.)

556.  Adrian also relies upon *Karkainen v. Kovalchuk*, 445 F.3d 280 (3d Cir. 2006). This case was also decided before *Monasky*, but even more notably, it involved a mature 11-year-old child who had been permitted by her parents to decide where she would live. *Karkainen*, 445 F.3d at 294.  Adrian also cites *Feder v. Evans-Feder*, 63 F.3d 217 (3d Cir. 1995) which involved a couple moving to Australia together, *buying and renovating a home* and enrolling their child in preschool.

Adrian also cites *Goldstein v. Simon*, 2024 U.S. App. LEXIS 24300 (11th Cir. Sept. 25, 2024). That case involved a family who previously led a transitory lifestyle, which buttressed the conclusion that they had acquired habitual residence in Florida. *Goldstein*, 2024 U.S. App. LEXIS 24300, *8.  The decision was also based on witness credibility. *Id* at *8.

There are other cases where similar amounts of time did not result in the acquisition of habitual residence in the United States.  In *Argueta v. Argueta-Ugalde*, 2023 U.S. App. LEXIS 18632  (6th Cir. July 20, 2023) the child was present in the United States for four months, enrolled in school and made friendships here. *Id*. at *10-11. That Sixth Circuit noted that *Monasky* still allowed district courts to consider parental intent, and could weigh those factors along with acclimatization. *Id* .at 8.

*Horacius v. Richard*, 2024 U.S. App. LEXIS 18819, *2 (11th Cir. July 30, 2024) involved an even longer period of time – one year, which still resulted in the child's return.

*Giguere v. Tardif*, 2025 U.S. Dist. LEXIS 165575, *36 (D. Mass, Aug. 26, 2025, *appeal filed* No. 25 –1831) is a case where the parents were in the United States for a very lengthy period of time, over 1 ½ years. At the time of the retention, the parties purchased a home and the older child was in daycare and about to enter preschool. *Id*. at *20.  [Petitioner needs to correct an incorrect statement in Petitioner's Brief relating to the *Giguere* case, which said the child was

6

already in the preschool. (Pet. Brief p. 22)]. This family moved on a trial basis, and immigration status was an issue. *Id*. at *40, 44.

An applicable case on parental intent is the pre-*Monasky* decision *Darín v. Olivero-Huffman*, 746 F.3d 1 (1st Circ. 2014). The case involves several facts similar to the instant case. The child was born and raised in Argentina with family ties in that country. 747 F.3d at 13. The father was from Argentina, the mother was from the United States, and the child was a dual citizen. *Id*. at 5. The parents came to the United States and the mother chose to remain, while the father was forced to leave due to visa status. *Id*. at 10. The retention occurred months before the father's departure when the mother announced her plans. *Id*. at 10. At that point the habitual residence was Argentina. *Id*. at 13. The mother's own intention was not sufficient to change the child's habitual residence. *Id*.

There are many distinguishing factors for this case. One of them is Leyla's presence in Germany for the first four months after the children arrived. The children remained in frequent contact with their mother, and they were distressed by the separation. This fundamental connection between the children and their home country far outweighed any new friendships or other relations they acquired during their few months in the United States. The children could not have established habitual residence in the United States by December 2024, and they certainly could not have established it during the eight-week period after their mother arrived.

In the end, a comparison of cases is not going to be dispositive for the Court. As *Monasky* observes, each case is unique. That is why the Court must make a common-sense determination, taking into account all of the circumstances.[6] It simply does not make sense that Leyla's visa sponsor could bring her and the children to the United States with promises of support, and then

---

[6] *Monasky's* "coercion" scenario is a good example of the Court can consider every relevant circumstance. 589 U.S. at 78.

prevent them from leaving a mere eight weeks after their mother discovered the support was withdrawn.

## RIGHTS OF CUSTODY

Adrian argues that there can be no finding of a wrongful retention because Leyla did not prove that her rights of custody were breached. (Resp. Brief 10.) It is not clear on what authority Adrian is basing this claim. Under the Hague Convention, rights of custody "include rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence." Hague Convention Art. 5.  Rights of custody "may arise in particular by operation of law or by reason of a judicial or administrative decision, or by reason of an agreement having legal effect under the law of that State." Hague Convention Art. 3. The Pérez-Vera Report states that "the law of the child's habitual residence is invoked in the widest possible sense," and that the Convention favors "a flexible interpretation of the terms used, which allows the greatest possible number of cases to be brought into consideration." Pérez-Vera Report, 446.[7] The First Circuit restated this exact language in *Whallon v. Lynn*, 230 F.3d 450, 455 (1st Cir. 2000).

