UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

SARAH LEYLA POWELL,               )
                                  )
        Petitioner,               )
                                  )
    v.                            )          No. 2:25-cv-00641-JAW
                                  )
ADRIAN MAURICE POWELL JR.,        )
                                  )
        Respondent.               )

**FNDINGS OF FACT AND CONCLUSIONS OF LAW**

In this international custody dispute over two minor children under the Hague Convention, a mother petitions this court for an order allowing her to return to Germany with her two children and for enforcement of the custody order of a German court. Following the framework under federal and international law, the court concludes that children's habitual residence is Germany, no exception applies, and that Germany is the most appropriate forum to adjudicate the custody dispute. Accordingly, the court grants the mother's petition and orders the children to return to Germany.

## I.   PROCEDURAL HISTORY

This action was initiated pursuant to the Hague Convention on the Civil Aspects of Child Abduction (Hague Convention or Convention), Oct. 25, 1980, T.I.A.S. No. 11,670, 1343 U.N.T.S. 89, reprinted in 51 Fed. Reg. 10,494 (Mar. 26, 1986), as implemented by the International Child Abduction Remedies Act (ICARA), 22 U.S.C. §§ 9001-9011 (formerly 42 U.S.C. §§ 11601 *et seq.*). *Verified Pet. for Return of Children to Germany and for Issuance of Show Cause Order* (ECF No. 1) (*Pet.*).

On December 22, 2025 Petitioner Sarah Leyla Powell filed her verified petition pursuant to the Hague Convention directing the return of her two minor children (the children), N.P. and Z.P. to Germany, *Pet.*, along with her motion for expedited consideration of the petition and the issuance of an order to show cause against the Respondent, Adrian Maurice Powell Jr.  *See Mot. for Expedited Consideration of Verified Pet. for Return of Children to Germany and Issuance of Show Cause Order* (ECF No. 3).  The Petitioner alleges that the Respondent unlawfully kept the children in the United States.  *Pet.* ¶ 52.  On December 23, 2025, the Court issued a temporary restraining order, preventing the Respondent from removing the children from the Court's jurisdiction and directing the Respondent to relinquish the children's passports.  *TRO* (ECF No. 5).[1]

The Court held a telephonic conference of counsel on this matter on January 9, 2026 at 3:30 p.m. EST.  *Min. Entry* (ECF No. 14), and scheduled an expedited evidentiary hearing for January 22-23, 2026 in federal court in Portland, Maine.  *Id.* Following the telephone conference, the Court issued a report of conference and scheduling order outlining deadlines for the evidentiary hearing on the verified petition, staying any state court proceedings, and directing the parties to notify the state court that its proceedings have been stayed.  *Report of Conf. and Scheduling Order* (ECF No. 16).

---

[1]     The Court takes judicial notice of the fact that on January 21, 2026, the Respondent complied with this order and the children's passports are now retained by the Clerk of Court.  *Receipt for Surrender of Passports* (ECF No. 48).

2

On January 16, 2026, the Petitioner filed her trial brief, *Pet'r's Pre-Hearing Brief* (ECF No. 26), and on January 16, 2026, the Respondent filed his answer, *Resp't's Answer and Affirmative Defenses* (ECF No. 27), his amended answer and counterclaim for reasonable attorney's fees and costs, *Resp't's <u>Am.</u> Answer, Affirmative Defenses, and Countercl.* (ECF No. 28), and his trial brief. *Resp't's Pre-Hearing Brief* (ECF No. 29). The Petitioner opposed Respondent's request for attorney's fees and costs arguing that ICARA only provides an award of fees to prevailing petitioners. *Answer to Countercl.* at 1, n.1 (ECF No. 31).[2]

At the conclusion of the two-day evidentiary hearing on January 22-23, 2026, the Court instructed the parties to file post hearing briefs. *Min. Entry* (ECF No. 52). On February 18, 2025, the Respondent filed his brief, *Resp't's Post-Trial Brief* (ECF No. 59), and, a corrected version of the same. *Resp't's Post-Trial Brief* (ECF No. 60) (*Resp't's Brief*). The Petitioner also filed her brief on February 18, 2026. *Pet'r's Post-Trial Brief* (ECF No. 61) (*Pet'r's Brief*). Both parties timely filed their responses on

---

[2] On January 17, 2026, after the Court scheduled the expedited evidentiary hearing consistent with the Hague Convention requirements, the Respondent filed a motion seeking summary judgment against the Petitioner's verified petition and listing the Respondent's statement of material fact. *Resp't's Mot. for Summ. J.* (ECF No. 30). On January 20, 2026, the Court held a telephone conference with the parties and explained that the evidentiary hearing would be the preferred way to handle the dispute, but the Respondent objected to dismissal of the motion for summary judgment and the Court expedited the Petitioner's response. *Min. Entry* (ECF No. 33). The Respondent waived reply. *Id.*

On January 20, 2026, the Petitioner filed her opposition, *Pet'r's Obj. to Mot. for Summ. J.* (ECF No. 36), and an opposing statement of fact with additional facts. *Opposing Statement of Material Facts and Statement of Additional Material Facts* (ECF No. 37). On the first day of the evidentiary hearing, the Court orally denied the Respondent's motion for summary judgment, *Min. Entry* (ECF No. 50), on the ground that "there are genuine issues of material fact in dispute that preclude summary disposition of the case." *Tr. of Proceedings*, 3:24-4:1 (ECF No. 56). On January 29, 2026, the Court issued a written order, detailing the same. *Order Denying Mot. for Summ. J.* (ECF No. 55).

February 20, 2026. *Resp't's Reply Brief* (ECF No. 63) (*Resp't's Reply*); *Pet'r's Reply to Resp't's Post-Trial Brief* (ECF No. 62) (*Pet'r's Reply*). The Court did not allow replies.

## II.    LEGAL STANDARD

### A.    Overview

The Hague Convention was adopted by the signatory nations—including the United States and Germany—"[t]o address 'the problem of international child abductions during domestic disputes.'" *Lozano v. Montoya Alvarez*, 572 U.S. 1, 4 (2014) (citing *Abbott v. Abbott*, 560 U.S. 1, 8 (2010)); *see also Diaz-Alarcon v. Flandez-Marcel*, 944 F.3d 303, 305 (1st Cir. 2019) (noting the Convention "aims to deter parents from abducting their children to a country whose courts might side with them in a custody battle"); *Mendez v. May*, 778 F.3d 337, 343 (1st Cir. 2015) (explaining "The Convention's underlying principle is that the courts of a child's country of habitual residence should be the entities to make custody determinations in the child's best interest") (citations omitted).