The parties agree that at the least, Leyla had joint custody rights over the children. (Resp. Brief 10.)  These rights arose by operation of law and include the right to determine the child's residence. (Hanke Tr. 13:15 – 14:5.)  Adrian also signed a custody power of attorney in 2021. Pet. Ex. 2.  By executing this document, Adrian delegated his right to exercise joint custody to Leyla, including the right to determine residence of the children. (Hanke Tr. 15:24 – 16:7.) Adrian had not revoked the document on or before February 8, 2025. (Leyla Tr. 92:4 – 92:12.)

---

[7] 1980 Conférence de La Haye de droit international privé, Enlèvement d'enfants, E. Pérez-Vera, Explanatory Report, in 3 Actes et Documents de la Quatorzième Session, 446 (1982).

The Hague Convention provides that retention is wrongful where it is in breach of a petitioner's custody rights under the state of the child's habitual residence, and "at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention." Hague Convention Art. 3. Here, Leyla would have exercised her right to determine the children's residence but for Adrian withholding the children's passports.[8] Further, Dr. Hanke testified that retention of a child outside the country of his habitual residence, without a joint custody holder's consent, would violate German law. It would also violate the delegation of rights in the power of attorney. (Hanke Tr. 19:19 – 20:6.)

Adrian's position would render the Hague Convention largely ineffective in any case involving joint custody.  Taken to its logical conclusion, Adrian's argument would mean that a parent with joint custody could unilaterally retain a child outside the country of habitual residence and then insulate that action from review simply by invoking the other parent's lack of "sole" authority. That is not the law.

Nor may Adrian rely on that theory here. He cannot induce Leyla's and the children's temporary relocation to the United States through assurances of financial support, then withdraw that support and invoke joint custody as a shield against a finding of wrongful retention. This Court cannot allow a parent to manufacture the very circumstances that frustrate the other parent's custodial rights, and then claim those rights were never breached.

---

[8] The power of attorney also provides that it "in particular authori[z]es [Leyla] to make all legal acts and declarations for the application and issuance of identity papers for [the] children on her own." Pet. Ex. 2, page 3, §1. Accordingly, it is likely that the act of withholding the passports, viewed even in isolation, was a violation of Leyla's rights of custody under German law.

**CONCLUSION**

Leyla met her burden at trial, and Adrian's arguments fail.  The evidence demonstrates that Leyla's consent to the children's stay in the United States was limited and conditional, and that those conditions were not met. When Adrian refused to permit the children's return after disavowing his financial obligations and withholding their passports, the retention became wrongful as of February 8, 2025.

Germany was the children's habitual residence at that time, and Leyla possessed and was exercising rights of custody under German law, including the right to determine their place of residence. Adrian's reliance on post-retention events does not alter that analysis.

Accordingly, the Court should grant the Petition for return under the Hague Convention.

WHEREFORE, Petitioner prays that this Honorable Court will grant her Petition, order return of the children to Germany, award her reasonable attorneys fees, costs and expenses of travel, and grant such further relief as this Court deems just and appropriate.

Dated this    20th  day of February, 2026.


*/s/ Bradley C. Morin*
Bradley C. Morin, Bar No. 004268

*/s/ Joshua B. Narey*
Joshua B. Narey, Bar No. 11451

Attorneys for Petitioner
**BOURQUE CLEGG**
**CAUSEY & MORIN LLC**
P.O. Box 1068
949 Main St.
Sanford ME 04073
Tel. 207-324-4422
Fax 207-324-9556
bmorin@bourqueclegg.com

CERTIFICATE OF SERVICE

I hereby certify that on this date I electronically filed this Reply Brief on behalf of Petitioner, Sarah Leyla Powell, through the ECF system and the same will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) as follows:

KATELYN D. SKINNER   kds@buckley-law.com
KATRINA ANNE SEIPEL   kas@buckley-law.com
NICOLE A. MILAM    nicole@milamcollective.com

Dated this 20th day of February, 2026.

       */s/ Bradley C. Morin*
       Bradley C. Morin, Bar No. 004268
       Attorney for Petitioner