The Convention sets forth a statutory framework "to secure the prompt return of children" under age sixteen who are "wrongfully removed to or retained in any Contracting State" unless an exception applies. Hague Convention, arts. 1(a), 4, 13. The return remedy follows "the Convention's core premise that 'the interests of children . . . in matters relating to their custody' are best served when custody decisions are made in the child's country of 'habitual residence.'" *Monasky v. Taglieri*, 589 U.S. 68, 72 (2020) (citing Hague Convention, pmbl.). Accordingly, the Convention's "central operating feature is the return remedy." *Abbott*, 560 U.S. at 9.

4

Relatedly, "[t]he Convention's return requirement is a 'provisional' remedy that fixes the forum for custody proceedings. . .. Upon the child's return, the custody adjudication will proceed in that forum." *Monasky*, 589 U.S. at 72 (citing Linda Silberman, Interpreting the Hague Convention: In Search of a Global Jurisprudence, 38 U.C.D.L. REV. 1049, 1054 (2005)). "[I]t is the job of the courts of [the child's habitual residence], not the district court, to 'make the appropriate custodial and family law determinations.'" *da Silva v. de Aredes*, 953 F.3d 67, 77 (1st Cir. 2020) (quoting *Mauvais v. Herisse*, 772 F.3d 6, 21 (1st Cir. 2014)); *see also Vieira v. De Souza*, 22 F.4th 304, 308 (1st Cir. 2022) ("Notably, an order of return pursuant to the Hague Convention is not a final determination of custody rights. It simply ensures that custodial decisions will be made by the courts of the children's country of habitual residence") (citations omitted).

The United States implemented the Convention through the International Child Abduction Remedies Act, which extends jurisdiction to federal courts over Hague Convention disputes, 22 U.S.C. § 9003(a), and provides that courts "shall decide [each] case in accordance with the Convention." *Id.* § 9003(d). In "adjudicating a dispute under the Convention," the Court undertakes a threshold inquiry: "whether the child was wrongfully removed from the jurisdiction" of habitual residence. *Moura v. Cunha*, 67 F. Supp. 3d 493, 497 (D. Mass. 2014). An answer in the affirmative "creates a presumption in favor of return" that governs unless the Court concludes an affirmative defense rebuts the presumption. *Id.*

## B.    Threshold Inquiry

Under ICARA, a parent can petition a court for the return of their wrongfully removed child to the child's country of habitual residence.  *See* 22 U.S.C. § 9003(b). To prevail, the petitioning parent must establish by a preponderance of the evidence that the other parent "wrongfully removed or retained [the child] within the meaning of the Convention."  *Id.* § 9003(e)(1).   To establish that a retention[3] is "wrongful" under the Convention, the petitioning parent must show that she or he: (1) seeks to return the child to the child's country of habitual residence, (2) had custody rights immediately prior to the child's retention, and (3) was exercising those custody rights. *Mendez*, 788 F.3d at 343 (citing Hague Convention, art. 3); *see also Giguère v. Tardif*, No. 1:25-CV-10468-IT, 2025 U.S. Dist. LEXIS 165575, at *30 (D. Mass. Aug. 26, 2025), *appeal docketed* No. 90-567 (1st Cir. Sept. 1, 2025) (discussing the same three factors) (citing Hague Convention, art. 3).

## C.    Affirmative Defenses

Once a petitioner establishes wrongful retention under the Convention, ICARA requires that the "[c]hildren who are wrongfully removed or retained within the meaning of the Convention are to be promptly returned unless one of the narrow exceptions set forth in the Convention applies."  22 U.S.C. § 9001(a)(4).  Affirmative defenses include:

> that (1) the child objects to being returned and is of sufficient age and maturity for [their] views to be taken into account, Hague Convention, art. 13; (2) the petitioner commenced the proceeding more than a year after the child's wrongful removal or retention and the child has become

---

[3]    The Hague Convention contemplates both wrongful removal and wrongful retention.  Here, the Petitioner alleges wrongful retention.

> well-settled in his new environment, *id.* art. 12; and (3) returning the child would pose a 'grave risk' to [their] physical or psychological well-being or place him 'in an intolerable situation,' *id.* art. 13(b).

*de Queiroz v. Schuenck*, No. 4:25-CV-40161, 2026 U.S. Dist. LEXIS 5175, at *5-6 (D. Mass. Jan. 12, 2026) (citing *Swett v. Bowe*, 733 F. Supp. 3d 225, 242 (S.D.N.Y 2024), *aff'd sub nom. Urquieta v. Bowe*, 120 F.4th 335 (2d Cir. 2024)).   Although affirmative defenses can ground a return order, "[t]his Court may exercise its discretion to order removal even if it is found that one or more of these defenses apply."   *De Aguiar Dias v. De Souza*, 212 F. Supp. 3d 259, 270 (D. Mass. 2016) (citing Hague Convention, art. 18).[4]

## III.   FINDINGS OF FACT[5]

### A.    The Parties

Petitioner Sarah Leyla Powell is a citizen of Germany.   *Pet*. ¶ 2.   The Respondent, Adrian Maurice Powell, Jr. is a citizen of the United States.   *Id.*   The Petitioner and the Respondent have two children, N.P. and Z.P., born in Germany in 2016 and 2020, respectively.   *Id.* ¶ 3.   The children are dual citizens.   *Tr. of Proceedings Volume I of II* at 69:18-20 (ECF No. 56) (*Tr. Vol. I*).

### B.    The Relationship

The parties met in 2015 while the Respondent was serving in the U.S. Air Force in Germany.   *Id.* at 72:2-6.   They married in Germany on March 3, 2016, and the

---

[4]    The Petitioner does not claim that any narrow exception applies.

[5]    The Court enters the following findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.   FED. R. CIV. P. 52

Petitioner gave birth to her first child, N.P. later that year.  *Id.* at 72:7-73:7.  The family of three lived in Germany for over a year until they moved to the state of Georgia in 2017 on orders from the U.S. Air Force.  *Id.* at 73:12-20.  While living in Georgia, the Petitioner and the Respondent experienced marital troubles and in December of 2018 the parties were "breaking up" so the Petitioner and N.P. moved back to Germany.  *Id.* at 73:21-25-74:9, 74:24-75:12.

At some point after the Petitioner and N.P returned to Germany in December 2018, the Respondent was deployed to Africa.  *Id.* at 74:24-75:12.  The Respondent video called but never visited Germany during this deployment; the Petitioner lived with and cared for N.P. between December 2018 and October 2019.  *Id.* at 75:1-22, 76:21-25.  In October of 2019, the Respondent returned to Germany as a civilian, and the couple briefly reconciled.  *Id.* at 75:13-76:3.  In 2020, the parties' second child, Z.P. was born.  *Id.* at 76:11-12.  By September of 2021, however, the parties were again experiencing marital difficulties and decided to begin separating; the Respondent moved back to the United States on November 30, 2021.  *Id.* at 77:18-78:4.

### C.    The Custody Agreement

When the Respondent returned to the United States in November of 2021, the parties agreed that the children would stay with the Petitioner in Germany.  *Id.* at 78:25-79:8.  Because the parties were married, German law had automatically granted them joint custody of the children, including the right to determine the children's residence.  *Id.* at 13:14-15:23.  In preparation for the Respondent's move

8

back to the United States, the parties visited a German official who prepared a custody power of attorney. *Id.* at 78:25-79:8, 15:24-16:17; *Pet.*, Attach. 1, *Custody Power of Att'y* (*Power of Att'y*). As the Petitioner's witness, Andreas Hanke, explained, the custody power of attorney does not extinguish or alter the Respondent's rights, but it delegates the Respondent's right to exercise joint custody to the Petitioner. *Tr. Vol. I* at 15:24-17:7. The delegation includes the right to determine the children's residence. *Id.* at 17:5-7. Nothing in the record indicates that the Respondent revoked the power of attorney. *Id.* at 92:4-12. According to Attorney Hanke, under this custody agreement and the power of attorney, retention of the children outside their country of habitual residence, without a joint custody holder's consent, would violate both German law and the delegation of rights in the power of attorney. *Id.* at 19:19-20:6.

### D. The Children's Lives and Connections in Germany

Z.P. was one and N.P. was five when their father, the Respondent, moved back to the United States. The Petitioner, as primary caregiver for the children, continued raising them in Germany, supporting herself with her employment with the Mannheim city government. *Id.* at 77:4-9, 84:3-86:5.

Although dual citizens, the children only hold active German passports. *Id.* at 212:11-212:21. The children's first language is German, but both also speak English as all German children take English lessons in school, many Germans are fluent in English, and the Petitioner has read the children German and English storybooks their entire lives. *Id.* at 83:15-84:9.

9

N.P. completed five years of school in Germany and Z.P. completed three years, as early education starts at age one. *Id.* at 86:6-88:12. The children have close friends in Mannheim and lived in a cosmopolitan neighborhood with friends the children played with "all the time," *id.* at 90:10-12, many of whom spoke English. *Id.* at 88:13-23. The neighborhood has affordable parks, gardens, public pools that the children enjoyed. *Id.* at 88:25-89:6. The Petitioner was pregnant with Z.P. at the same time her best friend was pregnant, making the two children fast friends from birth. *Id.* at 90:1-6.

The children were also connected to family; N.P. saw the Petitioner's brother every Monday; they all visited the Petitioner's family every other weekend; and, during some stretches of time, the children's maternal uncle would cook for the Petitioner and the children once a week. *Id.* at 89:7-11. The children also have cousins and extended family near in age. *Id.* at 90:7-9.

Were the children to return to Germany, they would live with the Petitioner and her grandparents, who call often and would be "very happy" to have the three of them back in Germany. *Id.* at 159:18-160. The children would also spend time with the Petitioner's aunt, her brother, and all the children's friends. *Id.* The children would go back to school—N.P. would return immediately, as it is mandatory, and Z.P. would apply for a spot in kindergarten after some time, as the Petitioner is worried about how all the change has affected him. *Id.* at 160:4-12. The Petitioner has a job offer as a manager at a climbing gym that will remain open for her until March 2026. *Id.* at 160:19-25.

10

### E.    The Children Visit the Respondent in the United States in the Summer of 2023

In the Summer of 2023, the children visited the Respondent in the United States, but to do so, the Petitioner had to give the Respondent a travel authorization, notarized at the town hall, stating that any travel documents had to be returned to the Petitioner when the children returned. *Id.* at 80:22-82-14. The Respondent flew to Germany to pick up the children and when their visit was over, he flew them back, returning the travel documents to Petitioner. *Id.* at 82:15-25.

### F.    Final Divorce

The Petitioner served her petition for divorce in July 2023. *Id.* at 90:19-91:1. On September 6, 2023, the Petitioner and the Respondent entered a written divorce agreement, drafted and recorded by a German official and presented to the German family court on September 8. 2023. *Id.* at 91:20-25; *Pet.*, Attach. 2, *Divorce Agreement* (*Divorce Agreement*) (dated September 6, 2023). By the terms of the divorce agreement, the children had their permanent residence with the Petitioner in Germany. *Divorce Agreement* at 10; *Tr. Vol. I* at 17:8-18:6. The agreement also obligated the Respondent to pay child and spousal support. *Divorce Agreement* at 10; *Tr. Vol. I* at 17:23-18:6. By ordering child support, the divorce agreement recognized that the children lived with the Petitioner and the Respondent had visitation. *Tr. Vol. I* at 18:7-13. A final divorce judgment came several months later in May 2024 to formally dissolve the marriage and divide pension rights. *Id.* at 18:14-19:18; *Pet.*, Attach. 3, *Decision* (*Final Divorce Judgment*). The final divorce judgment referenced the September 6, 2023 divorce agreement. *Final Divorce Judgment* at 3.

11

### G.    The Decision to Travel to the United States

Just before the final divorce judgment issued in May 2024, the Respondent reached out to the Petitioner about coming to the United States. *Tr. Vol. I* at 99:3-5. At the time, the Respondent and his now wife, Kylie, were living in Maine. *Id.* at 99:21-25. The idea was for the Petitioner to attend York Community College on an F-1 visa sponsored by the Respondent. *Id.* at 100:23-101:20. The F-1 visa application indicated that the Petitioner would return to Germany after her studies, which could extend four years or longer. *Tr. Of Proceedings Volume II of II* at 220:5-20 (ECF No. 57) (*Tr. Vol. II*).[6] The parties submitted the appropriate paperwork, which confirmed that the Petitioner needed to remain a full-time student to comply with her visa status. *Tr. Vol. I* at 101:21-104:18. The Petitioner also understood that she would have minimal work opportunities under the particular visa. *Id.* at 105:10-19. The Respondent attested that he intended to provide room and board, a weekly allowance of $500 a week, all school fees, for all basic needs, and transportation. *Id.* at 107:21:108-1. The parties agreed that if the Petitioner's visa was not granted, the children would return to Germany. *Id.* at 109:17-110:1.[7]

---

[6]    The Respondent testified at the hearing that despite what the declarations said, he understood that the Petitioner intended to remain in the United States after her schooling. *Tr. Vol. II* at 235:1-4. On cross examination, the Respondent again agreed that the visa application indicated the Petitioner would return to Germany at the end of her education and that the parties never discussed anything to the contrary. *Id.* at 257:17-258:1. The Court views the Respondent's testimony as his private hope that the Petitioner and the children were permanently moving to the United States, not something Petitioner agreed to do.

[7]    On cross examination, the Respondent admitted that if the Petitioner did not get the visa application approved, the children would return to her in Germany. *Tr. Vol. II* at 257:10-16.

To get the visa, the Petitioner also had to submit evidence of her continuing ties to Germany including bank accounts, insurance policies, driver's license, family, and debts. *Id.* at 111:1-113:2. Despite these continuing ties, the Petitioner also sold many of the children's belongings before sending them to the Untied States, and she no longer has a lease in Germany. *Id.* at 187:8-23. The children traveled on one-way tickets with clothes, a few toys, and some important keepsakes. *Tr. Vol. II* at 232:17-22.

By the summer of 2024, the Petitioner had not been granted entry to the United States, so the parties agreed that the children would travel to Maine with the Respondent ahead of the Petitioner so that the children could begin school in Maine on time. *Tr. Vol. I* at 113:3-25. Again, the parties agreed that if the Petitioner's visa were not granted, the children would return to Germany. *Id.* at 109:17-110:1. Like the prior visit the United States, the Respondent had to get the Petitioner's permission to fly with the children to the United States with a travel authorization that also instructed the Respondent to return the passports to the Petitioner when the authorization expired on December 31, 2024, at the latest. *Id.* at 115:5-116:5, 210:18-24.[8] The children left Germany for Maine on August 6, 2024. *Id.* at 125:18-21.

The Petitioner's visa was granted October 8, 2024, and she was authorized to travel to the United States no earlier than December 14, 2024. *Id.* at 120:14-20. The

---

[8]    The Respondent denied telling the Petitioner that he would return the children's passports to her when she arrived in the United States. *Id.* at 259:23-250:1. The Court credits the Petitioner's account given that the children's prior travel to the United States also required the Petitioner's authorization and instructed the Respondent to return travel documents to her. *Id.* at 80:22-82-14.

13

Respondent paid for her ticket, and she flew to Maine on December 14, 2024. *Id.* at 120:19-22.

### H.     The Children's Lives and Connections in the United States

In August 2024, the children had emotional goodbyes in Germany and while the older child, N.P., understood that the Petitioner would hopefully join the children in Maine in a few months, the younger child, Z.P., did not understand and was upset. *Id.* at 119:12-18. When the children first arrived in the United States in August 2024, they missed their mother and the younger child, Z.P., had particular difficulty—he thought his mother had left him. *Id.* at 122:21-123:9.

Despite the early behavioral struggles, Z.P.'s report card from January of 2025 confirmed that he made a lot of progress throughout the fall. *Tr. Vol. II* at 237:2-23. N.P. was doing well in school. *Id.* Her third-grade teacher remarked that she quickly made friends despite being new to the district and that she is a strong student, especially gifted in reading. *Id.* at 238:11-25; *Resp't's* <u>Am</u>. *Answer, Affirmative Defenses, and Countercl.*, Attach. 15, *Letter From Sarah Wilder*. In fact, both children have friends and community support in Maine. *Tr. Vol. II* at 239:1-10; *Resp't's* <u>Am.</u> *Answer, Affirmative Defenses, and Countercl.*, Attach. 9, *Letter from Katie Reynolds and Darryl Jenkins*.

In February 2025, the children were in karate lessons, but they stopped the lessons because they did not enjoy the activity. *Tr. Vol. II* at 172:6-7.

In Maine, the children spend time with the Respondent's now wife, Kylie, and Kylie's family. *Tr. Vol. II* at 241:24-242:4; *see also Resp't's Am. Answer, Affirmative*

*Defenses, and Countercl.*, Attach. 5, *Letter from Angie Stewart* (Kylie's mother explaining her closeness to the children and their adjustment to the United States); *id.* Attach. 7, *Letter from Jessica Richard* (Kylie's aunt explaining the same); *id.*, Attach. 8, *Letter from Kendra Quinn* (Kylie's sister explaining the same).

The Respondent's parents and family also visit and call from Baltimore. *Tr. Vol. II* at 241:24-242:10, 243:3-15; *see also Resp't's Am. Answer, Affirmative Defenses, and Countercl.*, Attach. 4, *Letter From Alyssa M. Powell* (the Respondent's sister explaining her view of the children's adjustment to the United States). The Respondent has plans to move back to Baltimore with his family. *Tr. Vol. I* at 161:23-162:1.

The Respondent and Kylie have a dog named Winnie that the children love. *Id.* at 246:6-11. The Respondent and Kylie were also expecting a son on February 4, 2026, the Court assumes the child was born and that the children now have a half-brother. *Id.* at 244:2-11.

## I.    The Children's Retention in the United States

The Petitioner traveled to the United States December 14, 2024 with a ticket paid for by the Respondent. *Id.* at 120:17-22. At first, the Petitioner lived in a winter rental in Old Orchard Beach, Maine, about five minutes from the Respondent's home and she saw the kids every day. *Id.* at 120:23-121:14. Soon after arrival, the Respondent notified the Petitioner that the allowance would be bi-monthly, rather than weekly. *Id.* at 121:23-122:20. The parties also had disagreements about the

children's nutrition and wellbeing. *Id.* at 122:21-123:2. The Petitioner's classes at York Community College began January 13, 2025. *Id.* at 121:15-17.

On February 7, 2025, the Respondent and his now wife informed the Petitioner that she had until March to find a way to pay for half of the Old Orchard Beach rental, otherwise, they would need to move the Petitioner to shared housing or student housing, which would not allow the children to have overnight visits with the Petitioner. *Id.* at 127:25-128:13. The Petitioner's understanding had been that she would have a place paid for by the Respondent where the children could regularly visit and stay overnight. *Id.* at 128:8-13. The Petitioner felt like she had been tricked. *Id.* at 130: 11-18. The Respondent explained that the Old Orchard rental only went through May, tourists were likely to rent the spot, and the February 7, 2025 conversation was an effort to proactively discuss the Petitioner's housing. *Tr. Vol. II* at 225:1-25. The Respondent acknowledged that the conversation upset the Petitioner and that she may have taken him to say that if she did not get a job, she would be kicked out. *Id.* 226:17-227:6. Both parties agree that when Petitioner left the conversation, she felt lied to. *Id.*; *Tr. Vol. I* at 128:8-13.

On February 8, 2025, the Petitioner texted the Respondent that she wanted to return to Germany with the children immediately and that she wanted the passports and travel document back. *Id.* at 131:19-132:6, 133:24-134:4. The Respondent refused. The Respondent stated on cross examination that he did not return the passports to the Petitioner because he did not want her to return to Germany with the children. *Tr. Vol. II* at 260:4-11.

16

## IV.    CONCLUSIONS OF LAW

Based on its factual findings, the Court makes the following conclusions of law:

### A.    The Petitioner's Threshold Case for the Children's Return

The Petitioner has demonstrated that she "(1) seeks to return the [children] to the [children's] country of habitual residence, (2) had custody rights immediately prior to the [children's] removal, and (3) was exercising those rights." *Mendez*, 778 F.3d at 343 (citing Hague Convention, art. 3).

#### 1.    Wrongful Retention

The alleged date of wrongful retention is February 8, 2025 when the Respondent refused to return the children's passports, so that the Petitioner could return to Germany with the children. *Pet.* ¶¶ 4; 36-37; *Tr. Vol. I* at 131:19-132:6, 133:24-134:4; *Tr. Vol. II* at 260:4-11 ("Q: Your reasoning for why you didn't give her back the passports was because you didn't want her to return with your children to Germany, Correct?" "A: Yes").

From the Respondent's perspective, this case is a simple one, because in his view, there was no wrongful retention on February 8, 2025 and therefore the Petitioner's petition must fail. *Resp't's Brief* at 1-5.  Consistent with his position in filing the motion for summary judgment, the Respondent argues that prior to the three-part threshold inquiry, the Court "must determine whether there was a wrongful retention at all." *Id.* at 1.  The Respondent argues that there is no wrongful retention because "the parties agreed that the children would reside in the United States until Mother completed her" education and the Petitioner "had not completed" her education "as of February 8, 2025, and still today is satisfactorily enrolled and

17

attending school." *Id.* at 2-3. Thus, according to the Respondent, retention cannot become wrongful until after the Petitioner completes her education. *Id.* at 3 (citing *Demaj v. Sakaj*, 3:09 CV 255-JGM, 2013 U.S. Dist. LEXIS 36725, at *27-28 (D. Conn. 2013)).

The Petitioner, on the other hand, cites two different definitions of wrongful retention, both of which support her claim that the Respondent wrongfully retained the children as of February 8, 2025. The Petitioner says that under Third Circuit precedent, retention is wrongful where, as here, the Petitioner unequivocally demonstrates that she no longer consents to the children living with the Respondent and demands return of the children. *Pet'r's Brief* at 16-17 (citing *Karkkainen v. Kovalchuk*, 445 F.3d 280, 290 (3d Cir. 2006); *Blackledge v. Blackledge*, 866 F.3d 169, 179 (3d Cir. 2017)). The Petitioner also argues the Respondent's retention became wrongful as of February 8, 2025 under the approach of the United States District Court for the District of Massachusetts when the Petitioner unequivocally withdrew consent to the children living with the Respondent, and the Respondent clearly manifested an intent not to return the children. *Pet'r's Brief* at 16-17 (citing *Zucker v. Andrews*, 2 F. Supp. 2d 134, 140 (D. Mass. 1998)).

Based on the evidence in this case, the Court finds that February 8, 2025 is the date of wrongful retention and on February 8, 2025, the Respondent wrongfully retained the children. In refusing to return the children's passports to the Petitioner—after she asked for them back and explained she wished to return to Germany with the children immediately—the Respondent made clear to the

18

Petitioner that he would not permit the children to return to Germany. To his credit, the Respondent admitted that he had retained the children's passports expressly to prevent her from returning to Germany with them:

> Q. You agree that the reason why you didn't give her back the passports is because you didn't want her to return with your children to Germany?
>
> A. Could you say that again?
>
> Q. Your reasoning for why you didn't give her back the passports was because you didn't want her to return with your children to Germany, correct?
>
> A. Yes.

*Tr. of Proceedings* 260:4-11 (ECF No. 57). This is textbook wrongful retention. The Petitioner had custody of the children under the German court decree and asked for their passports to return them to Germany. The Respondent wrongfully withheld their passports with the express intent to prevent her from exercising her custodial rights and returning with the children to Germany. *See Darin v. Olivero-Huffman*, 746 F.3d 1, 10 (1st Cir. 2014) (finding that wrongful retention occurred when the petitioner had no legal way of remaining with his child long-term). In *Darin*, the respondent refused to return to Argentina with the child and given that the petitioner's visa excluded the possibility of staying indefinitely in the United States and the petitioner could not take the child back to Argentia alone, wrongful retention occurred. *Id.*

Just so here. Here, the Respondent refused to voluntarily allow the children to return to Germany, the Petitioner's visa excluded the possibility of staying indefinitely in the United States with the children, and the Petitioner could not take

the children back to Germany alone because the Respondent refused to return the children's passports. As of February 8, 2025, the Petitioner had no legal way of remaining with her children in the United States long-term. She did the only thing she could to seek a remedy—file a petition under the Hague Convention.

The Court does not agree with the Respondent's argument that wrongful retention is not possible unless and until the Petitioner completes her education. The F-1 visa application contemplated a four-year bachelor's degree and potential additional training, but the visa was approved on Petitioner's showing that she was admitted to a two-year program at York Community College. The visa is itself open-ended, allowing the Petitioner to remain here for two years if she graduates from York Community College, four years if she were to transfer to a four-year program, or even beyond four years in some circumstances.

In his reply, the Respondent argues that the visa set "a minimum return date" and that "[t]he record is completely devoid of any discussion or agreement of the parties that the children would return to Germany at Mother's whim." *Resp't's Reply* at 2. In her reply, the Petitioner argues that her "consent to the children's temporary relocation to Maine was conditioned on her status as a student *and* Adrian's financial support." *Pet'r's Reply* at 2.

The Court finds that the Petitioner has the better argument under the Hague Convention. Not only was there no fixed end-date to this "agreement," but both parties also failed to fully meet the anticipated terms. The Petitioner has not completed her education, and the Respondent did not satisfactorily meet his promised

financial and support obligations. Although the parties disagree about whether the support the Respondent continues to provide complies with what he promised in the visa application, the Petitioner's allowance and housing were not what he had promised and what she had expected.

February 8, 2025 is the date of wrongful retention for the additional reasons cited by the Petitioner. *See Pet'r's Brief* at 16-17. On that day, the Petitioner made clear that she did not agree to an extension of the children's stay in Maine on February 8, 2025, and thus is the date of wrongful retention. *See Blackledge v. Blackledge*, 866 F.3d 169, 179 (3d Cir. 2017) (defining the "retention date" as "the date beyond which the noncustodial parent no longer consents to the child's continued habitation with the custodial parent and instead seeks to reassert custody rights, as clearly and unequivocally communicated through words, actions, or some combination thereof"); *Marks on Behalf of SM, AM, and BM v. Hochhauser*, 876 F.3d 416, 422 (2d Cir. 2017) (identifying date of wrongful retention as that "on which the child ought to have been returned to its custodians or on which the holder of the right of custody refused to agree to an extension of the child's stay in a place other than that of its habitual residence") (internal quotation marks and citation omitted); *Karkkainen v. Kovalchuk*, 445 F.3d 280, 290 (3d Cir. 2006) (holding that where a parent permitted a child to travel to the United States without a specific return date, retention became wrongful on the date the petitioner had "unequivocally communicated her opposition to [the child's] presence in the United States"); *Zucker v. Andrews*, 2 F. Supp. 2d 134, 140 (D. Mass. 1998) (finding wrongful retention occurs

when the petitioner revokes consent and the respondent demonstrates refusal to return the child).

### 2.    The Children's Habitual Residence

"Removal under the Hague Convention is only appropriate if the child is being retained in a country other than his or her place of habitual residence." *Mendez*, 778 F.3d at 344 (citing *Sanchez-Londono v. Gonzalez*, 752 F.3d 533, 540 (1st Cir. 2014)). To sustain her burden, the Petitioner must show that the children were "habitually resident" in Germany "immediately before the . . . retention." Hague Convention, art. 3.

The Supreme Court determined that "a child's habitual residence depends on the totality of the circumstances specific to the case." *Monasky*, 589 U.S. at 71. "No single fact . . . is dispositive across all cases." *Id.* at 78. A child's "residence in a particular country can be deemed 'habitual,' however, only when her residence there is more than transitory. 'Habitual' implies '[c]ustomary, usual, of the nature of a habit.'" *Id.* at 76 (quoting Black's Law Dictionary 640 (5th ed. 1979)). The aim of this inquiry is "to ensure that custody is adjudicated in what is presumptively the most appropriate forum—the country where the child is at home." *Id.* at 79.

"For older children capable of acclimating to their surroundings," courts consider the following facts when determining whether children have acclimated to a new place:

> a change in geography combined with the passage of an appreciable period of time, age of the child, immigration status of child and parent, academic activities, social engagements, participation in sports programs and excursions, meaningful connections with the people and places in the child's new country, language proficiency, and location of personal belongings.

*Id.* at 78 n.3 (quoting Federal Judicial Center, J. Garbolino, The 1980 Hague Convention on the Civil Aspects of International Child Abduction: A Guide for Judges 67–68 (2d ed. 2015)) (internal quotation marks removed). "Because children, especially those too young or otherwise unable to acclimate, depend on their parents as caregivers, the intentions and circumstances of caregiving parents are relevant considerations." *Id.* at 78. The place where a child is at home, at the time of removal or retention, ranks as the child's habitual residence." *Monasky*, 589 U.S. at 77. Here, the alleged wrongful retention occurred on February 8, 2025. Guided by the factors set forth in *Monasky*, the Court considers the totality of the circumstances as of that date.

### a.    More Than Transitory

By February 8, 2025, the children had only been in Maine for six months and the Petitioner had only been in the country for about six weeks. Because both parties agree that if the Petitioner's visa had been denied, the children would have returned to Germany, the period prior to the October 8, 2024, when the Petitioner's visa was approved, was explicitly transitory. *Tr. Vol. I* at 109:17-110:1, 120:14-20; *Tr. Vol. II* at 257:10-16. In this way, the parties only contemplated a lasting stint in the United States for the four months between October 8, 2024 and February 8, 2025, when the Petitioner made clear she wanted to leave with the children. *Tr. Vol. I* at 131:19-132:6, 133:24-134:4.

### b.    Age of the Children

N.P. and Z.P. were age eight and four, respectively, in February of 2025.

### c.    Immigration Status of the Children and Parents

The children remain dual citizens, *Tr. Vol. I* at 69:18-20, the Petitioner remains a German citizen, *Pet*. ¶ 2, and the Respondent remains an American citizen. *Id.* The Petitioner's visa status is entirely dependent on her continued enrollment in school. *Tr. Vol. I* at 101:21-104:18. Without that, she will be forced to leave the United States.

### d.    Community Ties

The facts here support that the children were at home in Germany. Although dual citizens, the children only hold active German passports. *Tr. Vol. II* at 212:11-212:21. The children have spent the majority of their lives enrolled in German schools. *Tr. Vol. I* at 86:6-88:12. In Germany they have family, friends, social lives, and meaningful connections with the people and places in the greater Mannheim area. *See supra* Section III. D. When the children first came to Maine, they were homesick for Germany and their mother. *Tr. Vol. I* at *Id.* at 122:21-123:9.

To the extent the children developed similar ties in Maine before February 8, 2025, *see supra* Section III. H., those connections were markedly shorter lived than those the children had to Germany. The Court also agrees with the Petitioner that the Respondent improperly relied on post-retention activities. *Pet'r's Reply* at 4. For example, the children were not yet participating in sports, but only briefly enrolled in karate classes as of February 2025, later quitting because they did not enjoy the activity, and they had not yet established pediatric care. *Id.* As to the family connections in Maine and the United States, the Court agrees with the Petitioner that the letters the Respondent provided, *see supra* Section III. H. (citing letters the

24

Respondent provided), "contain many generalized statements of how the authors believe the children are doing well and adjusting, which includes post-retention events" and also many "of those authors also had limited opportunities to visit with the children, because they came on holidays or vacations from Maryland." *Id.* at 5 (citing *Tr. Vol. II* at 241:20 – 243:15.)

Further, the connections to Maine are undercut by the Respondent's plans to move the children to Maryland. *Tr. Vol. I* at 161:23-162:1. This factor favors finding the children at home in Germany.[9]

### e.    Language Proficiency

The children speak German as their first language and speak English. *Tr. Vol. I* at 83:15-18. The Petitioner is bilingual as well. The Respondent does not speak much German. *Id.* at 94:10-14. It is mandatory to learn English in Germany, so most Germans speak English. *Id.* at 83:19-24. Additionally, the Petitioner has read to English and German storybooks to her children since birth. *Id.* at 84:3-9. Accordingly, the Court does not consider the children's English fluency a factor favoring being at home in the United States.

### f.    Location of Personal Belongings

The Respondent shared that the Petitioner sold most of the children's belongings before sending them to the United States with clothes, a few toys, and keepsakes. *Tr. Vol. II* at 232:17-22. One the one hand, that the children no longer have objects in Germany could suggest that they were moving more permanently to

---

[9]    The children now have a half-brother, but that Kylie was not pregnant as of the date of wrongful retention. *Tr. Vol. II* at 244:2-11.

the United States, but on the other hand, culling items can be a financial necessity given that storage units can be expensive.[10]

The Petitioner did not permanently relocate to the United States—her visa did not allow it, requiring proof of her continuing ties to Germany.  *Tr. Vol. I* at 111:1-113:2.  The Court concludes that the Petitioner did not permanently relocate her children somewhere she herself could not permanently relocate.

### g.    Intentions and Circumstances of Caregiving Parents

"Although the First Circuit's former approach of addressing shared intent as a primary factor no longer controls, *Monasky* nevertheless highlighted that 'the intentions and circumstances of caregiving parents are relevant considerations' where 'children, especially those too young or otherwise unable to acclimate, depend on their parents as caregivers.'"  *Giguere*, 2025 WL 2452168 at *35-36 (citing *Monasky*, 589 U.S. at 78).  Because N.P. and Z.P. were age eight and four, respectively, in February of 2025, the parents' intentions are relevant.

"In discerning the parties' intentions, [the First Circuit has looked] 'specifically to the last moment of the parents' shared intent.'"  *Mendez*, 778 F.3d at 344 (citing *Mauvais v. Herisse*, 772 F.3d 6, 12 (1st Cir. 2014)).  "Where a child has moved with a parent from one country to another, the record must evidence the parties' latest settled intention for the child to abandon a former place of habitual residence and acquire a new one." *Id.* at 344.

---

[10]    The Respondent explained that his savings were depleted, in part, due to the cost of a storage unit. *Tr. Vol. II* at 265:6-16.

Although the Respondent may have intended to have the children abandon Germany as a place of habitual residence and intended to have them take the United States as permanent residence, the record fails to show that both parties shared this intent.

The parties' intentions suggest that moving to Maine was temporary, hinging both on the Petitioner's education and the Respondent's satisfactory support of the Petitioner, but it was not a decision to resettle indefinitely.  "Their opinions about whether their new lives were working out diverged after they arrived." *Giguère*, 2025 WL 2452168 at *39-40.

This brings the Court to the circumstances of the Petitioner's stay in the United States.  Soon after arrival, the Petitioner realized that she would not get the level of support the Respondent had promised.  First, her allowance was reduced from weekly to bi-monthly and then she learned that she needed to find new housing.  *Tr. Vol. I* at 121:23-122:20, 127:25-128:7.  When the Petitioner realized that life in Maine was not going to work out as expected, she told the Respondent that she wanted the children's passports and travel documents back so she could return to Germany immediately.  *Id.* at 131:19-132:6, 133:24-134:4.

The Court concludes that the parties never expressly discussed moving the children to the United States indefinitely.  Accordingly, this factor favors Germany as the children's habitual residence.

### h.    Conclusion on the *Monasky* Factors

Under the totality of the circumstances, the Court concludes that the Petitioner has demonstrated that Germany is the children's country of habitual

residence and that she wishes to return her children to Germany. While "no single fact . . . is dispositive across all cases," *Monasky*, 589 U.S. at 78, a preponderance of the evidence indicates that the children's habitual residence as of February 8, 2025 was Germany.

### 3. The Petitioners Custody Rights

The Petitioner established that she had custody rights immediately prior to the children's retention. "Rights of custody 'may arise in particular by operation of law or by reason of a judicial or administrative decision, or by reason of an agreement having legal effect under the law of [the] State.'" *Aredes v. Aredes*, No. 22-cv-10666, 2022 U.S. Dist. LEXIS 110216, at *11 (D. Mass. June 22, 2022) (quoting Hague Convention, art. 3). "Custody is determined by the law of country in which the child was habitually resident." *Mendez v. May*, 85 F. Supp.3d 539, 555 (D. Mass. 2015), *rev'd on other grounds*, 778 F.3d 337 (1st Cir. 2015) (citing Hague Convention, art. 3(a)). Here, the custody agreement—in effect immediately prior to the children's retention—establishes the Petitioner's requisite custody rights.

Because they were married when the children were born, the parties automatically have joint custody of the children. *Tr. Vol. I* at 13:14-15:23. As Andreas Hanke explained, through the custody power of attorney, the Respondent delegated his right to exercise joint custody to the Petitioner. *Id.* at 15:24-17:7; *Power of Att'y*. The delegation included the right to determine the children's residence. *Tr. Vol. I* at 17:5-7. The divorce agreement stipulated that the children had their permanent residence with the Petitioner in Germany. *Divorce Agreement* at 10; *Tr. Vol. I* at 17:8-18:6. The agreement also obligated the Respondent to pay child support

and spousal support.  *Divorce Agreement* at 10; *Tr. Vol. I* at 17:23-18:6.  By ordering child support, the divorce agreement recognized that the children lived with the Petitioner and the Respondent had visitation.  *Tr. Vol. I* at 18:7-13.  The final divorce judgment, issued in May 2024 also referenced the September 6, 2023 divorce agreement.  *Final Divorce Judgment* at 3.  Nothing in the record suggests that the Respondent revoked the power of attorney.  *Id.* at 92:4-12.  Under this custody agreement and the power of attorney, retention of the children outside their country of habitual residence, without a joint custody holder's consent, would violate both German law and the delegation of rights in the power of attorney.  *Id.* at 19:19-20:6.

The Respondent fails to point to any judicial decision that invalidated or otherwise altered the Petitioner's custody rights.  Instead, the Respondent argues that because the parties retained joint custody, the Petitioner "did not have the authority to make a unilateral decision to retract her agreement for the children to remain in the United States." *Resp't's Brief* at 10-11.  The Respondent thus concludes that "the children remaining in the United States is not in breach of mother's custodial rights because she does not have the sole right to retract her agreement for the children to remain in the United States." *Id.* at 11.

The Petitioner counters that there is no requirement that she have sole custody; in fact, the Convention provides "that retention is wrongful where it is in breach of a petitioner's custody rights under the state of the child's habitual residence, and 'at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal

29

or retention.'" *Pet'r's Reply* at 9 (citing Hague Convention, art. 3). The Petitioner argues that she would "would have exercised her right to determine the children's residence but for Adrian withholding the children's passports." *Id.*

Further, although not dispositive, the fact that the Respondent sought the Petitioner's permission—granted formally via the international travel authorization—to travel internationally with the children demonstrates the Respondent's understanding of Petitioner's custody rights at the time of the children's retention. By failing to return the children's passports and any other travel documents on February 8, 2025, the Respondent was in violation of the very travel authorization that authorized him to take the children to Maine in August of 2024. *Tr. Vol. I* at 115:5-116:5; 210:18-24.

### 4. The Petitioner's Exercise of Custody Rights

The Petitioner established that she exercised her custody rights immediately prior to the children's retention. "Despite the fact that 'a showing of "actual exercise" is a necessary element of a claim for wrongful removal under the Hague Convention,' the Convention itself does not define the term." *Krefter v. Wills*, 623 F. Supp. 2d 125, 133 (D. Mass. 2009) (citing *Bader v. Kramer*, 484 F.3d 666, 670 (4th Cir. 2007). Without a definition in the Convention, courts take a liberal approach to finding an exercise of custody rights: it occurs "whenever a parent with . . . custody rights keeps, or seeks to keep, any sort of regular contact with his or her child." *Friedrich v. Friedrich*, 78 F.3d 1060, 1065 (6th Cir. 1996) (*Friedrich II*); *see also Mendez*, 85 F. Supp. 3d at 555, *rev'd on other grounds*, 778 F.3d 337 (1st Cir. 2015) (citing the same); *de Queiroz*, 2026 U.S. Dist. LEXIS 5175 at *18 (same). The Respondent concedes that

30

the Petitioner was exercising her custody rights on February 8, 2025. *Resp't's Pre-Hearing Brief* at 8 ("Should the Court reach this step in its analysis of Mother's *prima facie* case, Father concedes that Mother, on February 8, 2025, was exercising custody rights").

### B.    No Affirmative Defenses Raised

Given that Petitioner has demonstrated wrongful retention under the Convention, the Court must order the children's prompt return unless one of the Convention's "narrow" affirmative defenses apply.  22 U.S.C. §§ 9001(a)(4), 9003(e)(2).  The Respondent did not raise an affirmative defense, so the Court does not reach the issue.

### C.    This Court's Limited Mandate

As the parties know, this Court's role in this case is extremely constrained.  It is charged under the law only with making a preliminary decision as to whether the courts of Germany or the United States should decide the custody issue.  The family courts in both Germany and the United States are much more adept than this Court at resolving the sensitive and difficult issues of family law, especially child custody issues.  Thus, this Court's determination is neither an endorsement of one parent over the other nor a final determination regarding what is in the children's best interest, though as the Court told the parties, it strikes the Court that if the parents can see their way to cooperating, the children could well be the beneficiaries of two remarkable cultures under the care of two caring parents.  Such assessments are beyond the Court's jurisdiction and are better handled by courts with specialized expertise in family law.  "The Convention . . . empower[s] courts in the United States

to determine only rights under the Convention and not the merits of any underlying child custody claims." 22 U.S.C.A. § 9001(b)(4).

## V.    CONCLUSION

Based on the findings of fact, conclusions of law, and reasons stated herein, the Court GRANTS Petitioner Sarah Leyla Powell's Verified Petition for Return of Children to Germany and for Issuance of Show Cause Order (ECF No. 1), DENIES Respondent Adrian M. Powell Jr.'s Respondent's <u>Amended</u> Answer and Affirmative Defenses (ECF No. 28) insofar as it seeks reasonable attorney fees and costs, and ORDERS the following:

1.    The Children's passports are to be returned to the Petitioner;

2.    The Respondent shall return to the Petitioner any other travel documents, educational, or medical records provided by the Petitioner or otherwise necessary for government or educational purposes in Germany;

3.    The Petitioner and the children may return to Germany immediately;

4.    The proceedings in Biddeford District Court shall remain stayed pending an order from a court of competent jurisdiction in Germany; and

5.    The Petitioner may submit a motion for award of fees and costs within seven days from this order with reply and response due within fourteen and twenty-one days, respectively.

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 2nd day of March, 2026